Mark A. Nickel (14082)
**GORDON REES SCULLY MANSUKHANI, LLP**
15 West South Temple, Suite 1600
Salt Lake City, UT 84101
Telephone: (801) 204-9990
Facsimile: (385) 282-7590
mnickel@grsm.com

*Attorney for SkyWest Airlines, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RANDY T. CHAPPELL,<br><br>     Plaintiff,<br><br>v.<br><br>SKYWEST AIRLINES, INC.,<br><br>     Defendant. | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Civil No. 4:21-CV-00083-RJS-PK<br><br>District Judge Robert J. Shelby<br>Magistrate Judge Paul Kohler |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ii

INTRODUCTION.................................................................................................1

DEFENDANT'S STATEMENT OF RELEVANT FACTS ........................................2

ARGUMENT.....................................................................................................15

    I.     Legal Standard ..........................................................................15

    II.    Summary Judgement is warranted on Plaintiff's Associational Disability
            Discrimination Claim ..............................................................15

    III.   Plaintiff's Age Discrimination Claim Fails .........................................17

    IV.   Plaintiff's ERISA Claim is Prone to Summary Judgment ...................18

           A. Plaintiff Cannot Establish ERISA Interference .............................19

           B. Plaintiff Cannot Establish ERISA Retaliation ..............................20

    V.    Plaintiff's Rehabilitation Act Claim Fails ..........................................21

           A. Plaintiff's Claim for Discrimination under the Rehabilitation Act Fails .........21

           B. Plaintiff's Claim for Retaliation under the Rehabilitation Act Fails ...............22

    VI.   Plaintiff's Breach of Contract Claim Fails .........................................23

    VII.  Plaintiff's Negligence Claim Fails ...................................................25

V. CONCLUSION.............................................................................................27

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Coors Brewing Co*., 181 F.3d 1171, 1178 (10th Cir. 1999)....................................22

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ....................................................15

*Beesley v. Hansen*, No. 2:17-cv-00889-JNP-EJF, 2019 WL 1573152, at *1 (D. Utah Apr. 11, 2019)
(citation omitted) ..................................................................................................................23

*Berube v. Fashion Centre, Ltd.*, 771 P.2d 1033, 1044 (Utah 1989) ..........................................24

*Bunker v. Union Pac. R.R. Co.*, 114 P. 764, 775 (1911) ...........................................................26

*Card v. Hercules Inc.*, 5 F.3d 545 (Table), at *3 (10th Cir. 1993) ...........................................19

*Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1151 (10th Cir. 2011) ..............19, 20

*Cunningham v. Adams*, 106 Fed.Appx. 693, 698 (10th Cir. 2004) ...........................................20

*Dee v. Johnson*, 286 P.3d 22, 23 (Ct. App. Utah 2012)............................................................26

*Den Hartog v. Wasatch Acad*., 129 F.3d 1076, 1085 (10th Cir. 1997) ....................................15

*Garratt v. Walker*, 164 F. 3d 1249, 1256 (10th Cir. 1998) ......................................................19

*Godwin v. Sw. Research Inst.*, 237 Fed. Appx. 306, 308 (10th Cir. 2007) ...............................19

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) .......................................................17

*Hannagir v. Utah Dep't of Corrections*, 587 F.3d 1255, 1267 n. 5 (10th Cir. 2009)..............21

*Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1279 (10th Cir. 2010) ....................................17

*Kitchen v. Cal Gas Co., Inc.*, 821 P.2d 458, 461 (Ct. App. Utah 1991) ...................................25

*Maez v. Mountain States Tel. and Tel., Inc*., 54 F.3d 1488, 1504 (10th Cir. 1995) ..................19

*MX Group, Inc. v. City of Covington*, 293 F.3d 326, 332 (6th Cir. 2002) .................................21

*Myles v. Delta Air Lines, Inc.*, No. 89-C-1039W, 1990 WL 264720, *3 (D. Utah 1990) .........24

*Phelps v. Field Real Estate Co*., 991 F.2d 645, 649 (10th Cir. 1993) ................................18, 20

*Pierson v. Mrs. Fields Cookies*, 857 F. Supp. 867, 868 (D. Utah 1994) (quoting *Celotex Corp. v. Catrett*,
477 U.S. 317, 324 (1986))....................................................................................................15

*Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007) ...................................18

*See Beck v. Dahn Corp.*, 145 F.3d 1345 .................................................................................16

*Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) ...............................................19

*Thompson v. N. Amer. Stainless*, 131 S. Ct. 863, 867-68 (2011) .............................................22

*Watkins v. Jordan School Dist.*, Case No. 2:19-cv-00407-PMW, 2020 WL 2617928, *3 (D. Utah May 22,
2020)....................................................................................................................................22

*Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993) .......................................................22, 23

Statutes

29 U.S.C. § 1140 ...................................................................................................................... 20

42 U.S.C. § 12112(b)(4) .......................................................................................................... 15

42 U.S.C. § 12203(a) ............................................................................................................... 22

42 U.S.C. 12203(a) .................................................................................................................. 22

Fed. R. Civ. P. 56(a) ............................................................................................................... 15

SkyWest Airlines, Inc. ("SkyWest"), through its undersigned counsel, submits this Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56, stating as follows:

## INTRODUCTION AND RELIEF REQUESTED

On the morning of March 24, 2020, Plaintiff Randy Chappell was the Pilot in Command of SkyWest Flight 4235 departing Saint George, Utah for Salt Lake City.  The flight pushed back from the gate and the ground crew gave the "all clear" sign for forward movement.  But instead of turning his aircraft to the right, where there was lit pavement, Plaintiff turned the aircraft to the left, into a dark, unpaved, unlit field.

After the aircraft left the pavement, it lurched through uneven terrain and eventually became stuck in the mud. To return to the tarmac, Plaintiff had to apply high thrust (at levels nearing take-off power) to dislodge the aircraft from the mud.

The first officer, Justin Reber, announced the aircraft had left the pavement and tried to get Plaintiff to address the issue prior to departure. However, Plaintiff ignored Mr. Reber and instructed him to perform his radio duties in preparation for takeoff.  Plaintiff departed with no idea whether his aircraft was still airworthy.

Upon arrival in Salt Lake City, Plaintiff turned his aircraft over to another crew without alerting them to the incident or requesting a maintenance inspection.  After Mr. Reber pointed to residual mud on the landing gear, Plaintiff ignored it and ordered Mr. Reber to leave the area.  Both pilots were later terminated for dereliction of duty.

