**EXHIBIT A**



IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| | ) |
| | ) Video-recorded |
| | ) deposition of: |
| | ) |
| RANDY T. CHAPPELL, | ) RANDY THOMAS CHAPPELL |
| | ) |
| Plaintiff, | ) |
| | ) Case No. |
| vs. | ) 4:21-cv-00083-RJS-PK |
| | ) |
| SKYWEST AIRLINES, INC., | ) |
| | ) District Judge Robert |
| Defendant. | ) J. Shelby |
| | ) |
| | ) Magistrate Judge Paul |
| | ) Kohler |

December 6, 2022 * 9:57 a.m.

Location: Office of Gordon Rees Scully Mansukhani
15 West South Temple, Suite 1600
Salt Lake City, Utah 84101

Reporter: Kelly Fine-Jensen, RPR

Videographer: Ryan Reverman, CLVS



A P P E A R A N C E S

FOR THE PLAINTIFF:

Patrick M. Jones
PMJ PLLC
Attorney at law
The National Building
125 South Clark Street, 17th Floor
Chicago, Illinois 60603
Telephone: (312) 255-7976
E-mail: pmj@pmjpllc.com

FOR THE DEFENDANT:

Chad Shultz
Gordon Rees Scully Mansukhani, LLC
Attorney at law
55 Ivan Allen, Jr. Boulevard NW, Suite 750
Atlanta, Georgia 30308
Telephone: (404) 978-7325
E-mail: cshultz@grsm.com

ALSO PRESENT:

Todd Emerson
Ann Purvis (via Zoom)



I N D E X


| RANDY THOMAS CHAPPELL: | PAGE |
|---|---|
| Examination by Mr. Shultz | 5 |
| Examination by Mr. Jones | 211 |
| Further examination by Mr. Shultz | 224 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Code of Conduct, Standard Practice 150, SkyWest00067-76 | 155 |
| Exhibit 2 | Code of Conduct, Standard Practice 150, Skywest00067-76 | 157 |
| Exhibit 3 | Pilot Rules of Conduct, SkyWest00077-80 | 158 |
| Exhibit 4 | Corrective Action and Employment Separation | 161 |
| Exhibit 5 | Pilot Disciplinary Appeals Procedure | 161 |
| Exhibit 6 | Corrective Action, SkyWest00080 | 164 |
| Exhibit 7 | SkyWest CRJ 200 Photo, SkyWest00086 | 164 |
| Exhibit 8 | Safety Report, SkyWest00518-526 | 165 |
| Exhibit 9 | IOR, Randy Chappell, March 25, 2020, SkyWest00010 | 176 |
| Exhibit 10 | Statement, SkyWest00002-03 | 178 |
| Exhibit 11 | IOR, Justin Reber, March 25, 2020, SkyWest00011 | 180 |




P R O C E E D I N G S

THE VIDEOGRAPHER: We are now on the record.

The time is approximately 9:57 a.m.

This is the video-recorded deposition of Randy Chappell, in the matter of Chappell versus SkyWest Airlines, Incorporated, being held at the office of Gordon Rees Scully Mansukhani, in Salt Lake City, Utah, on December 6th, 2022.

My name is Ryan Reverman. I am a certified legal videographer, here along with certified court reporter, Kelly Fine-Jensen.

At this time, counsel will state their appearances for the record. And the witness will be sworn.

MR. SHULTZ: My name is Chad Shultz. I represent the company.

MR. JONES: My name is Patrick Jones. I represent the plaintiff.

RANDY THOMAS CHAPPELL,
called as a witness, being first duly sworn,
was examined and testified as follows:

EXAMINATION
BY MR. SHULTZ:
Q. Mr. Chappell, my name is Chad Shultz. And I represent the company.
I have a series of questions here for you.
But, let me ask you first if you'll introduce yourself by giving us your first -- or your full name, please.
A. Randy Chappell.
Q. Do you have a middle name?
A. Thomas.
Q. And have you ever gone by any name other than Randy Chappell?
A. No.
Q. And in the last 24 hours, have you taken any medication?
A. No.
Q. Is there any reason that you can't give me your best testimony today?
A. No.
Q. Have you ever provided any testimony under oath like you are today?
A. No. I don't believe so.
Q. Never testified in any courtroom?
A. Maybe small claims. But, I don't remember



being put under oath.
Q. Okay. And what kind of small claims event would there be that you're referencing?
A. There was a carpet company that didn't do what they were supposed to do, so I had to take them to small claims court.
Q. And how long ago was that?
A. I don't recall. Prior to 2000.
Q. Oh. So, a long time ago?
A. Oh, yeah, yeah.
Q. Okay. Any other time that you've ever been involved in a lawsuit, either as a plaintiff or a defendant, other than the case we're here about today and the small claims case against the carpet company?
A. Yeah. Actually, there was. In 2012 there was a small claims action against me.
Q. What was that claim?
A. It was a debt collection.
Q. Tell me a little bit more about that.
A. I -- I don't have any specific details. I didn't win.
Q. Who was it that brought the claim against you?
A. I don't recall the company -- the



collection company it was.
Q. What kind of debt was it? What did it relate to?
A. I don't even recall that either. They didn't provide a debt verification to me. So, I never knew exactly what it was.
Q. Do you know how much the claim was for?
A. I think it was about $5,000.
Q. So, $5,000. And -- and are you saying that you don't know who you actually owed the money to?
A. That's correct.
Q. $5,000?
A. It was a combination. It was a -- it was a firm that bought up some things. And -- and, so, it was a combination.
Q. So, did you --
A. They never provided me with what it was for.
Q. Did you pay that?
A. I did.
Q. Without knowing what it was for?
A. I went through the -- the legal process. And because I'm not an attorney, I didn't file a motion to set aside summary judgment and I lost.



Q. And was there a trial in that matter?
A. No.
Q. Where was that -- was that in Salt Lake City?
A. No. It was in Utah County.
Q. And I'm not that familiar with Utah. Where is Utah County from where we are today?
A. American Fork, south of here.
Q. How far?
A. Thirty miles.
Q. Okay. Any other time that you've ever been involved in any litigation either as a plaintiff or a defendant?
A. No.
Q. Have you ever been arrested?
A. Yes.
Q. When?
A. I think about 2011.
Q. For what?
A. Domestic violence.
Q. The accusation was against you, asserting that you had domestically -- you had been violent against another individual?
A. It was dismissed.
Q. Who was the other individual that you were

Page 9

being accused of being violent with?
A. My wife.
Q. What's your wife's name?
A. Patricia Chappell.
Q. Are you all still married?
A. Yes.
Q. Okay. And what was the result of that arrest?
A. I don't understand. It was --
Q. Did you say the charges were dismissed?
A. Yes.
Q. Did you go to a hearing?
A. I don't believe so.
Q. Were you actually put in handcuffs and arrested?
A. Yes.
Q. Taken to jail?
A. Yes.
Q. How long were you in jail?
A. An hour.
Q. And then you bailed out?
A. Yes.
Q. Did you hire a lawyer for that incident?
A. I don't believe I did.
Q. Any other arrests?

Page 10

A. No.
Q. And you're saying there was not a conviction based on that arrest because the charges were dismissed by your wife?
A. I don't know if the -- the prosecuting attorney dismissed them or -- I don't know what the -- how that came about.
Q. What's the incident that led to the arrest?
A. A verbal argument.
Q. Did you strike your wife?
A. No.
Q. Just a verbal argument?
A. Uh-huh (affirmative).
Q. And where did this occur?
A. At our home in Saratoga Springs.
Q. What's the address?
A. I don't recall the address. It's been too many years.
Q. How long did you live at this address?
A. Five years.
Q. Okay. So, it's your testimony that you lived in this house for five years about ten years ago and you have no idea what the address is?
A. It's 38 something. 3865 Lake Mountain.

Page 11

Or, 3856. I can't really remember the exact number.
Q. Sure. But, you remember the street?
A. Yes.
Q. Lake Mountain?
A. Uh-huh (affirmative).
Q. And what's the city?
A. Saratoga Springs.
Q. Again, I'm not that familiar with the area. How far is that from here?
A. Thirty miles.
Q. What direction?
A. South.
Q. And it was just a verbal argument? There wasn't any physical violence where you hit your wife?
A. No.
Q. Okay. And that was in 2011?
A. I believe so. '10 -- yeah, '11.
Q. And you had not had any arrest prior to that or after that?
A. No.
Q. Okay. Did you notify the company of that --
A. Yes.
Q. -- arrest?
A. Yes.

Page 12

Q. Who did you notify?
A. My chief pilot at the time, Dave Aquino.
Q. Was there ever a time that you recall where you had to hire a lawyer, other than this case?
A. Yeah. There -- I -- I called the police on my wife in '07 for a -- for a -- she pulled a knife on me. And I was cited, but not arrested. And that was also dismissed by the prosecuting attorney.
Q. So, you called the police because your wife pulled a knife on you and you're the one that got cited?
A. That is correct.
Q. Explain that to me.
A. She pulled a knife on me. I took the knife out of her hand. She ran over to the neighbor's house. And I called the police. They took statements from my -- my minor children and statements from me. And cited me for -- for domestic violence, even though -- you know, DCFS got involved. They collected the -- the evidence and questioned me. And were flabbergasted how she wasn't charged with aggravated assault. And everything was -- you know.
Q. Was she ever charged with aggravated assault?
A. Huh-uh (negative).

Page 13

Q. Were there any other incidences of domestic violence between your -- you and your wife other than the incident you just told me about in 2007 --
A. No.
Q. -- and the one you told me about in 2011?
A. No.
Q. Okay. And you said that you were cited, but not arrested. What -- I'm not sure I --
A. They wrote me a ticket --
Q. -- I'm not a criminal lawyer, so I don't know what that means.
A. They wrote me a ticket. It was just, I guess, a summons to appear, or whatever.
Q. And did you?
A. Yes.
Q. And was that situation resolved?
A. Yes.
Q. How was it resolved?
A. I think it was dismissed.
Q. And -- and was that at this same address --
A. Yes.
Q. -- in Saratoga Springs?
A. That's correct.

Page 14

Q. And the same police department then?
A. Yes.
Q. What is the name of that police department?
A. Saratoga Springs.
Q. Is it a county or is it a city?
A. City.
Q. City. And you didn't -- you were never arrested on that incident?
A. (Shaking head negatively.)
Q. Okay.
THE REPORTER: Is that a -- is that a "no"?
THE WITNESS: Yes. No. I was -- no. Never arrested.
MR. SHULTZ: Thank you for catching that. Because sometimes I -- I miss that. Thank you.
Q. (By Mr. Shultz) Was there -- and the way we started this is I was asking you if there was ever a time that you had the services of a lawyer. Are you saying you had a lawyer for the '07 --
A. Yes.
Q. -- citation?
A. Yes.
Q. And who was that lawyer?

Page 15

A. I don't recall. It was a public defender.
Q. Okay. Was there ever a time --
A. I believe.
Q. Oh, I didn't mean to interrupt you, sir.
A. I believe it was a public defender.
Q. Okay. Was there ever a time, other than that, that you retained the services of an attorney --
A. In --
Q. -- other than --
A. In '11, I did. But, obviously didn't need her services because it was dismissed. I don't recall the name. A local attorney.
Q. Any other time that you've ever retained the services of a lawyer?
A. No.
Q. Okay. And what is your date of birth?
A. 6/24/65.
Q. What is your address?
A. 8321 West Sahara Avenue, Las Vegas, Nevada 89117.
Q. And how long have you lived at this address?
A. A year and a half.
Q. Who lives there with you?

Page 16

A. My friend, Chip Drane.
Q. Chip -- I'm sorry?
A. Drane, D-R-A-N-E.
Q. A-N-E.
Anyone else?
A. No.
Q. Where did you live prior to the Las Vegas address?
A. I lived in Lehi.
Q. That's Nevada?
A. No. Lehi. Utah County.
Q. Utah.
A. Thirty miles south.
Q. Oh, okay. And what was your address there?
A. I think it was 1661 West Westbury Way, Apartment I --
Q. And who --
A. Lehi.
Q. -- lived there with you?
A. Just myself.
Q. How long?
A. Good question. About two years. Two and a half years.
Q. Where did you live before that?

Page 17

A. I don't recall the address. It was in Lehi, in a rental home.
Q. How long?
A. About two years.
Q. Okay. So, this is the end of 2022. You're saying that the addresses you've given me so far would take us from 2017 to 2022?
A. Roughly.
Q. Okay. And during that five years, you have either lived alone or you've lived with Chip Drane?
A. No. I lived with my wife until 2018.
Q. Okay. And at what address did you last reside with your wife?
A. I -- I don't remember the address.
Q. But, she never lived with you in the Lehi --
A. No.
Q. -- apartment?
A. Yes. That's correct.
Q. She never lived with you in either of the Lehi apartments or in Las Vegas?
A. That's correct.
Q. Okay. So, does that help us to determine that the Lehi apartments and Las Vegas would have

Page 18

been sometime between 2018 and 2022?
A. Correct.
Q. Okay. And you said that you lived somewhere with your wife until 2018?
A. Correct.
Q. Do you remember when you moved out from your wife?
A. It would have been April of '18.
Q. Are you all still married?
A. Yes.
Q. But, you have not lived together since April of 2018?
A. Correct.
Q. Okay. And where did you live with your wife? You said that was in what town?
A. Lehi.
Q. Oh, that was Lehi also?
A. Uh-huh (affirmative).
Q. And you lived with her in a house?
A. Uh-huh (affirmative).
Q. Is that something that you all owned?
A. No.
Q. A rental?
A. A rental, yes.
Q. And how long did you live there?

Page 19

A. About two years.
Q. If you can -- and -- and we can go through this step by step if you want to. But, if you can just give me kind of a sketch of where you lived from 2010 to 2018.
A. 2010 to 2011, I lived in Saratoga Springs.
From '11 to '18 -- no, to 2020, Lehi, Utah.
And then Las Vegas.
Q. Okay. And from 2010 to 2018, how many different places did you live? How many different addresses?
A. Three homes. And then in '18 I moved into the condominium.
Q. Did you own -- do you own any real property now?
A. I do not.
Q. Have you ever?
A. Yes.
Q. When?
A. From '05 to '11, in Saratoga, the house I built.
I owned the house in Lehi from '92 to '05.
Q. And then moved in '05 to a house that you built in Lehi?

Page 20

A. Correct. Yes.
Q. And then that's when you started moving into apartments?
A. Uh-huh (affirmative).
Q. First moved into apartments with your wife, then you --
A. Rental houses, yes.
Q. Okay. And then -- are you all -- are you all separated --
A. Not legally.
Q. -- you and your wife?
A. Not legally.
Q. Okay. But, you haven't lived together for four years?
A. Correct. Yes.
Q. Do you have any children?
A. Yes.
Q. How many?
A. Two.
Q. Names?
A. Spencer and Blake.
Q. How old is Spencer?
A. Twenty-one.
Q. How old is Blake?
A. Nineteen.

Page 21

Q. What does Spencer do?
A. He works at an ATV shop.
Q. How long has he been there?
A. Six months. I can't really tell you accurately.
Q. Does he live here?
A. Yes. He lives with his mom.
Q. In Utah?
A. Uh-huh (affirmative).
Q. And Blake?
A. He's unemployed at the current -- currently.
Q. Also lives here in Utah?
A. Yes.
Q. Those are your only two children?
A. No. I have two older boys from my first marriage.
Q. Okay. Because when I first asked you, like, tell me how many children you have, you said, "two."
A. Well, right there I thought you were pertaining to -- with my wife.
Q. Let's start over.
How many children do you have?
A. Four boys.

Page 22

Q. Okay. Tell me their ages.
A. 36, 34, 21, and 19.
Q. Okay. And I think I have the information on the 21 and the 19 year olds.
Tell me about the 36 year old.
A. His name is Brandon.
Q. Your last name?
A. Chappell, yes.
Q. Okay. The 34 year old?
A. Cameron Chappell.
Q. And where do -- where does Brandon live?
A. Las Vegas.
Q. And where does Cameron live?
A. North Carolina.
Q. I know there's one child in this lawsuit who's referenced as having -- who is a diabetic. Which one -- which --
A. Blake.
Q. -- child is that?
And Blake is the 19 year old; correct?
A. Yes.
Q. How long have you been married to your wife? And you said her name is -- what was it? I'm sorry. I didn't write it down. What's your wife's name?

Page 23

A. Patricia.
Q. Oh, yeah. Patricia.
How long have you been married to Patricia?
A. Twenty-three years.
Q. Any other marriages?
A. Yeah. One.
Q. And who is that?
A. Shelly Cane.
Q. Cane, C-A-N-E?
A. I believe so. Maybe C-A-I-N.
Q. Okay. That's her maiden name?
A. No. That was her married name, remarried.
Q. Okay. And Patricia, what her last name?
A. Bruno.
Q. B-R-U-N-O?
A. Correct.
Q. That's her legal name?
A. She's -- Patricia Chappell is her legal name.
Q. That's what I wondered. Because some women use their maiden name.
But -- so, her -- Bruno was her maiden name?
A. Correct. (Cell phone beeping).

Page 24

Q. Okay. So --
A. Sorry.
Q. Sure. What is Patricia's current address?
A. Oh, what is it? 1911 Pointe Meadow Loop, Lehi, Utah.
Q. Who does she live there with?
A. My -- my two boys.
Q. Brandon and --
A. No.
Q. I mean, Blake and Spencer?
A. Correct.
Q. Okay. How long has she lived at that address?
A. Two -- two and a half years.
Q. Do you know her cell number?
MR. JONES: Randy, don't look it up. Just if you know.
THE WITNESS: Okay. I have -- huh? What's that?
MR. JONES: If you know.
THE WITNESS: I don't know it right offhand.
Q. (By Mr. Shultz) Is there a way that you could tell me what her number is?
A. If I can find it. We don't speak on the

Page 25

phone. So, yeah. I don't have it in my phone.
Q. What's your educational background?
A. High school graduate. Couple semesters of college.
Q. What college?
A. University of Nevada Las Vegas.
Q. You're currently a resident of Nevada?
A. Yes.
Q. Graduated high school, what, eighty --
A. Three.
Q. -- three?
Any other schooling other than the two years of college after high school?
A. Just my aviation career.
Q. Okay. Where did you go to school for aviation?
A. Well, I didn't. I'm talking about the training involved.
Q. What was your training?
A. Well, the private pilot, instrument rating, commercial rating, multi-engine rating. And then all the training that I had in the airlines.
Q. Okay. To get your license -- I mean, my understanding is that people do it either by military involvement --

Page 26

A. I did civilian.
Q. Okay. And civilian. Did you actually take, like, some classroom study in addition to --
A. (Shaking head negatively.)
Q. No?
A. Mostly home study.
Q. Okay. And you got your pilot's license initially at what year?
A. '86.
Q. And been flying ever since?
A. Yes.
Q. And starting in '86, where did you fly?
A. I -- I wasn't employed until '89.
Q. Okay. Starting in '89 --
A. Scenic Airlines.
Q. Scenic. And how long were you at Scenic?
A. Roughly a year.
Q. Then what did you do?
A. I was hired by SkyWest in 1990.
Q. Did you work anywhere else other than Scenic and SkyWest as a pilot prior to the time of your termination in 2020?
A. No.
Q. Did you derive income from any source other than Scenic and SkyWest between 1989 and the

Page 27

time of your termination in 2020?
A. No.
Q. Now, in this case, as I understand it, you filed a charge of discrimination.
Had you ever filed a charge of discrimination any other time?
A. No.
Q. Had you ever alleged that you had been the victim of any discrimination prior to this incident?
A. No.
Q. How did you -- and I don't want you to testify about anything that your lawyers ever told you. But, how did you meet your lawyers?
A. A mutual associate.
Q. Okay. And who is the mutual associate?
A. Rob Fiedler.
Q. Who is Rob Fiedler?
A. A friend of mine.
Q. How do you know Rob?
A. Rob?
Q. Yeah.
A. We golf together in Las Vegas.
Q. And you're saying that Rob is the one who introduced you to your lawyer?
A. Correct.

Page 28

Q. Okay. Do you have a cell phone?
A. I do not.
Q. Have you had a cell phone within the last five --
A. Oh, I have a cell phone. Yes. I'm sorry. I thought you asked for a phone number.
I do have a cell phone.
Q. Okay. Can you tell me your phone number?
A. 801-458-3928. (Cell phone beeping). I'm sorry. That's my son's diabetes.
Q. Do you need to take a break?
A. No. I'm good.
Q. And when you say your son's diabetes, what does that mean?
A. That's his continuous glucose monitor. So, I get notifications on my phone.
Q. It notifies you --
A. His blood sugar level.
Q. Okay. So, that then you can notify him if you don't get a response?
A. Yes.
Q. Do you need to take a break so that --
A. No. I'm good.
Q. -- you can monitor that? Okay.
A. No.

Page 29

Q. That's your cell phone currently.
Do you have any other cell phone numbers?
A. No.
Q. How long has that been your number?
A. Longer than I can remember.
Q. So, ten years?
A. At least.
Q. Who is your supplier or your -- the company that gives you --
A. T-Mobile.
Q. T-Mobile. How long have you had T-Mobile?
A. Three years.
Q. When these incidents took place in 2020, who was your provider?
A. I believe it was T-Mobile. It could have been Verizon. I'm not sure of the timeline.
Q. And this was always the number that you used?
A. Correct.
Q. What kind of phone do you currently use?
A. IPhone.
Q. How long have you had an iPhone?
A. Over ten years.
Q. And the iPhone that you currently have in your pocket, how long have you had that one?

Page 30

A. Eight, nine months.
Q. What model is it, if you know?
A. I think it's a 13.
Q. What model did you have prior to the 13?
A. 11, possibly.
Q. And how long did you have the 11?
A. Three years. Two, three years.
Q. So, when this incident occurred in 2020, you had an iPhone 11?
A. Correct.
Q. And you've since switched to an iPhone 13?
A. Yes.
Q. Do you still have the iPhone 11?
A. I do not.
Q. Why not?
A. I think I traded it in to get this phone.
Q. And would have traded that in eight to nine months ago?
A. Correct.
Q. So, during the time that this lawsuit was pending, you traded in the phone that you had --
A. It stopped working.
Q. -- at the time of the incident?
A. Correct.
Q. So, you -- you don't have that phone?

