Roy Glassy (SP): --discuss each slide with context before they're read. I will potentially make sure.

Moderator: Perfect, okay.

(Long pause)

All right, we are here today for the review board of Captain Randy Chapel. Today's date is June 16, 2020. The time is approximately 1:00 p.m. It's 1:07 to be exact.

The review board is being held at the Salt Lake City hanger. The reason for this review board is due to a request by Captain Chapel and he is requesting reinstatement.

Captain Chapel was employed as a Captain located in Salt Lake City, okay? The employee was terminated on April 24, 2020 and the reason reported for the termination was violation of policy.

The Representing Manager is Roy Glassy. Seated on the panel today are the following members—Mackenzie Meek, Mike Pendleton. And our management panel members are Chuck Barber and Chris Brown.

There are no observers or individuals in this room for this review board. Do you, Captain Chapel, approve the panel members seated here today?

Captain Randy Chapel: Yes.

Moderator: Do you, Roy, approve the panel members seated here today?

Roy Glassy: Yes.

Moderator: Do you both agree to abide by the panel's decision and conclusion at the end of the review board?

Captain Randy Chapel: Yes.

Roy Glassy: Yes.

Moderator: Thank you. The panel members understand that they are to be objective in this process and carefully listen to the facts presented by both parties. They also should understand the employee has the right to this review

board and the review board should not affect their objectivity towards the employee in any way.

(Long pause)

Do you, members of the review board panel, agree to abide by the instructions provided today?

Panel members: Yes. (In unison)

Moderator: All right, thank you. Have any of the panel members participated in any of the conversations or dialogue regarding the termination of Captain Chapel before this review board and prior to this point?

Panel members: No. (In unison)

Moderator: All right, so, I will provide some basic instructions and procedures added to follow for the review board. It is important that each presenter is allowed their time without interruption.

What this means is there'll be an opportunity for questions after both presentations, and the employee, and the representative manager have presented.

This appeal begins with a presumption that this disciplinary action previously rendered in this matter was appropriate. Neither the manager nor actions taken by the manager are on trial.

As such, it's the employee making the appeal who has the burden of proof to demonstrate with clear and convincing evidence that the termination was in error. So, in other words, we're not going to reinvestigate an investigation here. What we're doing is we're looking at the facts and making sure that policy was followed according to the termination code and the information as provided to you today.

So, clear and convincing evidence is evidence that removes any substantial doubt that you have as to the truth or correctness as to the employee's argument and the reason of termination. Did you see in the panel instructions where you were given information regarding that you can determine that the engine was running if you feel it and it's warm, right?

You don't have to hear the engine running. You don't have to see it. What you have to know is you can conclude that it was based on the evidence that you had in front of you. Do you get that?

Okay, great. All right, because the employee has the burden of proving the action was inappropriate, the employee will be given the opportunity to go first.

After the employee has presented, the representing manager will be given an opportunity to present. And then, after those presentations are completed, Randy, you will have an opportunity to rebut, okay? To add any additional comments, clarify anything you want to. And then, after you have concluded, we'll have an opportunity to ask have some questions and answers.

All right, you can ask questions of the employee, the manager. I ask in that forum that you direct your question to one of these gentlemen. Let them know who you're talking to. Let's not throw them out into that moment without specifically asking a question to who you'd like to answer that question.

After the closing, okay. At the end of the questions, both employee and the representative manager will be allowed to present closing statements. And then, that's after the questions, all right?

And then, the closing statements, the manager will be dismissed with the employee and you will be allowed to deliberate for as long as you need to. And the recording will not be on at that time.

When you do, you will be deliberating to come to one of the three renderings. One would be to find in favor of the employee and recommend reinstatement of employment. You'd find against the employee and sustain the termination or you could find the shared fault. That's #3 and recommend a modified solution.

I also have here that these modified solutions need to be approved by the Vice President. So, it will be determined here today if you do find that you'd like to go with the #3.

So, I will be present during your deliberations and I can assist with any clarifications and questions that you have. While a unanimous vote is preferred, I'd like that to happen. But the findings of the panel require only a majority vote, okay?

If it ends up 2-2 that's fine. There's a process for that. We'd hope that you would stand with your conviction and not be moved unless you're given evidence that changes your mind. And don't feel any pressure to make the

change. If it's what you believe, let's stick with it and we will work with that.

Okay, Randy. I invite you to begin your presentation and let us—

Randy Chapel: Okay. Well—

Moderator: Let us hear you.

Randy Chapel: --thanks to everyone for being here and facilitating this on my behalf. I appreciate it.

First and foremost, I don't have a lot of supporting documents or evidence to provide to this review board. But what I do have is to just to talk about myself—why I'm here, why I feel this process is important.

I'm here to save my job. I wouldn't be here if I didn't feel like I've earned that right to do that.

There's no discrepancy as to what occurred. Why it occurred, there's a multitude of things that we can get to later. But it occurred. I wish it hadn't.

In hindsight, there may have been opportunities for me to possibly handle things differently at the time, be more observant. I don't know. It's just something that occurred and I regret it. And I take full responsibility for it.

With that being said, I've been here for slightly over 30 years. I believe—and I feel my peers believe—that I'm an employee of high character, professionalism and I've worked very hard to maintain that.

I have raised four grown sons while working here. SkyWest has been a great place. They afforded me the ability to take care of my dying father, dying mother to their last breath. I was there. And if it would've been a different company, I probably wouldn't have been able to do that. So, I owe a lot to SkyWest, grateful.

(Long pause)

I don't want to reiterate stuff I don't have in front of me. But my statements in the IOR and my statements to the FAA inspector were factual as to what I believed occurred at that time.

In hindsight, they're still factual, but I have to question myself on many of them. But those are the facts surrounding what occurred that morning. I can go over a couple of them.

I arrived the night before and pulled into a familiar parking spot in St. George. When I showed up in the morning to the aircraft, they'd swapped me into a different airplane parked into a different location.

I was unfamiliar with the location, but assumed that it was a safe area. I was unaware. Based on the information that I had available to me, I was unaware of the close proximity to the gravel area. I didn't see any reflective cones set at my left wingtip. It was very dark on the ramp. There was no lighting or no signage to indicate what gate I might be parked at nor did the information I had from the company indicate other than a Gate 1 and 2 parking spot. I assumed in hindsight, I was parked at Gate 4 or 5. I don't know.

We made a normal pushback on time. We were not rushed. We performed a once (SP) briefing. It was pretty mundane. It was, you know, the weather was VFR (SP). The airport, we felt we were familiar with. We discussed our taxi route on the parallel taxiway out to Runway 2 for departure.

We talked about the high terrain and the darkness. And there were no applicable totems (SP). So, we discussed those things. It wasn't lengthy. It was concise and to the point. And we made a normal pushback.

I was pushed back and turned with my tail to the southwest, my nose pointing northeast 30-40 degrees. They disconnected. We ran our checklists and they did not give me a marshalling. But the salute and wave-off was in that direction.

We started our taxi. I made a normal left turn to go out to the parallel taxiway—about 150 degree turn and obviously rolled into the gravel. What I thought and felt at the time initially wasn't much until we completed the turn. And our momentum stopped which isn't abnormal.

And I added power and I know that the power exceeded the specific limitations. I'm aware of that. It wasn't done deliberately. Don't even know if it was done in need. That's just what I got when I brought them up and I brought them back. And the aircraft continued to move. There was nothing felt in the flight controls. There was nothing more than I had experienced numerous times.

And later, I have pictures. I have a picture. I found out it was exactly what I suspected it was. It was a drainage grate at my right main roll through.

And those drainage grates are grated to drain and they're, you know, however, as big as this table I suspect. And that's what kind of stopped my momentum and that's what I powered out of. And I've experienced that on concrete ramps, asphalt ramps many, many times in my career. I didn't think much about it.

Don't know. Can't recall exactly specifically what was said regarding that feeling, but we didn't think we had done any, you know. We didn't think anything was abnormal at that time.

We taxied out, took off to back up slightly. Without sounding demonstrative and without pointing fingers because this is my responsibility. There were many opportunities for this to be avoided at that point and they weren't unfortunately.

I am aware that the standard practice and the policy of the ground handling people are to notify the flight crew immediately when they witness something that is contrary to safety. They had that opportunity. Visually, they had that opportunity to let me know that we had left the pavement.

They could've called me on company frequency which I always monitor on my #2 radio. They could've contacted me on CCAF (SP) and they didn't do those either. They have a requirement to contact Operation Control Center and Dispatch. And they could've done that and they didn't. And they could've sent me a cart (SP) to return to the gate.

And if any of those things were to happen, I am a humble person. This mistake was not a big deal. I would've assumed the responsibility. We would've corrected the situation and we wouldn't be here today. And that's the way I've conducted myself for 30 years.

Never have I even contemplated putting my passengers, my crew, my equipment or my company at risk—ever. And my record is indicative of that. I've always tried to, you know, conduct a professional operation and do a good job. And I feel I have done that. I'm proud of that.

A little disappointed in my inability to recognize, identify, accept potentially in hindsight. I'm disappointed. I've kicked myself a little bit over this couple of months.

But we talk about policy and we have policies, so that things are consistent. And so, that the company's protected and the employees are protected. And we have guiding principles—fairness, consistency.

I feel there are times that the employees have a big enough issue with disciplinary whether it be counseling statements, letters of correction, trouble with FARS, and the FAA performance-related issues and training, questions of judgment, potentially character. And at some point when we've gone through the process, termination is justified. It's what has to take place.

I don't feel that has happened in my case. I feel that this was an unfortunate event with a lot of contributing factors. And I feel that, you know, if I was to be reinstated as I have for 30 years, but now being even smarter or I can't say more vigilant. But, you know, I would work very hard for something like this never to occur again.

There's human factors. We're, you know, I'm not perfect. I think I've done a good job and fortunately my training, my judgment, and my character, my decision making process has afforded me 30 years of absolute spotless flight operations performance, training performance, and employee performance at the company.

But that doesn't mean I haven't made mistakes in the past. I have. And fortunately, like I said, my training and everything has made those mistakes have been corrected. We've, you know, corrected those in the process. And we all do that on a day-to-day basis. It's a complex operation that we do and we're all capable of making mistakes. It's how we correct those and the final outcome.

(Long pause)

Give me just a moment.

(Long pause)

I was entrusted for around 12 years to be a Check Airman here at SkyWest. I was very proud of the job I did. But often, I was given what we would categorize as problem cases—candidates that were struggling to make it through the process. And I seem to have the ability to work with them, and identify where they needed help, and get them through.

And I've also done many special projects—management projects—with the company. And I've always given my all to do those projects and felt I did a good job on all that I was tasked to do.

(Long pause)

I kind of jumped ahead, but I'll wrap up here shortly.

(Long pause)

Once again, we're here because of a policy infraction that ultimately ended my job and potentially ends my career. I'm 55 years old. I have a disabled child that I've taken care of since he was a baby. And I desperately need my job. I desperately need my benefits—my medical coverage. And I'm here to, you know, basically, you know, hope that you see that I'm a good person. I'm a good employee. I have been and I made a mistake, and to fairly and consistently administer the discipline policy that we have here.

That has been afforded to many crew members. We have a lengthy history of incidences and failures, so on and so forth. And policies are broken daily. And not every person is terminated because they break a policy or make a mistake.

I'm not saying that by any means or to insinuate that this is discriminatory I don't feel that. What I feel is I want to be afforded the same opportunity that other employees are afforded. I want to correct this wrong, and take suitable punishment for what occurred, and let you know that it will never occur again. And by no means was it deliberate. By no means was it malicious. It's just not how I operate.

I, you know, I've always considered myself an employee and an aviator of integrity and character. And I'm disappointed in myself. But it's brought us here today and I hope that you understand that I have integrity. And this isn't something I would do, but it happened. So, thank you.

Moderator: Thank you. Go ahead.