Plaintiff claims he was unaware of the excursion and believes his termination was driven by: (1) associational disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"); (2) age discrimination under the Age Discrimination in Employment

1Act, 29 U.S.C. § 621, *et seq.* ("ADEA"); (3) violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"); (4) violation of the Rehabilitation Act of 1973, 281 U.S.C. § 791, *et seq.*; (5) breach of contract; and (6) negligence.  But Plaintiff cannot establish the elements of any of his claims.  For the reasons stated herein, SkyWest respectfully requests that the Court grant summary judgment on all claims.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     Plaintiff was employed at SkyWest as a pilot until 2020. Pl. Dep. Tr. (Excerpts) (**Exhibit A**) at 26:18-23 ("I was hired by SkyWest in 1990. Q. Did you work anywhere else other than Scenic and SkyWest as a pilot prior to the time of your termination in 2020?  A. No.").

2.     Plaintiff agrees that it is never appropriate for a pilot to assume that something is safe.  *See* Ex. A at 49:12-15 ("Q. Would you agree with me that it is never appropriate for a pilot to assume that something is safe? A. That is correct.").

3.     Plaintiff admits that, as a captain, by regulation, he must take full responsibility for the safe operation of the aircraft on every flight.  *See* Ex. A at 52:6-18 ("You agree with me that the captain is in full charge when it comes to the safety of every flight? A. Under regulation, yes. Q. You believe in that old saying of the buck stops here, meaning the buck stops with the captain when it comes to safety? A. I take responsibility for the safe operation of the aircraft under regulation, yes. Q. Every captain should? A. Absolutely. Q. Every captain must? A. Absolutely.").

### The Occurrence

4.     Plaintiff and First Officer Justin Reber ("Reber") flew from St. George to Salt Lake City, Utah in the early morning on March 24, 2020 (the "Flight"). *See* Ex. A at 62:10-64:10.

5.     Upon pushing back from the gate, Plaintiff made a roughly 270 degree turn to go

2

to the runway.  *See* Ex. A at 86:16-23 ("Q. . . And you were trying to ultimately go to the right to get to the – to the runway? A. No. I understand what you're saying. The turn was made to the left. But, yeah. Q. A 270 degree turn? A. Roughly.").

6.      As he was making the turn, Plaintiff drove the airplane off the tarmac into dirt (the "Occurrence"). *See* Ex. A at 93:19-22 ("Q. And both your front tires, right, and the tires on the right side of the aircraft both went off the pavement? A. Yes, I saw the pictures.").

7.      The wheels sank into the mud about 14 inches.  *See* Ex. A at 93:14-18 ("Q. But, you've seen that the aircraft you were operating, when it went off the – the tarmac, the concrete, whatever, it dug down in to the dirt up to 14 inches down; right? A. I – I did – I did see that. Yes."); *see also* Photo of Dirt Tracks (SkyWest 01165) (**Exhibit B**).

8.      The aircraft got stuck and stopped moving. *See* Ex. A at 87:22-24 ("Q. And you got stuck. The aircraft stopped moving; correct? A. The momentum stopped. Yes.").

9.      Plaintiff testified that he assumed he had run over a drainage grate.  *See* Ex. A at 91:2-3 ("Q. What did you think it was? A. A drainage grate.").

10.     Yet, Plaintiff admits that he did nothing to confirm that it was a drainage grate. *See* Ex. A at 102:9-13 ("Q. Did you make any attempts to confirm that it was, in fact, a grate? A. There was no need to. It was – Q. I didn't ask you if there was a need to.  A. No. I – no. I did not.").

11.     Plaintiff used the thrusters to get the plane moving again, thrusting up to 75%.  *See* Ex. A at 87:25-88:12 ("Q. And you had to – like, at this point, you're the one who has got your hand on the thrusters? A. Yes. Q. Not the first officer? A. Yes. Q. And you thrust up to – what is it, 75%? A. I don't know the exact number. Q. You've seen the report. I mean, it's 70, 75%; right? A. If that's what it says.  I – I don't recall looking at them."); *see also* Engines Thrust Analysis

(SkyWest 00526) (**Exhibit C**) (showing that Plaintiff used 75% thrust).

12.     Plaintiff felt the plane shift from side to side; having reviewed video of this, Plaintiff admits it looks "pretty dramatic." *See* Ex. A at 92:6-9 ("Q. Was the aircraft at this point completely stable or was it shifting from side to side?  A. A slight shift. Yeah. When you come out of that."); *see also id.* at 102:4-7 ("Q. Did you feel the plane going – you know, dipping to the right, then dipping to the left, any movement? A. Yes. Because the right wheel was in the grate. Yes."); *id.* at 142:14-17 ("So, you would acknowledge that, reviewing the video, it looks pretty dramatic in the way that the aircraft moved? A. Yeah. Yes.").

13.     Plaintiff drove back onto the tarmac and proceeded to the runway, without stopping to check anything. *See* Ex. A at 94:23-95:3 ("Q. So, you come – the evidence will show, the pictures and all, that you came back onto the pavement then? A. Yes.  Q. And then you proceeded toward the runway? A Yes.  Q. And did not stop to check anything; right? A. No reason to. No.").

14.     The Flight proceeded to Salt Lake City. *See* Ex. A at 105:19-21.

15.     Having landed, Reber did a walk-around of the aircraft.  *See* Ex. A at 112:1-4 ("So, when you come down the steps from the aircraft, where was Mr. Reber?  A. He was walking around the back of the airplane.").

16.     Reber told Plaintiff that there was dirt on the tire. *See* Ex. A at 114:3-11 ("do you recall there being any comment made to you from Mr. Reber in the van about there being any dirt or mud or anything else on the right tire? A. Yes. Q. What do you recall specifically him saying? A. There's dirt – there's a little bit of dirt on the right tire.").

17.     Still, Plaintiff did not feel the need to go look at the tire.  *See* Ex. A at 128:18-24:4 ("When you said earlier that the only thing Mr. Reber said to you was there was some dirt marks

on the tire, and you're saying there was no further discussion of that, did that not raise a red flag in your mind as to, whoa, we better stop the van and go and look at that? A. No. Because – Q. Why? A. – tires are always dirty. There's always dirt on the tires from mud puddles, whatever. They're – they've always got some smudge of dirt on them or something.").

18.     Without ascertaining the severity of dirt on the tires, Plaintiff left the scene.  *See* Ex. A at 129:10-13 ("When he said that and you drove off, you didn't know the extent of the dirt on that tire; did you? A. No.").

**Investigation**

19.     At the request of his supervisor, Plaintiff submitted an Irregular Operations Report ("IOR") the next day, on March 25, 2020.  *See* Chappell IOR (SkyWest 00010) (**Exhibit D**); *see also* Ex. A at 116:25-117:5 (his supervisor let him know there was an issue with the Flight); *id.* at 118:10-21 (his supervisor told him to submit an IOR).

20.     In his IOR, Plaintiff stated, "We were unaware that the aircraft was not on the tarmac. If we would have I would have returned to the gate." Ex. D.