Page 31

A. That is correct. I do not have it.
Q. And when you switched from one phone, which was an 11 to a 13, how did you transfer the information?
A. The T-Mobile store did it for me.
Q. So, you know at the time that that occurred you were using T-Mobile?
A. Yes.
Q. But, you're saying that the phone that you had, the number 11, was not operating?
A. Was not. Yeah. It was broken.
Q. That's the reason that you got the new phone?
A. Correct.
Q. Were all of your text messages on your number 11 phone transferred over to your 13?
A. I believe so. I'm not sure.
Q. Did you do anything in conjunction with this lawsuit to preserve any text messages on the number 11 at any time?
A. I don't recall.
Q. So, as you sit here today, you don't recall any efforts that you've ever made to preserve any information that was on your iPhone 11 that you had up until eight to nine months ago?

Page 32

A. That is correct.
Q. So, if there was any information that was on that iPhone in 2020, when all of these incidents took place, you're saying that that information is lost?
A. I believe there's some in the file. Is that accurate?
MR. JONES: Yeah. And I'll --
THE WITNESS: Whatever was --
MR. JONES: I'll object to the question. I think it's been asked and answered. He said that he did go to the T-Mobile store and they transferred the data.
THE WITNESS: That's correct.
Q. (By Mr. Shultz) Yeah. And I was just asking you, are you confident that all of the data from 2020 was converted over to your two thousand --
A. I can't --
Q. -- to your number 13?
A. I'm unable to answer that question.
Q. You don't know?
A. I wouldn't know. Just whatever they do when you get a phone.
Q. And you're not aware of any efforts you made, like when you first filed the lawsuit, to

Page 33

preserve whatever evidence was on your phone?
A. Well, it was there. That -- it was there. And then when I got counsel, I mean, I -- whatever I felt was pertinent was relayed to my attorney.
Q. Okay. But, you're not aware of anything you did special, like you didn't go to a store or go to some place and say, "Hey, look, it's very important that I preserve all of the evidence that is on my phone by way of text messages. Can you preserve that and send it to me by e-mail or something?" Like, you didn't do anything like that?
A. No.
Q. Okay. And for the last five years, you're saying that that's the only cell number you've used?
A. Yes.
Q. And the two phones that we discussed are really the only two physical phones that you've had for the last five years?
A. Correct.
Q. In addition to receiving telephone calls and making telephone calls on your phone, and sending and receiving text messages, do you also have the capability of receiving and sending e-mails?
A. I do.
Q. And do you use that phone for e-mails?

Page 34

A. I do.
Q. And back to talking about text messages, during the last three years, on average, how many text messages would you say you send or receive on a weekly basis?
A. I couldn't answer that.
Q. Yeah. And I know what you're saying. But, there are some people who just text constantly and there's some people who hardly ever text. Which one are you?
A. I -- I text frequently.
Q. Who do you text with?
A. My kids, my family, friends.
Q. So, you would say that you use the text messages capability on your phone a good bit?
A. Yes.
Q. And what about e-mail?
A. I'm not a -- not a big e-mailer.
Q. Okay. And what is your e-mail address?
A. It's rchappell --
Q. Where?
A. -- 1999@gmail.com.
Q. What's the significance of "1999"?
A. It's my anniversary date.
Q. Okay.

Page 35

A. It's when we were married.
Q. And do you use or have you used in the last five years any other e-mail address?
A. No. Well, I have a -- I have an e-mail associated to my job.
Q. Okay. And what e-mail address is that?
A. Randyc@primis --
Q. P-R-I-M-U-S?
A. I-S. Primis.com.
Q. And that's a work e-mail address?
A. Yes.
Q. Okay. But, for a personal e-mail, you're saying the one you've used in the last five years has been rchappell1999?
A. Yes.
Q. And that's the only one for personal?
A. (Nodding head affirmatively.)
Q. Do you use the Primis e-mail for personal or just work?
A. Just work.
Q. And do you have on your cell phone both --
A. Yes.
Q. -- e-mail -- okay.
A. Yes.
Q. And in addition to a cell phone, what

Page 36

other electronic devices do you use?
A. I have a company laptop provided. And a company iPad.
Q. And the company laptop, does it also -- do you use it for personal e-mails?
A. No.
Q. Do you use your company iPad for personal e-mails?
A. No.
Q. So, for personal e-mails, is it fair to say that the only electronic device you use is your cell phone?
A. Correct.
Q. And that's been the case for the last five years?
A. Yes.
Q. Do you use social media, like Facebook, TikTok?
A. I have a Facebook. I don't use it. I just look at my grandkids.
Q. Okay. Any -- any other social media other than Facebook?
A. Not that I'm aware of.
Q. Like, you don't use instant message or --
A. No.

Page 37

Q. Okay. And as far as e-mails that you use, is that all, like, through an Outlook?
A. Gmail.
Q. Gmail.
A. Yes.
Q. Okay. And do you use a Gmail calendar?
A. No.
Q. Do you use any electronic calendar?
A. Whatever calendar is on my phone. But, I'm not a -- I don't use -- I have a work calendar that I use --
Q. Sure.
A. -- for work stuff. But, a personal calendar, I don't -- I don't use it --
Q. Okay.
A. -- per se.
Q. And do you believe that there are any personal e-mails that you have or have ever had that related to this incident that we're here about today?
A. No.
Q. And while you were an employee of SkyWest, did you have a SkyWest e-mail account or e-mail address?
A. I -- we had a portal, yes.
Q. Did you use the SkyWest e-mail address for

Page 38

any personal matters?
A. No.
Q. So, if you had any communication with anyone about this situation, it would have either been through text message, telephone calls, personal conversations, or e-mails with your personal e-mail?
A. Yes.
Q. Okay. And do you think that there are any communications you had with your personal e-mail related to this incident?
A. I -- I don't recall. I don't -- I don't believe so.
Q. Do you believe that there are any text messages that you have or had that would relate to this incident?
A. Yes.
Q. Okay. And who would be the recipient of those text messages?
A. I would have received a few text messages from Justin Reber.
Q. Okay. Anyone else?
A. Mark Richards.
Q. Anyone else?
A. Maybe a gentleman named Herb Sohn.
Q. Okay. Who is Herb?

Page 39

A. He's a friend of mine who I worked with.
Q. Another pilot?
A. Yes.
Q. At SkyWest?
A. Yes.
Q. How do you spell his last name?
A. I think it's S-O-H-N.
Q. A captain?
A. Yes.
Q. And what would the text messages be with Herb Sohn?
A. It would have been jokes and --
Q. But, I mean related to this incident.
A. I don't recall, to be honest. Yeah.
Q. Would you say -- that's what I was going to ask you. Like, who would there be that you would consider to be like a confidant of yours or a really good friend of yours in, you know, March of 2020?
A. There's a lot of them. But, I mean, I -- I don't have text messages from them, to them.
Q. Would there -- would you have sent any text messages to anyone particularly about the incident that occurred in St. George? Anybody that's --
A. No.

Page 40

Q. -- not on this list that you've already given me?
A. No.
Q. Wouldn't be anybody that you reached out to say, "Hey, what do you think I should do in this situation"?
A. I don't recall. I mean, I gave you the name that I had.
Q. And that's Herb Sohn?
A. Correct.
Q. And is that someone that you've worked with for a long time?
A. I've known him for many years, yes.
Q. So, he's also a captain?
A. That's correct.
Q. Which would mean that you didn't fly together, at least while you were both captains?
A. We -- no, not while we were both captains.
Q. And do you know how long he's been a captain?
A. Probably -- let's see. It's '22. Probably close to 20 years.
Q. Okay. So, for the last 20 years you haven't flown with him?
A. Huh-uh (negative).

Page 41

Q. But, what communication would you have had with him about this incident?
A. I don't recall specifically what -- if any.
Q. Okay. Anybody else that you would have communicated with?
A. I don't recall anyone.
Q. Anybody related to what I will loosely refer to as your union?
A. Oh. During the process there was some communication with the reps that Mark Richards put me in contact with. But, it was basically scheduling and so forth, stuff like that.
Q. But, you're saying there may be text messages with those individuals?
A. Yeah. Possibly.
Q. Okay. But, nobody else that you can think of?
A. Work -- yeah. No.
Q. Now, your employment was terminated from SkyWest in 2020.
Had you ever been disciplined by SkyWest prior to that?
A. No.
Q. And you were an air check man for how many

Page 42

years?
A. Let me think. In excess of ten years. I don't remember the exact dates.
Q. And I don't need the exact dates. But, just generally, what years?
A. Roughly, '07 to 2016, '17 maybe.
Q. And explain to me what a -- what an air check man --
A. Check airman?
Q. -- is? Check airman. I got it wrong. Sorry about that.
A. He oversees the flight standards. Does initial training of new crew members or upgraded crew members in the airplane. Performs line checks for standards and proficiency checks online. Does special management line checks on pilots that are in special tracking or -- or are coming back from retraining from an occurrence or incidences.
Q. Fair to say that as a check airman, you would be -- you would have received some additional training?
A. That's correct.
Q. And what kind of additional training can you tell me you received as a check airman?
A. Ground training on policies and procedures

Page 43

related to flight standards. And -- and simulator training for -- for -- you know, you have to have a certain amount of time in the simulator in the right seat. In case you're training a captain, you're flying from the right seat.
Q. And there would be times, too, where you would fly with other captains or first officers because you're the air check man and you're --
A. Correct.
Q. -- there to kind of help educate them, if you will?
A. Yes.
Q. Okay. And not all captains are check airman?
A. That is correct.
Q. What percentage of captains would you say with SkyWest are check airman?
A. I couldn't answer that. I wouldn't know.
Q. Less than ten percent?
A. Yeah. I -- I couldn't answer the question.
Q. Just generally, do you think less than ten percent?
A. Yeah. I would say ten percent. Five to ten probably.

Page 44

Q. And do the other captains and first officers, do they know that you're a check airman?
A. Yes.
Q. So, they know that you are someone who has additional training; right?
A. Yes. And --
Q. And has --
A. -- oversight.
Q. Yeah. And -- and you certainly have a good bit of experience to get that position?
A. Yes.
Q. Is that something you apply for?
A. Yes.
Q. And then do you automatically get it?
A. No.
Q. So, what happens -- or what happened in your situation? You applied for it and what happened?
A. I applied for it and I got it.
Q. Did you get it the first time?
A. I don't recall. I mean, it's usually a process of months and scheduling class dates and selecting candidates and filling those classes. What that's based on, I don't know.
Q. Did you receive some additional classroom

Page 45

training as a result of the -- that position?
A. Yes. You go to check airman class.
Q. And is that, like, kind of an ongoing education process?
A. You have a recurrent -- every year you have a recurrent check airman ground school.
And then when you go to your simulator checks, whether they were six months or -- or when they changed over to a yearly program, you would have additional items to do in the simulator. Obviously, flying from the right seat. So, you had to perform those maneuvers, had to be validated.
Q. And all these -- would you also be exposed to some different aircrafts or would it all be on the same --
A. No. It would be on the --
Q. -- kind of aircraft?
A. -- aircraft I was flying.
Q. Okay. And the -- so, there's the first officers. And then as you get more experienced, you can be elevated to be a captain?
A. Correct.
Q. And then you're saying that you actually applied for a position that would be a step above that to where you're a --

Page 46

A. Additional responsibilities.
Q. -- check airman?
A. Yes.
Q. Additional responsibilities. And they give you additional training to go along with that?
A. That's correct.
Q. And would it be fair to say that a lot of the additional training that you received is safety related?
A. Yes. Standards.
Q. Yeah. Because, I mean, once you learn how to fly a plane, like, you're not teaching the others how to fly a plane, you're teaching them about --
A. No.
Q. -- how to safely operate; correct?
A. To operate it within the standard operating procedure.
Q. Sure. And that is the procedure that's outlined by your employer, in this case SkyWest, but also by the FAA?
A. Yeah. They sign off on the procedures.
Q. Right. And one of the things that you're doing as a check airman is making sure that you're giving the education that you have, you're sharing that information with these other pilots?

Page 47

A. That's correct.
Q. So, like, you'll sign up for a line and you'll fly, like you said, with some pilots who are less experienced because then you're teaching them the -- the ways?
A. Correct.
Q. And is there a reason that you decided to stop doing that?
A. The schedule that I was bidding wasn't -- didn't facilitate the need for me to do check airman stuff.
Q. Okay.
A. Yeah.
Q. So -- oh, and do you also get, like, a little extra money for being a check airman?
A. When you're -- when you're doing check airman work, yes.
Q. So, you decided on your own, like it wasn't like the company demoted you --
A. No.
Q. -- or any -- it was, you decided on your own, I would -- I would like to step out of this role --
A. It was either do this, which I didn't want to do, and be a check airman, or continue doing what

Page 48

you're doing. And I was --
Q. Okay.
A. -- okay.
Q. I'll continue to be a captain?
A. Yeah. Continue to fly the schedule that I'm senior enough to hold.
Q. Okay. And, certainly, the -- the education that you get and the training that you get, I mean, you don't forget that the minute you stop being a check airman?
A. No.
Q. And is it kind of standard that check airmen will do that for a period of time and then step out? I mean, that's --
A. Yes.
Q. -- not unusual; right?
A. No, not unusual.
Q. Okay. Would you agree with me that the most important job of any pilot is to operate the aircraft in a safe manner?
A. That's correct.
Q. Any question about that?
A. No question.
Q. Would you also agree with me that it's very important for pilots to operate 100 percent of

Page 49

the time with complete integrity?
A. Absolutely.
Q. And it's absolutely critical that they be truthful?
A. Yes.
Q. And trustworthy?
A. Yes.
Q. And that's for the benefit of passengers, the company, and everybody involved in the industry; correct?
A. Correct.
Q. Would you agree with me that it is never appropriate for a pilot to assume that something is safe?
A. That is correct.
Q. And would you also agree with me that there is never a reason to not be 100 percent safe because it takes -- because of a time factor?
A. That's correct.
Q. So, you would never rush safety?
A. Never.
Q. Like, if there's a reason to question whether something is safe, you will take whatever time it takes to be completely convinced that it is safe?

Page 50

A. Absolutely.
Q. Whether that's delaying a flight or whatever it takes, safety, 100 percent?
A. Yep.
Q. And would you agree with me that it is never, ever appropriate to falsify company records?
A. Never.
Q. And would you agree with me that it would be appropriate for the company to terminate someone's employment if the company believed that someone has falsified company records?
A. Yes.
Q. Or, that it would be appropriate to terminate a pilot if they thought that pilot had flown in an unsafe manner?
A. Yes.
Q. No exceptions?
A. I don't have the report and the specific event, so I can't really answer that question.
Q. I'm not talking about a specific event. I'm saying, would it ever be appropriate for the company to just look the other way when they -- when they believed that there was a safety violation that had occurred?
A. Yeah. That happens frequently.

Page 51

Q. You think it's appropriate to do that?
A. Depends on the circumstances.
Q. So, you as a pilot, been doing this for 30-something years, you think there are circumstances where it's appropriate for the company to look the other way when they think there's been a safety violation?
A. I think they address it with training and -- and --
Q. I didn't ask you that.
A. I --
Q. Do you believe, as a pilot, who has got lots of experience, that it's ever appropriate for a company to overlook a safety violation, just look the other way?
A. Well, no. The question stated that way, no.
Q. Okay. And you agree with me that that has to be the rule; right?
A. No.
Q. You think the rule could be otherwise?
A. The rule is otherwise.
Q. You think that it's appropriate for the company to occasionally look the other way when it comes to safety?

Page 52

A. I don't believe it's appropriate, no.
Q. Okay. Do you believe it's ever appropriate to not be completely truthful when it comes to a safety issue?
A. Never.
Q. You agree with me that the captain is in full charge when it comes to the safety of every flight?
A. Under regulation, yes.
Q. You believe in that old saying of the buck stops here, meaning the buck stops with the captain when it comes to safety?
A. I take responsibility for the safe operation of the aircraft under regulation, yes.
Q. Every captain should?
A. Absolutely.
Q. Every captain must?
A. Absolutely.
Q. And what's one of the things that you, I assume, emphasized when you were flying as a check airman?
A. Yes.
Q. Would you agree with me that, generally, captains have more training than first officers?
A. No.

Page 53

Q. You think they have the same?
A. They do.
Q. What is it, then, that differentiates a first officer from a captain?
A. Going through an upgrade process, demonstrating his ability to captain the airplane. And seniority.
Q. Would a first officer have to demonstrate to the company that they were -- that they were qualified to be a captain in order to be elevated to that position?
A. There are certain minimum requirements before they're considered, yes.
Q. Were you ever involved in the process of someone being elevated from first officer to captain when you were operating as a check airman?
A. Yes.
Q. What role did you play in that?
A. I gave the upgrade candidate initial operating experience in the airplane. So, I flew with them.
Q. To make sure that their skills and knowledge were -- would meet the qualifications to be elevated to be a captain?
A. Correct.

Page 54

Q. And you would be one of the persons involved in that decision whether to elevate or not elevate?
A. That's correct.
Q. Can you think of any times when a captain is not ultimately responsible for the safe operation of that flight?
A. Not specifically.
Q. Even generally?
A. If he's not there and something occurs with the aircraft that the first officer is doing, then he couldn't be held responsible at that point.
Q. So, the only exception you can think of to where the captain is not ultimately responsible for the safe operation of that flight is if the captain isn't there?
A. Correct.
Q. Okay. What's a "PIC"?
A. Pilot in command.
Q. What does that mean?
A. Pilot in command is a definition. He's the pilot in command of the aircraft.
Q. And are all captains pilot in command?
A. Correct.
Q. And as a pilot in command, do you receive

Page 55

special leadership and professionalism training?
A. Within the ground school, yes.
Q. And as part of that training that integrity and truthfulness is paramount?
A. That's a fair statement. Yes.
Q. And also part of that training is that safety is just ultimately --
A. Yes.
Q. -- the end of the game -- the beginning and the end of the game; right?
A. Yes. Yes.
Q. Is there a difference between the right and left seat operations?
A. Yes.
Q. What?
A. I can't sum that up for you in a -- in a brief answer. I mean, there's different procedures and -- and callouts. It's -- it's quite lengthy.
Q. Is it understood that the person in the right seat takes direction from the person in the left?
A. Yes.
Q. And, ultimately, that the person on the -- in the left seat is the decisionmaker as it comes to that flight?

Page 56

A. Ultimately, yes.
Q. Do you still keep track of your hours of flight?
A. Roughly.
Q. How many hours, roughly, do you have --
A. 24,000.
Q. Is that considered, like, a high amount?
A. Very high amount.
Q. And that's -- when you say, "24,000 hours," that's actually, like, operating the aircraft?
A. Correct.
Q. Like, engines running, 24,000 hours worth?
A. Yes.
Q. And of that 24,000 -- I know you're not going to know an exact number and I don't expect it -- but just generally, as a captain, would it be half of those hours or more?
A. I'm about roughly 17,000 hours of pilot-in-command time.
Q. I would imagine that's pretty high?
A. It is.
Q. And I know -- and I don't expect an exact answer on this. But, if you looked -- if you took all of the pilots in the country, how many would

Page 57

actually have -- like percentage-wise -- 17,000 pilot-in-command hours? Less than ten percent?
A. It's a -- it's a hard question to answer. I don't really know. I mean, I could throw something out there. 15 percent of the airline pilots have that many hours.
Q. And, obviously, all your hours are operating since 1990 flying jets?
A. I flew seven years -- was it seven? No. I flew almost ten years in the turbo prop, which is a jet engine aircraft, but with a propeller.
Q. And then since then all --
A. Yeah.
Q. -- jet? And what kind of aircraft were you flying in March of 2020 when this incident occurred?
A. A Canadair Regional Jet.
Q. Canada Regional?
A. It's called a CRJ. That one was a CRJ 200.
Q. And as I recall, you have to be approved to fly that particular aircraft?
A. That's correct.
Q. And once you're approved to fly the CRJ 200, as a -- you're not -- you're usually not

Page 58

authorized to fly more than one kind of jet; right?
A. Well, at SkyWest we fly all three of the CRJs, the 200, the 700, and the 900.
Q. And you're approved for all three?
A. That's correct.
Q. And the difference is how long each of those is; right? Like, how many passengers it holds?
A. Correct.
Q. Like, basically, it's the same instrumentation and --
A. Basically.
Q. Okay. So, the particular aircraft that you were flying, just generally how long have you been authorized to fly a CRJ 200?
A. As a pilot in command, since 2000.
Q. So, for 20 years?
A. (Nodding head affirmatively.)
Q. And I assume that --
A. Yes. Sorry.
Q. -- over that 20 years, like when you said you have 17,000 hours of pilot in command, were all of those hours on CRJs?
A. No. I probably had 12,000 hours in the CRJ as a captain.
Q. Okay. And 12,000 hours on the CRJ 200 or

Page 59

would that be a combination?
A. A combination.
Q. Which aircraft did you fly most within the last ten years?
A. Probably the CRJ 200.
Q. So, that's the one you had the most time with?
A. Yes.
Q. And I assume that over, say, the last five years, you flew a lot of different aircrafts, but they were all the CRJs?
A. Yes.
Q. And just generally, like, would you have flown a hundred different ones or --
A. No, no, no. I flew the three different RJs.
Q. I know that. But, I'm saying particular aircrafts, like --
A. Oh, tail numbers? Yeah. I couldn't tell you how many.
Q. It -- it's whatever your line is, you get there --
A. Yeah.
Q. -- and that's the aircraft you have?
A. Yes.