Roy Glassy: Okay, thank you. Again, thanks for joining today, everybody. Appreciate everybody being here. And Randy, thank you for that. What I'll do here is I'll go ahead and provide a brief introduction, then get into the investigation, the summary and some additional information. And then, we'll also do a policy review, and tie it all together, and conclude this.

So, I provided a packet to everybody. Go ahead and grab it now. This is the same deck that I'm about to show on the screen. So, just follow along with me on this. And this might be fairly lengthy, but I'll highlight some specific points of importance as I go along.

And if it falls off the screen, we'll have to call the tech guy because this is my first time using this particular program. Okay. Starting off on the case review for Mr. Chapel. This just is a quick snapshot of the separation

record. So, it just shows data IR 416 1990 and the term date which was mentioned earlier of 4-24-2020. The reason was violation of policies and those policies will be reviewed as I go through the presentation.

So, the termination for cause was decided upon and the reasons are as follow—failure to take the proper remedial actions to insure airworthiness, and prevent further damage to the aircraft, and airport property following a ramp/taxiway excursion.

Another point—willful non-compliance with airworthiness procedures. The aircraft was operated and revenue serviced in an unknown state of airworthiness.

There was a failure to report possible aircraft damage. And this occurred prior to departing in St. George. And then, also upon arrival in Salt Lake City.

For instance, in Salt Lake City, there was confirmation of the excursion due to discovery of soil residue on the wheel assemblies. And then, operational limitations were exceeded during flight which I'll get into in a few minutes. When we have Maintenance inspect the aircraft, they have to inspect for parameters and exceedances. And they found a few additional exceedances incidental to this.

There's also failure to cooperate fully and provide truthful, accurate information to the company during the investigation. And I'll have some examples there.

For instance, the company report submitted initially was an IOR. And there's some inconsistency there. And also, during the investigation and the interview process.

(Long pause)

I'm going to go ahead and review the Discovery IOR. I labeled it that because this is how we discover the event happened. IOR's are submitted just for the group. Everybody knows about IOR submission. IOR's are submitted. They go in a queue. And then, they're reviewed when we get to that queue. They don't automatically populate in a leader's inbox.

So, there can be a delay. That's why critical safety issues must be communicated very quickly. But this came through an IOR—excuse me—and we got to it. It was actually created on March 24th—which is the date of the incident—a little bit later in the day.

So, the submitter narrative—I'll go through. "The Captain—" and pay attention to these IOR's as I go through. I do have some others and there's some consistent information in all of these.

"The Captain seemed to be in a hurry when he first arrived. He got on the plane and was flashing the lights on the plane to get going. We did our walkaround and he was on the headset telling us that he was ready to go.

We did the pushback and gave the Captain the all clear. The ramp has been instructed not to give a direction for turnout. When they pulled away to turnout, they turned to the left.

The aircraft was in our Spot 1 which was to the far north or is to the far north facing the building next to the dirt lot. He turned left and went into the dirt. It had been raining the day before, so the dirt was soft.

When he went into the dirt at first, it wasn't a problem. And then, he got stuck and had to use thrust to pull out of the mud. It—" meaning the aircraft. "It bounced around a lot and ran over a drain that is in the dirt lot. The aircraft visibly tilted to the right. The plane sunk into the dirt about 14 inches prior to returning to the tarmac. He then taxied and took off without communication to the ramp agents."

Now just a quick note on that flight. The scheduled departure time was 6:24 and they went out 12 minutes early at 6:12. The actual arrival was 24 minutes early. And these times are just notable because the submitter narrative and the investigation conversation indicate the hurried approach to operating this flight which may be a contributing factor to the incident, so.

So, the immediate actions upon discovery was the pilots were placed on paid administrative leave pending completion of a Flight Safety investigation.

Now our standard practice is when we place a crew or employees on administrative leave, it's paid until we have enough information to determine if the pay status is applicable or not. Unpaid would be punitive, so paid is normally what we protect with until we get the information and we can make a determination on that paid stint.

Okay. Without the first action, IOR's were requested from both pilots. The pilots did not submit IOR's on their own. They had to be requested.

And then, both pilots were going to complete a post-event interview/debrief as part of the investigation. SkyWest Safety coordinated internal investigation with internal SkyWest stakeholders.

So, the process is our Safety Department has a very professional and qualified team that investigates operational events, critical safety incidents. They determine all the facts. They compile a comprehensive report and then we receive a briefing from the Safety Department.

(Long pause)

Following requesting of the IOR from the crew, Captain Chapel submitted his the following day on March 25th late in the evening and I'll read it. His narrative states—

"I am submitting this IOR by the request of my Chief Pilot. Mark Richards called me on the 25th and told me of an incident reported by St. George ground personnel.

After pushback the aircraft was positioned with the noise approximately 30 degrees to the left. I proceeded to turn the aircraft in that direction after wave -ff. I made my turn to taxi on the parallel taxiway to Runway 01.

Overhead lighting on the ramp was very poor and we observed no required hold short ground markings or flashing non-movement lights when we made our turn. We were unaware that the aircraft was not on the tarmac. If we would have I would've returned to the gate.

When we debriefed our wants, we were unaware that our gate was that close to a threat. The ground personnel pushed us with our nose pointed at the threat and waved us off.

The wave-off was not a marshal in any specific direction. I'm not sure that we would have been able to turn right and clear the other gate."

And then, we provided a solution—better airport markings, ground lightings and vision ramp lighting to be able to identify the ground surface. Ground crew training to mitigate threats. In essence, don't push an aircraft close to approximately a non-movement area and point it in that direction.

(Long pause)

Now the First Officer submitted his IOR a little bit prior. However, his IOR reads as follows—

"I was informed by Scott Carr—" Scott Carr is the Flight Operations Supervisor. He assists Mark Richards in the Chief Pilot Officer. "I was informed by Scott Carr that a report had been submitted by St. George ramp personnel that we left the ramp tarmac onto a dirt area and that I should fill out an IOR of my experience that morning.

Our plane was pushed back from the St. George terminal from the far left spot of the four or so parking spots that are there. We were angled towards the left. The ramp was disconnected and waved us off.

We did the normal clear left, clear right and then proceeded to turnout left towards a taxiway. About 2/3 or so through the 270 degree turn we were headed towards Runway 01 for northbound departure that morning.

There was a potential plane could've been on the dirt for a moment. But I had little to no visibility from my vantagepoint as we were turning left. The Captain gave a bit more power to continue the taxi and we proceeded normally towards Runway 01.

In my post-flight walkaround in Salt Lake City, there were slight marks of dirt on the outer part of mostly the right main wheel." In the submitter solution he offered, "I don't recall any pavement edge paint lines or lights in that area and both those lights would help.

Also, the rampers could possibly help prevent this by not pushing planes back and angling them towards the dirt area. It was dark, early morning and it would've been helpful if there was better flood type lighting to illuminate the area towards the north part of the ramp."

(Long pause)

Now as we go ahead and get into the investigation, keep in mind the statements in those two IOR's. They're curiously consistent, but they had to be requested and the investigation revealed that's not quite in line with the initial statement submitted in the IOR's for both crew members.

So, we'll go through the state of the investigation and then we'll reconnect. So, as March 24th early morning Flight 4235 to St. George to Salt Lake City. The event occurred in St. George and the aircraft was a 200. It was 4610 West Gate.

Now keep in mind, the excursion is really not what we're focused on here. These things happen. What we're focused on here was the crew action following the excursion.

And the IOR's indicated there may not have been a full realization of the excursion and the report will reveal that there was a full cognoscente realization of the excursion. And I'll go through the facts that illustrate that.

(Long pause)

So, as we get into the investigation, SkyWest Safety conducted this investigation. Both pilots were interviewed. Maintenance information was obtained during the required airworthiness inspection and that was reviewed.

During the course of the Maintenance inspection it was discovered that limitations were exceeded during the flight which were not reported. And these were just discovered coincidentally as Maintenance was inspecting the aircraft to determine the state of airworthiness.

We had an aircraft that was deep in the mud and we don't know. There was no knowledge of any airframe or power exceedances, anything. So, it has to be looked at to get a good view of the aircraft before it's cleared. VMO essentially redline was exceeded on three different occasions, but we'll get back to that.

So, as we get into the event factual summary, at approximately 06:14 Mountain Daylight Time on March 24th, SkyWest Flight 4235 was involved in a taxiway excursion after pushback from the gate and during taxi for takeoff at St. George Regional Airport.

The following information is extracted from the event final report that was prepared by the Safety Department. "This was the first flight of the day for a two-leg standup for split duty schedule."

Now notably, split duty schedules—does everybody in the room understand what a split duty schedule is?

It's one leg usually later in the evening, a very short overnight and then it turns around. It's continuous duty with a very long break in the middle essentially. That may factor into the hurried approach in the morning.

"The flight crew arrived to pre-flight the aircraft and found the aircraft parked at Gate 1 which is on the north side of the ramp. After pushback, the aircraft was positioned with the nose angled slightly to the left."

It wasn't pointing at the dirt area. It was just angled slightly to the left. And I have a diagram here shortly.

"The Captain initially started to turn right." This is following pushback and during the initial taxi movement. "The Captain initially started to turn right, but then proceeded to turn the aircraft to the left after the wave-off and continued to make what he thought was a turn to taxi from the ramp onto a parallel taxi to Runway 01.

The Captain had indicated that overhead lighting on the ramp was poor and observed no hold short ground markings, edge lights, or flashing non-movement lights when they made the turn."

And I think we've concluded it's dark there. There are painted lines, but no flashing lights circulating.

(Long pause)

"So, although the landing light was on, the Captain indicated—" And again, this is from the investigation—the interview process. "Although the landing light was on, the Captain indicated that he was initially unaware that the aircraft was not on the paved tarmac."

So, the Captain stated during the investigation that he was unaware that they were in a soft, unpaved surface. "As the left turn continued, the aircraft nose and main gear dropped into a drainage ditch where it briefly stopped. The Captain was required to add significant breakaway thrust which is approximately 75% and one." On both engines by the way, to get back on the paved taxiway's surface. "The flight continued to taxi to Runway 01 where a takeoff was accomplished and flight to Salt Lake City was completed."

Now the previous bullet point, you'll see here shortly there's a video. And as you'll watch the video, you can see the aircraft angle to the right and it was determined to be about a seven degree bank angle into the mud.

The ground crew reported it was about a 14 inch. And then, there's another measurement in the investigation stating 17 inches for each different. But still, that's a bunch.

"The flight continued to taxi to Runway 01." Okay, I said that. "And the aircraft was not written up by the flight crew nor was Maintenance contacted or consulted."

Now this is a very important point. So, the aircraft turned out, got into a situation where it required 75% and one thrust on two engines to pop out of a ditch. And the crew continued. There could've been damage. There's everything wrong with that scenario. And the aircraft at that point should've stopped. The airworthiness in the aircraft should've been assessed and that didn't happen.

"So, the aircraft continued and subsequent maintenance inspection based on the St. George station notification was conducted in Salt Lake City. So, by the time we received that Discovery IOR, saw what happened, and we contacted Maintenance. Maintenance got on that aircraft right away and conducted a very thorough inspection starting with the landing gear and everything else. And they had to look at a lot of things .we did not know what had happened to that airplane during the time it was stuck.

The aircraft was grounded until the inspection was complete and the inspection did reveal aircraft limitation exceedances during flight." And again, that was coincidental discovery as Maintenance is looking to determine if the airplane had damage.

"461 South-Sierra-Whiskey was returned to service following the inspection and conformation of airworthiness status."

(Long pause)

So, in the investigation here, I just wanted to show a quick plan view of the St. George Airport. And you can see where the circled area—that's the ramp area. As a matter of fact, just to point this out.

(Long pause)

This is where the aircraft was parked and that's the soft area there. So, the plane turned around and as they powered out with 75% and one thrust column was this direction where there's parking, pedestrians, equipment, other things behind the aircraft.