21.     Reber also submitted an IOR on March 25, 2020.  *See* Reber IOR (SkyWest 00011) (**Exhibit E**).  In his IOR, Reber stated, "About two third or so through the 270 degree turn (we were headed towards runway 1 for a northbound departure that morning) there was the potential that the plane could have been on dirt for a moment, but I had little to no visibility from my vantage point as we were turning left."  Ex. E.

22.     SkyWest investigated the Occurrence.  *See* SkyWest Investigation Findings (SkyWest 00020-21) (**Exhibit F**).

23.     During the investigation, Reber was asked to and did submit a written statement.

*See* Ex. C at 44:17-45:3 (the safety committee asked him for a written statement, so he submitted one); *see also* St. George Taxi Event (SkyWest 00002-3) ("Event Statement") (**Exhibit G**).

24.     Reber wrote in his Event Statement that he knew the plane went into dirt. *See* Ex. G at 1 ("All of a sudden, midway through the turn I look down at the moving ground where the nose light is crossing and am shocked to see what appeared to be dirt. It was dark, flat, red dirt.").

25.     Reber also wrote that he verbally alerted Plaintiff about what had just happened. *See* Ex. G, at SkyWest 00002 ("After a few seconds I said, 'Randy, what the crap was that!?'").

26.     Following the investigation, Plaintiff's employment was terminated on April 24, 2020 for safety violations ("First Termination"). *See* Ex. G at p. SkyWest 00006) ("Term Effective Date: 04/24/2020; "Term Reason: 109 Violation of Policies – Involuntary – Ineligible for Rehire").

27.     Reber's employment was also terminated the same day for safety violations. *See* Ex. C at 52:7-12 ("Q. And this instance, when you didn't push the issue with the captain, you allowed him to ignore what you believed at the time was an incident where the aircraft went off the tarmac. That violates pilot policy, doesn't it? A. Yes, and that's why I was terminated, sir.").

**<u>Review Boards</u>**

28.     SkyWest has a review board process through which a pilot may appeal an employment termination. *See* Ex. A at 132:7-17 ("Q. And as I understand it, there is a review board, if you will, at SkyWest for pilots? A. Yes. Q. Explain to me how the review board process works. A. You have a four-member panel, a flight operations manager of some sort, which was the director of operations, another department manager, and two pilots that are on the in-house union, SAPA. You come in. You present first. The company presents. And then you rebut.").

29.     The review board panel consists of four people, including two pilots and two

management employees.  *See* Ex. A at 133:7-11 ("Q. So, there's two company management people and two pilots.  And do you have any say in who is on the pilot side? A. Yes.").

30.     The pilot who requests a review board is informed who will be on the panel and must approve of the panel members.  *See* Ex. A at 133:12-16 ("Q. You approve the panel? A. Yes. Q. And they tell you who it is and then you approve it?  A. Yes.").

31.     The review board is the decision-maker on whether the termination is upheld.  *See* Ex. A at 132:18-23 ("Q. And then this panel of four makes a decision on whether to uphold the termination– A. Correct. Q. –reject the termination, or do something in between the two? A. Yes.").

32.     Plaintiff used this process to appeal his First Termination; his review board hearing occurred on June 16, 2020 ("First Review Board").  *See* Ex. G at p. SkyWest 00005, *et seq.* (Case Review – Termination; Randy Chappell; June 16, 2020).

33.     During his First Review Board, Plaintiff admittedly told the panel that **he did not feel he was being discriminated against**.  *See* Ex. A at 139:21-6 ("Q. Do you remember saying to this board:  'I'm not saying that by any means or to insinuate that this is discriminatory. **I don't feel that**. What I feel is I want to be afforded the same opportunity that other employees are afforded. I want to correct this wrong and take suitable punishment for what occurred. And let you know that will never – it will never occur again. And by no means was it deliberate. By no means was it malicious'? Do you remember saying that?  A. **Yes**.") (emphases added).

34.     At the conclusion of the First Review Board, the panel overturned Plaintiff's First Termination on June 16, 2020 and reinstated him. *See* Ex. A at 145:3-7 ("Q. Now, at the conclusion of this first review panel, the decision of that review panel was to overturn the termination of your employment, correct? A. Correct. Yes."); *see also id.* at 145:24-146:1 ("Q. So, they made their

decision on the 16th and told you that decision? A. Yes.").

35.     Reber's review board hearing as to his termination occurred the next day, on June 17, 2020.  *See* Ex. A at 146:2-4 ("Q. Then they heard Mr. Reber's testimony on the 17th, the next day; correct? A. Uh-huh (affirmative).").

36.     Reber made self-incriminating statements (namely, that both he and Plaintiff knew the aircraft went off the tarmac) during his review board. *See* Ex. A at 221:7-16 (". . . This narrative not only incriminates me, **but incriminates him**. . . . .") (emphasis added).

37.     Having heard Reber's testimony, panel members reported to SkyWest's Employee Relations that they felt they had been "duped" by Plaintiff in the First Review Board the day prior. *See* Oct. 15, 2020 Review Bd. Hearing (overview) (SkyWest 00047-56) (**Exhibit H**) at p. SkyWest 00048.

38.     SkyWest investigated the panel members' report.  *See* Ex. H at p. SkyWest 00048-49 (investigation following the review board panel's complaints).

39.     On August 5, 2020, Plaintiff's employment was terminated again, now for being untruthful in violation of policies ("Second Termination"). *See* Ex. H at p. SkyWest 00049 (Aug. 5, 2020); *see also* Ex. A at 146:9-11 ("Q. And then your employment was terminated for not being truthful; correct? A. That's what I assume."); *see also* Message to Pl.) (RTC 000009-13) (**Exhibit I**), at RTC 000012-13 ("we conclude that you violated SP150 and 3006 by providing false and misleading testimony, which subverted the mission of the Review Board and merits termination.").

40.     Plaintiff appealed his Second Termination (the "Second Review Board"). *See* Ex. A at 146:12-17 (". . . A. I was subsequently re-terminated. Q. Yes. And then you took that decision before a second review committee? A. Yes.").

41.     The Second Review Board consisted of four people who had not been on the First Review Board.  *See* Ex. A at 146:18-24 ("Q. And that review committee, similar to the first . . . comprised of two management employees and two pilots? A. Correct. Q. But, they were different – different four people – A. Yes. Q. – for your second committee than the first? A. Correct.").

42.     Plaintiff approved of the Second Review Board members.  *See* Ex. A at 148:1-6 ("Q. Now, you were told in advance, before this hearing, that that's who your panel was going to be; correct? A. Uh-huh (affirmative). Q. And you told them that those will work? A. Yes. Q. You were fine with that arrangement? A. (Nodding head affirmatively.)").