Page 60

Q. Okay. Which requires you to be, I guess, like all pilots in charge, you have to be adaptable and know the aircraft?
A. Yes.
Q. Did you believe at any time that you did not have the proper training?
A. No.
Q. So, you believe you've been trained up properly to operate --
A. That aircraft.
Q. -- that aircraft?
A. Yes.
Q. Okay. Do you believe that it's appropriate for the company to have a zero tolerance for any safety violations?
A. Yes.
Q. Do you believe that it's appropriate for the company to have zero tolerance for -- as it relates to truthfulness from the pilots?
A. Yes.
MR. SHULTZ: Let's take a five-minute break. We've been at it for about an hour.
MR. JONES: Okay.
MR. SHULTZ: Thank you.
THE VIDEOGRAPHER: Going off the record.

Page 61

THE TIME IS APPROXIMATELY 10:56 a.m.

The time is approximately 10:56 a.m.
(Break taken at 10:56 to 11:04 a.m.)
THE VIDEOGRAPHER: Returning on the record.
The time is approximately 11:04 a.m.
Counsel.
Q. (By Mr. Shultz) Let me ask you a couple of follow-up questions about your roommate, Chip Drane.
How long have you lived with him?
A. A year and a half.
Q. Have you discussed this matter with him at all?
A. Yes.
Q. Is this the same Chip Drane that is a convicted felon for tax evasion?
A. He was. Yes.
Q. And was terminated from SkyWest?
A. That's correct.
Q. Where does he work now?
A. He works for Prime Insurance.
Q. Doing what?
A. Flying.
Q. Out of Las Vegas?
A. No.

Page 62

Q. Where does he fly out of?
A. Naples, Florida.
Q. Do you have his cell number?
A. Not on me.
Q. Is it in your phone?
A. Let me look. You ready?
Q. Yes.
A. 970-880-0341.
Q. Thank you.
Let's talk for a moment about the details of what occurred and what led to what occurred on March 24th of 2020.
A. Okay.
Q. Prior to that flight, how many times had you flown with Justin Reber?
A. It would be a rough guesstimate. I -- I couldn't tell you specifically.
Q. Oh, I know that.
A. Hundreds.
Q. Hundreds of times. In this particular trip -- is that what you call it --
A. Yeah.
Q. -- a "trip"?
What was the -- what did the trip involve? Where were you going?

Page 63

A. We went from Salt Lake to St. George the night before. And then from St. George, back to Salt Lake the next morning.
Q. Is it what they call a "stand-up"?
A. Correct.
Q. And a stand-up is something that involves an out and back?
A. Yes.
Q. And, essentially, it's a shortened trip, so you're basically kind of on duty that entire time?
A. Correct.
Q. So, you flew from Salt Lake to St. George, which is, what, 20 minutes in the air?
A. Nah. 45.
Q. Flew there in Aircraft A, parked it in St. George, then went to the hotel?
A. Correct.
Q. And this stand-up, does it include both the pilots and a flight attendant?
A. Yes.
Q. And the flight attendant for this stand-up was who?
A. Scott Miller.
Q. So, you, Justin Reber, and Scott Miller, your job, on March 23rd, is just to fly from Salt Lake to St. George?

Page 64

A. Yes.
Q. And at the time of this incident, were you living near Salt Lake?
A. Yes.
Q. Where were you living?
A. Lehi.
Q. So, when you got back to Salt Lake from St. George on March 24th, your trip was complete?
A. Yes.
Q. Where did you go?
A. Home.
Q. What did you do?
A. What do you mean, what did I do?
Q. Do you fish? Do you hunt?
A. I golf.
Q. Do you -- you golf. Do you remember what you did that day?
A. I do not.
Q. Do you have a calendar on your phone that might indicate to you what you did on that day?
A. No.
Q. You were quick to say that. How do you know?
A. You've already asked me that question. I

Page 65

don't use a calendar.
Q. I think you told me that occasionally you do use the calendar?
A. (Shaking head negatively.)
Q. No? Okay. Do you have any way of determining what you were doing that day?
A. No.
Q. Because you got home -- you got back to Salt Lake before 8:00 a.m.; right?
A. I -- I don't know the exact time.
Q. Yeah. I can tell you.
You arrived back in Salt Lake at 7:06 a.m.
Does that sound right?
A. Yes.
Q. How far did you live from the airport?
A. Thirty minutes.
Q. So, you were home by 9:00 for sure?
A. Oh, yeah.
Q. And you don't know what you had planned that day?
A. No.
Q. Do you remember what day of the week it was?
A. I do not.
Q. March 24 of 2020 appears to be a

Page 66

Wednesday.
A. Okay.
Q. That doesn't give you any clue as to what you were doing that day?
A. (Shaking head negatively.)
Q. You don't have a Wednesday golf schedule?
A. No.
Q. Okay. You said you had flown many times with Mr. Reber?
A. Yes.
Q. And is that something that like -- like just works out? Or, do you all try to fly together? Or --
A. Yes. They -- you can fly together.
Q. But, did you -- like, you select him or do you just --
A. No. I select what I want. And he selects what he wants.
Q. And you both had high seniority, him as a first officer, you as a captain. And, like, these stand-ups are obviously flights that captains and first officers like to get, if they can?
A. Yes.
Q. It's not working very many hours, but getting the maximum amount of pay?

Page 67

A. Yes.
Q. Okay. Had you ever had any problems with Mr. Reber?
A. No.
Q. A good relationship?
A. Yes.
Q. Do you believe that Mr. Reber was a good first officer?
A. Yes.
Q. Qualified?
A. Yes.
Q. Skilled?
A. Yes.
Q. Ever have any issues with his performance?
A. No.
Q. And you, being a former check airman, you're trained to look for flying ability --
A. Yes.
Q. -- if you will? And you never had any reason to question his skills?
A. No.
Q. Any reason to ever question his truthfulness?
A. No.
Q. Think he ever lied to you?

Page 68

A. Yes.
Q. When?
A. Post -- post the event.
Q. Post the event. Okay. So, let's break that down.
Pre-event, do you think he lied to you?
A. I don't believe so. No.
Q. Even about little things? You have no reason to believe he ever lied to you --
A. No.
Q. -- prior to the event?
A. No.
Q. But, you're saying that you believe that he lied to you after the event. Tell me about that.
A. What do you mean?
Q. I'm asking you if he ever lied to you. And you said, well, not pre-event, but --
A. Well, based on the records I've seen, I believe he has lied.
Q. Okay. I'm not asking you if he's ever lied. I asked you if you believe he's ever lied to you?
A. Specifically, no.
Q. Okay. So, as far as you know, he's never lied to you before the incident or after?

Page 69

A. No.
Q. My question was inartful. And I apologize for that.
Do you have any reason to believe that Mr. Reber ever lied to you?
A. No.
Q. Thank you.
Any reason to believe that he cuts any safety corners?
A. No.
Q. Any reason that if he told you something, that you would not believe him?
A. No.
Q. Do you like him, personally?
A. Yes.
Q. So, the night before, you, Mr. Reber, and Scott Miller fly to St. George.
Do you stay in the same hotel?
A. Yes.
Q. How did you get from the airport to the hotel?
A. The hotel picks us up.
Q. You rode in a hotel van then?
A. Yes.
Q. You all -- what time did you get into

Page 70

St. George? Do you recall?
A. I do not.
Q. Was it dark?
A. Yes.
Q. Do you go -- when you got to the hotel, did you go straight to your room or --
A. Yes.
Q. You all didn't hang out and have dinner or anything?
A. No.
Q. Okay. The next morning you meet up to go back to the airport?
A. Yes.
Q. Any communication with Mr. Reber from the time that you all got out of the van at the hotel until the next morning when you got back in the van? Wasn't any text messages --
A. No.
Q. -- that you're aware of? No?
A. No.
Q. So, the next morning you get in the van, you go back to the airport?
A. Yes.
Q. And how do you get to your aircraft?
A. You walk out of operations and down to

Page 71

your airplane.
Q. So, you don't go through where the regular passengers go?
A. There's no jetway to this particular spot the aircraft was located.
Q. But, you don't go through the same security line, for example, that the --
A. Not in St. George.
Q. Okay. There's like a back way in?
A. Uh-huh (affirmative).
Q. Okay.
A. Yes.
Q. And did you have any communication with anybody at SkyWest, either by e-mail, text message, phone call between the time you got out of the van in St. George and the time you got back in the van at the hotel?
A. No.
Q. So, when you get to the airport, you know that you parked your aircraft in a particular -- but, you were -- how did you learn that you weren't going to take the same aircraft back to Salt Lake?
A. It's on the flight release.
Q. And you get that by e-mail?
A. No. We usually get it either via computer

Page 72

or via the aircraft equipment will show it for us, the ACARS.
Q. So, that's a printout?
A. Sometimes it's printed out. Sometimes it's not.
Q. Okay. But, otherwise, you can get it --
A. Yes.
Q. -- by e-mail or --
A. From the company portal.
Q. Okay. And you found out that you're going to be flying a different aircraft?
A. Yes.
Q. Also a CRJ 200?
A. Correct. Yes.
Q. Do you know why it's a different aircraft?
A. It's just operational control. Dispatch, maintenance, whatever, they make those decisions.
Q. Is that unusual that there would be an extra aircraft in St. George?
A. Yes.
Q. Pretty small airport?
A. (Nodding head affirmatively.)
Q. Do you -- so, this was an unusual event?
A. Yes.
Q. Had you ever been to St. George before?

Page 73

A. Yes.
Q. How many times?
A. Dozens.
Q. Sometimes at night?
A. Yes.
Q. Or, early in the morning?
A. Yes.
Q. And then sometimes, obviously, during the daylight?
A. Yes.
Q. As a percentage, would you say you're usually there in the dark or in the daylight?
A. Yeah. Both. I mean...
Q. And, again, small airport?
A. Yes.
Q. Okay. So, you find out that you're flying this other aircraft. And you go -- you said you went out a door in operations, did you say?
A. Uh-huh (affirmative).
Q. And then how do you get into your aircraft?
A. You walk out and go up the stairs, go in the airplane.
Q. Same stairs that the passengers take?
A. Yes.

Page 74

Q. Is there any requirement that you do any kind of inspection of the outside of the -- of the aircraft?
A. No.
Q. So, you come out of the operations door, you go up, you get into your left seat?
A. Yes.
Q. And at that point, you're doing your --
A. Checks.
Q. -- checks?
And there's even more checks to be done first flight of the day; is that --
A. There's a few. Yes.
Q. -- accurate?
A. Yes.
Q. And the aircraft is not running when you get into it?
A. No.
Q. And you're obviously the first ones, you and the pilot and the flight attendant are the first ones onto the aircraft?
A. As far as I know.
Q. Okay. So, anything unusual or different that occurred up to this point?
A. No.

Page 75

Q. So, you sit down on the left side.
Mr. Reber -- like, did you all go into the aircraft together?
A. No. He did a pre-flight of the aircraft exterior.
Q. Okay. So, he walked around the outside just to check, and that's part of his process as a first officer?
A. Yes.
Q. And you go in and start the process of getting the plane running and all --
A. Yes.
Q. -- those things? Okay.
Nothing unusual has happened up to this point?
A. No.
Q. Okay. Tell me what happens next in the process. Like, what -- what do you do?
A. We run our checklists, you know, our pre-start, our originating checklist of the cockpit. Program the flight plan.
Q. And how long are you in the aircraft before passengers?
A. 30, 35 minutes.
Q. And you're doing work this whole time,

Page 76

like getting things ready?
A. Yes.
Q. Okay. Passengers get on. The door's closed. Anything unusual that's happened up till now?
A. No.
Q. Okay. Door's closed. Then what happens?
A. We complete our checklists. And -- and request from the ground people to push us back.
Q. And how do you do that?
A. Usually they're on a headset and we can talk to them. That's pretty much required. Sometimes the headsets don't work.
Q. So, in this situation, do you recall whether you spoke with them on headset?
A. I did not.
Q. You did not speak with them?
A. No. They can use hand signals. And they did.
Q. And in this situation, they did use hand signals?
A. Correct.
Q. Did you try to reach them on a -- through the headset and weren't able to?
A. No. They were -- they were on their

Page 77

phones.
Q. So, their job -- when you say, "they," how many people?
A. I think there were two.
Q. Okay.
A. One standing by the tug. One driving the tug.
Q. And the tug then pulls you away from the gate?
A. Pushes you away from the gate.
Q. Or, pushes you out. And then at some point, releases the tug from the aircraft?
A. Yes.
Q. Anything unusual about what happened that morning up till now?
A. Yes.
Q. What?
A. The rampers were on their phones. So, it's pretty common in the industry to hit your taxi light and get their attention, which I did.
Q. Okay.
A. And they said okay. And I gave them a brakes off signal. Clear to push. And they pushed us.
Q. So, the taxi light -- is there more than

Page 78

one light on this aircraft?
A. Yes.
Q. It's like a headlight?
A. Well, the taxi light is on the nose gear. And the landing lights are on the wings. There are two separate lights.
Q. Okay. And on this one, you're saying that you flashed the --
A. My nose --
Q. -- front light?
A. My nose gear light.
Q. Okay. And is there only one light there?
A. I think there's two elements.
Q. Okay. Pretty bright?
A. Oh, yeah.
Q. And did you have the wing lights on at this time?
A. Not the landing lights, no.
Q. Okay.
A. There's position lights, nav lights on the wings.
Q. Yeah. That are like --
A. Blue and red.
Q. Yeah.
A. Green and red.

Page 79

Q. Okay. And, so, they push you back -- or, drive you back?
A. Uh-huh (affirmative).
Q. At some point, you flash the lights. And you're saying you flashed the lights for what reason?
A. To -- to get their attention that our door was closed, our beacon was on, and we are now ready to push the aircraft.
Q. Okay. So, you do that at the beginning of this exercise --
A. Before we ever move.
Q. Then they move you back?
A. Correct.
Q. Approximately how far did they push you back?
A. Twenty feet. Twenty-five feet maybe.
Q. And at that point, what's the process? Like, do you give them a signal or do they give you a signal?
A. They disconnect the tug.
Q. So, they -- they choose how far to push you back?
A. Yes.
Q. And then they unhook. Then they move the tug so it's out of the way, I assume. And then the

Page 80

person who is driving the tug comes back and gives you a signal?
A. Uh-huh (affirmative).
Q. And then do you signal back to them?
A. You just, you know, wave.
Q. Okay. And at this point, when -- when you wave to them, is your headlight on?
A. No.
Q. Okay. Because the -- the tarmac in the airport itself is -- is lit with lights from above; correct?
A. Not that specific parking spot.
Q. Well, we can go back and look at the video.
You've seen the video; right?
A. Yeah. I've seen the video.
Q. Okay. And -- and you're saying that you don't think that that part of the airport is lit?
A. The video is not representative as to what you see when you're there.
Q. What does that mean?
A. I don't -- I'm not a -- I'm not a cinematographer or whatever. But, it appears to me a bright image of a video.
Q. So, the video makes it look like it's

Page 81

lighter than it really is, in your opinion?
A. Yes.
Q. Okay. So, the tug pushes you back, unhook, move forward, they give you the clear signal, and you thumbs up? Or, how does that work?
A. Yeah.
Q. And you haven't -- or just wave to him?
A. Yeah. Wave.
Q. And you haven't had any, like, radio communication with them?
A. (Shaking negatively.)
Q. Did you talk to either of these two people on the ground before you got onto the aircraft?
A. No. It's -- no.
Q. Okay. And, so, there's one person that's on the tug and the other person is out, like, walking the wing?
A. Well, there's other rampers out there walking the wings.
But, up at the tug, there's one guy driving. Usually a guy -- I can't recall if he was actually -- where he was at the completion of push.
Q. Okay.
A. Yeah.
Q. So, the -- whoever it is that would be

Page 82

along the wings, they're just there to make sure that you don't back into something or --
A. Correct.
Q. Okay. Okay. And at this point, you give them the wave signal. And do they then leave or do they move just out of the way?
A. Just move out of the way.
Q. Okay. And at what point do you turn on this lamp again?
A. When we complete our checklist and we're ready to taxi.
Q. Okay. And the -- the landing lights, do you ever turn those on?
A. No.
Q. So, it's only the -- the two elements at the front of the --
A. Right.
Q. -- aircraft?
And they're stationary, I assume? Like, you know what I mean?
A. Yeah.
Q. Like, they don't pivot with --
A. They might. I couldn't answer that question specifically.
Q. You don't know?

Page 83

A. I don't remember.
Q. Okay. But, they're on. And you don't turn them on until you're ready to start moving?
A. Correct.
Q. And the aircraft does not move -- like, the wheels don't have a motor on them?
A. No.
Q. It's a -- the engines have to --
A. Correct. Yes.
Q. -- push you forward?
What do you recall happening next?
A. We -- we couldn't turn to the right because there was an aircraft parked there. We could only turn to the left. And that's how we were positioned. So, I cleared the left side of the aircraft. That's standard. Looking at my left wing tip, making sure it doesn't strike or there's any -- nothing in my way. And I commenced a tight left turn.
Q. And at this point you think you're actually at Gate 4 or 5, but you're actually at Gate 1; is that right?
A. I have -- there's no signage. I have no idea what specific gate it is.
Q. But, you thought you were at 4 or 5?

Page 84

A. No.
Q. Well, that's what you told the board; correct?
A. Yeah. I'm -- I'm not sure what I told them. I know I was at a -- at a parking spot I had never been at before.
Q. You said, "There was no lighting or no signage to indicate what gate I might be parked at. Nor did I have the information."
A. Correct.
Q. "Nor did I have information that I was at Gate 1 or 2 parking spot. I assumed, in hindsight, I was parked at Gate 4 or 5. I don't know."
Do you remember that?
A. Okay. If that -- if that's what you have. I said that.
Q. Well, I mean, is it consistent with your recollection?
A. I couldn't -- I couldn't answer that question because I didn't have -- it wasn't published on the -- on the required chart that I had. That was just probably a speculation at that time.
Q. Well, the significance of thinking you're at 4 and 5 is that you've got a lot more room to the left, of pavement, to turn around than you would if

Page 85

you were at Gate 1 or 2; right?
A. Correct.
Q. And you're saying --
A. So, then that would be an accurate statement.
Q. Right. So, when you start out, you didn't know where you were, you thought you were further to the right than what you really were; right?
A. Yes.
Q. Okay. So, you start maneuvering -- did you -- I think Reber said you first started going to the right, then you turned and went around to the left.
Is that consistent with your understanding?
A. Yes.
Q. Okay. And you chose to go to the left because you thought there was something to your right that was --
A. There was an aircraft. Yes.
Q. Okay. So, you go to the left. Then what happens?
A. We make a normal left turn out to taxi out.
Q. When did you turn on the light that we

Page 86

were talking about?
A. When we started to move the aircraft.
Q. So, the light was on when you started moving first to the right, then to the left?
A. I believe so.
Q. And you're -- what you were trying to do is turn around and go back to -- if you're looking at the -- from where the plane was initially, you're -- you want to go to the right?
A. We never commenced a right turn. No.
Q. I know. Because you went around to the left?
A. Yes.
Q. Right.
A. Yeah.
Q. So, what you were trying to do is go -- turn around so you're going forward. And you were trying to ultimately go to the right to get to the -- to the runway?
A. No. I understand what you're saying. The turn was made to the left. But, yeah.
Q. A 270 degree turn?
A. Roughly.
Q. Okay. To the left to -- so that you could head toward the --

Page 87

A. Runway.
Q. -- runway?
A. Correct.
Q. So, as you're starting to move, tell me exactly what happens second by second.
A. I just did. I'm -- I'm clearing the left side of the aircraft, which is standard operating procedure.
Q. You're looking out the window?
A. No. I'm -- the left window.
Q. Yeah.
A. I'm making a tight turn to the left, so my attention is out at the left wing tip.
Q. Okay. And you've got the light on. And you go to make this 270 degree turn?
A. Yes.
Q. And you start to move the aircraft by moving the --
A. Thrust lever.
Q. -- thrusting the engines?
A. Yeah.
Q. And you got stuck. The aircraft stopped moving; correct?
A. The momentum stopped. Yes.
Q. And you had to -- like, at this point

Page 88

you're the one who has got your hand on the thrusters?
A. Yes.
Q. Not the first officer?
A. Yes.
Q. And you thrust up to -- what is it, 75 percent?
A. I don't know the exact number.
Q. You've seen the report. I mean, it's 70, 75 percent; right?
A. If that's what it says. I -- I don't recall looking at them.
Q. At -- at taxi, what's the percentage that you normally thrust?
A. N1, 68, 65. Pretty close -- that's pretty close to idle, N1. 57 percent.
Q. Okay. So, you're saying that the 70, 75 percent is not a high thrust?
A. It's not excessive.
Q. Have you ever used a 75 percent thrust in a taxi before?
A. I can't answer that. I -- I don't recall.
Q. As you sit here today, can you think of a time, other than on March 24th, 2020, when you ever had to thrust at 75 percent?

Page 89

A. Yes. If you get stuck in a big drainage grate or a depression in the concrete or asphalt ramp area, it's very common. Especially making a tight turn.
Q. Okay.
A. Because you're not rolling straight. The wheels are in.
Q. So, you're making a tight turn at this point?
A. Uh-huh (affirmative).
Q. And are you saying that you're looking out the left window?
A. Yes.
Q. And the light is on in the front of the aircraft?
A. Uh-huh (affirmative).
Q. And what do you see?
A. I see my left wing tip.
Q. Did you ever look at the ground?
A. No.
Q. If you had looked at the ground, do you now recognize that you would have seen dirt?
A. I can't answer that because I didn't --
Q. Don't know?
A. I didn't see it.