Moderator: You'll have an opportunity to look at it later.

Unknown: Oh okay. Thank you very much.

Roy Glassy: (Long pause)

Okay. And this is a scale drawing or scale diagram that is of the aircraft and the ramp in the position, so. And this was all assembled by all the data received.

So, you can see the soft area. You notice this would've been found out during the pre-flight inspection. The wingtip is over the soft area.

So, as the First Officer's doing the pre-flight inspection, they would likely walk on the dirt or mud area as they're inspecting the wingtip. There's a slight turn after the push—just a slight turn to the left.

And then, as the aircraft started, you can see the turn it made. And this is all in the dirt area and then it exited at this point.

(Long pause)

Unknown: Is that a good path for the wing? I'll ask later.

Roy Glassy: Say again?

Moderator: Thank you. He'll ask later.

Unknown: Oh.

Roy Glassy: Oh okay. Yeah, so just to reiterate. Airplane's pushback slight turn to the left. We see that. And then, a left 270. And then, that's where the nose gear and the right wing exited the paved area and got into the mud.

(Long pause)

So, at that point, returning to gate for inspection would've been prudent.

(Long pause)

Some additional findings—both pilots indicated they were on a standup schedule, well rested and no fitness for duty issued prior to the incident flight. So, no lack in judgment based on fatigue, anything like that.

According to the Captain, St. George ground personnel pushed the flight with their nose angled slightly left and waved them off. And then, just notably as a matter of policy and practice, St. George ground personnel do not marshal nor provide taxi direction after pushback and wave-off is completed That's not their process. They push the aircraft back and wave the aircraft off.

But St. George station personnel did report that all aircraft depart Gate 1 following push with an initial turn to the right. This was the only time they had ever seen an aircraft turn to the left.

Ramp lighting, maneuvering spaces adequate to the right of Gate 1 ramp push area and the ramp lighting is insufficient on the left side. Therefore, all aircraft turn right on initial movement.

That's important to know because the right side is clear. It's lit. It's paved. There's adequate room. It's the standard departure of process.

The left side aircraft essentially is a dark area. There's no guidance. It's a black hole. So, a turn to the right is prudent. But this is the only flight that they had reported that they'd ever seen turn to the left. Anywhere else we would've had another excursion event which we have not.

The flight crews walk (SP) brief did not include taxi from the ramp and the crew indicated they were unaware that Gate 1 was that close to a threat. And that's concerning because during the pre-flight inspection walking around that left wingtip would certainly give a tactile indication that the aircraft is that close to the ramp pavement. So, I hope that pre-flight inspection was done appropriately.

There are no St. George terminal ramp edge lights to mark the end of the paved surface area. There are two yellow borderlines on the treated asphalt to note the terminal ramp edge area.

And eyewitness accounts and surveillance video shows the airplane initiating a taxi by moving forward with a slight turn to the right and then a relatively tight turn to the left.

(Long pause)

For the more eyewitness accounts and surveillance video shows the aircraft accomplishing a 270 degree left turn back towards the terminal ramp area coming to a full stop in a drainage ditch. The aircraft is then seen and heard adding a significant increase of breakaway thrust approximately 75% and one to move out of the sunken drainage ditch area back to the paved surface—the terminal ramp.

The sunken area for drainage measures approximately 17 inches lower than the lip of the terminal ramp surface. The Captain indicated that he was initially unaware that the aircraft was off the paved surface.

However, the other pilot—the First Officer—indicated that he was under the impression that both crew members were immediately aware the aircraft had left the paved surface area. It was also indicated that there was minimal discussion in a clear and conscious decision that was made by the

Captain to continue the operation from the unpaved surface area to Runway 01 for takeoff.

(Long pause)

So, here I have a video of the event. So, bear with me as I—

Moderator: While he's bringing that up, Captain Chapel, can you confirm you're not recording this?

Captain Randy Chapel: Oh no!

Moderator: Okay, thank you.

Roy Glassy: Okay. I have to figure out how to find the video, so bear with me, everybody.

(Long pause)

Okay.

(Long pause)

I've got the video. I need to figure out how to get it up on the big screen. So, standby, everybody.

(Long pause)

Okay, here we go.

(Long pause)

Now we have about a 6:28 video. At about four minutes it counts down. And when it gets down to about four minutes, that's where we see the pushback.

And here's the aircraft here. You can see with my pointer.

(Long pause)

So, I started the video and for sake of time we can watch it in real-time or I can move it ahead to the relevant portion which is probably what I ought to do here.

(Long pause)

Okay, here we go. We'll just go with it.

(Long pause)

So, pay very close attention to the aircraft on the far right.

(Long pause as video plays silently)

Okay, now starts the movement. Pacing the aircraft.

(Long pause as video continues)

There's that abrupt stop and slight rollback.

(Long pause as video continues)

(Background chatter)

Okay. And the rest of the video looks like this until you see the aircraft depart within about two minutes. But let's go back and take a secondary look at this.

(Long pause as video continues)

As the aircraft turns out, you notice the abrupt stop and you can notice it listing slightly to the right. So, we'll look at this a few times.

(Long pause as video continues)

Here comes the thrust, and up, and out.

(Long pause as video continues)

Should I show that again? I'll do it one more time.

(Long pause as video continues)

And it should be noted, the video was obtained by the city based on the condition of that ramp area and the drainage ditch area. There was some concern that the city shared with the aircraft condition.

(Long pause as video continues)

Once again, going direct towards the dirt, then a slight turn.

(Long pause as video continues)

Then the abrupt stop, slight rollback, listing to the right, power applied and out of the mud back onto the paved surface.

(Long pause as video continues)

So, the reason I show this video is to clear up any doubt that—hold on. I'm trying to get back to this—clear up any doubt that there could've been no idea that the aircraft was stuck requiring excessive maneuvering to get out of that situation.

Bear with me while I try to find the slideshow again here—that function.

(Long pause)

Hold on a second.

(Long pause)

Okay. I think we're back in business here. Okay. We'll move on from the video and we'll show some closeup photos of the ramp area, again, confirming. It looks like they're hard to see on the screen. But if you look at the print copy I provided, you can see the areas where the tires depressed the mud—the deep depressions.

(Long pause)

And that shows the nose and right main mount tracks.

(Long pause)

And next is a little bit better depiction of the depth in the mud. And you can see as you look at that, follow the line down. There are painted lines on the side and some residual lighting on the edge of the paved area. But you can see the ramp agents standing there. It puts a size perspective in it.

Then here's the drainage ditch. Just a closeup showing that the aircraft did taxi over a ditch. So, certainly by hitting a drainage ditch there could've been tire damage, you know. The list goes on potential damage for something like this. That's where the concern came from.

So, back to the investigation findings. The post-flight inspection was conducted in Salt Lake City upon arrival by both crew members. There was no apparent damage noted to the aircraft. But a significant amount of mud was seen on the nose landing gear and the right main landing gear tires. That confirmed the excursion.

Now the Captain did not make an entry into the Maintenance log and there was no call to Maintenance. Neither flight crew member made a verbal nor written report of the incident until notified by their supervisor.

So, no call to Maintenance, no call to the supervisor, no communication to anybody about this. The aircraft was stuck in the mud. It motored out of the mud. It flew. Nobody was told about it. The airplane was inspected by Maintenance based on the St. George station notification.

So, as we get into this, let's talk about some more investigation points here—human factors. So, skill-based errors are inadequate—identified here—inadequate visual lookout. "The Captain's failure to see, assess or monitor the terminal ramp surface area."

And again, we're not focused on departing the pavement here. We're focused on what the crew did following discovery for confirmation of departing the pavement.

But the decision here was selection of an unsuitable taxi area. During taxi, the Captain either failed to develop a plan, or address the situation, or developed an erroneous plan.

The continuation of taxi in an unsuitable area is the concern. Once it was determine the airplane was no longer on a paved surface, the Captain failed to take proper remedial actions to prevent further damage to airport property for the airplane.

So, as you can see from the video, the photographs, and what you'll see as I go through the investigation, there's absolutely no question that the aircraft was in a precarious spot off the pavement requiring excessive thrust and potentially incurring damage at that point.

However, the Captain failed to take remedial action and continued. There's also failure to report the incident to the airport operations. It would've been incumbent upon the flight crew to advise the airport operations team in a timely manner the nature of the incident, airport property damage and airplane damage unknown to the flight crew could've presented a hazard to themselves and the passengers.

(Long pause)

More on human factors—we have some violations. And violation involves a deliberate deviation from expected behavior. Excessive risk taking—actions that pose unreasonable risk of harm and negligence.

A continuation of taxi in an unsuitable taxi area. Further, it was exacerbated when the airplane came to a full stop and the Captain used excess thrust to continue the operation.

There's a failure to generate a maintenance write-up. Upon the post-flight inspection, both flight crew members acknowledged there was mud on the nose in the right lane and gear, yet did not write in the maintenance log nor notify maintenance.

So, even though the aircraft flew, upon landing in Salt Lake City, it was confirmed by the soil residue that that airplane did indeed depart a paved surface and could've incurred damage.

So, why did that airplane continue? Well, let's talk about crew resource management. Based on the information from the initial investigation, and crew debrief, CRM during the sequence of events was virtually non-existent.

Flight deck communication threads were not fully briefed and included taxi clearance requirement for the taxiway and the ramp that did not include non-standard markings sided into (SP) the pavement.

Through briefings and threat error management considerations were articulated by both crew members. But there's no evidence that they were accomplished.

So, looking at some CRM failures and concerns, based on the investigation findings, these principles CRM skills were neglected.

1. Active listening—cognitive processing of information conveyed understanding the impact it has on any expectations associated with the information received.
2. And a close of communication—communication technique is used to avoid misunderstandings where the receiver communicates back to the center what was understood and the center confirms accuracy.

So, the conversation between the crew members indicated these CRM failures.

(Long pause)

Coworker statements received early investigation of the Safety Department in leadership did investigate this very thoroughly. And based on the CRM concerns and comments that came out during the investigation regarding CRM specifically Captain Chapel's flight deck dissent (SP) with CRM .Many concerning comments came out and I just put a few of them down here.

Now keep in mind. These were signed statements that are documented in this investigation report. But the submitters requested anonymity basically due to fear of retaliation and retribution from Mr. Chapel.

Now during this investigation—actually prior to—there was significant conversation between well, there were attempts of contact and some contact between Mr. Chapel and his First Officer. And there were other pilots that were contacting the First Officer to garner information.

The First Officer was very, very uncomfortable. And so, during this investigation, you know, we actually went outside just to try to determine what the issues were here.

But anyway, here are a few statements. But that's why there's really a fear of retaliation quite frankly. So, I de-identified these, but I'll just read these.

"If you know Randy, he's always right. There's no sensible negotiating. And it's his way or the highway. I do 90% of the work in pre-flight preparation while he tells me to do the remaining 10%."

"He is demanding and takes full advantage of my experience and willingness to do work."

"He can be a cockpit bully."

And another quote, "Other fellow FO's vent to me about similar experiences."

Now this is important to bring up here because as we go through the rest of this investigation, again, we're focusing on what happened after the excursion. And there was some communication that continued flight was not prudent. And that was not accepted by Captain Chapel. If it was, we wouldn't be having this conversation today.

So, additional contributing factors discovered—complacency by both flight crew members, a demonstrated lack of Safety ownership by both flight crew members, inadequate communication between the flight crew and SkyWest Airport operations, inadequate fretter or management. And both flight crew member failure to adequately employ CRM and make sure they had full situational awareness. Again, the excursion was addressed, but it was ignored.

So, let's talk about airworthiness management. One of the top Safety focus areas at SkyWest is airworthiness control, airworthiness management. As a matter of fact, at CMO, this remains one of their top Safety concerns.