43.     The final decision-maker as to Plaintiff's Second Termination was the Second Review Board.  *See* Ex. A at 165:2-5 ("Q. Yes. The second review board made the final decision that your employment should be terminated; correct? A. Yes.").

44.     Plaintiff admits that, ultimately, the Second Review Board had to decide who they were going to believe between Plaintiff and Reber.  *See* Ex. A at 150:25-151:6 ("Q. If one person says the comment was made and another person says it wasn't made, ultimately this review board has to decide who they're going to believe; right? A. Uh-huh (affirmative). Q. Right? A. Correct.").

45.     In the Second Review Board, Plaintiff took the opportunity to produce evidence. *See* Ex. A at 152:8-12 ("Q. Now, you took the position in the second review board that Mr. Reber had changed his story – A. Uh-huh (affirmative). Q. – right? A. And produced evidence.").

46.     The Second Review Board panel upheld Plaintiff's Second Termination.  *See* Ex. A at 152:13-16 ("Q. Exactly. And, ultimately, those four people unanimously agreed that your termination was appropriate; correct? A. Yes.").

47.     No other SkyWest pilot has been discharged for the same reasons that Plaintiff was

9

discharged (namely, dishonesty in violation of policies).  *See* Def.'s First Suppl. Resps. to Pl.'s Initial Interrog. Requests (**Exhibit J**), at Suppl. Resp. to Request No. 10.

48.    Plaintiff testified four times about why he believes his employment was terminated:

a)    for the Occurrence (*see* Ex. A at 155:6-11 ("Q. Why do you believe that your employment was terminated? A. For the occurrence that had happened on the 24th of March. Q. Any other reason? A. No."));

b)    because of the Occurrence (*see id.* at 131:25-132-6 ("Q. Do you recognize then, that the termination of your employment was related to this event on March 24th of 2020? A. Yes. Q. And that, ultimately, that resulted in you losing your job? A. Yes."));

c)    for not being truthful (*see id.* at ("Q. And then your employment was terminated for not being truthful; correct? A. That's what I assume.")); and

d)    he thinks SkyWest believed from the start that he knew he had driven into the dirt (*see id.* at 144:21-145:2 ("Q. Do you believe – or, do you think that the company believed from day one that you knew you had driven through the gravel? A. Yes. Q. And that's the reason they terminated your employment? A. Yes.")).

**SkyWest Policies**

49.    Plaintiff's employment was at will.  *See* Company Policy Manual, Nature of Employment, Standard Practice 51 (**Exhibit K**) ("Employment with SkyWest Airlines is voluntarily entered into and the employee is free to resign at will at any time, with or without cause.  Similarly, the employer may terminate the employment relationship at will at any time, with or without cause.").

50.    The Company Policy Manual expressly states that SkyWest's policies do not

constitute a contract.  *See* Ex. K, at ¶ B ("Policies set forth in the SkyWest Airlines Company Policy and the SkyWest Airlines Employee Handbook are not intended to create a contract, nor are they construed to constitute contractual obligations of any kind or a contract of employment between the employer and any of its employees.").

51.     The Pilot Policy Manual ("PPM") provides, "[t]his Policy Manual will remain in effect indefinitely."  *See* Pilot Policy Manual (excerpts) (**Exhibit L**), at pp. 3003.1.

52.     The PPM contains Pilot Rules of Conduct ("Rules"). *See* Ex. L at pp. 3006.2—.6.

53.     Plaintiff acknowledges that the Rules obligate him to provide full, complete, and honest information, and that SkyWest can terminate his employment for failure to comply.  *See* Ex. A at 159:17-24 ("And then 18 says, in part, 'Full cooperation is necessary when asked to provide information to the company in its investigation.' And you would agree that if the company is doing an investigation and asks for information from you, you have – you are obligated to provide them with full, complete, honest information? A. Yes. Q. And that if you don't the company has – well, the company has the right to terminate you anyway. But, you recognize that this policy says that if you don't comply with that, they can terminate your employment? A. Yes."); *see also, id.* at 157:11-18 (Plaintiff agrees the policies require good faith, transparency, and honesty); *id.* at 158:1-3 (Plaintiff acknowledges you can be fired for failing to comply with this).

54.     Plaintiff admits that falsifying company reports is an immediate termination issue. *See* Ex. A at 160:20-25 ("Q. And you recognize on this last page, where it says, '8. Falsifying company records or reports,' or, '10. Willful or deliberate violation of any organizational policies and procedures,' you recognize that's like an immediate termination issue? A. Yes.").

55.     Plaintiff admits that it would be appropriate for SkyWest to terminate one's

employment if SkyWest believed he falsified company records.  *See* Ex. A at 50:8-12 ("And would you agree with me that it would be appropriate for the company to terminate someone's employment if the company believed that someone has falsified company records?  A. Yes.")

56.    Plaintiff agrees that it is appropriate for SkyWest to have zero tolerance for untruthfulness from pilots.  *See* Ex. A at 60:17-20 ("Do you believe that it's appropriate for the company to have zero tolerance for – as it relates to truthfulness from the pilots? A. Yes.").

**Insufficient Evidence to Support Claims**

57.    Plaintiff is not aware of any evidence to support a conclusion that his termination was because he was over age 40.  *See* Ex. A at 185:16-20 ("Q. Do you have any evidence to support a conclusion that the termination of your employment was because you're over 40 years of age? A. Evidence? Not that I'm aware of at this present time.").

58.    The only evidence Plaintiff is aware of to show an ADA violation is that, when Plaintiff was reinstated in June 2020, it took SkyWest over three weeks to get him back on insurance. *See* Ex. A at 186:15-187:5 ("Q. . . . you told me that the evidence you have to support a conclusion that the ADA was the - was the motivating factor for your termination is that after you were initially reinstated on June 16th, it took the company over three weeks to get you back on the insurance run; is that right? A. Yes. Q. Do you have any other evidence to support a conclusion that the Americans with Disabilities Act was violated? A. By them withholding the insurance from – so that I could get his desperately needed supplies, yes, I feel that's a violation. Q. Is there anything else? A. Not pertinent to that.").

59.    Plaintiff admits that the expense of his wife's medical procedure, which occurred after his termination, was not a motivating factor in his termination.  *See* Ex. A at 190:23-191:6

("Q. So, you were terminated before she even had the surgery? A. Yes. Q. So, her surgery, you would agree with me, and the bills associated with that surgery, couldn't possibly be a – A. Did not contribute. Q. – motivating factor in your termination? A. No.").

60.     Plaintiff admits that SkyWest has paid for his wife's heart procedure.  *See* Ex. A at 190:4-12 ("Q. Okay. A. She had a heard procedure, a $[ ] bill, and it was never paid. Now, it – since – recently I think has been paid by SkyWest. . . .").