Page 90

Q. Okay. Well, you didn't see it because you didn't look down; right?
A. Right. I -- I was -- my attention was where it was supposed to be by standard operating procedure.
Q. Yes. To watch the wing tip to make sure you don't run into anything?
A. Correct.
Q. Okay. You never looked down even when the aircraft stopped; is that your testimony?
A. That is correct.
Q. And when the aircraft stopped, you reach over with your hand and push --
A. Yeah.
Q. -- the --
A. Thrust lever.
Q. -- levers forward and you thrust out of whatever was stopping you -- whatever was stopping the aircraft?
A. Correct.
Q. Did you at that point wonder, "I wonder what that was that stopped me"?
A. No. I --
Q. Why not?
A. I knew what it was. I had experienced it

Page 91

many times.
Q. What did you think it was?
A. A drainage grate.
Q. You had -- had you ever seen this drainage grate in the daylight when you had flown to St. George before?
A. (Shaking head negatively.)
Q. Had you --
A. No.
Q. Had you seen the drainage grate that morning?
A. No.
Q. And let me understand more -- like, what did you believe this drainage grate would look like?
A. I know what they look like.
Q. Tell me what they look -- what it -- what -- describe them for me.
A. They're thirty to forty inches wide. Six to ten feet long. Heavy metal. Usually grated, you know, to drain.
Q. And you're saying that it's common for you to have to thrust up to 75 percent to move past a drainage grate?
A. Yes.
Q. And that a drainage grate itself would --

Page 92

excuse me -- be enough to stop the aircraft?
A. Yes.
Q. How long was the aircraft stopped before you thrust forward?
A. A millisecond. A second.
Q. Was the aircraft at this point completely stable or was it shifting from side to side?
A. A slight shift. Yeah. When you come out of that.
Q. What did you believe was causing that?
A. The drainage grate.
Q. Did you understand that there was actually, like, a drop of up to 14 inches off of the tarmac? Did you feel that at all?
A. No.
Q. Have you ever in your career taxied off the runway or off the --
A. Never.
Q. -- the --
A. Never.
Q. Have you ever in your career had a situation where the aircraft dropped down 14 inches while you were on the --
A. No.
Q. -- concrete?

Page 93
A. No.
Q. So, this would be an unusual event?
A. There was not a 14-inch drop in the taxi. There was -- it was a normal turn, with a slight pause of momentum.
Q. Well, we've seen the tracks in the dirt. I mean, they went out and measured it. It's 14 inches; right?
A. The -- yes. The tracks in the dirt? Yes. They were. The tracks were.
But, the tarmac, from my understanding, is pretty much level with the dirt. From pictures. And should be. There's no drop.
Q. But, you've seen that the aircraft you were operating, when it went off the -- the tarmac, the concrete, whatever, it dug down into the dirt up to 14 inches down; right?
A. I -- I did -- I did see that. Yes.
Q. And both your front tires, right, and the tires on the right side of the aircraft both went off the pavement?
A. Yes. I saw the pictures.
Q. The ones on the left stayed on the pavement?
A. I can't answer that question for sure.

Page 94
Q. Well, you've seen the pictures; correct?
A. Yes.
Q. And you were making a very tight turn. So, really, it kind of pivots off of the --
A. Yes.
Q. -- left side --
A. Correct.
Q. -- right?
A. Correct.
Q. And, in fact, when you're -- how is it that you're able to pivot? Is it you just run the right engine?
A. No. It's -- the nose wheel turns at a very -- 90 degrees and the airplane just turns.
Q. So, you're doing both of them at the same --
A. Yes.
Q. -- both engines are being thrust at the same level?
A. Uh-huh (affirmative).
Q. Okay.
A. Yes.
Q. So, you come -- the evidence will show, the pictures and all, that you came back onto the pavement then?

Page 95
A. Yes.
Q. And then you proceeded toward the runway?
A. Yes.
Q. And did not stop to check anything; right?
A. No reason to. No.
Q. And made no attempts to contact anybody on the ground to say, hey, was that a grate that I went across? Like, there was no attempt to communicate with them?
A. No. It wouldn't be standard to communicate with them.
Q. I didn't ask you that.
A. No. No.
Q. Okay. Was there any communication between you and Mr. Reber at all during this turnaround?
A. No.
Q. So, when he testified that he said to you -- because he's on the right side of the aircraft; right? And when he said to you, we're in the dirt, or something like that, you're saying that never happened?
A. He didn't say that.
Q. Was there any communication between you and Mr. Reber at all during runway -- getting to the runway?

Page 96
A. Just the standard checklists.
Q. Well, you'd already done the checklists.
A. No. There's a taxi checklist, a before takeoff checklist that we have to do.
Q. So --
A. Final checks.
Q. -- what precisely, from the time the aircraft started moving until you got out to the runway, what do you recall precisely being communicated between you and Mr. Reber?
A. Standard cockpit items.
Q. Meaning what?
A. The checklists.
Q. Okay. I wasn't there. Tell me what you said.
A. I -- I can't remember. It's two and a half years. I can't remember the exact items on the checklist. Flaps are set in the appropriate position. The trims are set for takeoff. The frequencies are correct for the departure. The runway heading is set. Those are the items that you'd find on a checklist.
Q. So, let's not even talk about this flight for a minute. Let's not even talk about this flight.
Typically what would be the communication

Page 97

between the captain and first officer when you first start moving toward the runway? What would you say to the first officer --
A. Well, I would look out the window and say, "Clear to left."
Q. Okay. And then what would the first officer say?
A. He would say, "Clear right."
Q. Then what?
A. That's it. Non-essential communication is not allowed.
Q. So, there would be -- that would be the only thing said is, clear left, clear right, not another word is said?
A. Uh-huh (affirmative).
Q. And in this particular -- now we're back to this flight.
A. Uh-huh (affirmative).
Q. Do you recall you saying, "clear left"?
A. I believe I would have. I don't know for sure, but...
Q. Do you recall him saying, "clear right"?
A. I don't recall.
Q. So, if there was anything said at all, it would be clear left, clear right. But, you don't

Page 98

recall that even being said?
A. (Shaking head negatively.)
Q. So, you think it was either those two things were said or nothing was said?
A. Other than the items that are on the checklist.
Q. No. But, I'm talking about what was said.
A. Nothing was said.
Q. Okay. So, it's -- is it accurate to say that it's your recollection that there was not a single thing said to you or from you to Mr. Reber from the time you started moving, to the time you got to the runway?
A. Yes.
Q. So, once you got to the runway, did you stop at the end or did you just roll --
A. Probably --
Q. -- through and take off?
A. -- rolled through and took off.
Q. Was there any communication with Mr. Reber while -- once you -- you get to where you can take off, is there anything verbally that's communicated between you and Mr. Reber at that point?
A. No.
Q. And you're flying the plane?

Page 99

A. No. Reber was flying the plane.
Q. At what point does Reber move over --
A. When we take --
Q. -- and take his hands and put them on the thruster?
A. When we get on the runway.
Q. Okay. Is there any communication of, okay, it's your turn or --
A. No. "Your flight controls" is the call.
Q. So, you would have said to him, "your flight controls"?
A. Yes.
Q. And do you recall saying that to him?
A. Yes.
Q. And do you recall him saying anything back?
A. "I have the flight controls."
Q. Okay. You recall him saying that?
A. I don't specifically recall him saying that. But, that's what he would have said. And I've flown with him enough. So, yes, I believe he said that.
Q. You do have a recollection of yourself saying --
A. Yes.

Page 100

Q. Okay. So, from the time the engines are on, you start moving, there's not a single thing said between you and Mr. Reber other than "your flight controls"?
A. As I've stated before, we had checklist items to comply with. So, there was conversation regarding the standard operation of the aircraft.
Q. Yeah. That's what I'm asking you. Like, I want to know what was said -- what would -- we can go back.
A. Yeah.
Q. Tell me what is typically communicated between the two?
A. I would say, "Taxi checklist," once we're in motion.
Q. Anything else?
A. He would -- he would read the items. I would respond to the items.
And then there would be a before takeoff checklist after that checklist. And I would say, "Before takeoff." And he would read the items. And I would respond to them. And we would confirm the items.
Q. So, there was that communication --
A. Yes.

Page 101

Q. -- between the two of you?
A. Yes.
Q. But, you're saying there was no communication at all of, hey, we're off the tarmac, we're off the runway, we're off the concrete, we're in the dirt? We're in the mud?
A. No.
Q. There was nothing said?
A. No.
Q. There wasn't a holy crap we're off the -- nothing?
A. Nothing.
Q. And you're saying that you never saw anything that would lead you to believe that you were off the --
A. That is correct.
Q. And you're saying that you never felt anything that you thought was unusual?
A. That is correct.
Q. You didn't feel the plane going from side to side?
A. Running through a grate like that is not unusual.
Q. Okay. But, you didn't feel anything? Like, you never felt it drop off into the dirt?

Page 102

A. I felt the grate is what I felt.
Q. Okay. And you -- did you --
A. And uneven surface.
Q. Did you feel the plane going -- you know, dipping to the right, then dipping to the left, any movement?
A. Yes. Because the right wheel was in the grate. Yes.
Q. Did you make any attempts to confirm that it was, in fact, a grate?
A. There was no need to. It was --
Q. I didn't ask you if there was a need to.
A. No. I -- no. I did not.
Q. So, it's your testimony, sworn testimony, that when you took off, you had no reason to believe -- strike that.
So, it's your sworn testimony that when you took off, you did not believe that you had driven through the dirt?
A. Yes.
Q. If you did believe that you had driven through the dirt, what would you have done differently?
A. I would have stopped the aircraft right then and there. Shut the engines off. Deplane the

Page 103

passengers.
Q. You would have -- when -- when -- like, for example, if -- when the plane stopped moving and you looked down and you realized I have driven off of the concrete, would you have thrust out of it or would you have just stopped right there?
A. No. I would have stopped right there.
Q. Why?
A. Because that's where the aircraft was. And it needs to be inspected. And I would have stopped the aircraft and made the appropriate calls to dispatch and maintenance.
Q. You would not have moved another inch?
A. That is correct.
Q. And you would have done that because that's the safe thing to do?
A. Yes.
Q. And that's what the proper procedures would require?
A. Yes.
Q. The passengers would all get off the plane and you would call maintenance?
A. Yes.
Q. How do you -- how do you call maintenance?
A. I can call them on a phone number. I

Page 104

would have -- yeah.
Q. You'd use a cell phone or a --
A. Sure.
Q. And you would have said what?
A. I would have said, hey, we've run off the tarmac here. We're in the gravel next to the tarmac area. And we need maintenance to come out and inspect the aircraft and determine what we're going to do.
Q. Has there ever been a time in your career where you've done that?
A. Run off -- run through -- no.
Q. Have you ever heard of another pilot doing that?
A. Oh, yeah.
Q. And what have you heard they did in that situation?
A. I -- I didn't hear the specifics of what they did.
Q. Have you ever heard of any pilot who knows they're in that situation, who continues to fly without maintenance doing an inspection?
A. I can't -- I can't answer that question. I don't know.
Q. So, as far -- as you sit here today,

Page 105

you've never heard of a situation where the pilot knew he was in the dirt and didn't immediately shut the aircraft down?
A. Yeah. I -- I can't answer that.
Q. Because you agree with me that even thrusting out of that situation is improper?
A. No. If I knew I was in the dirt, it would be improper. But, thrusting out of a depression in an asphalt ramp or a drainage grate, happens all the time.
Q. Right. But, if you knew you were in the dirt, even thrusting out of it would be improper?
A. Yes.
Q. You should just stop right there, empty everybody out --
A. Yes.
Q. -- start fresh?
A. Yes.
Q. You proceed to take off from St. George going to Salt Lake?
A. Yes. Sorry. Correct.
Q. And the only thing that would make that, in your mind, eventful at this point, with what you knew, was, wow, we got slowed down by a grate and I had to thrust out of it?

Page 106

A. Yes.
Q. Right? I mean, other than that, the flight was uneventful?
A. Correct.
Q. From start to finish?
A. Correct.
Q. You land in Salt Lake?
A. Uh-huh (affirmative).
Q. All the passengers get out first --
A. Uh-huh (affirmative).
Q. -- I assume? You stand up there and say, "Goodbye" and "thank you" to everybody; right?
A. Sometimes.
Q. Okay. Then you, the flight attendant, and Mr. Reber all exit the plane at the same time; correct?
A. I think the -- I think I went back and -- yes. Roughly. Correct.
Q. Let me ask you this. Like, this review board that you went to, you've gone to two review boards; right?
A. Correct.
Q. And even though you didn't stand up and take an oath, everything you said was truthful; right?

Page 107

A. Yes.
Q. I mean, you didn't say anything that wasn't truthful?
A. No.
Q. Okay. So, the three of you -- like, in Salt Lake, is it a -- how do you get --
A. It was a free stand. There wasn't a jetway.
Q. Okay. So, it's -- you go down a -- the --
A. Steps.
Q. -- steps the same way as everybody else?
A. Yes.
Q. And at the bottom of the steps -- well, typically, is there a requirement to do any kind of an inspection at that point?
A. The first officer generally does a post-flight inspection.
Q. And a post-flight inspection would include walking --
A. Just --
Q. -- around the outside of the aircraft?
A. General condition of the aircraft.
Q. And would you typically stand there as a captain and wait for him?
A. Not necessarily.

Page 108

Q. You may just walk off?
A. Correct.
Q. This particular day, though, when you came down, Mr. Reber was -- and there was some communication between the two of you at that point; correct?
A. No.
Q. No communication?
A. Just -- just we're leaving type -- you know, we're getting in -- the van's here.
Q. Did you all get in a van together?
A. Yes.
Q. Oh, I forgot to ask you this. Was there any discussion between you and Mr. Reber from the time you took off in -- in St. George to the time you landed in Salt Lake?
A. No.
Q. So, it was just a silent flight?
A. What do you mean by "discussion"? I mean --
Q. You know, where you moved your mouth and --
A. Oh, yeah. I mean --
Q. -- noises were made.
A. -- I can't recall what -- what the -- what

Page 109

type of conversation, you know. Just normal conversation above 10,000 feet.
Q. Nothing you thought was unusual?
A. No.
Q. What's a barber pole?
A. It's a -- a speed -- the speed limit of the aircraft.
Q. Meaning that you -- if -- if the -- if the buzzer goes off --
A. Yeah.
Q. -- it means that you've exceeded the speed of the aircraft?
A. The demonstrated speed of the aircraft, yes.
Q. Which all depends on altitude?
A. Altitude, temperature.
Q. Do you recall on that flight that you exceeded the speed between --
A. I did not recall that.
Q. Okay. But, you know now that you did?
A. Yes.
Q. Because that's something that's recorded?
A. Yes.
Q. And -- like, I'm not sure I understand what that means. Is that just like, hey, you're

Page 110

trying to get there too fast?
A. No.
Q. What's it mean?
A. Like, you going down the freeway and the speed limit is 70. And you look down and you're going 75, so you make an adjustment. That's what the warning on the aircraft is for.
Q. So, if the conclusion from anybody who is looking at this is, hey, for whatever reason, Mr. -- or Captain Chappell was in a hurry to get back to -- that's not true?
A. No.
Q. Who flew the aircraft between St. George and Salt Lake?
A. Justin.
Q. Who landed it?
A. He did.
Q. So, are you saying that Mr. Reber did not point out to you that the tires on the right rear of the aircraft had mud on them?
A. No.
Q. You're saying he never did?
A. No.
Q. You had no idea that there was any mud, dirt, residue of any kind --

Page 111

A. If -- if so, I would have went and looked. No. No. I did not. No.
Q. You had no -- you have no recollection of that?
A. That's correct.
Q. You're saying that Mr. Reber did not point that out to you?
A. That's correct.
Q. And if Mr. Reber testified under oath that he did point that out to you, you're saying he's lying under oath?
A. Yes.
Q. If the flight attendant, who was with you all that day, if he testified that Mr. Reber pointed out to you that there is dirt on the tires that morning when you all got off the aircraft, are you saying that that would also be a lie?
A. Well, you asked me if he pointed out mud on the tire.
Q. No. I asked you, did he point to you that there was any dirt, mud, anything on the tire?
A. He mentioned that when we got in the van.
Q. Okay.
A. That there was mud on the tire.
Q. So, let's back up.

Page 112

So, when you come down the steps from the aircraft, where was Mr. Reber?
A. He was walking around the back of the airplane.
Q. Okay. And at any point did Mr. Reber point to a tire?
A. I don't recall that. No.
Q. At any point did Mr. Reber ask you to come out and look at a tire?
A. No.
Q. At any point did he signal to you to come out and look?
A. No.
Q. At any point did he say anything to you while you were standing there about there being dirt on the tire?
A. I don't recall that. No.
Q. So, it's possible he did, you just don't recall?
A. Yes.
Q. And if the flight attendant, who was there, testified that Mr. Reber pointed to you that there was dirt on the tires, made a comment to you about there's dirt on the tires, you're saying that that did not occur or you just don't remember?

Page 113

A. I don't recall that happening.
Q. So, it's possible that that happened, you just don't recall?
A. That's correct.
Q. And you're saying that at that -- that -- then the three of you got in a van together?
A. Uh-huh (affirmative).
Q. Do you recall there being any communication before you got into the van with Mr. Reber about dirt on the tires?
A. No.
Q. You're not saying it didn't happen, you just don't remember; right?
A. Correct.
Q. Okay. So, the three of you all get in the van and you go to where?
A. The terminal. Crew lounge area.
Q. And in the van, was there any discussion -- because I minute ago you said something about he didn't say anything until we got in the van.
A. I -- yeah. I think he said there was dirt on the right tire. And there might have been a comment saying there's puddles on the ramp. It had been raining in St. George and in Salt Lake. Wasn't --

Page 114

Q. Let's back up. Because this is getting too general.
At -- do you recall there being any comment made to you from Mr. Reber in the van about there being any dirt or mud or anything else on the right tire?
A. Yes.
Q. What do you recall specifically him saying?
A. There's dirt -- there's a little bit of dirt on the right tire.
Q. Okay. And did you have a response to that?
A. I said, "We ran through a puddle or something on the ramp," is what I figured.
Q. Well, I'm not asking what you figured. I'm asking you --
A. Well, I mean, I think -- I think that's probably what I would have said.
Q. Do you have a recollection of what you said?
A. No. Specifically.
Q. No recollection?
A. (Shaking head negatively.)
Q. But, you do recall him specifically saying

Page 115

there was dirt?
A. Dirt, yes.
Q. And he used the word "dirt"?
A. Yes.
Q. On the right tire?
A. Yes.
Q. And you don't recall what your response to that was?
A. No.
Q. Do you recall him saying --
A. No.
Q. -- anything else to you?
A. No.
Q. And then you all get to the terminal and each go your separate ways?
A. Yes.
Q. So, did you have -- up until the time you went your separate ways, you're telling me that the only comment that Mr. Reber ever made to you about being in the dirt, having dirt on the tires, or anything, was when Mr. Reber said to you in the van there was dirt on the rear tire, rear right tire --
A. Yes.
Q. -- of the aircraft?
A. Yes.

Page 116

Q. That's the only eight words that he ever said to you before you all separated and went your own way about anything related to being in the dirt in --
A. Yes.
Q. -- St. George?
A. Yes.
Q. And you don't recall the flight attendant ever saying anything to you?
A. I don't recall Scott saying anything.
Q. You're not saying he didn't?
A. No.
Q. You're just saying that you don't recall?
A. I don't recall the context of anything he said to me.
Q. You get to the terminal, all three of you go your separate ways?
A. Correct.
Q. Did you ever fly with Mr. Reber again after that?
A. I never flew again after that.
Q. Did you ever fly -- well, you're saying you didn't fly at all?
A. Yeah.
Q. When did you first learn from anybody

associated with SkyWest that there was any issue with the flight from St. George to Salt Lake?
A. The next day.
Q. And who did you hear that from?
A. Mark Richards.
Q. And Mark Richards was your chief pilot?
A. Salt Lake chief pilot. Correct.
Q. And you were obviously stationed in Salt Lake?
A. Yes.
Q. And have been for years?
A. (Nodding head affirmatively.)
Q. And did he call you on the phone?
A. Yes.
Q. Cell phone?
A. Yes.
Q. And was that unusual?
A. Yeah. For me. It was unusual.
Q. Had you ever had any other cell phone conversations with him while he was chief pilot --
A. I don't --
Q. -- prior to this?
A. I don't recall.
Q. When your phone rings, do you know it's him? Like, is he in your contacts?



A. I don't remember if he was or not. He might have been.
Q. So, you answer the phone and he says what to you?
A. He says, "What happened in St. George yesterday?"
Q. And what do you say?
A. "I don't know. What happened in St. George?"
Q. Tell me the whole conversation.
A. "What happened in St. George? "
"Well, the rampers saw you run into the dirt. You -- you ran off the side the tarmac area and went through the dirt."
I said, "Oh, no. I -- I didn't know I had done that."
And he said, "Well, just submit an IOR." Which I did.
Q. And "IOR" stands for what?
A. Incident, you know, report. Irregular operations.
Q. In the last year that you worked at SkyWest, did you ever do an IOR other than this incident?
A. I don't believe I had for the previous



year.
Q. IORs are unique? Unusual?
A. They could be for anything. A passenger discrepancy. Just anything irregular.
Q. But, you don't recall ever having to fill one out?
A. Not in the previous year I don't.
Q. Okay. So, did you get any other information from -- from Mark Richards at this point?
A. No.
Q. Did you have any communication with Mr. Reber at this point?
A. No.
Q. So, you're saying -- well, let me ask you this. Did you ever speak with Mr. Reber about this flight?
A. No.
Q. You've never had a conversation with him?
A. Nope.
Q. He never called you, you never called him?
A. I called him. That would be normal. Yes. I called him.
Q. So, you called him, but he didn't answer?
A. Correct.
Q. Did you text him?