When we have a failure to document a mechanical irregularity and it's discovered, we face certificate action, punitive action and it's just unsafe. And so, we've had situations in the past where crews encounter some sort of an irregularity and their failure to document. The FAA gets wind of it and then we have a very uncomfortable conversation with the FAA. We have to manage that.

But to mitigate this, we have several strategies and flight operations to assure crew members comply strictly with airworthiness procedures. First of all, it's in the FOM. It's very simple, very clear.

But to assure everybody knows where to get this information and how to apply it, we send out bulletins. We send out messages. We call them My Messages. Management Portal My Messages where we will construct messages regarding top Safety concerns.

And this has been a hot topic with these. I have the Chief send out local regional messaging. We call it Chief's Notes or whatever they want to call it locally. But we'll communicate some of these things. But airworthiness management is a top Safety focus area and it continues to be.

(Long pause)

Anyway, we continue to send these out and we'll continue to send these out. But this is a situation where even the focus on airworthiness management was neglected by this crew.

So, with that, let's talk policy. Let's go over the airworthiness policies just to make sure everybody is aware of these. These are all in the Flight Ops manual.

So, FOM646 states, "Reporting actual or possible aircraft damage—PSE reports the actual or possible damage to maintenance. Maintenance

determines the action required. The PSE insures that the actual possible damage is entered into flight view, has been successfully transmitted by noting the aircraft status that's listed on the OTS."

And B) "Aircraft damage may include, but is not limited to conditions introduced by the flight crew or encountered externally exceeding operating limitations, overspeed flapper gear, overspeed engine or EPU over temperature."

So, here we address overspeed specifically. It's in policy. Pilot required reporting in the FOM states, "The PIC is required to report non-standard and emergency events as outlined in the Pilot Required Reporting table."

Now I didn't include the entire table. It's lengthy. However, I just extracted something relevant here. And, you know, I'll have EFP, so you can look at these more thoroughly if you care to.

But failure to report potential damage upon discovery of soil residue on wheel assemblies. That was something that should've occurred.

(Long pause)

Okay. So, let's talk about additional policy out of the PPM. So, SP330062B has several subparts in it that lists some rules of conduct and there was another.

(Background chatter)

Moderator: We can even take a break if you want for 12 minutes.

(Background chatter)

Okay. So, let's talk about policy. So, I think we made it very clear that just two highlighted policies—two excerpts from the FOM concerning airworthiness and required actions which were not followed here.

Let's look at Pilot Policy. The PPMSP300662B Pilot Rule of Conduct—"Pilots will maintain proper flight deck and traffic vigilance, discipline and collision avoidance at all times." We know that.

Well, actually the flight deck for inattention to duty were "unprofessional conduct will not be tolerated". We'll get to that in a few minutes.

Item 3) “Pilots will use checklists and follow company policies and procedures at all times. Follow company policies and procedures at all times.”

Think about the airworthiness, the FOM requirements. Follow company policies and procedures at all times. If that had happened, we would not have had an aircraft depart in an unknown state of airworthiness.

Item 12) “Pilots shall cooperate fully with other members or employees of the Flight Operations Department and other departments within the company, as well as other agencies, and businesses the company does business with.”

During the investigation, there’s not full cooperation. “Pilots will be courtesy and professional at all times. Rude and abusive language and/or behavior will not be tolerated.” More to come on that in a moment.

Item 18) “Pilots are expected to follow direct legal orders given by a member of management or other person in authority. Full cooperation is necessary when asked to provide information to the company in an investigation.”

Once again, “Full cooperation is necessary when asked to provide information to the company in an investigation.” During the investigation, there is some disingenuous conversation. There were facts that were withheld that eventually came out later.

Item 25) “Pilots will submit only true and accurate information on all company records and reports. And pilots are expected to promptly report work-related accidents, irregularities, incidents, injuries, or property damage.”

So, “report work-related accidents, irregularities, incidents, injuries, property damage”. Quite clear what needs to be reported.

Continuing in the PPM—

(Long pause)

Go on to SP3024 and this is the corrective action and employment separation area. And this is important to review because we have several levels of discipline for various infractions. And we like to follow a step discipline process.

But depending on the infraction and other extenuating circumstances, moving up to a higher level of discipline is appropriate in some cases. And I'll provide that.

So, SP3024 states, "Categories of inappropriate behavior—" and I won't list all of them. But Category G is the following:

Safety and Flight Operations—This conduct may be described as any action that causes concern for passengers, crew, aircraft safety, or willful disregard for FAR's or company policies and procedures." Again, "willful disregard for company policies and procedures."

Levels of Corrective Action—there are several. But let's go right up to the levels of corrective action that are applied to Mr. Chapel—suspension of duty. And this is when the pilot's notified of a more serious infraction that he failed to correct.

We don't have to get into all that, but we suspend a pilot, so it gives us time to investigate the infraction to determine the proper course of action. So, the suspension happened and that's the administrative leave component I mentioned earlier.

And like I said, it was paid. Until we get all the facts we do this under pay. There's nothing that's presumed to be punitive until we complete the investigation.

And then, Level 6 would be Separation. That's the level we finally went to. "Severe infractions and/or failure to correct any performance or behavioral issues will result in separation of employment." And this was a severe infraction due to the airworthiness issue.

(Long pause)

Now SP3024 goes on to address Extenuating Considerations and Individual Circumstances. And this is very important. We need to take a 360 view of everything.

And so, while we had information that the aircraft may have been damaged, we had to take a very through look at what was going on here. And so, with this, we determine that the crews failure, or inappropriate response, or lack of response to the excursion based on the unknown airworthiness state of that aircraft.

That was enough. But we can look through and look for anything else on this. And so, it says here, "While using the guidelines listed above—"

which I went over "—the Chief Pilot has the discretion to consider the circumstances surrounding each event on its own merit.

When evaluating and assigning the appropriate level of corrective action response, a Chief Pilot may take into consideration any of the following extenuating considerations and/or individual circumstances.

This list should not be considered inclusive. Only a presentation of examples of types of factors that might affect the Chief Pilot's correction."

So, Item 1) "The severity of the infractions."

Item 2) "The length of pilot service in his or her history of overall performance."

Item 3) "The pilot's response and outlook for continuous earnings with the company."

So, again, the pilot's response. And then, what I highlighted here, "Any history of adverse interaction with fellow employees and/or customers."

Okay. And then, "Past failures to correct performance/behavioral issue and/or the pilot's attitude."

So, let's look at IOR's. First of all, before we get into the IOR's, there's a situation with the previous—and this is from February 2019. There was a failure to document—the same thing that happened here. There was a failure to document this irregularity in St. George. Previously, there was a failure to document.

So, Salt Lake Maintenance Supervisor was frustrated, reached out to it looks like Captain Greyser (SP) who at that time was the Chief Pilot in charge of Region 4 which at that point included Salt Lake City.

Anyway, he said, "He had to return to field due to reported flap fail during takeoff." Why that happened?

"Plane returned to the gate after Maintenance had left. It was reported to me by Maintenance Control we had a flap fail."

So, Maintenance Control notified them. We brought the plane to the hanger late. Anyway, it says here, "If you could talk to Randy Chapel and David Smart, I would appreciate it."

Basically, it wasn't written up. So, there wasn't a conversation. A quick call to Maintenance Control, so they knew about it. Thank goodness for that. But again, it was not documented.

So, flight view was researched to determine if there was any malfunction and we couldn't find anything, so. But at least Maintenance was called.

But let's get back to the history. So, again, SP3024584 states, "Any history of adverse interaction with fellow employees and/or customers is a factor to consider the direction to go with the pilot."

So, let's talk about 4226 Twin Falls, Salt Lake City. Paragraph 10 (SP) "Sent out before numbers could be submitted." "Paragraph was taxing out before numbers could be submitted before the auto close (SP) out of the aircraft.

Above wing counts were 42 adults, one child. _____[01:17:54] accounts showed 46 and one. So, there was a discrepancy. The—

Randy Chapel: Excuse me. What page are we on, Roy, so I can follow along?

Roy Glassy: Oh, I don't know what page number it is. It's—

Unknown: Does it begin with IOR?

Roy Glassy: You'll find it with some yellow print on the top.

Unknown: Item 6483. (In unison)

Randy: 83, yeah. Okay. I'm just not reading what you just said.

Roy Glassy: Okay. So anyway, this was just a complaint about an early departure. And again, note the St. George departure--the expedited departure out of St. George the morning early.

Well, here we have scheduled departure at 6:30. Actual departure at 6:19 which was 11 minutes early without the auto closeout and without matching numbers.

That concerned the station on the face of the IOR. The Delta policy by the way, is no departures more than five minutes early.

(Long pause)

So, then we have another IOR again from Twin Falls. “Crew did not wait for above wing counts to be submitted.”

Submitted narrative, “Crew did not wait for above wing counts to be submitted. They requested 100 lbs. of _____[01:19:10] to be loaded. When the Flight Service pulled up after takeoff, the recurred (SP) counts showed 50 adults. Their above wing counts were 49 adult, one child and were submitted eight minutes before departure.” Again, this one departed seven minutes early.

(Long pause)

Another IOR—this one for “Adverse Interaction”. Those first two just show essentially not following process just to hurry.

“Alleged Verbal Abuse of a Customer Service Rep”—so, this complaint came across. “The crew came in at showtime—5:50—and was verified and allowed to access the aircraft routinely.

After boarding the aircraft, the Captain addressed the gate agent positioning the board at the bridge. He stated that the heater needed to be placed on the aircraft earlier. The gate agent responded respectfully and explained that the heater was placed on the aircraft as early as possible as a heater was shared with another R01 position—” another aircraft “—that was scheduled to depart prior to them.

The Captain then told the gate agent that the other flight did not leave prior to him the previous day. He asked the gate agent, ‘What does that plane say on it?’ And proceeded to answer his own question with, ‘It says Go Jet.’

He continued by asking the gate agent what company they worked for. When the agent responded, ‘SkyWest’, the Captain then again pointed out that the other aircraft is Go Jet, not SkyWest and that his passengers needed to be comfortable, not the other carriers.

He also addressed the ramp agent with the same quote. ‘What does that plane say on it?’ Question. ‘I told the ramp agent the same thing he told the gate agent.’ That greatly bothered the Ground Support Team, so they filed the complaint.

Well, here’s another one .This is out of Salt Lake City. “Alleged Incorrect Delay Announcement—the situation arose when—” looks like the agent. “I had an acquaintance to fly into Idaho station on Sunday, the 10th.

The Delta plane came in. It had to be parked at the gate due to United landing a minute before them. It was told to me by my acquaintance that the pilot proceeded to get on the overhead speaker to the whole plane announcing that, 'This station is understaffed, so we will be waiting for a while. My concern is that we are all SkyWest and there's no use throwing us all under the bus."

You know, it's not uncommon to have a gate that's occupied. But the way we make our announcements in the past, we do have guidelines for passenger announcements to make sure that they're not misunderstood or taken out of context.

Here's another one.

(Long pause)

This one's a Jet blast incident.

(Long pause)

And this caught my attention as I was reviewing this because of the 75% and one on two engines used in St. George. Submitter narrative, "An aircraft taxis out. As the aircraft taxis out to the west, the Captain turns on thrust and jest blasts agents, equipment and building. Jet blast is so strong it blows over stands, blows delineator across the ramp. Most importantly, throws agents into the building.

This seems to be a Safety hazard especially as we approach the winter months with a sanded or icy ramp. We will follow-up with a Safety Concern Report."

And the solution states that, "Most crews wait to turn on the thrust—" apply power. "Most wait to turn on the thrust until they are clear of the marshal and have the aircraft's tail facing away from the building. Crews should be mindful of the ground crew to avoid unnecessarily enduring equipment damage."

Now looking at this—scheduled departure time 6:30. Actual departure 11 minutes early. Actual arrival 29 minutes early. Again, a hurry to get out of there and potential injuries.

Here's another one. This one deals with failure to write-up.