61.     Plaintiff believes he was a high-cost employee to SkyWest because of his health insurance needs. *See* Ex. A at 188:1-9 (" . . . But, yeah, I was a – I was a high cost employee.").

62.     Plaintiff admits that SkyWest was his family's health insurance provider for his last fourteen years and, during that time, SkyWest paid for those benefits. *See* Ex. A at 188:14-22 ("Q. So, for 17 years SkyWest was the health insurance provider for your family? A. Yes. Q. And over those 17 years – A. Well, 14 years. Q. Okay. 14 years, your – you received benefits – health insurance benefits for your son in the treatment of his diabetes? A. Yes.").

63.     Plaintiff cannot identify anything that changed such that SkyWest would no longer be willing to pay for his insurance.  Ex. A at 189:1-13 ("so, I'm trying to figure out then, what changed in, say, June of 2020, over the 14 years previous, when they paid those without any issue? A. I– I have no – I can't – I can't answer that question, you know. Q. It's not like your son all of a sudden started incurring huge expenses. You're saying that had occurred over 14 years; right? A. Yeah. Operational audit at the time of Covid. I have no idea. Q. Okay. A. Assumptions.").

64.     Plaintiff merely assumes that SkyWest wanted to end his benefits to save money. *See* Ex. A at 189:14-23 ("So, it is just based on an assumption that my son's medical condition was expensive and, therefore, the company decided to eliminate that expense by terminating my

employment? A. Just a mitigating factor. Q. Okay. And it's just based on the information you've given me, it's an assumption that that would be a way to save money? A. Kind of like their assumption of what had occurred that morning. **They're all assumptions**.") (emphasis added).

65.     Aside from the expense of his son's diabetes, Plaintiff is aware of no other correlation between his benefits and his termination. *See* Ex. A at 191:9-12 ("Q. And then we already talked about your son. Is there any other benefit-related correlation between your termination and benefits? A. Not that I'm aware of.").

66.     Plaintiff admits that he has no evidence that anyone who was involved in the termination of his employment had any access to information about his benefit use. *See* Ex. A at 226:10-227:2 ("Q. You have no reason to believe that anyone who was involved in the termination of your employment had any access to information about what your benefit use is; right? . . . Q. I'm asking you how you know that those individuals had access to information related to your use? A. I have no evidence at this current time.").

67.     Plaintiff admits that, as far as he knows, **no one** at SkyWest has access to his benefits use information. *See* Ex. A at 227:11-13 ("Q. Okay. So, as far as you know, no one at SkyWest has that information; right? A. As far as I know.").

68.     When asked what contract was breached, Plaintiff testified that he is not aware that he has such a claim. *See* Ex. A at 191:19-23 ("Q. I think you had a claim saying that the company breached its contract. What contract is that? A. I'm not – I'm not aware of that complaint myself.").

69.     Plaintiff is not aware of any witnesses that would support any of his claims. *See* Ex. A at 208:23-209:1 ("Q. As you sit here today, are you aware of any witnesses that would support any of your claims against SkyWest? A. Not currently.").

**ARGUMENT**

## I.     LEGAL STANDARD.

Summary judgment should be granted when there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Once the moving party meets its initial burden to show that no genuine issue of material fact exists, the burden shifts to the non-moving party "to designate 'specific facts showing that there is a genuine issue for trial.'" *Pierson v. Mrs. Fields Cookies*, 857 F. Supp. 867, 868 (D. Utah 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  Mere allegations, conjecture, or speculation are not enough; the non-moving party must produce admissible evidence that is "significantly probative of the claims he has made." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## II.    SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFF'S ASSOCIATIONAL DISABILITY DISCRIMINATION CLAIM.

Absent direct evidence of associational disability discrimination under 42 U.S.C. § 12112(b)(4), the *McDonnell Douglas* burden-shifting framework applies.  First, a plaintiff must establish a *prima facie* case, by showing:  (1) he was qualified for the job at the time of the adverse employment action, (2) he was subjected to an adverse employment action, (3) he was known by his employer at the time to have a relative or associate with a disability, and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.  *See Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir. 1997). Next, the defendant may proffer a legitimate, non-discriminatory reason for the plaintiff's adverse employment action.  *Id.* The burden then shifts back to the plaintiff to provide evidence that the stated reason is pretextual. *Id.*

Here, Plaintiff's claim fails at least the fourth element: the circumstances do not raise an inference that Plaintiff's relative's disability was a determining factor in SkyWest's termination decision. Foremost, Plaintiff expressly disavowed any claim of discrimination, stating that he **did not believe** his termination was discriminatory. *See* ¶ 33, *supra* (Plaintiff admits to telling the panel, "'I'm not saying that by any means or to insinuate that this is discriminatory. **I don't feel that**.") (emphasis added).  Additionally, Plaintiff testified on four occasions as to the reasons for his termination, and none of them involve disability. *See* ¶ 48, *supra* (he believes he was terminated because of: (a)-(b) the Occurrence, (c) for being untruthful, and (d) he thinks SkyWest believed he knew he had driven in dirt from the start). Where Plaintiff himself does not believe his termination was because of disability discrimination, there is no inference of discrimination. *See Beck v. Dahn Corp.*, 145 F.3d 1345 (Table), *3 (10th Cir. 1998) (affirming grant of summary judgment on associational disability claim where, according to plaintiff's own admissions about why he was fired, his termination was not because of his wife's disability).

Moreover, Plaintiff's claim rests on two allegations: (1) that SkyWest did not pay for his wife's medical procedure, and (2) that SkyWest caused a three-week delay on reinstating Plaintiff's insurance. *See* ¶ 58, *supra*. These allegations do not support his claim. First, Plaintiff admits that his wife's medical procedure did not contribute – and could not possibly have contributed – to his termination, as it occurred after his employment ended. *See* ¶ 59, *supra*. In any event, Plaintiff admits that SkyWest ultimately paid for his wife's medical procedure, negating any inference of discrimination. *See* ¶ 60, *supra*. Second, the alleged delay in insurance occurred not only after Plaintiff's First Termination but also **after he was reinstated**. *See* ¶ 58, *supra*. Thus, the adverse action was already reversed at the time of the alleged delay. And Plaintiff's

16

reinstatement – when his son's disability status had not changed – undermines any inference that his termination was because of his son's disability. Plaintiff does not allege that the delay in insurance had anything to do with his Second Termination. *See generally*, Compl. Finally, Plaintiff provides no evidence that any decision-maker was motivated by his son's disability.