A. Yeah.
Q. How many times?
A. Two or three.
Q. Did he ever respond?
A. Yes.
Q. Okay. And what did you text to him?
A. I said, "Hey, I got a call from Mark. It appears we drove through the gravel next to the ramp in St. George. And we have to fill out IORs."
And he texted back: "Yes. I got a call, too. I've got to fill out an IOR. Mark advised me not to speak with you."
Q. Okay. Now, you keep saying, "gravel." What -- why -- why do you say, "gravel"?
A. From the pictures I saw and what's normally around the airport in close proximity to runways, taxiways, it's usually a tightly compacted gravel, dirt area, you know.
Q. So, based on an assumption?
A. No. It's based on what I've seen for 35 years doing this. It's not an assumption.
Q. The fact that you believed you drove through gravel is an assumption based on your prior experiences?
A. Based on the pictures I saw. And what

Page 121

I've seen around taxiways, yes. It's an assumption that it's gravel.
Q. Any reason to believe that the pictures you've seen of the tracks going through the gravel, dirt, whatever we want to call it, that those aren't accurate?
A. I -- I can't speak to that. I mean...
Q. Any reason to believe that those were not tracks made by your aircraft?
A. No.
Q. So, you're saying that the only conversation that you've ever had with Mr. Reber, or Reber, is the one that we talked about today where he said to you in the van there's dirt on the tire?
A. Yeah.
Q. And then he told you: "Mark, told me not to talk about the event"?
A. Correct. I -- I did communicate with him after his review board. After I had heard that I was reinstated and he was reinstated, I texted him: "Congratulations Justin." And he responded back.
And then he included in his text message, which I have: "Sorry I couldn't speak with you. Mark had been helping me and I didn't want to lose his trust."

Page 122

Q. Okay.
A. I said, "No problem."
Q. And that is the only communication?
A. Yep.
Q. Even up to today?
A. Correct.
MR. SHULTZ: Okay. We've been going about another hour. Let's take a break. And probably should take a break for lunch.
MR. JONES: Uh-huh (affirmative).
MR. SHULTZ: Do you prefer to do that now or would you like to do it the next hour?
THE WITNESS: Doesn't matter to me. I'd prefer to keep going if you'd like.
MR. SHULTZ: We'll keep going. But, we are going to take a lunch break. Because this is going to be a long process.
So, would you prefer to do the lunch break now or after we talk a bit more?
MR. JONES: Yeah. Whenever you think is good. It's your deposition. Whatever you think is a good breaking time. That's fine.
MR. SHULTZ: So, we'll meet back here at 1:00. And I won't start with you.
MR. JONES: Okay.

Page 123

THE WITNESS: Could you start without me?
THE VIDEOGRAPHER: Going off the record. The time is 12:05 p.m.
(Break taken at 12:05 to 1:17 p.m.)
THE VIDEOGRAPHER: Returning on the record.
The time is approximately 1:17 p.m.
Counsel.
MR. SHULTZ: Thank you.
Q. (By Mr. Shultz) Mr. Chappell, let me ask you a couple of questions about the ground crew.
You were saying earlier that the ground crew, that they were on their cell phones?
A. Yes.
Q. And you were able to observe that?
A. Yes.
Q. From your -- your seat in the plane?
A. Uh-huh (affirmative).
Q. Is there any issue with them being on their cell phones?
A. Yes.
Q. And what is that issue?
A. Safety.
Q. And is there any kind of a regulation or a rule that SkyWest has about the ground crew being on

Page 124

their cell phones?
A. I -- I don't know.
Q. Were you concerned about the safety with them being on their cell phones?
A. I was concerned that they were not operating like they're supposed to because they were distracted. So, yes.
Q. And who did you report that to?
A. I didn't -- I didn't report it.
Q. Why not?
A. Because it happens all the time. I mean, it's -- you know.
Q. But, I mean, you're the captain --
A. I -- I --
Q. -- and your obligation is to make sure that things are done safely.
Is there any reason that you didn't report this ground crew?
A. Just -- no. There's not.
Q. Do you recognize that you should have?
A. No.
Q. You don't think you should have?
A. I -- I don't think it's -- I don't think that it's a safety of flight issue. It's just how they should be paying attention to the aircraft and

Page 125

the passengers, the customers, you know.
Q. So, that would be the difference, it's not a safety flight issue, it's just --
A. Correct.
Q. -- a safety issue?
A. General -- yeah. They shouldn't be on their cell phones while they're working around an aircraft.
Q. But, you don't feel any obligation, as a pilot in charge, to report that to anyone because it doesn't affect the safety of the flight?
A. Yes.
Q. Do you in any way blame the ground crew for what happened on the 24th?
A. Yes.
Q. How?
A. Well, their -- their policy says that they're to notify me of any safety of aircraft items. They witnessed me roll through the gravel. They had every opportunity to notify me visually, with the lighted hand wands, or by the company operations frequency or the common traffic advisory frequency, which they monitor. And also required to notify dispatch immediately. And they did none of that. This would have never occurred.

Page 126

Q. You say "this" would never have occurred?
A. This occurrence, as the FAA categorizes it, not an incident, an occurrence, would have not happened because I would have stopped right there and it would have been over with.
Q. Explain to me the difference between an incident and an occurrence.
A. Severity.
Q. So, you're saying that this incident that we've been talking about that occurred on the 24th, the FAA characterizes it as an occurrence?
A. Yes.
Q. Rather than just an incident?
A. An accident, incident, occurrence.
Q. Accident, being the --
A. Loss of life and severe damage to equipment.
Q. So, it goes accident is the most severe, then occurrence --
A. No. Incident.
Q. Oh, okay. So, you said this -- I -- I must have misunderstood you. You said this incident would have --
A. Occurrence.
Q. Okay. The occurrence wouldn't have

Page 127

happened?
A. Correct.
Q. And what is the occurrence?
A. The aircraft not being on the pavement. Me turning out and rolling through the gravel adjacent to the ramp area.
Q. Okay. But, you were saying that the problem was they didn't report the fact that you did that? Or, are you saying they should have prevented you from doing it?
A. Absolutely. They're required to by policy, the Delta Ground Operation Manual. They simply went inside and wrote up a report and let me fly to Salt Lake.
Q. You know what? Let's -- let's back up.
Are you saying that they should have prevented you from going into the gravel?
A. No.
Q. Okay. So, they couldn't have prevented the occurrence, they should have just reported the occurrence?
A. They're required to report to me directly.
Q. Okay. So, you're not saying they should have prevented you from driving into the gravel?
A. They -- they didn't -- they wouldn't have

Page 128

been able to, making that left turn, I mean.
Q. Right. But, what they should have done was reported this to you before you took off?
A. Absolutely.
Q. Okay. And you're saying that the FAA rules are, there's an accident, then incident is below that, and then occurrence?
A. Yes.
Q. And this, in your mind, has been characterized as an occurrence?
A. No. It's been characterized as that by the FAA.
Q. Okay. But, it is something that's not just blown off. I mean, this is a --
A. No.
Q. -- significant issue?
A. No.
Q. When you said earlier that the only thing Mr. Reber said to you was there was some dirt marks on the tire, and you're saying there was no further discussion of that, did that not raise a red flag in your mind as to, whoa, we better stop the van and go and look at that?
A. No. Because --
Q. Why?

Page 129

A. -- tires are always dirty. There's always dirt on the tires from mud puddles, whatever. They're -- they've always got some smudge of dirt on them or something.
Q. But, you don't know the severity of this dirt; do you?
A. He didn't -- he didn't -- he didn't have -- it didn't seem to be a concern of his when he mentioned that.
Q. But, answer my question. When he said that and you drove off, you didn't know the extent of the dirt on that tire; did you?
A. No.
Q. And would you agree with me that when you, as a pilot in command, go and get on an aircraft, you're assuming that whoever flew that aircraft before you, if there were any safety concerns at all they would have documented that?
A. They're supposed to.
Q. Well, when you get into a plane, you're assuming that the person before you that was in charge of that plane is going to notify you of any safety concern; right?
A. Well, he's going to write a discrepancy in the maintenance log. It's electronic now. But, yes.

Page 130

I mean --
Q. Yeah.
A. -- there's continuity of flight safety.
Q. You would agree with me that the fact that this plane was not inspected before you -- strike that.
Would you agree with me that if you had noticed that there was dirt on the tires, when you look back on it, you should have investigated that; right?
A. No.
Q. Really?
A. Yeah.
Q. Just leave it?
A. It's -- it's normal.
Q. Well, you don't know the extent of the dirt on the tires. What do you mean, it's normal? You don't have any idea what was on the tire.
A. The -- the -- the dirt could have been on the tire previous to our departure. It's not --
Q. Right. But, you don't know the extent of the dirt on the tire at all and you don't think that's something you should have investigated?
A. No. It wouldn't be something that would be an issue. If the tire is inflated and -- and

Page 131

everything looks normal, the tire has a smudge of dirt on it, it's not -- it's a non-issue.
Q. And you don't think it's even something that you would have inquired of Mr. Reber as to what he observed?
A. He didn't seem concerned about it.
Q. I didn't ask you that.
A. No.
Q. Don't you --
A. No.
Q. -- think you should have inquired of him about what he means when he says there's dirt on the tire?
A. No.
Q. Even when you look back on it, after all you've been through, you don't think for a second that you should have gotten out of the van --
A. No. I do not.
Q. -- and checked the tire?
A. No. I do not.
Q. Okay. Now, as a result of this incident, you said you never flew after March 24th of 2020 for SkyWest; correct?
A. That's correct.
Q. Do you recognize, then, that the

Page 132

termination of your employment was related to this event on March 24th of 2020?
A. Yes.
Q. And that, ultimately, that resulted in you losing your job?
A. Yes.
Q. And as I understand it, there is a review board, if you will, at SkyWest for pilots?
A. Yes.
Q. Explain to me how the review board process works.
A. You have a four-member panel, a flight operations manager of some sort, which was the director of operations, another department manager, and two pilots that are on the in-house union, SAPA. You come in. You present first. The company presents. And then you rebut.
Q. And then this panel of four makes a decision on whether to uphold the termination --
A. Correct.
Q. -- reject the termination, or do something in between the two?
A. Yes.
Q. And as it relates to the two pilots, the SAPA members, they're typically captains?

Page 133

A. Not necessarily.
Q. But, they are pilots?
A. Yes.
Q. And they're not union management -- I mean, they're not company management?
A. That is correct.
Q. So, there's two company management people and two pilots.
And do you have any say in who is on the pilot side?
A. Yes.
Q. You approve the panel?
A. Yes.
Q. And they tell you who it is and then you approve it?
A. Yes.
Q. Right? And you have -- you -- have you ever utilized this review board before this situation?
A. No.
Q. And you were informed as to how that process works when this situation came up?
A. Yes.
Q. And at this event -- or this -- this meeting, you get an opportunity to explain to these

Page 134

four decision makers about what happened?
A. (Nodding head affirmatively.)
Q. And in this situation -- we'll focus on the first review board -- you explained to them that you thought termination of your employment was not fair; correct?
A. Yes.
Q. And you told me earlier that although you weren't under oath, you did testify truthfully?
A. Yes.
Q. Do you remember telling this review board that you were familiar with the airport?
A. Yes.
Q. Now, you were saying earlier that the -- the lights on the front of the aircraft, that you had them turned on when you started moving the aircraft?
A. Correct.
Q. With those lights on, when you look back on it, if you had looked down, you would have been able to see the dirt; correct?
A. Not necessarily.
Q. Would you agree with me that the airport itself is lit up, like the -- the tarmac and everything is lit up?
A. No.

Page 135

Q. Have you seen the video?
A. I have seen the video. And I've explained, you know, what you see on an image is not reflective of what you see out of the cockpit window. It was dark, completely dark.
Now, the ramp was not completely dark.
But, the illumination was not what I would consider normal on that side of the -- the end of the building, you know.
Q. Would you agree with me that when you turned to the left, you turned into the dark?
A. Oh, absolutely.
Q. Which is part of the reason that you had the lights on?
A. No. That's -- that's standard operating procedure. When you start moving the aircraft, the taxi light comes on.
Q. When do you turn it off?
A. When you stop moving. If you park the airplane somewhere, you turn it off.
Q. Like, when you -- do you fly with it on?
A. No. They get turned off after you take off.
Q. So, after takeoff --
A. Yes.

Page 136

Q. -- you turn them off?
A. Uh-huh (affirmative).
Q. Okay. You say, "I added power and I know that the power exceeded the specific limitations."
What are the limitations?
A. I can't tell you the exact limitations. I think what that statement refers to is you know if the -- if you had a little too much power, you know, just by the way the aircraft reacts.
Q. So, you think you gave it too much power?
A. Not too much. No.
Q. You said, "I'm aware of that, but it wasn't done deliberately."
A. Right.
Q. "I don't even know if it was done in need."
A. Right.
Q. So, you're saying the 75 percent was too much?
A. Do you want me to explain how that might have occurred?
Q. Sure.
A. Okay. The CRJ 200s are old aircraft. They have a friction lock on the thrust levers. Those friction locks don't always work. It's not a

Page 137

safety of flight item. Some of the thrust levers are extremely stiff. Some of them are extremely loose. So, you don't always get what you think you're getting and you make an adjustment to that.
Q. You say, "We would have corrected the decision and we wouldn't be here today."
When you say that, what you mean is, you wouldn't have been before this review board?
A. If -- if the ground personnel had done their job, we would not be here today.
Q. Well -- because you would have stopped the aircraft in the mud --
A. Yes.
Q. -- right?
A. Oh, absolutely.
Q. And when you say you would have corrected the situation, what would you have done to correct the situation?
A. I would have had the aircraft inspected. I would have left it in maintenance and dispatch's hand as to what they were doing with that piece of equipment. And we would have never flown the airplane to Salt Lake.
Q. But, you recognize that you were at the review board because you were terminated; right?

Page 138

A. Yes.
Q. And you were terminated because of what happened on March 24th?
A. Yes.
Q. Okay. You say, "I'm a little disappointed in my inability to recognize, identify, accept potentially in hindsight. I'm disappointed. I've kicked myself a little bit over this the last couple months."
Why did you kick yourself?
A. Well, because, it -- it was -- because I accept responsibility for not recognizing what had occurred. In hindsight, you can always look back and go, well, if I'd have done this or I'd done that. But, you know, I was doing everything I was trained to do. I was doing it properly. If you want to use the term, I was set up to fail because of where the aircraft was, the direction I was pushed back. I mean, I -- you know -- I mean, I still accept responsibility for -- for -- for being in that situation.
Q. And you kick yourself because you didn't recognize the --
A. Yes.
Q. -- what was going on? And you didn't

Page 139

recognize that you were in the gravel?
A. Yes.
Q. Do you kick yourself for not investigating, once you got to Salt Lake City, the dirt on the tires?
A. No. Because there was nothing -- no -- nothing to lead me to think I needed to look at anything. Because nothing had occurred.
Q. You would agree with me that termination as a result of safety violations is certainly a possibility; right?
A. Sure.
Q. You just think that under these circumstances, the decision made to terminate your employment was too harsh?
A. Yes.
Q. You don't believe that you were terminated for going in the dirt; do you?
A. I don't know why -- what their reasoning is. I can't answer that question.
Q. Do you remember saying to this board: "I'm not saying that by any means or to insinuate that this is discriminatory. I don't feel that. What I feel is I want to be afforded the same opportunity that other employees are afforded. I

Page 140

want to correct this wrong and take suitable punishment for what occurred. And let you know that will never -- it will never occur again. And by no means was it deliberate. By no means was it malicious"? Do you remember saying that?
A. Yes.
Q. You say, "I -- you know, I've always considered myself an employee and an aviator of integrity and character. I'm disappointed in myself."
Why are you disappointed in yourself?
A. Because I didn't recognize that something had occurred. Because I felt -- you know, I felt I was -- my record speaks for itself. I -- you know, it -- it's something that happened. I take responsibility for it.
But, in hindsight, after knowing what had occurred, I felt like the rampers had failed in their responsibilities and this would have never occurred.
Q. And you would agree with me that you characterize flying this aircraft after it's been through the dirt placed the lives of all the passengers and crew members on board in danger?
A. Yes. Potentially.
Q. A significant incident?

Page 141

A. No.
Q. Or occurrence?
A. Eh -- I mean, you just don't know. Fortunately not.
Q. Well, you do know that it placed lives in danger; correct?
A. Potentially.
Q. Well, what do you mean, "potentially"? I mean, it's always potentially. I mean, you -- you placed their lives in danger?
A. If there -- I didn't. Because I didn't know it happened.
Q. Okay. The -- what did happen, and flying under that circumstance, you would agree with me placed their lives, the crew members' lives, and the lives of the passengers onboard in danger --
A. Yes.
Q. -- correct?
A. Yes.
Q. Do you remember at this review board -- it was brought up by Roy Glassey, who was basically the other spokesperson at the hearing -- that there had been complaints about you and your rudeness, your bullying with other pilots, with other ground crew, and with flight attendants?

Page 142

A. I don't -- I'm not aware of that. He did say that. I was -- it was never brought to my attention.
Q. But, you heard that at this hearing?
A. Yes.
Q. Okay. Do you believe that you were negligent in any way?
A. No.
Q. Do you remember reviewing the videotape of this incident and replying that, "Now, looking at that video, I even say to myself, wow, that looks pretty dramatic"?
A. Yes.
Q. So, you would acknowledge that, reviewing the video, it looks pretty dramatic in the way that the aircraft moved?
A. Yeah. Yes.
Q. And when -- you just gave me a signal, like when it moved from right to left; right?
A. Well, the right tire was in that depression. But, when it came out of the depression, it rocked a little. But, it looks more dramatic than it felt.
Q. Would you say that your 30 years of experience, that over time you sort of -- you learn

Page 143

to have an instinct for things?
A. Yes.
Q. I mean, is that part of why you're disappointed, is that you didn't have the instinct that, look, this is more than just driving over a grate?
A. No. Because it didn't feel like that. No.
Q. Do you remember telling this board that you thought your termination was potentially somehow connected to the CARES money that the company received from the government?
A. No.
Q. Do you remember saying, "I also understand that we got 468 million in CARES package money. And that does not allow us to furlough or lay anyone off until that expires, but you can surely terminate people."
A. Yes.
Q. "If we can come up with a justification to do that, we can terminate people. I hope that's not the case here. I don't think it is. But, you know, I think it's a perfect storm for some reason. We can cut from the bottom, you know. Maybe we can cut from the top, too, if somebody makes a mistake."

Page 144

Do you believe that the termination of your employment had anything to do with the CARES package money in 2020?
A. Yes.
Q. You believe that that was the reason that they terminated your employment?
A. I don't understand the question.
Q. Do you believe that the CARES money had anything to do with the reason they terminated your employment?
A. Yes.
Q. It was a motivating factor?
A. Speculation.
Q. But, you believe that to be the case?
A. Yes.
Q. Have you ever sat on a review board?
A. No.
Q. Have you ever been asked to?
A. No.
Q. Did you -- well, strike that.
Do you believe -- or, do you think that the company believed from day one that you knew you had driven through the gravel?
A. Yes.
Q. And that's the reason they terminated your

Page 145

employment?
A. Yes.
Q. Now, at the conclusion of this first review panel, the decision of that review panel was to overturn the termination of your employment; correct?
A. Correct. Yes.
Q. And that review panel occurred -- the first one -- occurred on June 16th of 2020.
Does that sound correct?
A. Yes.
Q. And then you understand that on June 17th the review board heard the Reber situation?
A. Yes.
Q. And you understand that the review board process does not allow you to call witnesses?
A. Yes.
Q. It does not; correct?
A. Correct.
Q. It's just, you get up, you tell your story, the company tells its story, and then the review panel makes a decision?
A. Yes.
Q. So, they made their decision on the 16th and told you that decision?

Page 146

A. Yes.
Q. Then they heard Mr. Reber's testimony on the 17th, the next day; correct?
A. Uh-huh (affirmative).
Q. And it's your understanding, based on Mr. Reber's testimony, the review board concluded that you had not been truthful on the 16th; correct?
A. That's my understanding.
Q. And then your employment was terminated for not being truthful; correct?
A. That's what I assume.
Q. And then you went before a second review committee; correct?
A. I was subsequently re-terminated.
Q. Yes. And then you took that decision before a second review committee?
A. Yes.
Q. And that review committee, similar to the first -- or the same as the first, comprised of two management employees and two pilots?
A. Correct.
Q. But, they were different -- different four people --
A. Yes.
Q. -- for your second committee than the

Page 147

first?
A. Correct.
Q. And this review committee, again, was approved by you; correct --
A. Yes.
Q. -- in advance?
And it comprised of Ian Whiting, who is the -- from flight ops, he's the manager of planning and analysis; right?
A. Correct.
Q. Did you know him?
A. No.
Q. It included Jason Miller, who is the director -- or a director of maintenance.
Did you know him?
A. No.
Q. And it included, for the peer group, Brooke Lawrence?
A. (Shaking head negatively.)
Q. Don't know that?
A. (Shaking head negatively.)
Q. Is it a male or a female?
A. Female, I believe.
Q. And Lucas Rupert?
A. Don't know him.

Page 148

Q. Now, you were told in advance, before this hearing, that that's who your panel was going to be; correct?
A. Uh-huh (affirmative).
Q. And you told them that those will work?
A. Yes.
Q. You were fine with that arrangement?
A. (Nodding head affirmatively.)
Q. And you presented your case to this second panel, your termination, and this panel affirmed the termination --
A. Yes.
Q. -- correct?
A. The second termination.
Q. Yes. Did you say anything to the second panel that you believed that this was actually a situation of age discrimination?
A. Potentially. I mean, you'll have to check --
Q. No. I'm asking you. Do you recall ever telling them that you thought, hey, the real reason for this termination is my age?
A. I don't recall whether I did or didn't.
Q. Do you recall ever telling them anything about, hey, this is really discrimination based on my

Page 149

son's diabetes?
A. Possibly.
Q. But, you don't have a recollection of that?
A. Huh-uh (negative).
Q. So, your recollection is that you went in and relayed to this group of four that the termination was unfair?
A. Yes.
Q. That you thought that the punishment was beyond reasonable?
A. Yes.
Q. And that you had, in fact, been truthful?
A. Yes.
Q. And the company's position was that you had not been truthful and that your statements and your testimony was inconsistent with that of First Officer Reber; correct?
A. Correct.
Q. And you've taken the position that Mr. Reber's statements, testimony, evidence, however you say it, has been inconsistent?
A. Yes.
Q. How has it been inconsistent?
A. His IOR is factual. His statements to the FAA are factual. And at some point in time, the narrative changed.