(Long pause)

"When the next crew arrived to work, the outbound flight—"

(Background chatter)

Oh yeah. "On 944, the outbound crew for 4225 found the emergency release lever pulled up and inbound crew not reported a no Maintenance tag on throttles and inquired to agents."

Anyway, the airplane wasn't ready to go. They had to have Maintenance come out. The airplane had to be put up on the jacks with the gear swing. Anyway, scheduled departure 6:30. They went out eight minutes early. But this is on arrival.

Arrival time 27 minutes early coming inbound from one of those split duties in a hurry. So, something moved that one. We don't know what that did, but a hasty escape from an aircraft in an effort to get home out of there. We don't know, but there was a complaint.

Here's another one.

(Long pause)

"Crew was creating an unsafe environment for the Pushback Operator. During pushback, crew was creating an unsafe environment for Pushback Operator, GTF crew." That was outbound in Salt Lake City by the way.

"Was in a hurry to get their flight departed, but was being belligerent to the tow operator. The crew first initiated the pushback by telling the driver he was clear to push, but a Delta plane that had pushed off the Delta gate was about to block the push. And when he signaled to stop at Gate 21—" it gives the tail "--at Great Falls Aircraft was blocked. And then, the push was continued. And then, there was another Delta airplane pushing off the Delta gate."

So, they're blocked. Anyway, "The push operator had a not so stellar push." He was new. "—had a not so stellar push. Stopped a few times and I had to motion the operator to continue to push to disconnect the Hotspot 24, so the push would not be blocked and the rampers would not have any jet blast off the Great Falls aircraft.

Also, the push operator had only been in Salt Lake station for a few weeks and was not fully aware of how to handle the situation with the crew.

But the way the crew interacted with the agent was uncomfortable. Therefore, they filed a complaint and they provided a solution to be

patient and allow safe pushback operation to occur. This is a crew have an obligation to safe flight. We on the ramp have an obligation to safety and to allow safety pushback on the proper drop-off point as well as other factors.

Be aware that other factors may be aware of present amount of pushback, not to be in a hurry and creation of an unsafe situation during pushback, and not to yell at a kid who just started here and is trying to do the proper pushback procedure."

(Long pause)

Yet another one and this has to do with well, this is actually not another one It's the same one. Just going back to some of the similarities in this ramp excursion situation, you know, flashing.

"Seemed to be in a hurry flashing the lights on the plane to get going." There's obviously a 12 minute early departure with the 24 minute early arrival.

So, I bring those up to show clearly the history of adverse interactions with ramp agents and some of these external folks that are handling the aircraft. And so, just in conclusion, Captain Chapel's actions following the excursion justify termination for cause as process.

So, looking back at what we went through, I went through all the facts, the investigation. And starting with the excursion, that really was not the issue that got us here today. It's what the crew did following the excursion.

So, the investigation concluded that the crew knew about the excursion. They used significant thrust to get out of that dirt. There was an unknown state of airworthiness.

Upon arrival in Salt Lake City, they confirmed that there was still soil residue. Even with that, there was not a call to Maintenance. The bus showed up and the First Officer was directed, "Just get on the bus. Don't worry about it." I think "Don't worry about it" was a phrase used on the taxi out when the First Officer questioned the continuation of the flight.

There was a disregard for the aircraft condition. But en route to Salt Lake City, a few airspeed exceedances and such that should've been written up. So, the airplane was neglected and left for the next crew, the next several passengers to fly without a known state of airworthiness.

Anyway, the comprehensive review of the event and the final Summary Safety Report—believe me, we poured over this in detail. It indicated clearly a willful non-compliance with their witness procedures.

Again, operating the aircraft in revenue service, unknown state of airworthiness, falsification of company report, disingenuous information provided initially in the IOR, disingenuous information provided, or omitted, or withheld during the investigation process—the verbal interviews.

And then, failure to comply fully and provide truthful/accurate information to the company during the investigation. That's what I just mentioned. And then, ineffective CRM.

So, this investigation revealed chronic CRM deficiencies, indicated concern with Captain Chapel's interaction with other employees, ground personnel based on those reports I read. There's several others, but as anecdote to bring up, I just like to have the report that was finally submitted and there are several. They're all consistent.

CRM deficiencies—I read some First Officer statements that describe their feeling about flying in a flight deck with Captain Chapel and those are concerning.

So, with that, the termination for cause was processed. It was appropriate. Again, I did review the specific policy—the FOM policy, and the non-compliance therein, and then the PPM policy that actually requires FOM compliance as well.

So, with that, I'll go ahead and conclude. Thank you for enduring this. This was very lengthy, but I wanted to be very, very careful. We didn't omit anything. And all the facts were brought out and everything that we had reviewed.

So, the only things that we didn't put out here are well, there's mountains of paperwork. But this is the distilled version. So, thank you for enduring the explanation. And that's all I have at this point.

Moderator: Thank you.

Roy Glass: Yeah.

Moderator: Captain Chapel, do you have some additional comments or some—

Captain

Randy Chapel: Oh, I have a lengthy rebuttal. But do we want to take a break?

Moderator: Sure. Does anybody feel like this is a good time to take a break?

Captain Randy Chapel: I need to use the restroom.

Moderator: Okay.

Captain Randy Chapel: Yeah. I think, yeah. We'll have to go through this in its entirety.

Moderator: Sure. Does everyone know where the restrooms are?

Captain Randy Chapel: Yeah.

Unknown: Yeah.

Moderator: Okay. Please refrain from speaking to each other or to anybody else. Should we say is 5-7 minutes enough—

Captain Randy Chapel: Sure.

Moderator: --to be back or—

Captain Randy Chapel: Thank you.

Moderator: (Background chatter)

[End of Recording]

Roy Glassy (SP): (Background chatter)

Penny: Okay.

Captain Randy Chapel: Okay, ready?

Penny: We are. Thank you.

Captain Randy Chapel: Okay. I'll try not to drag this out too long, but obviously—

Penny: It's fine. That's what we're here for.

Captain Randy Chapel: Okay. I do want to touch upon most of this. I want to address departure times. We do have a policy. However, if you've done standups, that's the first flight into the hub in the morning. And generally speaking, the station with that might be their only flight are generally in a hurry to get you aboard, get you out of there, and get you on your way to Salt Lake.

So, that—though it may be contrary to Delta's policy—it's never been something that's been overly discussed with crew members. And then, obviously, we don't know what the winds aloft are. There's less traffic, less arrival traffic, so on and so forth.

I mean, most of these flights are somewhat overbooked. We get in early all the time. It's just the way it is.

We did have a program though addressing this. Which I was asked by David Keno (SP) and Tracy Gallo to head up to try to increase our block times and to explain why it was so important that we do that financially.

They asked me to head up the program and I said, "Okay, I'll give it a try" because I was a guy doing standups. I went to the group of pilots. Mike may have been of them at the time. I can't remember. And I articulated to them why we needed to increase our block time, why it was hurting the company financially, and we needed to do this, and some of my thoughts on how to do it, you know, taxis—what the guys in the daytime do to get their appendix time or whatever.

"Go ahead and taxi slower." "Fly the full route." "If it looks like you're going to be ahead of schedule, it's going to affect the block, fly slower", you know. We did all these things. And the most egregious individuals made the biggest improvement. In fact, past everyone up.

I being one of them. I led by example. I did the program and, you know. There was York Zentner. There was a handful of guys that were quite under the block and everyone else was under the block as well.

But we made a huge improvement that month and Tracy was blown away. She said, "How did you do that?" I said, "Well, the guys respect me and I was able to articulate to them why we needed to do it, why it was important and potentially we could lose our standups. If they are not profitable they go away and it worked."

And for some reason—and I don't remember exactly why, but it kind of went by the wayside from above down to us. So, addressing the early departures and the early arrivals, basically, I don't know what it cost the company or anything. But I know there was it set up the rest of the day for success. It got these aircraft into position. And, you know, I was never brought in and counseled on any of this stuff regarding that.

I do want to address these things as they're fresh in my mind. Quite often in an IOR, things are invalid a bit. I am aware of two of these. The others I'm not. I will talk about the flap failure in February which I remember vividly and it was written up.

I called Maintenance Control. It was written up. Maintenance, when they got it to the hanger somehow figured that it wasn't written up. And as we talked to whoever it was we talked to—I can't remember—but we did write it up. It was a return to field because of a flap failure. Of course I would write it up! It was a known thing. That's an inaccurate IOR from the Maintenance Department unfortunately. And maybe it's just what they had, you know, had witnessed that night. I'm not sure.

As for this Casper situation? This was an ongoing situation with our SkyWest station there. Many crews were complaining about it as it's quite cold in the winter there in Casper. And they had a couple of aircraft on the ramp at the time—one being Go Jet.

We were constantly showing up to the aircraft and the heater had never been on the airplane. It was literally six degrees inside the airplane. It was impossible to put Delta passengers on an airplane like that.

And this was a lengthy thing which I tried to constructively workout with the station without having to go to Dave Casillas, so on and so forth, and write up the station. Handle it internally. Handle it constructively.

It didn't work. And on this particular morning, we did show up to the airplane and the heater wasn't on the aircraft. We stood in the jetway as she moved the jetway to the airplane. And I said very diplomatically, "Is there a reason why we don't have a heater on the airplane? It's, you know, eight degrees outside .The wind's blowing 30 miles an hour."

And she says, "Well, our contract is we have to put the heater on that airplane." And I said, "Well, but that airplane doesn't depart for a while and we are departing. And we're a Delta flight and we're a SkyWest station. I would think that, you know, we need to protect our passengers right now."

And she says, you know, she was like, "Okay, yeah", you know. And I did say. I said, "This airplane's a SkyWest airplane." I didn't say what's on this airplane. I said, "This is a SkyWest airplane. That's a competitor of ours that we contract to work. But this is why it's due out and this is an ongoing problem."

Mark called me about it because of this write-up and he said, "What's going on over there?" I explained it to him and he said, "Well—" He goes, "Thanks for caring about our passengers. Let me see what I can get done with it. But next time you have an incident like this, bring me into the loop." I said, "You got it."

I played golf with Mark and Scott that day and later on after the round he says, "Well, you did it!" He says, "Dave and Customer Service are all over this. This is never going to happen again." And I said, "Well, I'm happy to take a little punishment if that's what it takes." He goes, "I wasn't punishing you." I said, "Well, I'm happy to stick my neck out if it makes a difference." And that's what's pertinent to that write-up.

Now with regards to the Twin Falls jet blast scenario? When you make the right 90 degree turn to exit the ramp at Twin Falls, there's a considerable grate this way and grate that way.

If you start the #1 engine and you turn out, you should be on two engines. But I believe that morning we had started one engine and made the turn. And when I came up on the power after coming into that uphill portion, it didn't blast them. It didn't damage any equipment. It didn't do anything later to find out from Mark or from whoever it was. I can't remember who the Chief was at that time. I'd have to look at the date.

Well, it was a year. It was September I believe. No, that's not the right one. But anyway, none of these complaints--other than the Casper one and the Twin Falls one—were ever brought to my attention. I was never

counseled on them. I was never written up on them, given time off for them. There's no supporting documentation here that says I even knew about some of these. I'm admitting to—because I'm honest—I'm admitting to these events that I recall.

Also, we have a Safety reporting system here at SkyWest. And it's unbeknownst to me these comments from First Officers that are obviously thrown into this whole thing to support your decision in terminating me. I've never been counseled on these. I've never been brought in and said, "We're not going to tell you who, but so-and-so says you do this or you do that."

I've never been spoken to about that ever. So, it's just like there's a lot of stuff in this lengthy, lengthy narrative here that are, you know, with all do respect, slightly embellished. I mean, it obviously paints me in a very bad light.

You can't point to any specific documentable evidence that supports this in the sense that, you know, when was I counseled? When did I sign a counseling statement? When was I given a letter of correction? When was I given time off without pay? When was I disciplined in 30 years?