In sum, Plaintiff cannot state a *prima facie* case.  Even if he could, the evidence shows that SkyWest's reason for ultimately discharging Plaintiff was his dishonesty in violation of policies. *See* ¶¶ 39, 46, *supra*. He admits that this credibility determination was SkyWest's to make.  *See* ¶ 44, *supra*. And he admits that it would be appropriate for SkyWest to have zero tolerance and terminate his employment if it found him to be dishonest. *See* ¶¶ 53-55, *supra*. Plaintiff cannot show that SkyWest's reason was pretext for discrimination.  Summary judgment is appropriate.

## III.    PLAINTIFF'S AGE DISCRIMINATION CLAIM FAILS.

In the absence of direct evidence of age discrimination, the *McDonnell Douglas* burden-shifting framework applies to ADEA cases. *Jones v. Okla. City Pub. Schs.,* 617 F.3d 1273, 1279 (10th Cir. 2010). To prove a *prima facie* case of age discrimination, a plaintiff must show that: (1) he is a member of the class protected by the ADEA, (2) he suffered an adverse employment action, (3) he was qualified for the position at issue, and (4) he was treated less favorably than others not in the protected class.  *Id.*  The plaintiff must prove that age was the but-for cause of the employer's adverse action. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).

As an initial matter, Plaintiff himself does not believe his termination was discriminatory. *See* ¶ 33, *supra*. This defeats his ability to show that age was the but-for cause of his termination.

Further, Plaintiff's claim fails at least the fourth element:  he was not treated less favorably than those similarly situated outside the protected class. Plaintiff's second employment termination

was for dishonesty. *See* ¶¶ 39, 46. No other SkyWest pilot has been discharged for the same reasons that Plaintiff was (i.e., providing false information in an investigation and during a Review Board). *See* ¶ 47, *supra*.  In short, Plaintiff cannot establish that any employee outside the protected class who violated the same policies received more favorable treatment.

In any event, Plaintiff testified that he is not aware of *any evidence* of age discrimination. *See* ¶ 57. To the extent Plaintiff seeks to compare himself to Reber, this is unavailing.  As Plaintiff admits, Reber acknowledged his errors and made self-incriminating statements during his June 17, 2020 review board. *See* ¶ 36. Plaintiff, on the other hand, maintained that he was unaware of the Occurrence. *See* ¶ 20. Plaintiff admits that it was for the panel to decide who it believes.  *See* ¶ 44. The Second Review Board panel's good faith business judgment, even if wrong, should not be second-guessed by courts.  *See Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007) ("we consider the facts as they appeared to the person making the decision, and we do not second-guess the employer's decision even if it seems in hindsight that the action taken constituted poor business judgment.  'The reason for this rule is plain: our role is to prevent intentional discriminatory hiring practices, not to act as a "super personnel department," second guessing employers' honestly held (even if erroneous) business judgments.'") (citation omitted).  Summary judgment is appropriate.

## IV.    PLAINTIFF'S ERISA CLAIM IS PRONE TO SUMMARY JUDGMENT.

To prevail under Section 510 of ERISA, an employee must demonstrate that the defendant had the specific intent to interfere with his ERISA rights. *See Phelps v. Field Real Estate Co*., 991 F.2d 645, 649 (10th Cir. 1993). The employee can satisfy his burden by relying on either direct or circumstantial proof of the defendant's intent. *See Garratt v. Walker*, 164 F. 3d 1249, 1256 (10th

Cir. 1998). When indirect evidence of defendant's intent is proffered, the *McDonnell Douglas* burden-shifting analysis may be applied. *See Godwin v. Sw. Research Inst.*, 237 Fed. Appx. 306, 308 (10th Cir. 2007). *See generally Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).

### A.   Plaintiff Cannot Establish ERISA Interference.

To establish a *prima facie* case of interference under Section 510, a plaintiff must show: (1) prohibited employer conduct; (2) taken for the purpose of interfering; (3) with the attainment of any right to which the employee may become entitled. *Maez v. Mountain States Tel. and Tel., Inc.*, 54 F.3d 1488, 1504 (10th Cir. 1995). No action lies where the alleged loss of rights is a mere consequence, as opposed to a motivating factor, behind the adverse employment action. *See Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1151 (10th Cir. 2011).

Plaintiff relies on indirect evidence, so he must establish a *prima facie* case. But his claim fails at the first and second elements: SkyWest did not engage in prohibited conduct for the purpose of interfering with his benefits. Plaintiff's claim rests on the allegations that: (a) he was a "high cost employee" because of the expensive health insurance benefits he received for his son's diabetes, and (b) SkyWest terminated his employment to eliminate that expense. *See* ¶¶ 61, 64, *supra*. Yet Plaintiff admits that SkyWest paid for his health insurance for the last fourteen years. *See* ¶ 62. He cannot identify anything that changed around the time of the Occurrence such that SkyWest would no longer be willing to pay for it; he admits that it is just his "assumption[]." *See* ¶ 63. Plaintiff is not aware of any other connection between his termination and his benefits. *See* ¶ 65, *supra*. In short, Plaintiff merely "assumes" that SkyWest discharged him because it suddenly wanted to save the expense. But assumptions do not suffice to show intent. *See, e.g., Card v. Hercules Inc.*, 5 F.3d 545 (Table), at *3 (10th Cir. 1993) (affirming summary judgment on ERISA

claim where plaintiff "offered little more than speculation," finding: "the fact that he would have received a more generous pension if he had worked longer does not establish an intent on the part of Hercules to interfere with his pension benefits."); *see also Carter*, 662 F.3d at 1151 (no action lies where loss of rights is a mere consequence, not a motivating factor).

Plaintiff's claim fails at the second element for another reason:  he cannot show that interfering with his rights was a motivating factor in his termination.  Plaintiff admits that he has no evidence that any decision-makers concerning his termination had access to information on his benefits use.  *See* ¶ 66, *supra*.  Indeed, Plaintiff admits that, as far as he knows, *no one* at SkyWest has access to information on how he used his benefits.  *See* ¶ 67, *supra*. Thus, he cannot establish that this was a motivating factor in his termination. *See Cunningham v. Adams*, 106 Fed.Appx. 693, 698 (10th Cir. 2004) (affirming summary judgment on plaintiff's ERISA claim where there was no showing that the individual making the decision to terminate plaintiff's employment even knew that plaintiff had requested plan information at the time of termination).  In sum, Plaintiff admittedly has no evidence to support his ERISA claim, and summary judgment is appropriate.

### B.    Plaintiff Cannot Establish ERISA Retaliation.

To establish retaliation under ERISA, a plaintiff must show that he was discharged or discriminated against for exercising a right to which he is entitled under the provisions of an employee benefit plan.  *See* 29 U.S.C. § 1140.  To establish a *prima facie* case of retaliation, a plaintiff must demonstrate circumstances that give rise to an inference of discrimination.  *Lipe v. Mid-Central, Mfg.*, Case No. 05-1009-JTM, 2005 WL 3430421, *4 (D. Kan. Dec. 8, 2005.  "The mere knowledge of an employee's medical condition is insufficient by itself to create an inference of retaliation." *Id.* (citing *Phelps v. Field Real Estate*, 991 F.2d 645, 649-50 (10th Cir. 1993)).