Page 150

Q. Okay. And I'm asking you, what changed? You know, first he said the light was green, then he said it was red. That's what I want you to tell me. What -- what do you believe changed factually in his statements to anybody?
A. Well, he changed from his written statement in the IOR to normal operations, no occurrence.
His statements to the FAA, that were factual, that mirrored his IOR.
And then he comes into the review board and states that he knew about it, I knew about it, you know. In my opinion, an embellished false -- false statement.
Q. That he lied to them?
A. Yeah.
Q. Would you agree with me that it's really ultimately a decision for these four people to determine who they believe?
A. No.
Q. This review board?
A. No.
Q. If one person says the comment was made and another person says it wasn't made, ultimately this review board has to decide who they're going to believe; right?

Page 151

A. Uh-huh (affirmative).
Q. Right?
A. Correct.
Q. And if this review board ultimately concluded that they did not believe your story when you said I've completely told the truth --
A. That's in --
Q. -- they didn't believe that?
A. That's incorrect.
Q. What do you believe?
A. On the 16th they made a decision, unanimously, in their own words I quote: Captain Chappell did not know that his aircraft had entered the -- they were unanimously convinced that he did not know that this had occurred and, therefore, had not violated the policy.
Q. But, it was before they had the testimony of the person who was also there --
A. They weren't supposed to hear his review board. That was relayed to me by HR. Each employee gets an independent review of his termination. Not of the event, the occurrence, or anything else. They get an individual review. I -- I don't believe the review board members even saw his IOR.

Page 152

Q. The first review board?
A. His review board on the 17th. They didn't -- they weren't -- they weren't provided that information, so they didn't know he had changed his story. And that was propagated by the company.
Q. Now, you took the position in the second review board that Mr. Reber had changed his story --
A. Uh-huh (affirmative).
Q. -- right?
A. And produced evidence.
Q. Exactly. And, ultimately, those four people unanimously agreed that your termination was appropriate; correct?
A. Yes.
Q. Okay. Do you have any reason to believe that this panel, who you've told me, the four people -- I'm focusing now on the second panel -- these four people, Ian Whiting, Jason Miller, Brooke Lawrence, or Lucas Rupert -- well, let me ask you this. Ultimately, would you agree with me, they are the decision makers of you being terminated?
A. No.
Q. Well --

Page 153

A. Their decision can be overrided by upper management one way or the other.
Q. Yes. Okay. Let me back up.
So, you're terminated by the company?
A. Correct.
Q. You then have the opportunity to appeal that decision --
A. (Nodding head affirmatively.)
Q. -- to a review board of four people that we've talked about?
A. Correct.
Q. And the review board in your situation was Ian Whiting, Jason Miller, Brooke Lawrence, and Lucas Rupert?
A. The second review panel.
Q. And they had an opportunity -- well, you had an opportunity to tell them everything you knew about why you shouldn't be fired --
A. Uh-huh (affirmative).
Q. -- right?
A. Uh-huh (affirmative).
Q. You have to say, "yes."
A. Yes. Sorry. Sorry.
Q. No. I --
A. You were shaking your head and I'm shaking

Page 154

with you.
Q. It's not easy.
So, you had an opportunity to present to them all of the evidence you had to say my termination is not correct, like I should not be fired for this --
A. Yes.
Q. -- right?
A. Yes.
Q. And this group of four people unanimously disagreed with you?
A. No.
Q. Tell me what --
A. It was a three-one decision. I don't know who voted which way. Doesn't matter.
Q. Who told you it was a three-one decision?
A. HR.
Q. So, you understand that the majority of the people in that review process agreed that termination of your employment was proper?
A. Yes.
Q. And although the company does have the authority to override that decision, in this case, the final decision makers was -- the final decision maker was this committee; correct?

Page 155

A. In the second review board, yes.
Q. Yes. The second review board made the final decision that your employment should be terminated; correct?
A. Yes.
Q. Why do you believe that your employment was terminated?
A. For the occurrence that had happened on the 24th of March.
Q. Any other reason?
A. No.
MR. SHULTZ: Do you mind if I look at your screen to see that testimony? If you can go back just -- right there.
Q. (By Mr. Shultz) I'm going to show you a series of exhibits that are policies I just want you to sort of acknowledge that you're familiar with or not familiar with.
(EXHIBIT 1 WAS MARKED.)
Q. (By Mr. Shultz) I'm going to mark this as Exhibit 1 to your deposition.
Here, sir.
MR. JONES: Thank you.
Q. (By Mr. Shultz) Do you recognize that policy?

Page 156

A. After reading it, yes.
Q. And these policies like this, like this Code of Conduct, when you're employed by SkyWest, do you have access to that information?
A. Yes.
Q. It's like through an intranet? Or, how would you find it?
A. I believe it was on our -- our electronic flight bag, within our documents and stuff.
Q. Because every pilot is issued -- is it a laptop or an iPad?
A. It's an iPad.
Q. IPad?
A. Uh-huh (affirmative).
Q. And you think that on the iPad all these policies --
A. Should be.
Q. -- are there? Okay.
So, if you wanted to review the policies, they were available to you?
A. Yes.
Q. Okay. And no reason to believe that this is not a policy of SkyWest; right?
A. No.
Q. Okay.

Page 157

(EXHIBIT 2 WAS MARKED.)
Q. (By Mr. Shultz) I show you next what I've marked as Exhibit 2 to your deposition.
Kind of the same questions, are you familiar with that policy?
A. Okay. Yes.
Q. Basically what it says -- if you'll go to the third page, I think I've got a highlighted section.
A. Okay.
Q. It's saying there, employees who are involved in any internal investigations are required to participate in good faith by providing transparent and honest information.
A. Uh-huh (affirmative).
Q. And by not taking any steps to interfere with the investigation.
A. Yes.
Q. Right? And then on the last page, Corrective Action, it just says that if an employee violates this policy, that's something you can be fired for?
A. The last page?
Q. Yeah. I think I've even highlighted it.
A. Okay.

Page 158

Q. It just says you can be fired for violating this policy; right?
A. Yes.
Q. And you recognize that this policy is one of the bases for their final termination of your employment; correct?
A. I did not understand that.
Q. Okay. But, no reason to disbelieve that; right?
A. Yes.
Q. Okay. That's one of those weird ones. No reason -- I gave you a false --
A. Yeah. I -- I picked up on it. Yeah.
Q. Any -- you have no reason to believe that that's not a policy they -- they relied upon for the termination of your employment; correct?
A. Correct.
Q. Okay. Thank you.
(EXHIBIT 3 WAS MARKED.)
Q. (By Mr. Shultz) I show you next what I've marked as Exhibit 3 to your deposition.
Do you recognize that as being Pilot Rules of Conduct?
A. I see that on the top of the page, yes.
Q. Okay. And, again, this appears to be one

Page 159

of those policies that you had loaded on your laptop -- or on your iPad; correct?
A. Yes.
Q. Okay. And, you know, one of the things that it says for number three is: "Pilots will use checklists and follow company policies and procedures at all times."
A. Yes.
Q. You agree with that?
A. Yes.
Q. Number 12 says, "Pilots shall cooperate fully with other members/employees of the flight operations department and other departments within the company, as well as other agencies and businesses the company does business with."
A. Yes.
Q. And then 18 says, in part, "Full cooperation is necessary when asked to provide information to the company in its investigation."
And you would agree that if the company is doing an investigation and asks for information from you, you have -- you are obligated to provide them with full, complete, honest information?
A. Yes.
Q. And that if you don't, the company has --

Page 160

well, the company has the right to terminate you anyway. But, you recognize that this policy says that if you don't comply with that, they can terminate your employment?
A. Yes.
Q. And then 25 says, "Pilots will submit only true and accurate information on all company records and reports."
A. Yes.
Q. That's necessary and fair; right?
A. Yep.
Q. Reasonable?
A. Yes.
Q. Then it says, "31. Improper or negligent behavior while on company property or in other work-related circumstances will not be allowed."
A. Yes.
Q. Do you see that?
A. Yep.
Q. And you recognize on this last page, where it says, "8. Falsifying company records or reports," or, "10. Willful or deliberate violation of any organizational policies and procedures," you recognize that's like an immediate termination issue?
A. Yes.

Page 161

Q. Okay.
MR. JONES: Chad, if we're going to go through documents, can we take a quick break?
MR. SHULTZ: Sure.
THE VIDEOGRAPHER: Going off the record. The time is approximately 2:06 p.m.
(Break taken at 2:06 to 2:20 p.m.)
THE VIDEOGRAPHER: Returning on the record.
2:20 p.m. is the time.
Counsel.
(EXHIBIT 4 WAS MARKED.)
Q. (By Mr. Shultz) I show you what's marked as Exhibit 4 to your deposition.
Do you recognize that as being a policy of SkyWest?
A. Yes.
Q. And is that one of those, too, that you're not familiar with the specifics, but you recognize that it was available to you on your iPad?
A. Yes.
Q. Okay.
(EXHIBIT 5 WAS MARKED.)
Q. (By Mr. Shultz) I show you next what I'm going to mark as Exhibit 5 to your deposition.

Page 162

Now, Exhibit 5, this is the appeals procedure that we were talking about before --
A. Yes.
Q. -- is that right?
A. Yes.
Q. And I assume that at some point you were made aware of this policy and read through it?
A. Yes.
Q. Yes. And -- and do you have any issue with the way that the board procedure was set up or handled in your case?
A. Yes.
Q. Okay. And what is that?
A. Well, the review -- the initial review board that I had unanimously reversed the termination --
Q. Okay.
A. -- said I should be reinstated. And then that same panel was used the following day, with my co-worker. I feel that was not appropriate.
Q. Where does it say in Exhibit 5 that that's not a proper procedure?
A. It -- it doesn't say it is or isn't in this policy. But, what was conveyed to me, from the HR representative, was that's how they conduct it.

Page 163

Q. That it would be an independent --
A. Yes.
Q. -- review board?
A. Yes.
Q. Okay. And -- and is that your only issue with the review process?
A. With the -- with the initial review board that I had, the first one on the 16th, yes.
And then --
Q. Okay. What about the second one?
A. The second one, the two pilots that were on the review board are junior to me. They're not peers. They benefit from my -- from me leaving the company. So, that -- that's, to some degree, a problem.
Also, the fact that -- yeah. That's -- that's all, the only problem I have.
Q. Now, with that, you had the opportunity to do some background investigation on these two pilots that were on the review board before you approved them; right?
A. They were all junior to me, Chad. So...
Q. So, you were informed of who they were and you approved those panel members. And you're saying now that your issue is you think they were somehow

Page 164

biased, because by getting rid of someone with more seniority, they automatically -- it benefits them?
A. Sure.
Q. Is that right?
A. Yes.
Q. Okay. And -- and that's your only issue with that second board; right?
A. Yes.
Q. Okay. And I think I've got one more to show you. I'm going to mark this as Exhibit 6.
(EXHIBIT 6 WAS MARKED.)
Q. (By Mr. Shultz) Do you recognize Exhibit 6 as being a policy of SkyWest?
A. Yes.
Q. And same as the other questions I asked you about, your -- you had access to it, even if you're not familiar with it?
A. Yes.
(EXHIBIT 7 WAS MARKED.)
Q. (By Mr. Shultz) Is what I've marked as Exhibit 7, is that -- is that a picture of an RJ 200, like --
A. Yes.
Q. -- you were flying that day? It is?
A. Yes.

Page 165

Q. Okay. Now, you recognize that the safety department at SkyWest also did an investigation in this matter?
A. Yes.
Q. Have you ever had a chance to review that --
A. No.
Q. -- report?
A. No.
(EXHIBIT 8 WAS MARKED.)
Q. (By Mr. Shultz) I show you next what I've marked as Exhibit 8 to your deposition.
Do you recognize that as the safety report related to the incident at St. George?
A. Okay.
Q. But, you're saying you've never seen this before?
A. It may have been sent to me. I haven't reviewed it.
Q. Okay. And, so, on the front page, again, is a picture of the aircraft; right? Or, an aircraft similar --
A. Yes.
Q. -- to the one you were flying?
A. Yes.

Page 166

Q. And then the second one shows -- or, the second -- on the first page, but the second diagram shows your flight pattern from St. George to Salt Lake?
A. Yes.
Q. If you look on the third page, does that depict, like, where the aircraft was parked in relation to the terminal in St. George?
A. No. It -- it shows the terminal. It's not detailed enough to depict --
Q. Okay.
A. -- exactly where.
Q. Let's look to the fifth page then.
A. All right.
Q. On the bottom it says, "SkyWest" --
A. Yep.
Q. -- "522," does that look accurate?
A. Yes.
Q. And what they're saying -- or what they're showing here is where the aircraft was parked, and then it was moved back, and that's when it shows you making the 270 degree turn; right?
A. Correct.
Q. Then the next page is -- as far as you know, that's an accurate depiction of the tracks that

Page 167

were left in the gravel?
A. Based on what they've said. I mean, I don't know that those tracks weren't there prior to me taxiing out.
Q. Okay. And you see there is a yellow reflective line, two of them on this picture; right?
A. Actually, that -- that -- that paint was not reflective. It was just yellow.
Q. Okay. And then on the next page, there's another photograph.
A. Uh-huh (affirmative).
Q. And that also shows, like, the line; right? And it shows the tracks in the dirt?
A. Uh-huh (affirmative).
Q. And this would show, does it not, that both the front wheel -- or front tire and the back went through the -- you referred to it as "gravel"?
A. The dirt. Gravel, dirt.
Q. And you see the tracks there?
A. Yes.
Q. And then on the next photograph, it's showing what you've referred to as the "grate"?
A. Yes.
Q. And would you agree with me that this picture anyway, makes it look like the dirt is pretty

Page 168

equal to the level of the grate?
A. (Nodding head affirmatively.)
Q. So, really, the thrust was required because you were in the mud; right?
A. No. The -- what the picture doesn't show is how it's grated, it's grated so that water will run into this grate. So, there is a -- there is a gradient to that slope that's not depicted in the picture.
Q. Well -- but, that would mean that the dirt surrounding it is higher than the cement on the grate, otherwise the water would pool up when it got to the cement; right?
A. That's correct.
Q. Okay. So, that -- that would show that -- what I'm trying to say is, isn't it true, when you look back on this, that the thrust you needed was to get out of the mud, not to get over a grate?
A. No.
Q. Okay. Then when we look to the next page, last page there, are you familiar with charts like this?
A. No.
Q. Never saw one?
A. Huh-uh (negative).

Page 169

Q. Now that you do see it, do you recognize that the chart there is showing the thrust that was used? And it shows that the thrust was up at, like, 75 percent?
A. Uh-huh (affirmative).
Q. And then it went way back down?
A. Right.
Q. And you continued to taxi at 25 percent.
A. Okay.
Q. What were you saying earlier, that you taxi at 68 percent?
A. N2. N2. This is N1. N2 is at the that -- at the level -- at the numbers I gave you before.
Q. What do you mean by that?
A. There's two different readings off the engine. N2 is a different compressor section. N1 is fan speed.
Q. Okay. Well, let's look at N1.
MR. EMERSON: N1. N2.
THE WITNESS: But, this is N1.
Q. (By Mr. Shultz) Okay. Well, yeah, they both say, "N1, Engine N1."
So, is there a dial on your -- a gauge that you have access to that shows you --

Page 170

A. Sure.
Q. -- what that is?
A. Yeah.
Q. And, typically, when you're taxiing, at least according to this, it looks like you taxi at 25 percent; right?
A. To get the aircraft moving, it could be upwards as high as 75 percent.
Q. Yeah. Once you get to the runway?
A. No, no, no. To get the aircraft moving, even from it being stopped, it could take -- it's going to take more than a rolling N1.
Q. Well, let's -- let's look at the diagram. I mean, I'm not -- I'm not a scientist, but --
A. Right.
Q. -- this thing shows that you started moving --
A. Uh-huh (affirmative).
Q. -- and you got up to 25 percent?
A. Uh-huh (affirmative).
Q. And then you jumped all the way up to 75 percent, then you immediately went back down to 25, rolled on 25 until you got to the end of the runway, and then you took off at 78 percent?
A. That -- that is inaccurate.

Page 171

Q. Well, look at the top line. It shows your -- your altimeter and it's showing that you were -- you were -- you were running that engine --
A. Well, that's -- that's -- no. The N1, if you look at the line, would be up over 90 percent. You got 75, 80, 85, 90, 95, 100 percent N1.
Q. Okay. So, you were over 90 to take off?
A. Oh, yeah. Yeah. And then the --
Q. But, you were 75 to get out of the dirt?
A. The initial line there, we haven't started moving yet. When it starts going up beyond 25 percent is when we started the turn.
Q. Well, you were running at 25 percent for awhile here. Then you spiked it. And then you went back to 25 until you got to where you were going to take off?
A. That's correct.
Q. So, what were you saying about 68? You're saying that's not an N1 number?
A. The numbers I quoted before were N2 numbers.
Q. Well, let's stick with N1. Because I'm --
A. Yeah, yeah, yeah.
Q. -- not that smart.
A. That's fine.

Page 172

Q. Okay. So, N1, what is your -- what is your thrust number at N1 when you're just taxiing?
A. So, it appears to be 25 30 percent.
Q. Okay. And isn't part of the reason that you would keep that thrust down is you don't want those engines sucking anything up that's on the tarmac; right?
A. Potentially.
Q. And if you're still where they park planes and drive buggies and throw suitcases and all, there's still -- there's an opportunity there, more than on the runway, that you could pull something up; right?
A. Potentially.
Q. And, like, I'm trying to think of -- like, when you're running at 25, you're up about an inch on the lever; aren't you?
A. I -- I don't know. It's up a little.
Q. Well, you've been doing it 30-something years; right? What do you mean you don't know?
A. I understand. I did explain to you the thrust lever quadrant in the RJ, which I thought would be helpful. But, I don't think you quite understood me. I mean, it's -- it's -- this wasn't a deliberate act. It was just a bump them up and bring

Page 173

them back. That's just what we ended up getting out of it.
Q. Show me -- like, based on this, okay, like in realtime, as best you can, sitting there -- we've got this on video --
A. Yeah.
Q. Like, show me -- put your right hand out there and you show me, okay, from the time -- and we'll try to do this by how long it took. And -- and what I want you to do is kind of go through, okay, well, I started out, then we started moving, I'm up here.
A. Uh-huh (affirmative).
Q. And then I -- and then walk me through that. And we won't -- I'll -- I'll -- I'll stop talking. I just want to sort of demonstrate -- we've already got it on video. Demonstrate to me at what point you thrust up and then show me with your hand, like, when you came back down.
A. I don't know if I can demonstrate that as an honest depiction of what occurred that morning. It just -- you know -- I mean --
Q. Best recollection.
A. Like I said, you -- you -- you walk the throttles up, the aircraft starts moving, you need a

Page 174

little more thrust, you give it a little more pressure. And if -- if the throttles are stiff or not stiff, you may get more than you bargained for. So, they might jump up. You pull them right back. And that's what occurred.
Q. Okay. Let's do this, though. So, without -- I mean, it doesn't have anything to do with what's on that paper. Just as best as you can recall, from the time you started moving, walk me through the motion you would use with your right hand until you got to taxiing out to the run way. Show me that. And do it in realtime.
A. (Witness demonstrating). That's about it.
Q. Well, at one point you must have goosed it up?
A. Well, the -- the -- if the aircraft is not moving, you give it a little more thrust.
Q. Well, we know that you did here?
A. Yeah.
Q. So, show me in realtime. Like -- okay. So, you start moving. It takes 10, 15 seconds. I'm going around. I get stuck. I juice it. I come -- I mean, do that --
A. I'm not able to reenact that for you without --

Page 175

Q. Why?
A. -- without throttles in my hand. Because it's just a -- it's an assumption of this is what I did. There's no friction there. There's -- there's no engines running. It's impossible to demonstrate to you that.
Q. Okay. All right. Any reason to believe that this report was not done in a fair manner, this inspection?
A. The report itself, I can't answer that question. No.
Q. No reason to believe it's not --
A. I can't -- no. I can't --
Q. -- fair?
A. -- answer the question. I wasn't involved in the investigation.
Q. That's all I'm saying. Like, as you sit here today, you don't have any knowledge that there's anything unfair, unreasonable about how this was investigated?
A. Other than statements made, I have no -- I don't know.
Q. Okay. Well, tell me what you mean by that.
A. There were statements made by the safety

Page 176

department that indicated that -- that they believed -- they believed that we knew it occurred.
Q. Tell me what statements.
A. That -- that's the statement. They believed -- they believed we knew it occurred. They -- they didn't -- you know, that was -- that was said early on in this -- in this whole process by a number of people, that the company -- the company believed you knew it happened and did it anyway. So, I'll leave it at that.
Q. Well, I think it's fair to say that you're the only one who says that you didn't know it; right?
A. No. Justin said that, too. Scott Miller said that. They've all said. That's what was told to the FAA. That's what was put in writing.
(EXHIBIT 9 WAS MARKED.)
Q. (By Mr. Shultz) I show you what's marked as Exhibit 9 to your deposition.
Do you recognize that as the IOR that you created on March 25 of 2020?
A. Yes.
Q. Are you aware of any other IOR that you ever created related to this incident?
A. No.
Q. So, this is the only one?

Page 177

A. Uh-huh (affirmative).
Q. Right?
A. Yes.
Q. And this is your only written statement related to that incident?
A. Yes.
Q. Now, this says that if you would have known that you were in the gravel, you would have returned to the gate?
A. That's just a -- that's just a statement. Meaning, we were at the gate. Even though we're in the gravel, we're at the gate. We would have just discontinued the operation at that point.
"Return to the gate" is an industry phrase, in other words. So, if something would have happened while we were taxiing, a passenger fell down, something would have discontinued the safe operation of the flight, we would have returned to the gate. So, that's just an industry statement.
But, in that situation, if they would have told me to stop, I would have shut the airplane down because they told me to stop. And then I would have -- they would have walked up the stairs and said, "You're in the dirt." And, so, that's where we would have remained.