Not once. So, we come to this event and we talk about a willingly, knowingly violation of policy, and not documenting, and withholding information, and not being truthful. My IOR was a truthful statement. I wrote it down. It's a truthful statement.

At the time, we did not know we ran into the dirt. And when you look at that video, visually anything can look like something. But without you being there and feeling.

And you talk about 14-to-17 inches. That's the measurement from the top of the ramp down the sloped gravel to also the grated drainage grate that my left tire went through. It was very smooth and that thing that you see in the video didn't feel like anything I hadn't experienced before, you know, with a grate or whatever.

You talk about the danger of running over a grate. We couldn't specifically identify that it was a grate at the time. That's kind of what it felt like. Those are located on concrete raps. We drive over those all the time.

So, theoretically, trying to make that out as a threat, they're put there for a reason. Obviously, that one's put in the gravel where we should not have been. And, you know, like I said, if I could've identified it at the time that

that actually had happened and that I believed it happened, we wouldn't be here today.

The company is trying to make this appear that we deliberately did this or that we deliberately tried to hide it and that is not the case because it's really not a big deal. It would be a big deal to not address it. That's why we're here today.

(Long pause)

You also say that the aircraft was inspected in Salt Lake by both flight crew members and mud was found to be on the tires. That's an inaccurate statement.

The last time I did a walkaround was when I was doing IOE and I was the First Officer. And I did the pre and post-flight inspections of the aircraft. There was no reason for me to walk around the aircraft because, you know, as I spoke to the FAA Inspector, I asked him—because he was a 36 year Delta pilot. I said, "Buddy, when's the last time you did a walkaround?" And he chuckled. He said, "When I broke a toeboard (SP)."

I actually inspected the nose here. I said, "Exactly." I said, It's not normal for the Captain to get out, and follow the First Officer around an airplane, and do a post-flight inspection. It just doesn't happen. I can't remember the last time I did one."

So, that's an inaccurate statement. And then, we did talk about a lack of CRM. Well, I'd like to know what you're basing that on because I utilize CRM in every flight I do. I do my wants briefing. We debrief if there's items to debrief after we complete the flight. How are you coming to the assumption that CRM was not utilized?

I don't know how you'd come to that assumption. It is just that—an assumption and my opinion. You show a picture of the ramp area. And like I said, you talk about 14-to-17 inches. My best estimate looking at the pictures—and I've seen them and I have my own pictures. The tires actually went 3-to-4 inches into the mud. But your measurement is from the top of the ramp area down the slope. That's what they're measuring from.

It was very smooth other than when we lost our momentum and had to start going again. Then it took that amount of power. But with regards to that power, it wasn't deliberate. It was just a pushup of the thrust levers. And anyone who flies RJ200's now know that no two thrust lever quadrants are the same. Some are smooth and loose. Some are tight and

sticky. None of the friction locks were like they're supposed to. They don't adjust the tightness and the looseness of the thrust on the quadrant.

So, I pushed the thrust levers up to get moving, pulled them back as soon as we started moving and away we went.

(Long pause)

One other thing here. Obviously, there was a Safety Report. It's not included here today. I need to ask the panel if they've read the complete Safety report. That's a question I have for the panel members. Have you read the actual Safety Department's report regarding this incident—their findings and their recommendations to the FAA?

Penny: If you wanted to present in your remaining time (SP), they would not have had opportunity to see that.

Captain Randy Chapel: Okay. Well, I didn't have the opportunity to obtain it. It wasn't given to me. I was told it wasn't entitled to it and it's not here today.

I do, however, know in summary what's in that Safety Department report. There was numerous things. And after speaking with the FAA inspector, he spoke to me. He spoke to my First Officer. He read our IOR's.

And after speaking with us, he told me that he didn't know what type of training we would even require or be recommended to do. In his opinion, nothing. You didn't know what happened. Your written and verbal statements support one another.

And I'm closing the file on this. This is not even categorized as an incident, but an occurrence. And there's so many mitigating factors with regards to the things we discussed—lighting, markings, overflow parking, lack of information to the flight crews. There's so many mitigating factors that could've been addressed prior to that weren't, that put us into this situation.

When I had my Safety call with Monty, we discussed these things. I don't know who was on the call. But we discussed all of these things—the lighting. I will address the picture that you saw of the ramper standing there.

That is not an accurate depiction of what that looks like there. I don't know if there's a tug with their lights on. I don't know what it is. But literally, with that parking spot, you can't see much to the left and there's

a jetway that extends past the aircraft on the right. That's why we don't turn right.

Maybe if they pushed deeper. I don't know. I don't even know how much room was behind us actually. But that's not an accurate depiction—that picture they provided. That shows fairly well lit in my opinion.

Literally, it's dark as dark on that end with the ramp. And I believe it's equally dark to our right. It's just dark over there.

We talked about those things. I asked Monty if he was aware of those things that we had described prior to this event. And the Safety Manager told me that he was aware of those things.

In the FAA's opinion, there were so many factors that led us into this. Their exact words were, "You were hung out to dry." I don't feel that way, but, you know. It did happen.

But it wasn't an adequate place to park the aircraft and even in the IOR's that I read—Justin's IOR—normally most situations, the crew submits an IOR. It's not a "come together and lie". It's "Make sure we got all our facts straight and they get accurate information, so that they can address the situation."

I was informed right off the get-go that Management, Flight Operations, Mark Richards, whoever it was strongly advised my First Officer not to speak with me, you know. I see this in 30 years here kind of a, you know. It's quite evident that the company wants you to believe without any supporting documentation that I'm a bad guy, that I'm a jerk, a bully and that's not the case.

Most guys will tell you I might be too easygoing, you know. I've flown with Mike hundreds of times and my operation is always a smooth, standard operation, you know. We do our SOP. We don't deliberately cut corners. We're not hasty. And if that was the case, I think we'd have been here far sooner than we are now.

But that's the narrative. That's what's trying to be painted and it's a little bit unfair. It's not how I operate. If it was, I would've had violations, incidences, accidents, you name it. I would've had those things. And if any of this was accurate and there was a consensus amongst crew members that are depicted in this document, by all means, it could be a Safety issue. Why wasn't it brought to my attention? Why wasn't training offered? Why wasn't this addressed over the years?

It never was. So, you know, we come to this point and wow! This is all a big surprise to me. Not the early departures because that's pretty much standard. I can show you all the other departures and standups. And you would see many, many of these eight, 10, 11 minute departures early.

You'd also see a push initiated and you don't have your numbers. And I've sat on the ramp just after push and been on the frequency with Ops, you know, a few times, and say, "Hey, we don't have numbers. We can't go."

I've never taken an aircraft off without my numbers ever. And I don't really remember if you're insinuating that I did but being pushed back potentially.

(Long pause)

There's no FAA action here. And in fact, the opinion of the FAA is that there were too many mitigating factors, too many things needed to be cleaned up. And in their own words, they can't even believe they terminated this flight crew. That's what's been conveyed to me.

It doesn't change the fact that like I said, I take responsibility for not being on the pavement. But what led me to get to that point? And without you actually being in the cockpit, you can't know what you would feel, or what you would think, or what you would belief at that specific moment. There's just no way.

Now looking at that video, I even say to myself, "Wow! That looks pretty dramatic." But what you see and what you feel are two different things.

Somebody asked me. They said, "Well, couldn't you feel the gravel under the tire?" I said, "I've got a 50,000 lb. airplane, you know, with tires that are pumped up." I said, "I couldn't feel anything. It felt as smooth as any other taxi other than the losing our momentum, and coming to a halt, and having to add power nothing felt out of the ordinary."

But anyway, I do know I can't speak specifically. There's obviously people deserve privacy. But, you know, I do know that my First Officer's narrative changed. I do know that my First Officer had more conversations on the phone with possibly you, Roy or Flight Operations. I don't know who he spoke to. But I know he had a few more phone calls than I had.

I had a call from Mark to file an IOR. I had a Safety briefing call and I had a conference call where you terminated me. But he had a couple of more phone calls with management.

I do know he was told not to speak to me, not to overthink the situation and it just doesn't add up to me to be a fair and equitable examination of the facts.

(Long pause)

Like I said and it's documentable. If we look at our incident history, our discipline, termination history, so on and so forth, not everyone who violates a policy or has an incident is terminated.

We've had many incidences that are maybe potentially more severe than these. More negligence was involved. And these crews have received training.

The Safety report—our Safety Department who conducts this report sends to the FAA their findings and recommendations. And in those findings and recommendations it states, "The ground employees will receive such and such training. The Flight Crew members will receive an MCRM training, logbook discrepancy entry training", so on and so forth.

So, even the recommendation from our Safety Department doesn't go in line with terminating two employees with impeccable performance records. I know you dug up a lot of stuff here that you can add it in here that's really, really not pertinent to what occurred that morning. It's just in there to really caste me in a bad light.

And, you know, I think it's a little unfair when you don't have the supporting documentations that, "Yes, he was counseled. He signed a counseling statement. He used abrasive language" or whatever, you know. If you had something to support these things, okay. I'm a bad guy.

But that's not me. So, let me make sure there isn't anything else on here.

(Long pause)

Do you have any questions?

Penny: We can go to the questions in just a moment.

Captain Randy Chapel: Okay.

Penny: If you—

Captain Randy Chapel: All right, let me—

Penny: Yeah. Take your time. You can. There will also be time at the end to summarize. So, if there's something you believe be sure to write down.

Captain Randy Chapel: Well—

Penny: But take your time.

Captain Randy Chapel: --I have to be honest. This is a little bit shady because it does caste me in such a bad light. I'm a little bit, you know. I'm a little bit hurt especially when some of these things are accurate. Most of them never brought to my attention and some inaccurate. But they're all included in this, you know. It's kind of just a bunch of stuff that really has no relevance to what occurred on March 24th. It's just there for your enjoyment.

(Long pause)

Okay. So, you said there will be a summation when we wrap-up?

Penny: Yes. You'll have an opportunity, yes.

Captain Randy Chapel: Okay.

Penny: And you'll be able to decide if you want to go first or last when it comes to that.

Captain Randy Chapel: Okay.

Penny: But we can move at this point to the Question and Answers. So, if you have this question, like I said, please apply to whom you're asking the question and redirect making sure it's a question and not so much a comment or opinion, all right?

I'll move it to you to ask your questions.

Panel Member: Randy, I'd like to get your opinion on the investigation findings that state, "The FO indicated that he was under the impression that both crew members were immediately aware the aircraft had left the pavement surface area." What would give him that impression? Did he say anything?

Captain Randy Chapel: No, that's the thing. I think it clearly states there it was his impression. It wasn't articulated.

(Long pause)

Panel member: Then I guess—and I'm not sure which investigation he was speaking of.

Captain Randy Chapel: What page are you looking at, so I can—

Panel member: It's not numbered. It's under the "Investigation Findings" right after the pictures of the ramp—the diagram of the ramp.

Captain Randy Chapel: Okay, let me find it.

Panel member: And then, it's—

Captain Randy Chapel: Is it his IOR?

Panel member: It's the red print. Keep going.

Captain Randy Chapel: Okay, red print. "—indicated he was under the impression". Okay.

Panel member: What about the next bullet as well? "It was also indicated there was minimum discussion." I'm not sure if the FO is saying that. And "—a clear and conscious decision made by the Captain to continue."

Captain Randy Chapel: I don't know what that refers to. Like I said, we did come to a loss of momentum there—

Panel member: Yeah.

Captain Randy Chapel: --and continued our taxi. I think it was pertaining to that, you know, that we had come to a stop. I had added power to taxi. Maybe that's what he's referring to if this is even from him. It's not from me.