Here, as shown above, Plaintiff admittedly has no evidence that any decision-makers, or anyone at all at SkyWest, had access to information on his benefits use. *See ¶¶ 66-67, supra; see also Lipe*, 2005 WL 3430421 at *4 (summary judgment appropriate even where some decision-makers knew of plaintiff's health problems).  Further, even five months between learning of an employee's health problem and termination has been held to be too attenuated in time to infer retaliation.  *See id.* (plaintiffs were not laid off until one year, eight months, and five months after their respective health events; the Court found: "[b]ecause of the extended time between the time of the company's learning about the plaintiffs' ailments and the time of the reduction-in-force, the company's knowledge has no substantial inferential value.")  Here, much stronger than in *Lipe v. Mid-Central, Mfg.*, Plaintiff admits that SkyWest paid his benefits without issue for *fourteen years* prior to his termination, negating any inference of retaliation. *See id.; see also ¶ 62, supra*.

The evidence shows that Plaintiff's termination was for his dishonesty and was unrelated to his benefits use.  Plaintiff cannot establish pretext.  Thus, summary judgment is appropriate.

## V.   PLAINTIFF'S REHABILITATION ACT CLAIM FAILS.

Associational discrimination and associational retaliation claims are viable under the Rehabilitation Act, just as they are under the ADA. *See, e.g., MX Group, Inc. v. City of Covington*, 293 F.3d 326, 332 (6th Cir. 2002). "[T]he standards for discrimination and retaliation claims under the Rehabilitation Act are the same as those for discrimination and retaliation under the ADA." *Hannagir v. Utah Dep't of Corrections*, 587 F.3d 1255, 1267 n. 5 (10th Cir. 2009).

### A.   Plaintiff's Claim for Discrimination under the Rehabilitation Act Fails.

For all the same reasons regarding Plaintiff's ADA claim above, Plaintiff cannot establish a *prima facie* case of discrimination under the Rehabilitation Act.  *See Section II, supra*.

**B.      Plaintiff's Claim for Retaliation under the Rehabilitation Act Fails.**

The elements of the *prima facie* case of an ADA retaliation claim (and thus a Rehabilitation Act retaliation claim) are: (1) the plaintiff engaged in a protected activity, (2) the plaintiff was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity, and (3) there was a causal connection between the protected activity and the adverse employment action. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999). A plaintiff must show that "the individual who took adverse action against him knew of the employee's protected activity." *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993). An associational retaliation claim would presumably modify the first element by stating that the plaintiff is closely related to or associated with another individual who engaged in a protected activity. *See, e.g., Thompson v. N. Amer. Stainless*, 131 S. Ct. 863, 867-68 (2011) (an employee was entitled to bring a Title VII retaliation claim based on retaliation he suffered in response to the protected activity of a coworker, who was the plaintiff's fiancée).

Plaintiff's claim fails the first element:  he did not engage in a protected activity.  "Protected activity includes the making of a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing pursuant to the ADA." *Watkins v. Jordan School Dist.*, Case No. 2:19-cv-00407-PMW, 2020 WL 2617928, *3 (D. Utah May 22, 2020) (citing 42 U.S.C. § 12203(a)). Here, Plaintiff's only alleged protected activity is that he "exercise[ed] his right to the employer health plan offered to him to care for his son's disability." Compl. [Doc. 2] at ¶ 93. But merely using benefits does not amount to a protected activity; in doing so, he was not opposing any unlawful practice or participating in any investigation, proceedings, or hearings. *See Watkins*, 2020 WL 2617928, at *3; *see also* 42 U.S.C. 12203(a).

Plaintiff's claim also fails the third element: he cannot establish a causal connection between a protected activity and his termination. Plaintiff admits that he has no evidence that any decision-makers regarding his termination – or anyone at SkyWest – had access to information about his benefit use. *See* ¶¶ 66-67, *supra*. Where Plaintiff cannot show that the individuals taking the adverse action (termination) knew of his alleged protected activity (benefit use), there is no causation and his claim fails. *See Williams v. Rice*, 983 F.2d at 181 (plaintiff must show that the one taking adverse action knew of the protected activity).  Summary judgment is appropriate.

## VI.   PLAINTIFF'S BREACH OF CONTRACT CLAIM FAILS.

To establish a *prima facie* breach of contract claim, a plaintiff must show: (1) the existence of a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages. *Beesley v. Hansen*, No. 2:17-cv-00889-JNP-EJF, 2019 WL 1573152, at *1 (D. Utah Apr. 11, 2019) (citation omitted).

Plaintiff's claim fails at the first element: he cannot show that a contract exists. SkyWest Standard Practice Policy 51, entitled "Nature of Employment" states:  "Policies set forth in the SkyWest Airlines Company Policy and the SkyWest Airlines Employee Handbook are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between the employer and any of its employees."  *See* ¶ 50, *supra*.  The same Policy also states that employment with SkyWest is "at will."  *See* ¶ 49, *supra*.

Plaintiff ignores this plain language and focuses instead on the Pilot Policy Manual (PPM), which he argues creates an individual employment contract.  However, the PPM provides:  "This Policy Manual will remain in effect indefinitely."  *See* ¶ 49. This language further negates the existence of a contract and reaffirms that Plaintiff's employment was terminable at will.  *See Myles*

*v. Delta Air Lines, Inc.*, No. 89-C-1039W, 1990 WL 264720, *3 (D. Utah 1990) ("plaintiff must demonstrate the existence of an employment contract with an express or implied term of duration, or an express or implied requirement to terminate only for cause. This showing is required to rebut the presumption under Utah common law that any employment contract that contains no specified term of duration is terminable at will.") (citing *Berube v. Fashion Centre, Ltd.*, 771 P.2d 1033, 1044 (Utah 1989)).

Plaintiff's claim also fails at the second element: even if a contract existed, Plaintiff did not perform. Plaintiff admits that the Rules within the PPM require his full cooperation when asked for information in an investigation. *See* ¶¶ 53, *supra*. He admits that the Rules also obligate him to provide full, complete, and honest information. *See id.* Plaintiff admits that whether he had been honest was a decision for SkyWest (the Second Review Board) to make. *See* ¶ 44. Here, the Second Review Board agreed with and upheld SkyWest's Second Termination, finding that Plaintiff had not provided honest information. *See* ¶¶ 46, 39, *supra*. In short, Plaintiff failed to comply with Rules requiring honesty. His failure to perform defeats his claim.