Page 178

(EXHIBIT 10 WAS MARKED.)
Q. (By Mr. Shultz) I show you what's marked as Exhibit 10.
Have you ever read this statement before, which is a statement by Mr. Reber to the safety -- as part of the safety investigation?
A. I've run through some of it this morning.
Q. This the first time you've seen it, was this morning?
A. Do you have a date on this?
Q. I don't see a date on there.
The question was: Have you seen it prior to this morning?
A. No.
Q. That was the first time you ever saw it?
A. This morning, yes.
Q. What did you think of it when you read it?
A. It's a fabricated lie.
Q. That Reber's testimony --
A. Potentially scripted. I would say scripted.
Q. Scripted by who?
A. Don't know. But, I -- I heard -- I heard his audio recording at the review board and he don't talk that way.

Page 179

Q. What's that mean?
A. I've known -- I've known the man for over ten years. He grew up in Wells, Nevada. He doesn't speak that way.
Q. What would be a reason for Mr. Reber to fabricate?
A. To get his job back.
Q. You think that he would lie about what happened in an effort to get his job back?
A. Yes. Well, I -- I don't think he would. I know he did. I was there. I was there.
Q. If he was going to lie to get his job back, wouldn't the best lie be I had no idea we were in the dirt?
A. That's not a lie. That's a fact.
Q. I know. But, if he's going to say anything, why wouldn't he say -- I mean, if he's trying to just get his job back, why wouldn't he say, "I had no idea we were in the dirt"? Wouldn't that be better than I knew we were in the dirt and I didn't stop the flight?
A. Those were the facts. Those were the facts that he stated in writing to the FAA, yes.
Based on what I've read here, I don't know how he got his job back. Because this basically

Page 180

incriminates him for the company's assumption from day one. What the company believe occurred, he supported in this narrative.
Q. Do you have any reason to believe that he would lie in an effort to get you fired?
A. No.
(EXHIBIT 11 WAS MARKED.)
Q. (By Mr. Shultz) I show you what's marked as Exhibit 11.
Do you recognize that as being the IOR that Mr. Justin Reber submitted?
A. Yes.
Q. And you've seen this before?
A. Yes.
Q. In fact, you saw it on March 25th; right?
A. I didn't see this.
Q. You did not see his IOR?
A. Absolutely not.
Q. Do you remember telling him in a text message on the 25th that you had just reviewed his -- you just submitted yours and they're almost exactly the same?
A. No.
Q. "Let me know if you hear anything else"?
A. No.

Page 181

Q. That was not a text message from you on March 25, 2020, at 6:35 p.m. to Mr. Reber?
A. There was no way for me to look at this.
Q. Are you saying --
A. It's his portal. I don't know what that text message says. But -- yeah, I don't know what -- what that text message says.
Q. It's your testimony that on text message on March 25 of 2020 you did not review his IOR?
A. No. It had already been uploaded. I can't get into his portal. So, I don't know what that's referring to.
Q. So, it's your testimony that you did not have on the screen of your phone --
A. That's correct.
Q. -- via text message his IOR before --
A. I don't --
Q. -- before you submitted yours?
A. No.
Q. And that if I have text messages in my hand that are from Mr. Reber's phone showing that you did and that you said to him: "Cool. Just submitted mine. Almost exact same" --
A. Then -- then -- then I -- then he sent me a screen shot. But, I couldn't look it up on the --

Page 182

on the --
Q. So, you remember seeing a screen shot?
A. I didn't know -- I -- I -- it's a long time ago. I don't know exactly what was texted. All I know is the text messages that I had or that I've submitted as evidence, I don't recall ever seeing a screen shot of a text message of an IOR. I remember him saying, "I've already uploaded it. I can't pull it back up again," in his text message.
Q. Why would you say to him: "Cool. Just submitted mine. Almost exact same."
A. That would --
Q. "Let me know if you hear anything else"?
A. That would -- that would -- that would say that I had an opportunity to look at a screen shot.
Q. You did look at a screen shot on your phone of his IOR; didn't you?
A. Must have. Must have.
Q. Why did you deny it when I asked you earlier?
A. Because I didn't --
Q. Why did I have to show you that I've got it --
A. I didn't remember -- I didn't remember seeing a screen shot of an IOR.

Page 183

I do remember him telling me I can't -- I can't access it. I do remember that.
Q. And you remember calling him three times and texting him repeatedly because you wanted to get with him so your stories could match; correct?
A. Absolutely not. No. But -- but, it is normal procedure, when notified of an incident or occurrence, that the crew gets together and briefs or debriefs what had occurred.
And, in fact, by Mark Richards telling him not to speak to me, he interfered with the normal protocol of putting together the facts of an occurrence or incident.
Q. Do you mind -- do you mind -- do you remember telling him in text: "Send me yours so I can compare it to mine"?
A. Yes. Oh, yeah.
Q. Why?
A. Because that's normal.
Q. And then you took a text -- you took a snapshot of yours and sent it to him?
A. If you have --
Q. Or did you just look at this?
A. I don't know. If you have a snapshot. I can't remember. It's two and a half years ago.

Page 184

But, that's -- that's what any crew does all the time. Period.
Q. Do you remember telling him: "I'm not worried at all"?
A. Yeah. I'm not worried. We didn't do anything wrong. There's nothing to be worried about. I was surprised that we were even -- that it had occurred and that we were notified.
Q. Do you remember him telling you the next day, after you continued to ping him with text messages, "Mark just called me and I have to have a conference call with him"?
A. Safety department, yes. I did tell him that.
Q. "He advised me not to talk with you and over think this."
A. Yes. He -- he that's his text message. Right.
Q. Because when I asked you earlier if you had any communication with him, you told me no.
But, now, you're saying you saw his IOR?
A. I didn't remember seeing a screen shot of his IOR. I do remember not being able to access it. Because he told me, "Go look at it." And then he said, "I can't access it anymore."

Page 185

So, I don't -- I didn't recall seeing a screen shot of it.
And just so you understand, none of this is abnormal. It's just your perception or whoever's perception. This is normal operating practice. It's the way it's done. A lot of times those IORs are written together. Because everything in the airline industry is done in a crew format, from briefings, to debriefing, to IORs, to everything.
But, from the initial day of this event, the company didn't handle it like they normally do. They didn't tell me not to speak with him. They told him not to speak with me. So, me trying to contact him to get the facts straight is not abnormal. It's completely normal.
Q. Do you have any evidence to support a conclusion that the termination of your employment was because you're over 40 years of age?
A. Evidence? Not that I'm aware of at this present time.
Q. Do you have any evidence to support a conclusion that your employment was terminated as a violation of the Americans with Disabilities Act?
A. Yes.
Q. What is that?

Page 186

A. When I was reinstated on June 16th, I repeatedly called the benefits department to get my son's diabetic supplies. And it took them over three weeks to get me fully reinstated, when I was reinstated as of the 16th of June. That decision was made. I told them how critical it was that I got these supplies for my son. And they continued to drag it out and drag it out and drag it out.
There was also a -- my wife had a procedure in August. This isn't disability. This pertains to benefits. Are you interested? I won't go on if you're not.
Q. Well, let's take them one at a time.
A. Okay.
Q. So, as far as ADA, which is the Americans with Disabilities Act, you told me that the evidence you have to support a conclusion that the ADA was the -- was the motivating factor for your termination is that after you were initially reinstated on June 16th, it took the company over three weeks to get you back on the insurance run; is that right?
A. Yes.
Q. Do you have any other evidence to support a conclusion that the Americans with Disabilities Act was violated?

Page 187

A. By them withholding the insurance from -- so that I could get his desperately needed supplies, yes, I feel that's a violation.
Q. Is there anything else?
A. Not pertinent to that.
Q. Well, pertinent to the termination of your employment is what I'm looking at.
A. Well, as it relates to benefits --
Q. We'll get to that in a second.
A. Okay. Okay. Okay. That's fine.
Q. As far as the Disabilities Act --
A. Not that I'm aware of at the present time.
Q. Okay. Now, the benefits, let's talk about that. And that's part of your claim.
So, tell me what evidence you have that your health insurance benefits played any role in the termination decision related to your employment?
A. Well, my -- my son and my wife's medical conditions --
Q. Uh-huh (affirmative).
A. -- were very high cost. We cost -- we cost -- and I don't have the exact number, but a very large amount to SkyWest Airlines.
Q. How much is a "very large amount"?
A. I couldn't tell.

Page 188

Q. Just generally. A couple million?
A. Well, over the course of 15 years, I have know idea. I know my costs, my premium and co-payments, were 10,000, 11,000 a year. So, I would suspect theirs were in excess of that.
And I believe SkyWest is self-insured up to a certain point. Mr. Emerson can address that.
But, yeah, I was a -- I was a high cost employee.
Q. Was your -- when was your son diagnosed with his diabetes?
A. When he was 18 months. So, 17 -- over 17 years ago.
Q. So, for 17 years SkyWest was the health insurance provider for your family?
A. Yes.
Q. And over those 17 years --
A. Well, 14 years.
Q. Okay. 14 years, your -- you received benefits -- health insurance benefits for your son in the treatment of his diabetes?
A. Yes.
Q. And you're saying that that would have been expensive during that entire 14-year period?
A. Extremely.

Page 189

Q. Okay. And -- so, I'm trying to figure out then, what changed in, say, June of 2020, over the 14 years previous, when they paid those without any issue?
A. I -- I have no -- I can't -- I can't answer that question, you know.
Q. It's not like your son all of a sudden started incurring huge expenses. You're saying that had occurred over 14 years; right?
A. Yeah. Operational audit at the time of Covid. I have no idea.
Q. Okay.
A. Assumptions.
Q. Okay. So, it is just based on an assumption that my son's medical condition was expensive and, therefore, the company decided to eliminate that expense by terminating my employment?
A. Just a mitigating factor.
Q. Okay. And it's just based on the information you've given me, it's an assumption that that would be a way to save money?
A. Kind of like their assumption of what had occurred that morning. They're all assumptions.
Q. And you said something about your wife having some procedure in August?

Page 190

A. Yeah. I was terminated August 5th. And under the federal law, my insurance runs through the end of August.
Q. Okay.
A. She had a heart procedure, a $27,000 bill, and it was never paid.
Now, it -- since -- recently I think has been paid by SkyWest. But, it was there for two years not paid. And I even -- I even called the benefits department. I even said, hey, this bill needs to be paid. But, obviously, once I was terminated, they -- they weren't addressing it.
Q. But, what I want to talk about is --
A. It went to collections.
Q. -- evidence that you have that that medical bill in August was a motivating factor in terminating your employment?
A. No. It's --
Q. It wasn't?
A. It's just -- it's not a motivating factor in August. I was already terminated.
It just goes to show --
Q. So, you were terminated before she even had the surgery?
A. Yes.

Page 191

Q. So, her surgery, you would agree with me, and the bills associated with that surgery, couldn't possibly be a --
A. Did not contribute.
Q. -- motivating factor in your termination?
A. No.
Q. Okay.
A. No.
Q. And then we already talked about your son.
Is there any other benefit-related correlation between your termination and benefits?
A. Not that I'm aware of.
Q. Okay. And I think you've got a claim asserting that the company breached its contract -- do you want us to close that other window or are you digging the sun?
MR. JONES: We can close it. I was going to wait for a break.
Q. (By Mr. Shultz) I think you had a claim saying that the company breached its contract. What contract is that?
A. I'm not -- I'm not aware of that complaint myself.
Q. Okay. Or, that the company somehow acted fraudulently?

Page 192

A. Yeah. I believe that to be true.
Q. What did -- what did they do that was fraudulent?
A. The -- the -- the collusion between management and Reber for --
Q. Yeah. Tell me about that collusion theory. What -- what is -- what is that?
A. Well, one would have to assume that there was excessive communication between Mark Richards, potentially Scott Carr, the safety department, and Reber prior to review.
Q. One would have to assume? But, do you have any evidence that there was?
A. Well, the -- the text messages stating that "Mark has advised me not to speak with you."
Q. Anything else?
A. The text messages saying, "Sorry I couldn't talk to you. Mark had been helping me and I didn't want to lose his trust."
Well, I wasn't receiving any help from Mark Richards. I wasn't told not to speak to Reber. Only Reber was told that. And I'm entitled as an employee to the same treatment that he gets. Otherwise, you could say, potentially, they're discriminating against me, for whatever reason.

Page 193

But, yeah, I think that -- knowing this man for as long as I have and knowing what the facts are that occurred that morning, and seeing his IOR, this completely contradicts his IOR.
Q. When you say, "this," you're pointing to Exhibit Number 10?
A. Exhibit 11 -- Exhibit 10 contradicts Exhibit 11.
Q. Okay.
A. 11 was the written form when the investigation started. And his verbal statements to the FAA are a matter of record. And they are consistent with what I told the FAA. He and I never spoke personally over the phone. There were a few text messages regarding this in particular in the very beginning, because that's what would normally occur. But, Mark had told him not to speak to me about it.
Okay. Then this comes out. And I believe the date on this is --
Q. When you're saying, "this," you mean Exhibit 10?
A. Exhibit 10. I believe I saw a date on this exhibit of April -- I -- I can't -- I can't answer that without referring to it. But, this

Page 194

came -- this came considerably later.
Q. And it's your conclusion that there was collusion between someone in the company or several people in the company and Mr. Reber?
A. Yes.
Q. And have you told me all of the evidence that you're aware of that would support this collusion?
A. Well, the text messages that I -- that I described.
Q. Yeah. Okay. Anything else?
A. Not that I can think of at the present time.
Q. Have you figured out, like, a motive for why they would collude?
A. No.
Q. Or conspire?
A. (Shaking head negatively.)
Q. No? You don't know why they --
A. No.
Q. -- would do that?
A. No.
Q. You initially sued Todd Emerson. Why?
A. Collateral damage. I don't know. I don't know why he was a named defendant personally.

Page 195

Q. Do you know why you sued Mark Richards?
A. Yeah. He's named -- he was named as a defendant.
Q. Why? Why did you sue --
A. Because of his actions that didn't align with his duties as a chief pilot.
Q. What did he do that didn't align with his duties --
A. He told -- he told another employee not to speak to me.
Q. Anything else?
A. Just what the text threads show.
Q. No. But, is there anything else that you're aware of other than him telling Mr. Reber not to speak with you?
A. Him not providing assistance to me as one of his pilots, when I was fully aware that he was providing assistance to my co-worker.
Q. Anything else?
A. No.
Q. And, in fact, when you were terminated, Mr. Mark Richards was in the office with you; right?
A. That is correct.
Q. And do you remember saying to Mark on the way out, "I know you did everything you could for

Page 196

me"?
A. No. I did not say that.
Q. So, if a witness to that conversation supports that claim and says that you did, in fact, say that on the way out, you're saying that's not true?
A. I don't recall him saying that. I -- I recall -- I recall me saying to him that I -- this didn't happen the way they made it out to happen. This is all, you know, wrong. I remember saying that to him.
Q. Who is Scott Carr?
A. Scott Carr was also in the room, but was not with us when we walked out of the room. He's the assistant chief pilot.
Q. And you believe that when you were escorted out of the room --
A. By Mark Richards.
Q. -- you did not say to Richards, "I know you did everything you could for me"?
A. I don't recall saying that, no.
Q. Could have, you just don't remember?
A. Don't remember.
Q. Do you think --
A. Mark was a friend of mine. We played golf

Page 197

together.
Q. Any reason to believe that he's not still a friend?
A. Oh, he's definitely not a friend of mine anymore.
Q. Why not?
A. Because he didn't stand up for me. He stood up for Reber. He didn't stand up for me.
Q. In fact, in this investigation, Mr. Richards really didn't play any role, he handed all that off to Roy; correct?
A. I understand who had the roles in this.
Q. And you understand that Mr. Richards did not play a role in it; correct?
A. Well, he plays a role in -- in the facilitating of the investigation, of managing myself and Richards. He's the chief pilot. So, yeah, he -- he had a role in -- in -- in this investigation, collection of evidence.
But, in the final determination, no, that was Roy Glassey that terminated me over the phone.
Q. You don't think that in this situation Roy said to him, "Look, you just started this job, let me handle this"?
A. Potentially could have happened.

Page 198

Q. You don't know?
A. I don't know that. I wouldn't be privy to that information.
Q. And you understand that Roy is his boss?
A. Yes.
Q. Did you have -- do you have any issue with Roy?
A. Haven't. He's junior to me. I have no -- I had no issues with Roy.
Q. You have an issue with him now?
A. Yeah.
Q. What?
A. Because they believed, before any evidence was collected, before any IORs, before an FAA, an internal safety department, anything, they assumed from the morning it happened that we knew it happened. So, yeah. I have a major problem with that. That's not how this industry operates. But, for some reason, it did then.
Q. You have apparently come to the conclusion that a lot of people got together in an effort to end your employment?
A. Is this a question, Chad? Or, is this a --
Q. Yeah.

Page 199

A. -- a thought?
Q. If you'd let me get to the question mark, I'll do it.
A. Okay.
Q. But, if you stop me before I get to the question mark, it doesn't sound like a question. Okay?
So, the question is, you have explained today that your conclusion is that a lot of people got together to conspire to terminate your employment. You have implicated Mark Richards. Implicated Roy. Implicated HR, that you said somehow has misled you. You implicated the four board members that ultimately decided to terminate your employment. You certainly implicated Mr. Reber. And all these people somehow got together in an effort to get rid of you.
And I'm asking you, this is the question: Why do you believe all those people would go to all that trouble to get rid of a 30-year pilot?
A. They were told to.
Q. By who?
A. I don't -- I don't have that information for you. But, I've obviously been with the company a long time. And I've seen many of these scenarios

Page 200

play out. And I -- I honestly believe that's what took place.
Q. That they would go to all that trouble to get rid of a 30-year pilot, who has 17,000 hours, when there's clearly a pilot shortage in the United States?
A. There wasn't when I was terminated, Chad. We were just coming into COVID. I had already taken a leave of absence for the next month and on into the future to help the company. I was already going to be on a leave of absence so that we didn't have to -- I guess -- I didn't -- that was before the PPP money at that given moment. But, I'd already taken a leave of absence.
Q. When did you take a leave of absence?
A. When the bid closed 17th -- 10th, 17th of March. I bid for a leave of absence for the next month.
Q. Which would have started when?
A. April.
Q. You said that this was the last flight you took. Were you scheduled for others?
A. I was awarded a leave of absence bid for the next month. And I don't recall what my schedule showed after this flight. But, I was immediately put

Page 201

on administrative leave. So, yeah, I didn't fly after that.
Q. So, it's your conclusion that this was a conspiracy among lots of people, which must have been directed by someone, but you don't know who?
A. Just a feeling. It's not -- it's not a certainty on my -- on -- on myself or not. It's a feeling, based on everything that transpired.
Q. Did you ever have any conversation with the flight attendant about what happened --
A. Yes.
Q. -- in St. George?
What was that -- what was that discussion, please?
A. That -- he told me that -- that the company had asked him to write an IOR. But, he didn't know anything had happened, so he said, "I can't really write an IOR for something I didn't know happened." That was basically it.
Q. So, as far as you understand, he doesn't really have any knowledge?
A. That's -- I believe there's an IOR. Is there not an IOR from him? I -- I thought there was a statement or something somewhere that I read this morning that says everything was normal.

Page 202

Q. Okay. After your employment was terminated and this committee affirmed the termination, where have you derived income?
A. Unemployment. I had a -- I had a short --
Q. Oh.
A. -- kind of a temporary --
Q. Thank you.
A. I took a temporary position flying a small operation in Las Vegas, which I've listed, August to January.
And then in April, I was -- I was hired in my current job.
Q. Who do you work for now?
A. Prime Insurance.
Q. What do you do for them?
A. I'm a pilot.
Q. How often do you fly?
A. Too much. No. I mean, a lot.
Q. Is that -- did you say that's where your roommate -- is he working there, too?
A. Yes. Yep. I got him hired there, too.
Q. And this is from April of 2021?
A. No.
Q. Because all this stuff happened --
A. April of '22.

Page 203

Q. Okay. And, so, you worked for this temporary company from --
A. August of '21 to January of '22.
Q. And what did you do from September of 2020 to August of 2021?
A. September of what? 2020?
Q. Yeah. When your -- when your employment was terminated was in 2020.
A. I lived with a friend. Looked -- looked for jobs. I never thought about going back and flying because of this on my -- you know, a termination from an airline, you're not going to, you know.
Q. So, unemployment?
A. Yeah.
Q. And unemployment at this time, did you receive any of the enhanced --
A. I believe so.
Q. -- unemployment?
A. Yeah. I believe so.
Q. Did you receive any of the PIP money?
A. No. What -- what is "PIP"?
Q. The government programs that they were paying during COVID for --
A. It was -- oh, I think there was a couple

Page 204

of checks my wife got for whatever it was for two kids or something. I never saw them.
Q. And at your current employment, do you have insurance?
A. Yes.
Q. And is your son on your insurance?
A. Yes.
Q. And you've only worked there since April of 2022?
A. Yes.
Q. And how much do you make there?
A. 185,000.
Q. And how much did you make at SkyWest, when your employment was terminated?
A. Probably a hundred and -- I'd have to look at my tax returns. I can't -- around 120. I didn't work much.
Q. So, you're making more money at Prime than you made at SkyWest?
A. On the previous -- I would be making 250 to 280 right now at SkyWest. Or more.
Q. Because of the increase?
A. Or more. Yeah.
Q. Yeah. And you only made 120 because you didn't fly much?

Page 205

A. Yeah. I was lazy. I mean, I -- I had a cush schedule and, you know, I took advantage of that schedule. I could take off whenever I wanted. Pick up whenever I wanted.
Q. So, during this time from September of 2020 to -- oh, and you said you flew some temporary job --
A. Yeah.
Q. -- from August 2021 --
A. Right.
Q. Who did you do that for?
A. AirSmart.
Q. And where was that out of?
A. Las Vegas.
Q. And what kind of -- like, did you work full time?
A. Yeah. You could call it full time.
Q. How much did you make there?
A. 65,000.
Q. That's an annual?
A. Annual, yeah.
Q. Have insurance?
A. Yes. Did not -- was not able to put my son on it, on that one.
Q. How come?