Panel member: Yeah, it says it was indicated also.

| | |
|---|---|
| Captain Randy Chapel: | Yeah. |
| Panel member: | Also indicated, I'm assuming this was an investigator's note what the FO said. |
| Captain Randy Chapel: | Yeah, possibly. |
| Penny: | (Background chatter) |
| Panel member: | I don't know. Roy, do you know by chance? |
| Roy Glassy: | Now say that again, please? |
| Panel member: | The red? |
| Roy Glassy: | Yeah. |
| Panel member: | You see that bullet point here? |
| Roy Glassy: | Yeah. |
| Panel member: | Is this the investigator summarizing what the FO said? |
| Roy Glassy: | Right, this is right out of the investigation of the report that was just referred to. |
| Unknown: | Safety Report. |
| Roy Glassy: | The Safety Report. So, this is the Safety Report which was added to the PowerPoint, so everybody could have all the information from the Safety Report.<br><br>So, this is right out of the Safety Report. And the Safety Report was built with many sources including interviews from the individuals involved with it all. |
| Captain Randy Chapel: | Excuse me. Is this a question? |
| Penny: | He's asking him a question. |
| Captain Randy Chapel: | Oh okay. I'm just— |

| | |
|---|---|
| Panel member: | I just was asking, you know. |
| Roy Glassy: | Right. |
| Panel member: | Sounds like this was written down from the investigator and was brought up, or cut out of the First Officer's statement, or interview. |
| Roy Glassy: | Correct. That, yeah. |
| Panel member: | Okay. |
| Roy Glassy: | Yeah. |
| | (Long pause) |
| Panel member: | Can we see the Safety Report just— |
| Roy Glassy: | I can get it printed quickly. |
| Panel member: | --so it verifies where that statement came from? |
| Penny: | Do you happen to have that? |
| Roy Glassy; | I do. I've got some notes written on this one, but I can have a few printed in minutes and run over to us. |
| Penny: | (Background chatter) |
| | Do you want to read it to us? Would that be helpful? |
| Roy Glassy: | Well, it's— |
| Penny: | Oh. |
| Roy Glassy: | It's everything. |
| Panel member: | It's 17 pages long. |
| Roy Glassy: | Yeah. Yeah, this is it. |
| Penny: | What we can do then is— |
| Roy Glassy: | All these are distracting (SP). |

Penny: Perfect. What we can do then is as the panel deliberates, we can make sure that there's copies of that for you.

Roy Glassy: We can do that. I can scribble out my notes here because these are old notes that are irrelevant. This is just. So, I'll scribble these out and pass it around if you like--

Penny: Okay.

Roy Glassy: --so you don't know what my shopping list is.

Penny: (Long pause)

(Background chatter)

Panel member: Now yours doesn't include all—

Roy Glassy: This is the final summary report, so obviously part of the process is making notes, and getting information, and compiling it in this.

Penny: So, you're not going to get a direct, cool (SP)—

Roy Glassy: That's fine.

Penny: --statement from anybody.

Roy Glassy: I get it, so.

Penny: Okay.

Captain Randy Chapel: Excuse me, Penny (SP). Am I to believe this document that Roy's going to make copies of is the actual Safety Report that went to the FAA? It's a fair question. I don't know. Is this the 17 page report that the FAA report got in their hands?

Penny: If a panel member wants to ask that question—

Captain Randy Chapel: Oh.

Penny: --they can go ahead, but.

Captain Randy Chapel: Well, it's pertinent because I—

Penny: Sure.

Captain Randy Chapel: --haven't been able to see it.

Penny: Sure.

Panel member: Does the Safety Report even go to the FAA?

Roy Glassy: If there's a request for information that requires that, yeah. Does everybody understand how Requests for Information—RFI's—work?

Panel member: There was?

Roy Glassy: Yeah.

Panel member: Sort of.

Roy Glassy: They ask for different things. Sometimes they ask for this kind of information. Sometimes they don't. Oftentimes, all they want are the crew statements/IOR, conversation with the crew. So, I don't know if they have this or not.

But I've got this. I just sent this over to Jen. I don't know if she's still here. But she'll make some copies. But that essentially replicates or this replicates what's in that report.

Penny: And we can guarantee that there'll be no discussion on it.

(Background chatter)

(Long pause)

(Background chatter)

Panel Member: I have a question for Roy. It says right here 109 violations and policies?

Penny: No.

Roy Glassy: No, that's the code.

Penny: Okay. He may want to hear that too as well.

Panel member: Okay.

Penny: Yeah. Just—

Panel member: Okay, yeah.

Penny: So—

Panel member: Well, that's just a code. Okay, thank you.

Roy Glassy: (Break)

Captain Randy Chapel: I have a question, Penny. These review boards, are they conducted their own event, is that correct?

Penny: No.

Captain Randy Chapel: I have a review board. The First Officer has a review board. Are those sterile environments in the sense that what we go over here today is—what's the word—deliberated on and a conclusion is come to or are we being reviewed together?

Penny: They're separate events.

Captain Randy Chapel: Separate events. Okay, thank you.

Penny: (Break continues)

Jeff (SP), are you finding something in there that we could summarize for you, so we could move forward? Is there any—

Jeff: I just want to see what's in here. I'm not a pilot, but I do have some concerns about some of the things.

Penny: Sure. Sure. Sure. Sure, is this something that we can give you ample time to read?

Jeff: Nah, go ahead. I'm a little concerned we have Spot 1 (SP) there and there's no way to marshal the crew out in the middle of the night--

Penny: Right, so if there's a question—

Jeff: --or, you know.

Penny: If you have a question for someone—

Jeff: That's just something that's relevant to this discussion.

Roy Glassy: Is this a question I can address?

Penny: Is there a question there?

Captain Randy Chapel: Sir, is there a question directed at me?

Jeff: Why is there a ramp? They marshal us in there, right?

Roy Glassy: And that's—

Jeff: I know that's not your responsibility.

Roy Glassy: No, it's not why we're here. And agreed, they can mark those things better. But that's not why we're here today. It's the marking that it's irrelevant. It's what happened after.

Jeff: I get that. There's two aspects in my mind of how we got here.

Captain Randy Chapel: Thank you.

(Background chatter)

Penny: Oh, did you mean intent for it to go here?

Roy Glassy: What's that? Well—

Penny: You said four.

Roy Glassy: Yeah, it's for the panel. But he can look at it to see that it exists. But it's all replicated in the handout I sent out.

Penny: Okay.

Roy Glassy: I mean, it's a safety document. So, it's controlled, so.

Penny: Well, often, sometimes you can look at the document in order to see if there are any questions that you could ask the employee and the manager

while they're here. You'll have time during the deliberations to look at it in detail.

We can also give a call to either of these gentlemen and ask a more clarifying question if you have something during your deliberation. But I'm giving some time, so that you can form a question. If you have one while we're going on here.

But we want to be mindful and respectful of the time as well. There's probably a lot of questions that will create want (SP).

Roy Glassy: Yeah, this is one with some confidential information for just the panel. Can we introduce this?

Penny: Pardon me?

Roy Glassy: This document?

Penny: I don't understand your question.

Panel member: He says that it's confidential.

Roy Glassy: This is one that based on the submitter's request for privacy.

Penny: Do you want me to grab this one then?

Roy Glassy: There's extractions in that. So yeah, probably should.

Penny: Okay.

Roy Glassy: This may be a benefit to the panel, but it's—

Captain Randy Chapel: I haven't had a chance to review it yet. I mean, you know, it wasn't presented initially. So, I haven't had a chance to hear what's in it.

Roy Glassy: It's all summarized here.

Captain Randy Chapel: Oh okay.

Penny: Exactly, the summary's there.

Captain Randy Chapel: Okay.

Penny: Okay. I know we're for privacy and confidentiality maybe I'd better grab it.

Roy Glassy: Yeah.

Captain Randy Chapel: Oh, this?

Penny: Uh-huh. Yeah, okay. Thank you.

Captain Randy Chapel: I haven't seen anything in there that isn't able to be—

Penny: Exactly.

Captain Randy Chapel: --in there, but.

Roy Glassy: (Background chatter)

Penny: So, we're going to look at that, give you an idea of any questions that you might want to ask or do you want to move on?

Panel member: I don't have anymore questions.

Mark: I mean, I have one final question. I mean, if he's going to go right into a summary. I mean, Randy, I don't want to put you on the spot. I just want to know like in light of what's been shared and what we've learned, what would you do for yourself or moving forward, have you learned something that you would change something differently moving forward?

Captain Randy Chapel: In hindsight, you can always say yes to that question.

Mark: Sure.

Captain Randy Chapel: I never thought with my diligence that would ever happen to me. That may be in itself the change in the armor. It wasn't complacency. It was, you know, when they called me and I said, "Oh well, okay. Well, if it happened, it happened."

But I failed to recognize that it happened. I couldn't see. When I was making my turn, my attention was out the left side of the airplane. There's no lights pointing out the left side of the aircraft.

I continued to make that turn. We rolled into the gravel, completed our turn and came to a stop. Yeah, it's hard to answer that question specifically. I mean, you have to clarify exactly where you're looking. Did I happen to learn something? Absolutely.

Mark: I'm talking about more as a crew member, as a teammate, as a fellow employee like in light of some of the other stuff that's been brought to light, or that's been addressed, or introduced.

Captain Randy Chapel: Be specific.

Mark: Well, your attitude, how you're working with other crew members, how you're working with other parts of the company. Is that—

Captain Randy Chapel: Yes, I've had—

Mark: Is that something you would take internally and—

Captain Randy Chapel: Yes. There's been—

Penny: Let's hold on for Mark. I'm sorry. I would hope that you would get the full benefit of this as well.

Mark: Yeah

Penny: While he's here, he can—

Mark: Yeah.

Captain Randy Chapel: Do you want me to continue answering?

Mark: Yeah.

Captain Randy Chapel: There's been a couple of times in 30 years where I've had an altercation with a ramp person. One in particular, the guy was cussing on the headset

and our speaker was on. And I went out and explained to him. And he wrote me up. This was years ago.

Yeah, there's been a couple of times in my 30 years here where this is familiar. But the Casper IOR that you read is not completely accurate. It's embellished.

If they took it that way and perceived it that I was saying, "Hey, this is SkyWest. This is a SkyWest plane. You're going to do this or that", maybe it came across wrong or they perceived it that way.

But as for the people I fly with—and we generally fly with the same group of guys--I've always felt like we've had a very synergistic CRM standard operation. And it's kind of funny. I kind of chuckled when I heard, "I do 90% of the work and he's fixing to do the other 10% too."

I'm trying to figure out who that might be in my mind because, you know, I've made it a habit in the past couple of years. I get to the airplane usually before anyone else. I program the FMS. I go through everything. I don't do walkaround, but, you know. Usually my FO's come in and, you know, I say, "I got the box done. You want to fly? Okay, it's your lane. I did the box. But check it right now. And then, we'll go over it, go through our wants, and everything else."

I don't know where some of this is coming from other than, you know, I don't feel I'm demanding to my crew members at all. In fact, quite the opposite.

So, I don't know where some of this is coming from. But what I find interesting is that it comes up now. This information was solicited from management. They've gone out to people and asked these things, you know. "Hey, have you ever felt—" whatever the hypothetical.

"Have you ever felt like he's controlling the operation and not working as a team?" I don't know what the questions were. But it's amazing that none of these crew members have come to management in private before and made these comments.

And then, I'd be pulled in, and questioned about it, and disciplined if necessary or given training. I'm not understanding this right now. I mean, there's a lot of stuff in this document that I was able to look at. Not the other document.

Like stuff that's excluded as well like the standard practice for the ramp personnel and what they're supposed to do, what their responsibilities are.

As flight crew members, we rely on their training as much as our training to make sure we can conduct a safe operation, you know.

The FAA's opinion is, "What the heck was going on? Why were you parked there? What the heck were the rampers thinking when they witnessed something that could've been a Safety related item and they did nothing that's outlined in their standard practice. They did nothing to prevent it", you know.

It's frustrating, you know. I mean, like I said, I've been in the training environment at SkyWest. And I've always tried to identify and correct situations when I could. Even to this heater situation where they were putting Delta passengers on our plane in a six degree cabin, you know.