Plaintiff's claim also fails at the third element, as SkyWest did not breach. Plaintiff admits that, pursuant to the Rules, SkyWest can terminate a pilot's employment for failure to comply with those Rules. *See* ¶ 53, *supra*. He admits that it is appropriate for SkyWest to take a zero tolerance approach and terminate an employee's employment if SkyWest believes the employee falsified company records. *See* ¶¶ 53-56. Finally, he admits that it was for the company (the Second Review Board) to decide credibility. *See* ¶ 44. Here, SkyWest believed that Plaintiff had provided false information. *See* ¶ 39, *supra*. SkyWest again terminated Plaintiff's employment based on this belief. *See id.* The Second Review Board agreed and upheld the Second Termination. *See* ¶ 46,

*supra*. Thus, according to Plaintiff's own admissions, SkyWest was well within its rights to terminate Plaintiff's employment. Summary judgment should be granted.

## VII. PLAINTIFF'S NEGLIGENCE CLAIM FAILS.

"[A] party may not merely rely on bald assertions of negligence to overcome a motion for summary judgment." *Kitchen v. Cal Gas Co., Inc.*, 821 P.2d 458, 461 (Ct. App. Utah 1991). "To have a negligence case submitted to the jury, 'a plaintiff must submit sufficient evidence to establish a prima facie case against the defendant.'" *Id.* To establish a claim of negligence, a plaintiff must show that: (1) the defendant owed the plaintiff a duty, (2) the defendant breached that duty, (3) the breach of duty was the proximate cause of the plaintiff's injury, and (4) the plaintiff in fact suffered injury. *See id.*

Plaintiff's claim fails at the first element: he has not shown that SkyWest owed him the alleged duty. The duty Plaintiff alleges SkyWest owed to him was to ensure the safety of everyone on board the aircraft. But Plaintiff admits that, by regulation, it was his *own* duty as a captain to ensure safety. *See* ¶ 3, *supra* (as a captain, by regulation, he must take responsibility for the safe operation of the aircraft). Plaintiff has produced no evidence that this was SkyWest's duty to him.

Plaintiff's claim also fails at the second element: SkyWest did not breach any duty. Plaintiff alleges that SkyWest breached its alleged duty when the ground crew failed to notify Plaintiff of the Occurrence. But Plaintiff needed no notification. He testified that the aircraft came to a halt, and that he believed (but did not confirm) that he ran over a drainage grate. *See* ¶¶ 9-10, *supra*. He admits he had to use thrusters, up to 75%, to get the aircraft moving again and he felt the aircraft move from side to side during this process. *See* ¶¶ 11-12, *supra*. Thus, Plaintiff knew there was at least an irregularity, but he proceeded with the flight anyway. He should not have

done this, according to his own admission that it is never appropriate for a pilot to assume something is safe. *See* ¶ 2, *supra.* Further, Plaintiff admits that Reber later informed him of dirt on the aircraft's tires. *See* ¶ 16, *supra.* Yet Plaintiff felt no need to inspect them and left the scene without ascertaining the severity. *See* ¶ 18, *supra.* If anyone breached a safety duty, it was Plaintiff.

Plaintiff's claim also fails at the third element: the proximate cause of his termination was not a breach by SkyWest. "Proximate cause is 'that cause which, in a natural and continuous sequence, unbroken by any new cause, produced the injury, and without which the injury would not have occurred.'" *Dee v. Johnson*, 286 P.3d 22, 23 (Ct. App. Utah 2012) (quoting *Bunker v. Union Pac. R.R. Co.*, 114 P. 764, 775 (1911)). Proximate cause fails for two reasons.

First, Plaintiff's own allegations show a break in causation. He alleges that SkyWest breached when the ground crew failed to notify him of the Occurrence. *See* Compl. at ¶ 108. But then he alleges, "[a]s a result of SkyWest's breach, **Plaintiff . . . placed** the safety of himself, his First Officer, the flight crew, and passengers in danger." *Id.* at ¶ 109 (emphasis added). Plaintiff admits that, by regulation, he was required to and did take full responsibility of the aircraft. *See* ¶ 3, *supra*. Thus, his own actions jeopardized safety, even after the ground crew's alleged inaction.

Second, Plaintiff's employment ended because SkyWest found that he had been dishonest. *See* ¶¶ 39, 46, *supra*. Plaintiff himself believes this is why his employment ended. *See* ¶ 48(c), *supra*. Further, he admits that he approved of the Second Review Board panel members, that he had an opportunity to present his case to them, that it was for them to make a credibility determination, and that they were the ultimate decision-makers as to his termination. *See* ¶¶ 42, 45, 44, 43, *supra*. The Second Review Board did not breach a safety duty in deciding Plaintiff's termination. Thus, the proximate cause of Plaintiff's discharge was his own dishonesty, found in

a process that Plaintiff approved. *See* ¶¶ 39, 46, 42, 45, 43, *supra.* Summary judgment is warranted.

## <u>CONCLUSION</u>

Plaintiff cannot establish the elements of any of his claims.   Accordingly, SkyWest respectfully requests that the Court grant summary judgment in favor of SkyWest on all claims and dismiss this action with prejudice.

Respectfully submitted this 28th day of June, 2023.

**GORDON REES**
**SCULLY MANSUKHANI, LLP**

/s/ *Ann C. Purvis*
Mark A. Nickel, Esq.
15 West South Temple, Suite 1600
Salt Lake City, UT 84101
Telephone:  (801) 204-9990
Facsimile:  (385) 282-7590
mnickel@grsm.com

Chad Shultz (admitted *pro hac vice*)
55 Ivan Allen Jr. Blvd., Suite 750
Atlanta, GA 30308
Tel:  (404) 869-9054
Fax:  (678) 389-8475
cshultz@grsm.com

Ann C. Purvis (admitted *pro hac vice*)
555 Seventeenth Street, Suite 3400
Denver, CO 80202
Tel: (303) 534-5160
Fax: (303) 534-5161
apurvis@grsm.com

*Attorneys for Defendant SkyWest Airlines, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 28th day of June, 2023, the foregoing **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** was filed electronically with the Clerk of Court using the Court's CM/ECF electronic filing system, which will send an electronic copy of this filing to all counsel of record:

Andrew W. Stavros (8615)
STAVROS LAW P.C.
8915 South 700 East, Suite 202
Sandy, Utah 84070
Tel: (801) 758-7604
Email: andy@stavroslaw.com

Patrick M. Jones (admitted *pro hac vice*)
AEGIS LAW
Willis Tower
233 South Wacker Drive, 44th Floor
Chicago, IL 60606
Tel: (312) 404-3225
Email: pjones@aegislaw.com

*Attorneys for Plaintiff, Randy Chappell*

*/s/ Serita Gomez*
For Gordon Rees Scully Mansukhani, LLP

28