Page 206

A. I don't know. They just told me I couldn't.
Q. And what health insurance did your son use then from the time your employment was terminated in September of 2020 until now?
A. I think his mom had him on state, some form of state insurance.
Q. But, then in April of went 2022, were you able to put him on your insurance?
A. May. Yeah. A month later. Uh-huh (affirmative).
Q. Okay. So, since May, he's been on your insurance?
A. Correct.
Q. But, by the time -- but, from the time you were terminated until May of 2022, you know that he wasn't on your insurance?
A. Yes.
Q. And you believe that he was on some state subsidized insurance?
A. Yeah.
Q. What about your other son, is he on your insurance?
A. He is.
Q. So, both of them, the timing has been the

Page 207

same?
A. Yes.
Q. What kind of efforts did you make to find other employment between September of 2020, when you were terminated, and April of 2022, when you went to work for the insurance company?
A. I sent resumes out. Went in to get applications. Because, like I said, I didn't think I'd be able to obtain a flying job. So -- and, of course, I was over qualified. Nobody hired me. 55 years old. Nobody hired me.
Q. Did you have any job offers during that time that --
A. No.
Q. -- you did not accept?
A. No.
Q. And how did you find the job with the insurance company?
A. A friend of mine worked there and I said, "Hey, you know anybody that needs a pilot?"
And he said, "Yeah, I need one."
Q. And the job is actually in Florida?
A. They're headquartered in Salt Lake. We hangar in Florida, in Naples. But, we're everywhere. So, I'm home-based. I live in Las Vegas.

Page 208

Q. And do you anticipate that you're going to stay at this -- this company?
A. That's a tough question. It's a little different than flying for the airlines. But --
Q. In what way?
A. Well, you're dealing with a billionaire that has very high expectations that change every day. So, you know, I think he really appreciates the job I do and Chip does do. And, so, I think we're in good standing right now. But, that could change tomorrow.
Q. Who is "he"?
A. Rick Lindsey.
Q. And it's called Prime Insurance?
A. Uh-huh (affirmative).
Q. And it's based where?
A. Salt Lake.
Q. Salt Lake.
Do you have any witnesses that you believe have any relevant knowledge as it relates to your lawsuit against SkyWest?
A. I don't know. I don't know.
Q. As you sit here today, are you aware of any witnesses that would support any of your claims against SkyWest?

Page 209

A. Not currently.
Q. Are you aware of any documents that you believe support your claims against SkyWest?
A. Nothing at the current time that hasn't been provided.
Q. You also brought a negligence claim against SkyWest.
How do you believe they were negligent as it relates to your termination?
A. The rampers were negligent in their -- in their policy violations. They're employed by SkyWest. Somebody made a determination as to park that aircraft where it obviously should not have been parked. So, there were a lot of negligent decisions made by the company, the ramp personnel, the dispatch, whatever. That, in my mind, is negligent. It's a, you know, air management issue. They had all the opportunity to mitigate these things, but did not for whatever reason.
MR. SHULTZ: Let me take a few-minute break.
THE VIDEOGRAPHER: Going off the record.
3:23 p.m. is the time.
(Break taken at 3:23 to 3:34 p.m.)
THE VIDEOGRAPHER: Returning on the

Page 210

record.
The time is 3:34 p.m.
Counsel.
Q. (By Mr. Shultz) Mr. Chappell, I've tried to be thorough and give you an opportunity to tell us your side of the story. But, is there anything that you thought you would have an opportunity to explain to me today that you did not get a chance to do?
A. Well, as I explained to Mr. Emerson, I don't think the process worked like it is supposed to work, like it has worked for other employees. I think factual information was given to the company, to the FAA, by both individuals. I had a review board. That review board was unanimous, by their own words, that I should be reinstated. And I feel that should have been the end of it.
And then Reber should have been afforded a fair review board process. And whatever transpired within that review board transpired.
But, based on my first review board and his review board, they're completely 180 degrees.
So, I'm reinstated. He's reinstated.
None of this makes sense to me. And I don't believe it'll make sense to anyone else either. But, that brings us here today.

Page 211

Q. Anything else?
A. Not that I can think of.
MR. SHULTZ: All right. That's all the questions I have for you, sir. Thank you.
THE WITNESS: Thanks, Chad.
MR. JONES: Okay. I have a few questions to ask Mr. Chappell.
THE WITNESS: Okay.
THE VIDEOGRAPHER: Counsel, can I have you put your microphone on for this?
MR. JONES: Okay. Good? Okay.

EXAMINATION

BY MR. JONES:
Q. Mr. Chappell, counsel to the defendant asked whether you believed that SkyWest had predetermined that you lied in your IOR about being unaware that the ramp -- that the aircraft left the ramp. Do you recall that?
A. I do.
Q. And you said, yes, that you did believe that SkyWest had predetermined that fact; correct?
A. Yes.
Q. And what do you base that on?
A. I base that on my conversation with

Page 212

Mr. Emerson in -- sometime around August -- or, I'm sorry -- yeah, sometime around August, after my second termination when I was asking for documentation and discovery items to use in my second review, which I never received under FOIA. We had a lengthy conversation. I tried to, you know, present my case to him regarding the review board process and everything else. And, basically, it came down to he made a statement to me that the company believed, and I quote, "From the morning it happened, the company believed you knew it happened and flew the airplane anyway."
Which I said to Mr. Emerson, "So, let me get this straight, before IORs were submitted, before the FAA did an investigation, before the safety department did an investigation, before any of this information came out, they had already determined what the outcome was, and that was that we were guilty of doing something we weren't supposed to do?"
And Todd said, "Pretty much." And that was -- that's what led me to believe that I really didn't have a chance going in.
Q. Did you ask him why the company took that position?
A. I don't recall specifically asking him

Page 213

why. Or, if he had any response if I did.
Q. Okay. Fair enough.
The FAA also investigated the occurrence; correct?
A. Correct.
Q. And who did you -- did you speak with someone from the FAA?
A. Buddy Reed.
Q. Okay. And how did you communicate with him?
A. He called me.
Q. Okay. And did you represent to him that you were unaware during the occurrence when it happened that the aircraft had left the ramp?
A. That is correct.
Q. And that statement is correct with what you stated in your IOR, too; right?
A. Yes.
Q. And it's consistent with your testimony before the first review board; correct?
A. Yes.
Q. And the second review board?
A. Yes.
Q. And it's consistent with your testimony that you gave here today?

Page 214

A. Yes.
Q. And it's also consistent with, from what you understand, of Justin Reber's initial IOR?
A. That is correct.
Q. He also stated that we, meaning you and him; correct --
A. (Nodding head affirmatively.)
Q. -- were unaware that the aircraft left the ramp?
A. That is correct.
Q. And that's -- from what you understand, based on your conversations with Buddy Reed, that's also the testimony that Reber gave to the FAA?
A. He -- he -- he informed me he had already spoken to Justin. And after he spoke to me, he told me right then that his -- his interview with Justin was identical to mine. He had read the IORs. And he was closing the matter on the flight crew.
And I told him, I said, "I've been doing this 38 years and never had an incident, an unsatisfactory proficiency of anything in 38 years, and now I have an incident."
And he said, "No. You don't have an incident. We don't characterize this as an incident. This is a minor occurrence. And based on my

Page 215

investigation to this point, I find no fault with the flight crew."
And he did happen to say at that time, I'm now going to look into the ground handling of the aircraft and the airport, the ramp area, so on and so forth. Everything that was found actually in the safety department findings that I brought up to the safety department, the markings, the signage, the non-movement lights, so on and so forth.
And I am aware, after the fact, that I believe SkyWest complied with the FAA's recommendations. They didn't comply with the recommendations for crew members or for me of training, but they complied with adding I don't know how many feet, at least 50 feet of tarmac to that area, to construction barrier lights with flashing lights, non-movement lights, to that area. Which, in my mind, I have to say, well, if it was adequate then for operations, what was the need to do what they did? Other than the FAA told them to do that because the ramp area and the parking spot that I was parked in was not adequate for the operation. And -- and as I said to Chad, based on the ground personnel and the airport environment and the parking spot, we were put in a hazardous work environment. Period.

Page 216

Q. Okay. And that -- their repair or the reconstruction of the ramp area where this incident occurred, is that additional evidence of their negligence in this case?
A. I believe so.
Q. Okay. Counsel for the defendant asked you why you believed that you were terminated. And you responded, because of the occurrence; correct?
A. Yes.
Q. But, after the occurrence, you were reinstated; right?
A. Yes.
Q. So, you were only finally terminated after Justin Reber changed his recollection of the events during the occurrence to claim that you were aware that the aircraft left the ramp and that you, therefore, lied to SkyWest; is that correct?
A. That is --
MR. SHULTZ: Objection. That is a leading question, which is inappropriate for direct examination of your own witness.
Q. (By Mr. Jones) Okay. You can go ahead and answer.
A. Well, based on Exhibit 10 and Exhibit 11, your question is -- is accurate. This -- the IOR

Page 217

represents the fresh and factual information regarding the occurrence.

This, which we will have a date on -- oh, today's date, April 20th -- this was five weeks later. And -- and I never saw this, not even at my second review. I don't even know -- I guess this went to the safety department.

But, I do know, somewhere in here, regarding that, the safety department did find that the flood lighting on the ramp was not adequate.

They also found that the markings were not reflective.

And -- and I think the FAA recommended retraining for the ground personnel, who clearly violated company policies and I don't believe were terminated.

Q. Okay. But, with respect to Exhibit 10, it doesn't say who it was addressed to, but I think counsel for the defendant may have indicated that it was provided to the SkyWest safety department.

Do you recall that?

A. This?

Q. Yes.

A. I -- I'm not sure.

Q. That's what the counsel said.

Page 218

A. Oh.

Q. Correct?

A. If he said it, if he knows it --

Q. Okay.

A. -- to be true, that's...

Q. Did the SkyWest safety department request a statement from you?

A. I had a conference call with Monty from the safety department. And I believe Mark Richards was on the call. And -- and they were basic questions. I don't recall every question that was asked. But, he was specific in -- in me giving him a basic narrative, which was fresh. It was my IOR. It's exactly what occurred. But, then I added, as you see in my IOR, he asked me for recommendations to mitigate future threats and that's what I told him.

Q. Did they ask you for a written statement, though?

A. No. They did not.

Q. And in Exhibit 11, do you know who prepared this document?

A. This -- it says right here, Justin Reber.

Q. Well, I think that's referring to -- that he prepared the IOR this is based on.

A. Right.

Page 219

Q. But, anyway.

A. I believe this is part of the safety department's final report.

Q. Okay. As far as you know, does this contain the entire IOR of Justin Reber?

A. I only got to look at it briefly at my second review, so I can't -- I can't honestly answer the question.

Q. Okay. Does this state anywhere in here, this portion of Justin Reber's IOR, that quote "we were unaware that the aircraft left the ramp"? Any words to that effect?

A. Let me read through it real quick.

Q. Okay.

A. That's pretty consistent with what my IOR stated. The thing -- he says, "I had little to no visibility from my vantage point as we were turning left."

Q. But, does it expressly state that "we were unaware that the aircraft left the ramp"?

A. No. That was -- this does not.

Q. Okay.

A. The -- the -- the information to the FAA did.

Q. Okay. Okay. Also --

Page 220

A. I have to believe, as professional pilots, if we'd have known this had occurred, first of all, it wouldn't have gone any further. But, we both have a responsibility to disclose, to report, to call our chief pilot, to get maintenance to inspect the aircraft. And I didn't know anything had happened. And if Reber believes something had occurred, he had an obligation -- as the first officer, he has the same safety of flight obligations as a crew member as I do.

Q. Okay. And Counsel also asked you about evidence of age discrimination against you.

Do you recall that?

A. Yes.

Q. And you were -- you responded that you didn't have any at this time?

A. Well, I mean, the fact -- the facts are clear. I made more money. I was older than Justin by 15 years or something like that. I made more money than Justin. And, yeah, I believe that's -- that's discriminatory.

Q. And you were both present during the occurrence; correct?

A. Yes.

Q. And you both had the same obligations

Page 221

regarding safety; correct?
A. Absolutely.
Q. And you both reported that you were unaware that the aircraft left the ramp immediately after the occurrence; correct?
A. Correct.
Q. And you were terminated and he was reinstated; correct?
A. Well, I was terminated and reinstated.
And he was terminated and reinstated based on this narrative.
This narrative not only incriminates me, but incriminates him. These are the exact reasons the company terminated us for, lying. But, this is a lie.
This is fact.
Q. Okay. Counsel also asked you of evidence that the defendant violated the Americans with Disabilities Act.
Do you recall that?
A. Yes.
Q. And you testified several times that you and your family were a significant burden or greater than most other pilots on their healthcare --
A. Significantly more than the average

Page 222

family.
Q. -- on their self-insured insurance plan; is that correct?
A. That is correct.
Q. So, basically, they're -- that is evidence, don't you believe, that they terminated you because of your son's and wife's medical conditions?
A. I believe that.
MR. SHULTZ: Objection.
Q. (By Mr. Jones) Okay. Lastly, did you read all of Justin Reber's testimony provided to the review board?
A. I was not provided a typed version of it. I got to listen to it at review.
Q. Okay.
A. Yes.
Q. Would it surprise you if Justin Reber informed that board that he was not friendly to you?
A. Yeah. It would surprise me.
Q. And that he only tolerated you because of the job?
A. Yes.
Q. Why would that surprise you?
A. Because we had a normal guy relationship. Aside from crew member, we had a great, you know,

Page 223

working relationship. So, yeah, it's very surprising. It's -- you know.
Q. Did he ever invite you to get together outside of work?
A. Yeah. Invited me to go snowmobiling with his snowmobiles. Go ice fishing with him. Yeah. Shooting. Yeah. We never did any of those things just because of my schedule with my family and his. But, yeah. Absolutely.
Q. And you -- I think you testified that both you, as captain, and Mr. Reber, as a senior FO, had seniority to choose the routes they travel?
A. That's correct. Through the PBS system, through our bidding system.
Q. Right. So, you guys, as senior folks with priority, picked the good ones?
A. Yeah. And we flew sometimes multiple times a week. Sometimes multiple times a month. But, we flew -- I flew a lot with Justin.
Q. How many times in the -- you know, how many times have you and Justin flown together?
A. Hundreds.
Q. And if he wanted to, if he didn't like you, is there a way that he could have avoided you?
A. Yes. There's a bid avoid. When he places

Page 224

his bid, he can bid avoid me.
Q. And as far as you know, he never did that?
A. No.
Q. Is that a common practice?
A. Oh, yeah. People -- people don't like to fly with certain people and they will forego their seniority a bit and get lesser trips, you know, and bid avoid.
Q. And you liked Justin, you liked flying with him?
A. Yeah. Yep.
MR. JONES: Okay. That's all I have.
MR. SHULTZ: Just a couple of follow ups.

FURTHER EXAMINATION

BY MR. SHULTZ:
Q. As far as the lighting and the markings at the airport, do you have any reason to believe that SkyWest has any authority over that?
A. I don't know. I believe it's the airport authority.
I also know that SkyWest is an integral part of that airport. So, you know.
Q. As far as you know, that's an airport issue, not a SkyWest issue?

Page 225

A. I don't know that to be fact.
Q. Okay. You were saying that you believed that your benefit use, health insurance benefit use, was far greater than others. And I would like to know how you know that?
A. Because I know what my -- I know how expensive diabetes is. I know how expensive my wife's medications are and the health issue she had. So, I do know, based on just conversations with dozens and dozens of friends and co-workers that have families, that their costs were nowhere near as high as mine. Unless they had a diabetic child or a special needs, disabled child. You know, other than catastrophic accidents or something.
Q. Sure. That's what it's based on?
A. Mine was consistent. Well --
Q. That's what that knowledge is based on?
A. That's what it's based on at this current time.
Q. Okay. Have you ever seen any bills for people with cancer?
A. Oh, yeah. My dad died of cancer. I know what bills are like of cancer. And I'm sure -- I'm not saying everyone. I'm saying, on average, I was very -- a very high cost to the company --

Page 226

Q. And you know that based on --
A. -- for many years.
Q. Your -- your conclusion on that is based on what you just told me?
A. It's based on the length of time, the 15 years of high costs.
Q. Sure. You haven't seen any records, though?
A. Not yet.
Q. You have no reason to believe that anyone who was involved in the termination of your employment had any access to information about what your benefit use is; right?
A. The -- the person who made the final decision, whether that be Roy or Tracy or Chip Childs, they all have access to that.
Q. How do you know that?
A. I've been told they do.
Q. By who?
A. Well, they do -- they do internal audits at the company. They have a record -- SkyWest -- I've been there 30 years. They have a record of everything.
Q. I'm asking you how you know that those individuals had access to information related to your

Page 227

use?
A. I have no evidence at this current time.
Q. And do you have any evidence at all as to who does, at SkyWest, have access to that information?
A. I would imagine --
Q. No. I'm asking you, do you have knowledge?
A. I -- I -- I don't know exactly who would have that.
Q. Okay. So, as far as you know, no one at SkyWest has that information; right?
A. As far as I know.
Q. Do you have any recordings of any conversations with anyone related in any way to this lawsuit?
A. I don't believe I do.
Q. Did you record the conversation you had with Mr. Emerson?
A. I don't recall recording that conversation.
Q. Is it possible that you recorded that conversation?
A. It's possible.
Q. And how --

Page 228

A. It's legal.
Q. -- would you have recorded that conversation, if you did?
A. I would imagine on an app on the phone.
Q. Have you ever recorded any conversation in your entire life with an app on your phone?
A. Not on my phone.
Q. Have you recorded a conversation in your entire life with any recording device?
A. Yes.
Q. When?
A. With my first wife, when I had custody of my boys, I was -- counsel told me I needed to record the conversations for interference, custodial interference stuff. Yes. I recorded phone calls.
Q. Have you ever recorded a conversation with anyone associated with SkyWest ever?
A. Not that I'm aware of.
Q. Okay. Well, that answer puzzles me. Because I think you would know --
A. Your questions puzzle me, Chad.
Q. I think you would know if you have recorded a conversation.
A. You know, this -- this has been a very stressful thing in my life, ending my 30 years of

Page 229

spotless performance at a company that I built and seeing how this all, you know, played out. Yeah. It's -- it's been a very emotionally draining event in my life. I'm an old man now. And my plan was to finish my career at SkyWest, ride off into the sunset. And there was no reason, based on everything that you've presented and that we have that should have dictated otherwise. And like I said, I worked my entire career at SkyWest to get to a point where, due to the market, I would be making huge amounts of money for a regional airline. 250, 300, if I want to work hard, you know. And have -- have my seniority. Which can never be recouped anywhere. When I left, I was 58 out of 5,000 pilots. With a spotless performance and employment history with the company. I'd never had a -- I'd never had a day off for discipline. I'd never signed a corrective counseling statement. Never been violated by the FAA. Never failed a line check, a proficiency check, nothing, in 30 years.

Now, with that being said, as you know, you spend 30 years anywhere, there's going to be some people that don't like you. There's going to be a lot of people that do like you. And I don't apologize for that. Because I always conducted

Page 230

myself professionally and gave everyone the respect that I expected in return. And I'm proud of the 30 years I spent there.

Q. The question was: Does it strike you as being strange that you're not sure if you recorded somebody?

A. Yes.

Q. So, let me ask you again. Do you believe that you have ever made any tape recordings or recordings of any kind with anybody associated with SkyWest?

A. I can't honestly answer that question "yes" or "no."

Q. Because it's possible that you did?

A. It's possible.

MR. SHULTZ: Okay. That's all the questions I have. Thank you.

MR. JONES: Okay. Thank you. We're done.

THE VIDEOGRAPHER: This marks the conclusion of the deposition.

We are off the record at 4:00 p.m.

(Deposition concluded at 4:00 p.m.)

Page 231

REPORTER'S CERTIFICATE

STATE OF UTAH )
) ss.
COUNTY OF SALT LAKE )

I, Kelly Fine-Jensen, Registered Professional Reporter, do hereby certify:

That prior to being examined, the witness, RANDY THOMAS CHAPPELL, was by me duly sworn to tell the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in stenotype on December 6, 2022, at the place therein named, and was thereafter transcribed and that a true and correct transcription of said testimony is set forth in the preceding pages.

I further certify that, in accordance with Rule 30(e), a request having been made to review the transcript, a reading copy was sent to Mr. Jones for the witness to read and sign and then return for filing with Mr. Shultz.

I further certify that I am not kin or otherwise associated with any of the parties to said cause of action and that I am not interested in the outcome thereof.

WITNESS MY HAND this 20th day of December, 2022.

Kelly Fine-Jensen, RPR

Page 232

Case: Chappell v. SkyWest Airlines, Inc.
Case No.: 4:21-cv-00083-RJS-PK
Reporter: Kelly Fine-Jensen
Date taken: December 6, 2022

WITNESS CERTIFICATE

I, RANDY THOMAS CHAPPELL, HEREBY DECLARE: That I am the witness in the foregoing transcript; that I have read the transcript and know the contents thereof; that with these corrections I have noted this transcript truly and accurately reflects my testimony.

| PAGE-LINE | CHANGE/CORRECTION | REASON |
|---|---|---|
| ________ | ________________________ | _______ |
| ________ | ________________________ | _______ |
| ________ | ________________________ | _______ |
| ________ | ________________________ | _______ |
| ________ | ________________________ | _______ |
| ________ | ________________________ | _______ |
| ________ | ________________________ | _______ |
| ________ | ________________________ | _______ |
| ________ | ________________________ | _______ |
| ________ | ________________________ | _______ |
| ________ | ________________________ | _______ |
| ________ | ________________________ | _______ |

________ No corrections were made.

I, RANDY THOMAS CHAPPELL, HEREBY DECLARE UNDER THE PENALTIES OF PERJURY OF THE LAWS OF THE UNITED STATES OF AMERICA AND THE LAWS OF THE STATE OF UTAH THAT THE FOREGOING IS TRUE AND CORRECT.

_____________________ _________
RANDY THOMAS CHAPPELL DATE