I mean, I've always taken kind of a leadership role. But what's really funny is I'm seldom right. I'm just really good at correcting my wrongs, you know. I treat everything with humility.

I even, well, teach. I even tell the guys I pilot. "Listen, you don't have to worry about making a mistake. We all make mistakes. I just want to know that you're actively trying to correct that mistake", you know.

And even in my briefings for years, I would tell my First Officers, "Hey, we're working here together. If you see or think I'm doing something wrong, speak right up. I'm not going to hold it against you because you're probably right. I am probably messing something up. So, you need to tell me and then we'll talk, you know, talk about it later."

I mean, these are things I've always done in the cockpit. Okay, thank you. Thanks for the question.

(Long pause)

Panel member: Roy—or if anybody knows—when was the plane inspected? Did it happen to fly again before inspection? You mentioned that IOR's aren't top-ups (SP) and you may not know of something until a regular review of IOR's.

Roy Glassy: Yeah, I believe it did fly a few legs before we caught it and routed it.

(Long pause)

Panel member: But when they did inspect it, they didn't find anything that needed to be done to it?

Roy Glassy: No.

Panel member: Such as washing off.

Roy Glassy: No, there was no damage. They did find soil residue, mud on the two wheels, the rose and the right mane (SP). And there was concern about structural integrity. But that was all checked out and the airplane was fine fortunately.

Panel member: Okay.

(Long pause)

Panel member: And I couldn't tell from this. But I mean, I'm assuming CVR was reviewed, Mr. Glassy?

Roy Glassy: We don't pull the CVR for these types of things.

Panel member: Okay.

(Long pause)

(Background chatter)

And then, I guess maybe I'm asking the same question. Has the SOP for St. George ground crews changed? Are they putting up lights during darker times? Are they marshaling planes out? Are they changing their pushback procedures?

Roy Glassy: There were some findings on the Safety side as a recommendations for the St. George ramp area. But keep in mind, that's not why we're here. We're here solely because of what the crews response or lack thereof was after the event.

The event is not what we're talking about. But to answer your question, yes. There were some recommendations.

(Long pause)

Panel member: Does anyone else have any questions?

Panel member: That's it, no.

Panel member: That's it.

Panel member: No.

(Background chatter)

Penny: Thank you for your questions.

(Long pause)

So, at this point, as we look to the summations, you have an opportunity as the employee to either go first or last. You'll have one opportunity to summarize what you want them to know. So, would you like to begin or end?

Captain Randy Chapel: No, I'll end.

Penny: You'll end?

Captain Randy Chapel: Yeah.

Penny: Okay. Well, I'll give you the floor.

Roy Glassy: Okay, just in summary, we are here to review this. Well, let me back up. We're here because of Captain Chapel's actions following the excursion event. And many of these questions seem to focus back on the ramp and the ramp light, the ramp marking, and the ramp position which is not what we're discussing.

We have had crew members around the system have excursions for whatever reason. But those crew members do the right thing. They stop the aircraft. They contact Maintenance to assure that the aircraft is safe, secure. And that did not happen in this case.

This airplane was operated. It was known to have deviated from the pavement. It was known to have been in a pit essentially that required excessive thrust to motor out of that mud.

The video showed that clearly with the aircraft listing approximately seven degrees to the right as it popped over back onto the pavement. It was very clear both crew members statements illustrate that.

I'm trying to protect privacy, but it may be necessary to introduce more detailed document. However, the crew continued. They launched out of St. George in an unknown state of airworthiness.

Upon landing in Salt Lake City, the First Officer was doing the walkaround. The Captain didn't do the walkaround, but he was summoned to look at the mud on the wheels. And the response was, "Let's go. Get on the bus."

So, Maintenance was not contacted. Nobody was contacted. Supervisor wasn't contacted.

So, even though it was missed in St. George, the second opportunity to report this irregularity was in Salt Lake City. We find out about it through St. George reporting

So, we were able to get that airplane grounded, have Maintenance do their inspection to determine the airplane was safe. Which thank heavens it was and also when.

But again, the questions surrounding the ramp condition and everything, really that was just the beginning of this. But that's not why we're here. If Captain Chapel would have notified maintenance what occurred—especially upon discovering the mud on the wheels upon landing. That's when the realization should've been that, "We did have an excursion."

It's no regularity. And even without Maintenance—going around Maintenance—there's a responsibility. There's certain an irregularity. There's a policy that requires notification of chain of command. That's it.

The IOR's I pointed out were just in support of SP3024 that show a pattern of behaviors over the years. Thank you.

(Long pause)

Pattern of behaviors over the years that's relevant to application of the terms of SP3024. But again, the investigation was run. We considered all options. The Safety Department did a very thorough job.

And after careful consideration, separation was the only thing appropriate based on policy. So, willful violation or willful noncompliance that is of airworthiness procedures which is a top focus area.

We meet quarterly as a team to go over Safety items. This is always on the agenda.

The FAA in this case in their investigation, they were investigating the excursion, not what happened after or well, there's likely some ongoing or

some pending investigation we'll find out. But with that, again, it's not that excursion we're talking about. It was the action after.

The investigation uncovered several discrepancies and indicated what I briefed earlier in this investigation. There was information being withheld. There's disingenuous information provided. And that just didn't line up with the facts.

So, considering all that, and again, the CRM issues we've talked about. Those came out in the investigation. Considering all this, the only plausible remedy was separation.

So, I just urge the panel to look at the action following the excursion along with the history to determine appropriate action. Were the policies violated? Yes or no?

They were. Were they applied properly? Was SP3024 applied properly?

Yes. We're very careful about that.

So anyway, that's all I have unless there's other questions.

Captain Randy Chapel: I'll try to wrap it up quickly for you. Been here a while.

Moderator: No, take your time. That's what we're here for.

Captain Randy Chapel: We talk about separate events. And I understand the focus is, "Well, you didn't do the right thing. You didn't make the proper reports." Well, to make those reports would be based on a knowing of the event. Knowing and believing of actually what had happened.

And if you read my IOR and you read the First Officer's IOR, they're factual statements. They do basically state we were unaware that we weren't on the pavement.

Our verbal discussions with the FAA are identical. We had never spoken to one another about the IOR's or about what we would talk to the FAA about.

Those are supporting statements. After the fact, there seems to be a change in narrative to some degree. Don't know why. Don't know how it was brought up. But there's a little bit of change in narrative.

So, you know, when we say we're here to investigate only what Mr. Chapel didn't do, we don't want to talk about what led up to this even happening. That's not pertinent.

But it absolutely is pertinent to this whole thing. There's always a chain of events that lead into an incident, occurrence or accident and they all need to be addressed.

There is some more pending FAA involvement. But what Roy hasn't told you is it's focused on the ground crew, and the station of St. George, and the conditions, and the lighting, and the stuff that was in that Safety report that I wasn't able to look at.

There were many policies violated. My policies were violated unknowingly. And, you know, this whole document here is to impress upon you panel members that I'm not a good person, that I'm not a good employee, that I'm not a good pilot.

But I would stress have them provide supporting documentation not a bunch of fluff in the form of IOR's that I never even knew were written about me and I was never counseled on any of this stuff.

Provide training failures. Provide line failures, violation actions. Provide any of this stuff. Provide counseling. Anything that's been done in 30 years. Have them provide it to you to really alpine who I am as an employee and a pilot here.

I'm sure for whoever made these comments who were solicited at the time, I could bring in hundreds of captains I flew with, and hundreds of First Officers, and flight attendants that I flew with that would fill this room and go, "Oh, absolutely not I can give you examples", you know. This day, that day. They would give you tons of examples.

(Long pause)

You know, this is an effort to support in my opinion an action that I don't know if it was hasty or maybe it was even wanted. Maybe at some point there's a personality conflict or even personal. I hope it's not because it should never be that way. It should be professional and that's why we have a review board. But it's not completely accurate.

He talks about disingenuous information. My IOR is factual. My First Officer's IOR is factual. They were written independently. We didn't talk. He didn't talk to me and I didn't talk to him about the IOR.

In fact, when I called him to let him know I had filed my IOR, he texted me back and said, “Hey, Mark told me I shouldn’t speak with you and overthink this.” I said, “Okay.” I respected that. I haven’t spoken to him since, but.

And then, you know, I was questioned pretty intensely by the FAA Inspector. And, you know, he told me that everything matches up. “You were in a bad spot at a bad time in a situation that there was quite a bit of mitigating factors and you guys ran through the dirt. It’s not that big a deal. You didn’t know what happened. I’m closing the file on this. There’s no FAA action.”

After the Safety report came out, it was revealed that there were many policies violated. And no one can really believe that we were terminated for something we didn’t know and recognize at the time.

It’s easy in hindsight to say we should’ve. Oh yeah, we should’ve. But that’s the bit of time that morning on that dark morning making a left turn focusing out the left side of the aircraft didn’t recognize that we had done that.

So, you know, I hope you do take this into totality, you know. It’s not just what happened afterwards. There’s a 30 year career here of spotless performance on the employee side and on the Flight Operations side, you know.

This is a destruction of a career, a family. It’s huge. I don’t envy you being in this position by any means. But I hope you’ll look at it in totality and ask yourself the question, “Well, there’s always a possibility they didn’t. It’s like they said. They just didn’t recognize. It just didn’t happen the way this big, colorful document tries to make you believe it happened.”

The video, all of this stuff that I don’t have access to. I don’t have, you know, I don’t have a whole department putting on my representation. I know what the video looked like. And if I looked at that video I’d go, “How the hell wouldn’t they know they were in the dirt?”

But if you’re not sitting on an airplane making that turn feeling what I was feeling, you know, you can’t make that determination. And so, I’m, you know, I’m accepting that I made a mistake by not identifying it. I’m accepting, you know, punishment or training.

I think, you know, I was already out due to Covid. I think I’ve received adequate punishment. I’ve been off for two months without pay and no

medical benefits for my family and desperately for my diabetic son, you know.

I mean, the punishment's been pretty severe up to this point for a minor incident that is trying to be blown into a total dereliction of duty—a total disregard and malicious attempt to put the company in a comprising position. And I would never do that Never have, never would. It's unbelievable to me, but here we are.

So, I hope you do look at all of this and take, you know, take my employment history, and flight history with the company, and everything into account. And possibly, even you've been involved in these before and I know they're independent of one another. But, you know, there have been numerous policy violations.

Numerous things that have occurred, crew members have been disciplined and I hope you take that into consideration. Well, why were they disciplined? Why did they get a letter of correction? Why did they get training, you know. What happened here and what happened there? Why aren't we providing that to this crew?

We have a 17 year First Officer. He's on top of the pay scale. I'm a 30 year Captain. I'm on the top of the pay scale.

We're in a very difficult time in our industry. We need to pull together to get through it and I do understand that we probably have, you know, twice the staffing we need right now.

I also understand that we got 468 million in CAREs package money and that does not allow us to furlough or lay anyone off until that expires. But we can surely terminate people. If we can come up with a justification to do that, we can terminate people.

I hope that's not the case here. I don't think it is. But, you know, I think it's the perfect storm for some reason, you know. We can cut from the bottom, you know. Maybe we can cut from the top too if somebody makes a mistake. Are they being handled equitably over the course of our history? Is everything being handled equitably, you know.

And that's an HR issue as well. I mean, are we treating everybody consistent and fairly in this matter, you know. Is there second chances? If you mess up, do you get a second chance, you know. I don't know. We'll see.

Thanks for your time, guys. Thanks, Chris for coming up. I know you got a late minute call. Somebody else did too. Oh yeah! You did. I keep getting emails.

(Long pause)

That's all I have. There's no questions afterwards, so okay. Very good.

Penny: It's possible we may give you a phone call and ask you some clarifying questions in regards to.

(Background chatter)

So, I'm going to turn the recorder off.

(Off the record)

[End of Recording]