IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RANDY T. CHAPPELL, an individual, | ) Deposition of: |
| Plaintiff, | ) JUSTIN REBER |
| vs. | ) Case No. 4:21-cv-0083-DN |
| SKYWEST AIRLINES, INC., a Utah corporation, | ) Judge David Nuffer |
| Defendant. | ) |

December 8, 2022 * 10:07 a.m.

Location: Gordon Rees Scully Mansukhani
15 South West Temple, Suite 1600
Salt Lake City, Utah

Reporter: Dawn M. Perry, CSR

A P P E A R A N C E S

FOR THE PLAINTIFF:

Patrick M. Jones
Attorney at Law
PMJ PLLC
The National Building
125 South Clark Street, 17th Floor
Chicago, Illinois 60603
(312) 255-7976
(312) 803-0931 (fax)
pmj@pmjpllc.com

FOR THE WITNESS:

Lincoln Hobbs
Attorney at Law
Hobbs & Olson
620 J Street
Salt Lake City, Utah 84103
(801) 519-2555
lincoln@haolaw.com

FOR THE DEFENDANT:

Chad Shultz
Attorney at Law
Gordon Rees Scully Mansukhani
55 Ivan Allen Jr. Boulevard NW
Suite 750
Atlanta, Georgia 30308
(404) 978-7325
cshultz@grsm.com

and

Todd C. Emerson
Attorney at Law
444 South River Road
St. George, Utah 84790
(435) 634-3530
(435) 634-3505 (fax)
temerson@skywest.com

ALSO PRESENT:

Randy T. Chappell

# I N D E X


| JUSTIN REBER | PAGE |
|---|---|
| Examination by Mr. Jones | 4 |


* * *

## E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | SkyWest 00103 Reber Hearing | 12 |
| Exhibit 2 | SkyWest Pilot Policy Manual | 29 |
| Exhibit 3 | RFI 439 | 30 |
| Exhibit 4 | Text messages | 40 |
| Exhibit 5 | St. George Taxi Event | 44 |
| Exhibit 6 | E-mails and presentation to review board | 65 |
| Exhibit 7 | E-mail chain dated October 12 and 13, 2020 | 103 |


* * *

P R O C E E D I N G S

JUSTIN REBER,

called as a witness, being first sworn,

was examined and testified as follows:

EXAMINATION

BY MR. JONES:

Q. Good morning, Mr. Reber. My name is Patrick Jones. I represent the plaintiff, Randy Chappell, in this case. I'll be taking your deposition today.

Have you had your deposition taken before?

A. No.

Q. Okay. So I'll just give you some ground rules.

As you can see, the court reporter is taking down everything we say. There is no video, so if you're going to respond, you know, you've got to verbalize a yes or a no, not just a nod of the head.

Make sense?

A. Yes.

Q. All right. And if you could -- because she's taking down both of our statements, if you could let me finish the question completely. Sometimes I drone on, but if you could let me finish

completely before you start your answer, and I'll do the same with you so that we have a nice, clean transcript.
Sound good?
A. Sounds good.
Q. All right. If you could state your name and spell it for the reporter.
A. Justin, J-u-s-t-i-n, Niels, N-i-e-l-s, Reber, R-e-b-e-r.
Q. And, Justin, you're a pilot for SkyWest; is that right?
A. That's right.
Q. Where do you currently live?
A. Kamas, Utah.
Q. What's the address?
A. 965 East 350 South, Kamas, Utah 84036.
Q. And how long have you lived there?
A. Approximately eight years.
Q. Okay. You've never lived anywhere else within those eight years?
A. No.
Q. Do you have a vacation home?
A. No.
Q. And what's your highest level of education?

A. Bachelor's degree, two associate degrees.
Q. Okay. What are those degrees in?
A. Aviation, and the two associates are in applied sciences.
Q. Okay. When did you become a licensed commercial pilot?
A. Hmm. Commercial? I got my commercial license approximately year 2000. I can't be exact on that.
Q. Okay. Fair enough. That's all we need.
And what was your first job as a commercial pilot?
A. Commercial, SkyWest Airlines.
Q. Okay. And did you begin as a first officer?
A. Yes.
Q. Is that still your position now?
A. No.
Q. What's your position now?
A. Captain.
Q. Okay. Do you have a cell phone?
A. Yes.
Q. And what's the cell phone number?
A. (801) 879-6274.
Q. Which carrier do you use?

A. Verizon.
Q. And is the account in your name?
A. I believe so.
Q. And under the home address you gave me previously?
A. Correct.
Q. And that's the same cell phone that you had in January of 2020?
A. Yes.
Q. Did you -- do you have any other cell phones?
A. No.
Q. Okay. Do you use that cell phone for work calls?
A. Yes.
Q. And do you use it for texting?
A. Yes.
Q. E-mails?
A. Yes.
Q. Approximately how often do you text per day?
A. How often?
Q. Yeah.
A. Like, every hour, a few times. I don't know.

Q. Okay. Maybe 10 to 20 times a day? Does that sound about right? Maybe more?
A. Maybe more, maybe less. I don't know.
Q. Okay.
A. I don't take an average of how much I text per day.
Q. All right. How about social media accounts, do you have a Facebook account?
A. No.
Q. Do you have an Instagram account?
A. No.
Q. LinkedIn?
A. No.
Q. Do you use Telegram?
A. No.
Q. Any social media at all?
A. No.
Q. Do you have a WhatsApp account?
A. I think so. Yes, I think so.
Q. Not one that you use very often?
A. No, hardly ever.
Q. Okay. Do you post on message boards like Reddit?
A. No.
Q. Any online groups where you communicate

with other pilots?
A. No.
Q. How would you describe your responsibilities as first officer? Well, let me take that back.
When did you become a captain?
A. Summer of 2022. Just recently.
Q. Just recently. So when the events around this matter, which all take place in 2020, you were a first officer; is that right?
A. Correct.
Q. Okay. So could you describe for me the responsibilities, generally speaking -- if you are talking to somebody who is not a pilot, what does a first officer do?
A. There is a whole list of responsibilities. Fly the plane while the other person, or pilot, which would be the captain in that case, monitors. Pilot monitoring. And when the roles are reversed, when the captain is the pilot flying, the first officer would be the pilot monitoring, which would include duties such as checking radios, weather, briefings, a lot of the general aviation -- you know, communication with the air traffic control. SkyWest and all airlines have a whole list of

responsibilities that we're asked to do, and that's -- I mean, there could be -- I saw you had a pilot policy manual here. There is probably close to a thousand or more responsibilities.

Q. Okay.

A. Small, large and other.

Q. Okay. Well, that, to a layperson, sounds pretty much what a captain does as well. What are the differences, in your mind?

A. The captain has control of the flight. The captain is responsible for the flight. The burden of leadership and responsibility lies with the captain, and oversees the other crew members.

Q. So the -- just to be clear, are you saying that the first officer doesn't have responsibility for the flight?

A. No, the first officer certainly does as well but follows the leadership of the captain.

Q. Okay. If the first officer sees something irregular or maybe a safety issue, can he bring that up to the captain?

A. He can.

Q. He can. He has to, doesn't he, under the policy?

A. I believe the policy says that.

Q. Okay. So there are -- from what I do understand of the differences, there are a few things that the captain only does, such as taxiing to the runway; is that right?
A. Are you alluding to that's the only -- the only thing he does?
Q. No, no, no. That's the only thing that he does every time that the first officer doesn't do.
A. That is not correct.
Q. No?
A. The captain does a whole lot of things that's in the pilot policy manual. There's a whole list of things the captain is responsible for that the first officer is not.
Q. Right. I'm saying this is one example.
A. That is one of them, yes.
Q. Okay. Thank you.
And there are things that the first officer does, typically, that the captain doesn't do, correct?
A. Typically, but the captain is still held responsible for those things.
Q. Right. So the preflight check walkaround, that would be something the first officer would do?
A. Would do, but the captain is responsible

for it. In our flight operations manual, Chapter 5, it specifically states the captain -- or I believe it says the PIC, which stands for pilot in command -- is responsible for a thorough preflight and postflight inspection of the aircraft. It does not say that for the first officer.

Q. Okay. Let me go ahead and start with Exhibit Number 1. That's the -- it says SkyWest 00103 Reber hearing.

(EXHIBIT 1 WAS MARKED.)

Q. Why don't you take a look at that, Mr. Reber, and tell me when you have had a chance to review it.

A. The whole document?

Q. No, you don't have to look at every page, but get a sense of what it is.

A. Get a sense of what it is?

Q. Yes.

A. I get a sense of what it is.

Q. Okay. So do you recognize the document?

A. It looks like my hearing, yes.

Q. Okay. Great.

If you could just take a look at what's been marked as -- it's actually page 26 of the document.

A. And what about it?
Q. Okay. This is actually a transcript of the testimony of Roy Glassey. And we can confirm that. It's a very long amount of testimony from Mr. Glassey. But if you go back to page 17, you can see where his testimony begins, and then it continues on to at least page 26.
A. Okay.
Q. Okay and the one, two, three, four, five -- sixth paragraph starts with, "Pilots are expected."
Do you see that?
A. On page 26?
Q. Yes.
A. One, two, three, four, five, six, it says, "And then the pilot policy manual."
Q. Okay, the seventh, "Pilots are expected."
Do you see that?
A. Okay, seventh. Okay. "Pilots are expected." Okay.
Q. So this was Roy Glassey's testimony at your review board hearing; is that correct?
A. I guess so, yeah.
Q. Okay. And Mr. Glassey stated, "Pilots are expected to promptly report work-related accidents,

irregularities, incidents, injuries or property damage. It doesn't say captains, that says pilots. Captain, first officer. If you are a pilot, this is an expectation. I'll read that one more time. Pilots are expected to promptly report work-related accidents, irregularities, incidents, injuries or property damage."

And that's taken from the pilot's Rules of Conduct.

Do you agree with that statement?

A. I do. And also to add to that, it doesn't say who to report them to.

Q. Okay. Does it not say anything else? Else. A little levity; you can ignore it.

Well, for example. When you do your walkaround, if you spot a irregularity, incident, injury, property damage, is that something that you, as a first officer, would report to the captain?

A. Yes, to the captain.

Q. Okay. I'm done with that exhibit for now.

And if you spot an irregularity during taxiing or on the runway, is the responsibility of the FO equal to that of the captain to stop the flight, if necessary?

MR. HOBBS: Objection. Vague.

Go ahead.
THE WITNESS: What?
MR. HOBBS: I just made an objection, vague, but you can go ahead and answer.
THE WITNESS: Ask your question again, clearly.
Q. (BY MR. JONES) Yeah, if you don't understand me, you can always ask me to reask it.
A. That's what I did.
Q. If during the course of the flight the FO spots an irregularity, is he as responsible as the captain to stop the flight?
A. Stop the flight?
Q. Yes. So if you're taxiing --
A. Not for an irregularity, not required to stop it but to make mention of it to the captain.
Q. Okay.
A. Yes.
Q. What if the captain ignores you -- ignores the first officer, is the first officer then obligated to stop the flight?
MR. HOBBS: Same objection.
THE WITNESS: There is no rule that I know of on that per SkyWest policy -- pilot policy manual. Common sense would dictate if it was a

life-threatening incident you would stop the flight. Or if the captain was going rogue you would stop the flight. In this instance that we're talking about here today, neither of those were the case.

Q. (BY MR. JONES) Okay. We'll get to that, but let's focus on more general terms for now.

If there is a safety issue that the first officer spots, is he required to bring that up to the captain's attention?

A. Yes.

Q. And if the captain ignores him when it's a safety issue, is the first officer required to stop the flight at that point?

A. Stop the flight, like, take the controls over? Is that what you are asking?

Q. No, I'm saying -- let's say the situation --

A. How are you describing "stop the flight"?

Q. Where you are taxiing -- say a situation where you are taxiing --

A. Yes.

Q. -- and the first officer spots an irregularity; he brings it up to the captain's attention, the captain ignores him; is the first officer then responsible to stop that flight?

MR. HOBBS: Same objection.
THE WITNESS: Again, I don't know what you mean by "stop the flight." Am I -- are you asking to override his controls with my controls, to where we get in a battle over flight controls because they are dual controlled? That would not be an optimal situation to fight for controls in the cockpit, sir.
Q. (BY MR. JONES) Right. Understood. No, I'm saying, can you reach down, shut down the engines?
A. You can. That is not likely ever, unless it was life-threatening, sir.
Q. Okay. Let's talk about, as a pilot, how do you -- how do you get assigned to flights?
A. Each month we bid on them per our seniority, and are awarded trips based on seniority.
Q. So if you have higher seniority, either as a first officer or a captain, you are more likely to get the flight that you bid on; is that correct?
A. Correct.
Q. So is it true or is it accurate that when you bid, you don't necessarily know what co-pilot you are going to be matched with on a given flight? Is that right?
A. Correct.

Q. But is there a way to -- if you don't want to work with a captain or a first officer, is there a way to not work with that person?
A. FOs, or first officers, have one choice of a pilot that they can bid avoid, it's called, and avoid that person. That would be the only way. Other than calling in sick every time you didn't want to fly with someone.
Q. Okay. Did you ever bid avoid when you were first officer with Captain Chappell?
A. I don't remember.
Q. Did you ever bid avoid any captain as you -- when you were a first officer?
A. Yes.
Q. How often?
A. Nearly each month.
Q. Okay. So this is a fairly common practice?
A. For each FO it is, yes. Unfortunately, they only give us one bid avoid.
Q. But you don't recall whether you ever bid avoided Mr. Chappell?
A. That's correct.
Q. In fact, you and Captain Chappell ended up working together often because you were both high

priority for your position, correct?

A. We were probably about the same seniority, so you don't base it off who you are flying with but you base off what the trip is and then get matched accordingly afterwards. The company does that through a computer program.

Q. So some trips are more desirable than others, correct?

A. Correct.

Q. So those are the trips that both you and Mr. Chappell or people of high seniority are likely to bid on, right?

A. The trips, yes.

Q. So that would end up with you working fairly often with Mr. Chappell?

A. Sure, and many others the same way.

Q. Sure. How many times -- let's say before Captain Chappell was terminated in March 2020 -- in the two years prior to that, how many times would you say that the two of you flew together?

A. Numerous. I have no idea.

Q. A hundred?

A. I have no idea on the number.

Q. Ten?

A. I have no idea on the number.

Q. Well, can you give me a range?
A. No.
Q. Sure you can. Was it more than five?
A. It was more than five.
Q. Okay. Was it more than 20?
A. I have no idea. You could ask -- request that record from SkyWest and they could provide that with you.
Q. You have no idea?
A. No idea.
Q. In the year prior to Mr. Chappell being terminated, how many times did you fly together?
A. I could probably say numerous.
Q. Could you put an estimate to it?
A. Again, if you keep asking, I will give you the same answer. Numerous. And, no, I can't give you an answer. I want to be precise in this and I don't know.
Q. You can be precise. In the year prior was it more than 20?
A. Again, I don't know.
Q. In the year prior was it more than five?
A. It was probably more than five. I don't -- I can't give you a number. If you would like to request that document or information from

SkyWest, you are welcome to.
Q. Thanks.
Did you and Mr. Chappell ever talk about getting together outside of work?
A. Yes.
Q. Tell me about that.
A. He invited me to go elk hunting with him when him or his son got an elk tag.
Q. Okay. And did you ever invite him to anything?
A. No.
Q. You never invited him to go ride snowmobiles?
A. I don't think so. I don't remember.
Q. Did you ever invite him to go ice fishing?
A. Probably. I invite a lot of people to go ice fishing.
Q. Did you ever invite Mr. Chappell?
A. I don't remember specifically, but it's possible. I try to be cordial in the cockpit and invite people to do things with me, to come to my home. I can't say for certain. But I can say for certain I never did hang out with him outside of work.
Q. Okay. All right. Let's focus on the

occurrence. By "the occurrence" I mean the events that transpired on March 24th, 2020, at St. George Airport. Okay?

A. Okay.

Q. This was an early flight, right?

A. Early in the morning, is that what you are referring to?

Q. Yes.

A. Yeah.

Q. How early did you arrive at the airport?

A. It's probably -- I can't give you an exact time. Probably 5:30-ish. I can't remember.

Q. Okay. It was dark?

A. Dark.

Q. Did you ever send text messages -- exchange text messages with Mr. Chappell?

A. Did I ever?

Q. Yes.

A. Yes.

Q. About non-work-related matters?

A. Probably, yes.

Q. Jokes, perhaps?

A. Yes.

Q. Some of the adult nature?

A. Perhaps. I don't know.

Q. You don't know?
A. I could look it up and find it for you.
Q. I'm asking you whatever you remember.
A. I don't remember any specifics, but there was probably jokes, yes.
Q. Okay. Going back to the occurrence, when you arrived at the airport do you typically go -- or did you in this case review the 10-7 plate?
A. I can't remember that, but probably, yes.
Q. And what is the 10-7 plate?
A. There's a 10-7 plate that talks about the airport and -- and SkyWest facilities and -- and procedures.
Q. Okay. Does it have a map of the different gates and parking spots?
A. Yes.
Q. Do you remember -- maybe not specifically this time, but did you ever review the 10-7 plate at the St. George Airport?
A. Are you asking if I ever have?
Q. Yes.
A. Yes.
Q. Okay. And did you this day, do you recall?
A. I don't recall, but I don't think we did

that day -- or I did that day.

Q. Okay. And what parking spot was your aircraft parked in that morning?

A. The aircraft that we flew that morning was parked in the far north parking spot.

Q. Okay. And at that time, or around that time, was that spot located on the map, the 10-7 plate?

A. I don't recall.

Q. Do some 10-7 plates have hot spots marked?

A. The 10-9 charts have hot spots. I don't know about -- 10-7s don't, I don't believe.

Q. What is a 10-9 chart?

A. A 10-9 is a Jeppesen's -- it's a company that provides the plates, they call them, or descriptions of the airport -- and it has a diagram or map of the airport layout from the overhead view.

Q. Okay. Did the St. George Airport also have a 10-9?

A. Yes.

Q. Okay. And did you review that?

A. At some point, yes, but I don't think so that day. We go in and out there so often it's near memorized.

Q. Okay. And what did you refer to as the

spot you used on the day of the occurrence, the parking spot?

A. The one parking spot farthest to the north.

Q. Farthest to the north.

Was the spot that you used -- do you recall, was that marked on the 10-9 plate as a hot spot?

A. I don't recall. I don't memorize numerous charts like that.

Q. Okay. Do you recall whether the northernmost spot that you used that morning was even on the 10-9 plate?

A. I don't recall at all.

Q. Do you recall what number the spot was?

A. No.

Q. That you used that day? No?

A. No.

Q. So after the event of March 24, 2020, the first opportunity you had to document that event was your IOR; is that correct?

A. Opportunity?

Q. Yeah.

A. I could have documented it at any point in time. The company requested an IOR, and that's my

first time I did. I had an opportunity before that, though.

Q. Okay. But the first time you did document it was the IOR?

A. Correct.

Q. And that's while the event was still fresh in your mind, correct?

A. Correct.

Q. What's the purpose of an IOR? Well, let me back up.

What's the definition of an IOR? What does it stand for, the acronym?

A. Irregular operation report.

Q. Okay. And what's the purpose of an IOR?

A. Purpose, to briefly describe what happened in any irregular operation so the company can see that.

Q. Okay. And what does the company use it for?

A. Whatever they want. They can document it. They can review it. They can ask for more information about something. They just need documentation.

Q. Okay. So they can use it to maybe make safety improvements, right?

A. Yeah, you're speculating what -- what I know the company does with them, and I don't know what the company does with them. That's up to them. You would have to ask them that.
Q. Okay. And the IORs can sometimes lead to disciplinary actions, correct?
A. Correct.
Q. So it's important to be truthful and as accurate as possible when you fill out an IOR, right?
A. Yes.
Q. In fact, providing false information to the company in an IOR can be grounds for termination, correct?
A. I don't know what their -- their terms for that are. That's up to them.
Q. That's not in the policies that you review?
A. I don't know.
Q. Do you review the policies?
A. Yes.
Q. Okay. You just don't know if the bases for termination are in any of the policies?
A. They could be. I don't memorize 6,000 --
Q. Sitting here right now, you don't know?
A. I'm -- I'm -- yeah, very well could be

part of their protocol. I don't memorize every policy they have.

Q. Okay. I'm not asking if you memorize it; I'm just saying, sitting here right now, you don't recall whether the pilot's manual lists out the grounds for termination?

A. Yeah, I don't recall, no.

Q. Okay. When did you draft this specific IOR?

A. I would have to look.

MR. HOBBS: Objection. Vague.

MR. JONES: What's vague?

MR. HOBBS: Which IOR? I mean --

Q. (BY MR. JONES) You filled out an IOR in response to a request from Mark Richards, correct?

A. Correct. And you're expecting me to have memorized the date three ago -- nearly three years ago that I submitted it; is that correct?

Q. Yeah, we can look at it, but I'll tell you that the occurrence happened on March 24th, the morning of, correct?

A. I don't have the date memorized.

Q. Okay. Well, I'm telling you it's March 24th.

A. Okay. Thanks.

Q. The house -- and after you landed, Mr. Richards at some point requested an IOR from both you and Captain Chappell, correct?
A. Correct.
Q. Do you recall when he requested it? Was it the same day? Was is the next day after the occurrence?
A. I don't recall, but it was, I think the next day. Or maybe even two days. I don't recall exactly when.
Q. Okay. That's fine.
I think we covered this, but I hate to waste an exhibit, so I'll ask the court reporter to mark the SkyWest Pilot Manual -- Pilot Policy Manual as Exhibit 2.
(EXHIBIT 2 WAS MARKED.)
Q. And this is just the first page and the page I'd like to reference because the manual, as I'm sure you know, is pretty large. So let me know when you've had a chance to review this.
A. I've had a chance to review it.
Q. Okay. And from what you can tell, is that an accurate copy of these two pages of the pilot's manual?
A. It looks familiar, yes.

Q. Okay. So on the second page of the exhibit, Section 37, it states, "Pilots are expected to promptly report work-related" -- "work-related accidents, irregularities, incidents, injuries or property damage."

Do you see that?

A. I do see it.

Q. And do you have any objection to that responsibility?

A. No.

Q. Okay. Did you report anything, any accidents, irregularities, incidents, injuries or property damage, that happened on March 24th in St. George without being prompted?

A. Yes, to my captain.

Q. Okay. What did you say to him and when?

A. You want me to tell you all of them?

Q. Well, you know what? We'll get into it later. I'll ask you questions and we can go from there.

A. Okay.

(EXHIBIT 3 WAS MARKED.)

Q. Okay. Now let's go to your IOR. That's going to be -- if I can have the court reporter mark that as Exhibit 3. And that's a one-page document

titled RFI 439.
Take a look, Mr. Reber, and let me know when you've familiarized yourself with the document.
A. I've familiarized myself with the document.
Q. And what does this appear to be?
A. It appears to be the IOR that captain and I both wrote to the company.
Q. Okay. So you wrote this jointly with Captain Chappell?
A. I could give you many specifics on that.
Q. That's a yes or no question.
A. Not jointly, no.
Q. Okay.
A. He attempted to write it jointly with me by calling me numerous times and texting me numerous times, trying to convince me of what to write in it.
Q. Okay. We can get into that more as we go forward.
A. Perfect.
Q. Let's focus on the IOR right now. So in your IOR -- and this is your IOR that you submitted, right?
A. It looks like it's both of ours.
Q. I'm sorry. How do you -- you can jointly

split an IOR?
A. No, there is two of them here.
Q. And which -- is one yours and one his?
A. Let me read it and I'll -- I can probably tell you.
Yes, the first one appears to be mine.
The second one -- the second paragraph appears to be the captain's.
Q. Okay. So how did they get submitted jointly?
A. Oh, they weren't submitted jointly, but you asked what were these on the paper, this document, and I responded accordingly.
Q. Okay. Thank you.
Okay. So in the first paragraph of this IOR, on line one, two, three, four, five -- or four, you state that "About two-thirds or so through the 270-degree turn (we were headed towards runway 1 for a northbound departure that morning) there was a potential that the plane could have been on dirt for a moment, but I had little to no visibility from my vantage point as we were turning left."
Do you see that sentence?
MR. SHULTZ: Objection. You didn't read it correctly.

MR. JONES: What part was wrong?
MR. SHULTZ: You missed a word.
MR. JONES: What word?
MR. SHULTZ: "The."
MR. JONES: Which "the"?
MR. SHULTZ: "There was the potential that the plane had been" -- you missed "the."
MR. JONES: Okay. Thank you.
MR. SHULTZ: You said it's a potential. I just wanted the record to be clear.
MR. JONES: I appreciate that.
Q. Mr. Reber, did you write this sentence?
A. Yes.
Q. And you stated that you had little to no visibility from your vantage point as you were turning left, correct?
A. Correct.
Q. And no visibility of what?
A. Of what was coming from that direction.
Q. What was coming from the left?
A. Yeah. As you're turning left in a plane, it's different from a car vehicle. Have you flown a plane?
Q. No, I haven't.
A. Okay. So in a larger aircraft, as you

pivot on your back or main wheels, it is moving nearly horizontal to the position of the nose of the aircraft and you can't see necessarily very much from what's coming from the left if you're on the right seat, just as when you're going to the right and pivot to the right, you can't see what's over there.

Q. Okay. So at this point, when you write your IOR, you state that there was the potential that the plane could have been on the dirt for a moment, correct?

A. Correct.

Q. So at this point you weren't sure that the plane had been on the dirt; is that right?

A. No, I wrote -- I wrote that sentence, "There was the potential that the plane could have been on the dirt for a moment," just to be concise in my IOR. I didn't want to --

Q. Go ahead.

A. Yeah, thank you.

I didn't want to be stirring the beehive and making a mountain of a molehill when it didn't need to be.

Q. What do you mean by "stirring the beehive"?

A. What I mean is companies can -- SkyWest

could get -- you know, I had never been off the dirt before -- or on the dirt before with an airplane; I didn't know if it -- how bad or -- it was, and I just wanted to be concise and -- and simple and say that there is potential, and if the company wanted to investigate it further, that's up to them.

Q. Wouldn't it be more concise just to say the aircraft was on the dirt?

A. I guess so. That's -- that's what I wrote.

Q. Okay. What did you mean by you didn't want the airline to make a mountain out of a molehill?

A. Well, things happen all the time in aviation, in flying, and you don't want to have to write a report and march into the chief pilot's office over everything that comes up, and so you want to just get the job done.

Q. But you also want to be accurate in your report, correct?

A. Sure.

Q. And you just said that this was the first time in your career that you had been on the dirt, correct?

A. Correct.

Q. So wouldn't that be something that you would want to tell your chief pilot about, something you would want to include in the IOR?
A. That's why I did include that.
Q. If you were sure that it happened, you would want to include in the IOR that you knew that that's what happened, not that it was a potential possibility?
A. I guess. Hindsight is always 20/20, if that's what you're trying to get at, that -- you can write something in a million different ways and then go back and armchair quarterback what you wrote or said or did.
Q. Well, there is a difference between saying there was -- potentially we were on the dirt for a moment versus I knew we were on the dirt. Isn't that -- that's a qualitative difference, isn't it?
A. Sure.
Q. But this is what you chose to write at this time when this incident was fresh in your mind, right?
A. Right.
Q. Okay. You also go on to state -- I'll make sure I get all the "thes" in there. "The captain give a bit more power to continue the taxi

and we proceeded normally toward runway 1."

Do you see that?

A. I see it.

Q. And you wrote that sentence in your IOR?

A. Yes, I did.

Q. Okay. And is that consistent with your recollection?

A. Yes. Again, I was being very simple in that IOR. They've even asked us to be concise, and the moment they called me a couple days later -- or soon after I submitted this IOR, it was Scott Carr from the chief pilot's office in Salt Lake and said, Did this happen?

I said, Yes, and I spelled it all out.

And then they said, Can you put that in writing?

I said, You bet, and I gave much more detail. And I think you have the documents of all that in more and more detail.

Q. Yep, we'll get to that.

A. Perfect.

Q. Do you know whether they called Captain Chappell and asked for the same clarification?

A. I don't know. I -- I presume so.

Q. Okay. After the IOR you said you were contacted by someone to provide more information?

A. Scott Carr from the -- he's assistant chief pilot, Salt Lake City office, called and said, Did this happen?

And I said, Yes. Captain taxied the plane off the tarmac, onto the dirt, and it happened quickly and unexpectedly, and I didn't have control of it.

And he said, Oh, thank you.

Q. So now -- and when did he contact you?

A. When?

Q. Yes.

A. I don't recall the date, sir, or time.

Q. That's fine. I'm not asking for a specific date. It's after you submitted your IOR. So was it a week after? Was it a month after? Was it a year after? Was it a day after? Do you recall?

A. Actually, it was before the IOR, I remember. He said, We just got a report from a ramper in St. George reporting this incident, and he is saying this. Do you know about this?

And I said, Yes.

Q. So did that confirm to you that the aircraft did go off the tarmac?

A. There was no confirmation needed; I knew that it went off.

Q. Then why didn't you write it on your IOR?

A. Like I told you before, there's two reasons, sir. One being I didn't think it was, you know, a life-threatening big deal.

And, second, the captain that you're representing was calling me and there was pressure from him for me to write things in a specific way so as to not get in trouble. This is also a captain I would have to subsequently fly with and someone who in the chain of command is directly over me and there's pressure coming from that. And so I thought I would be just concise and simple and let the company take it where they wanted, and we know where they took it, and once they asked me, I spelled it all out for them.

Q. So you said that Captain Chappell called you?

A. Yes, numerous times.

Q. And did you answer?

A. Yes.

Q. What was the conversation?

A. A couple times I was eating dinner with my family and he tried calling and I -- I might have

answered him the first time, but the second time I didn't answer him.

And then he texted me numerous times, and I have those records; I believe we submitted them to you. He was trying to get what I was submitting on my IOR in so he could make sure the stories matched up and -- so he wouldn't get in trouble.

Q. Okay. Let's take a look at those text messages. And to be clear, in your response right there you didn't identify any actual phone calls that you have -- that you had with Captain Chappell that you recall, correct?

A. Didn't identify? What do you mean?

Q. Right. You said there was one call that you were eating dinner, you didn't answer that one.

Then there was a second call, you didn't answer that one, then you exchanged text messages.

A. Yeah, he -- he went to text messages because I was trying to brush him off.

Q. Okay. Let me hand you what we'll mark as Exhibit 4. That's this document.

I don't have one for you, Chad. Sorry.

(EXHIBIT 4 WAS MARKED.)

This is one of the documents that Mr. Reber's lawyers produced yesterday. Okay.

Have you had a chance to review it, Mr. Reber?
A. Review it? I submitted it.
Q. Have you had a chance to review it today?
A. Yes.
Q. Is it the same document you submitted?
A. Yes.
Q. So the first text -- and this is a chain of text messages between you and Mr. Chappell, correct?
A. Correct.
Q. And the first one is dated Wednesday, March 25th, 2020, at 3:32 p.m., right?
A. Right.
Q. All right. And the R stands for Randy Chappell, correct?
A. Correct.
Q. So he states, "Give me a call." Right?
A. Right.
Q. And then more than two hours later he states that "I am done with mine. Put some suggestions in but I want to run by you. Give me a call when you can." Right?
A. Right.
Q. And did you call him after that?

A. I don't remember. I don't think so.
Q. And then he sends you -- well, what is this on page 2?
MR. CHAPPELL: I can't even read it.
MR. JONES: Yeah, it's pretty tough.
THE WITNESS: That is the captain's IOR.
Q. (BY MR. JONES) Okay.
A. So he submitted to me his IOR.
Q. A screenshot?
A. Yeah.
Q. Okay. And then you respond at the next page -- or is this your response on the next page? It says, "Cool. Just submitted mine. Almost exact same. Let me know if you hear anything else." Correct?
A. Correct.
Q. So by the time you received a screenshot from Captain Chappell, you had already submitted your IOR, correct?
A. It appears so.
Q. Then you sent him a copy of your IOR, correct?
A. Incorrect.
Q. Okay. What is this on page 4 of this exhibit?

A. That's Captain -- the captain's IOR again.
Q. Oh, okay. Thank you.
And then if we go to the last page of the exhibit, there's a text dated March 26th, 2020, 9:59 a.m. And it states, "Mark just called me and I have to have a conference call with them. He advised me not to talk with you and overthink this."
Do you see it?
A. I see it.
Q. And that was a text message that you sent to Mr. Chappell?
A. Yes.
Q. And Mr. Chappell responds, "Yeah, I have a call with the safety rep tomorrow." Correct?
A. Correct.
Q. And that's where the text messages end?
A. With that conversation, yes.
Q. Okay. Was there separate text messaging conversations after this one?
A. Perhaps. I could look it up. I don't know.
Q. Well, you were asked for conversations between you and Captain Chappell about this incident, so you would have produced those if you had them, wouldn't you?

A. Yes.

MR. JONES: What time is it?

MR. HOBBS: 11:00.

MR. JONES: Okay. Let's go a little longer.

Q. Okay. The next one in everyone's pile of exhibits, it should be the two-page document titled St. George Taxi Event.

(EXHIBIT 5 WAS MARKED.)

This is Exhibit Number 5. So after the IOR was filed -- or scratch that.

You were -- I believe you said you were contacted by Scott Carr, who requested more information after reviewing your IOR; is that right?

Well, let me put it another way before you answer it.

What is this document?

A. After there was a -- what was it -- a -- a management safety committee member telephone conference over this issue. They called me. It happened two times -- two different separate phone calls.

I verbally described what happened in detail during that event. And then they said that they -- I can't remember who it was, but someone from

management said, Can you get that in writing to us?
And I said, Sure, and this is what I produced.
Q. And did they request it during the first call or the second call?
A. I don't recall.
Q. Do you recall when those calls happened with -- in relation to the IOR and the submission of this document?
A. It was after the IOR and before the submission of this that the phone calls happened.
Q. Right. Do you recall who was on the phone call with the safety committee, either one of them? Let's go with the first one.
A. Roy Glassey. A SAPA member, I think maybe -- I don't remember the name, but I think maybe McKenzie Meeks. Mark Richards. I think Scott Carr. I'm not sure on that, though. And there was a couple others from some safety committee I don't remember.
Q. Okay. And the second committee meeting was there?
A. Similar. Very similar, same --
Q. Similar group?
A. Same people, yeah.
Q. Was Randy Chappell on either one of these

calls?

A. No.

Q. How long did it take you to prepare this so-called St. George Taxi Event statement?

A. This written one?

Q. Yes.

A. Maybe an hour. I don't know.

Q. And it looks like, based on the first line, that you prepared it on April 20th.

Does that sound right?

A. That sounds right.

Q. Did you consult with anyone when you were drafting this document?

A. No.

Q. Did you reach out to Mark Richards for advice on what to include in the statement?

A. No.

Q. Anyone at all?

A. No.

Q. And you state in the third paragraph, "Since this event I've talked with Scott Carr, Mark Richards a few times, the FAA and two separate group calls with several management/safety committee members."

Do you see that sentence?

A. Yes.

Q. So I believe we've covered Scott Carr. Were there more conversations with Scott Carr or just the one that you mentioned where he requested the St. George Taxi Event statement?

A. That was the -- the only time -- the only time I've talked to Scott Carr since was maybe halfway through the investigation process. I called him on the phone and I said, What's the status on it?

And he replied, I don't have anything to do with that. I can't help you. Sorry.

And that was the end of the conversation.

Q. Okay. And then you say that you spoke with Mark Richards a few times. What's a few? Do you have a recollection of how many times you actually spoke with Mark Richards?

A. I don't recall any specifics, no.

Q. Do you recall what you and Mark talked about?

A. I asked him what was going to happen, like, procedurally.

And he described it. And he says, I've got to stay out of it. The best I can do is tell you to be honest and accurate and take responsibility for things you could have done better. He kept saying,

Be consistent.

I said, Okay.

Q. Okay. In the statement -- and this is April 20, the occurrence as you confirm here, that the occurrence happened on early morning of March 24th.

That's accurate, as far as you know?

A. Where does it say that? Oh, yeah.

Q. At the first line.

A. Yes, as far as I know it's accurate.

Q. Okay. So this is about four weeks later, four weeks after the occurrence.

So if we look down, the second paragraph, one, two, three, four, five, six, seven, eight -- ninth line. Are you there? The sentence that begins with, "All of a sudden"?

A. In what paragraph?

Q. Paragraph 2.

A. I show, "is just the same when." Paragraph 2? Paragraph 1 starts with, "On the morning" --

Q. Yeah, you are right.

A. -- paragraph 2 says --

Q. Yeah, it's that line, but I want to go over, and the first full sentence of that states,

"All of a sudden, midway through the turn I looked down at the moving ground where the nose light is crossing and am shocked to see what appears to be dirt."

Do you see that sentence?

A. Where are you at?

Q. Okay. Go back to the "is just" line.

A. Oh, "All of a sudden, mid" -- okay. Got it. Okay.

Q. Okay. Did I read that accurately?

A. "All of a sudden, midway through the turn I looked down at the moving ground where the nose light is crossing and am shocked to see what appeared to be dirt."

Q. Okay. So that's a more specific description of what happened that day than your description in your IOR, correct?

A. Correct.

Q. And did you just not recall this more specific information when you were drafting your IOR; is that why it wasn't included?

A. No, I knew it.

Q. Then why didn't you include the more specific information?

A. Because I chose to be concise and simple

and not create more problems.

Q. Okay. Going on it says, "It was dark, flat, red dirt. I started to say, quote, 'What the?' end quote, and then the nose of the plane was back on the pavement."

Do you see that statement?

A. I see it.

Q. So it states that you started to say, "What the." Did you actually say anything?

A. I don't think so.

Q. Did you do anything to alert the captain that the aircraft might be off the tarmac?

A. At that point?

Q. Yes.

A. No. It happened really quickly, like turning a car in a U-turn, a couple seconds. Not a lot of conversation happens in two or three seconds.

Q. After those couple of seconds did you raise it with the captain?

A. Yes.

Q. When?

A. As we were pulling back onto the tarmac.

Q. I thought that was what happened in a couple of seconds.

A. Yeah. Right -- after we pulled back on

the tarmac I raised the concern.

Q. Okay. How long after you were back on the tarmac did you raise the issue with the captain?

A. Maybe four more seconds.

Q. Okay. And what did you say?

A. I said, What the crap was that? That was dirt.

Q. And what did he say?

A. Not much. Didn't -- didn't respond. Didn't -- didn't want to engage in conversation about that.

Q. Okay. So at that point did you, as first officer, did you have the right to stop him and make him address the point?

A. Physically, is that what you are alluding to?

Q. No. I'm saying, was it your responsibility at that point to clarify what just happened with the captain before the flight goes forward?

A. I would say I could have been more assertive and said -- spoke up and said, Hey, we need to stop this aircraft, but he saw, just as I saw with my eyes, the dirt and was choosing to go on. And so it was obvious that he was choosing to go on and so I

was following his commandability, his lead, and followed his leadership and thought maybe it wasn't that big of a deal, and continued on.

Q. Well, it's one thing to be unassertive, but it's another thing to violate policy, correct?

A. Correct.

Q. And in this instance, when you didn't push the issue with the captain, you allowed him to ignore what you believed at the time was an incident where the aircraft went off the tarmac. That violates pilot policy, doesn't it?

A. Yes, and that's why I was terminated, sir.

Q. You said that he saw what you saw.

A. That's correct.

Q. What do you mean by that?

A. Well, my vision is 20/20 and every pilot's required to have their vision corrected to 20/20 to fly. And it was obvious there was dirt underneath us. And just as you and I know, it's daylight right now, without having to discuss it. He saw the dirt. I saw the dirt. There's never been a question in my mind in my whole life if I was on dirt or on pavement.

Q. Do you know what's on that wall?

A. Appears to be a picture, sir.

Q. I don't, because I'm not looking at it.
Do you know what Randy Chappell was looking at during this whole occurrence?
A. I don't know, but --
Q. Did you know that he looked at the same thing that you looked at?
A. Unless his eyes were closed, he was looking at it.
Q. So you don't know, though, correct?
A. I cannot prove it.
Q. During the maneuver, the 270-degree left turn, the captain's attention is going to be on the left wing, correct?
A. Incorrect.
Q. Okay. Why is that?
A. Well, you're looking in front of you and just to the left of where the hose of the aircraft is going, not the wing. That's why.
Q. Okay. And would the dirt appear to the left of the nose or where the aircraft is going?
A. Restate that question.
Q. If he was looking where you just said, where the aircraft was going, would he see dirt?
A. Yes, 100 percent.
Q. To the left of the nose?

A. We were on the dirt enough to see dirt underneath us. In fact, all three tires were in the dirt.
Q. You saw dirt underneath you, correct?
A. Correct.
Q. How do you know that Captain Chappell saw dirt under the plane?
A. I can't specifically prove it, but by his actions I knew he knew, and it was just obvious.
I also know, sir, since you brought it up and asked the question, once we landed in Salt Lake and drove home I was on my -- I was on my drive home up Parley's Canyon. And this captain rarely calls me, but he called me on the phone and said, Hey, if anyone says anything about what happened today, I'm not going to say anything. That was his words. That's how I know. It was obvious.
Q. Okay. But you stated -- and you state it several times -- that you knew that he knew, but now you're telling me you didn't know that at the time.
A. At the time I knew exactly that he knew. I just can't prove what he saw. You know, I -- I can't prove what someone sees or doesn't see, but it's just obvious.
Q. The man's career is going to be on the

line if what you say is true. So shouldn't you be a little more certain before you say exactly what he knew and what he saw?

A. Yeah, I can say with certainty that he knew. I'm not afraid of that. I'm not afraid of the truth, sir.

Q. Again, you've waffled on this, so I want to be clear.

A. I am not waffling.

MR. HOBBS: Objection.

Q. (BY MR. JONES) Did you see him look down and see dirt on the ground?

A. I was looking at the ground, I was not looking at his eyes.

Q. So because you're not looking at his eyes, you don't know what he was looking at, do you?

A. I don't.

Q. So how do you know that he saw dirt if you didn't know what he looked at?

A. I don't know what you're trying to get at.

Q. Can you answer the question?

A. What's your question?

Q. How do you know what he was looking at if you weren't looking at him?

A. If you word it like that, I guess I don't

know what he's looking at. Unless he's closing his eyes, though, the front of the aircraft is -- the dirt was in plain view of the front of the aircraft. Unless his head was swiveled 180 degrees looking backwards, he saw what I saw. Just as if you were looking out this window and you say, I saw these buildings, yeah, I see the buildings too. It's simple logic.

Q. But if I'm not looking out the window then you don't know what I'm seeing, correct?

A. Correct.

Q. Thank you.

A. But if we're looking forward, both of us, and we're looking at the same thing, we can objectively say we saw it.

Q. But you have no evidence -- you had no observation that he was looking at the same thing that you were looking at during this maneuver?

A. Correct. I didn't film him. I didn't film his eyes either.

Q. Okay. But that's a correct statement that I just made to that question?

A. I don't know which one you are talking about.

Q. You answered it. We'll move forward.

A. Perfect.
Q. So this new information --
MR. CHAPPELL: Can we take a break?
MR. JONES: Okay. Can we take a break? Everybody good?
MR. HOBBS: Yeah.
THE WITNESS: Yeah.
MR. HOBBS: How long do you want?
MR. JONES: Just five or ten minutes. Maybe five.
(A break was taken from 11:18 a.m. to 11:26 a.m.)
MR. JONES: Okay, Mr. Reber, we're back on the record.
Q. One thing I want to go back to is that I believe you stated -- and I'm not going to get it exactly right, but you stated that after he got back on the tarmac you stated to Captain Chappell something along the lines of, What the crap? Can you finish the sentence for me that you actually said?
A. Yeah. What the crap was that? We were just on dirt.
Q. Okay. And what was his response?
A. He didn't respond much. He tried to brush me off or ignore me.

Q. Okay. And in that situation, in the cockpit, if you're ignored -- well, first of all, did you -- did he hear you?

A. Unless his hearing went out or the audio system through the intercom went out, he heard me.

Q. Did he respond in any way, though? Did he brush you off physically with a hand gesture, or he didn't respond to you verbally, but did he respond in any way?

A. I think -- I can't recall exact, but he, I think, muttered something or mumbled something to -- Nnn, don't worry about it, just call LA, get clearance. That's the Los Angeles Center.

Q. So now you've gone from you don't recall whether he said anything to now you've got a couple of full sentences?

A. No, he didn't re -- what I'm saying is he didn't respond to the dirt. He didn't respond to me saying anything about going off the dirt. He then continued on with other language and other communication, other topics.

Q. Okay. I'm focused on the "What the crap, we just went off the dirt."

A. Oh, okay.

Q. Did he respond to that verbally?

A. No. He just muttered something and I was -- unintelligible, just --

Q. Okay. And in the CRM -- which stands for?

A. Crew Resource Management.

Q. Okay. There's something I believe is called -- what is it? Challenge and respond. Are you familiar with that?

A. Vaguely.

Q. Okay. What does it mean?

A. I don't know. You just talk back and forth and communicate.

Q. So if somebody asks you a question, you respond, correct?

A. Yeah.

Q. And if they don't -- if you ask somebody a question and they don't respond, you challenge them, correct?

A. Our manual says if they don't respond after two inquiries, you presume them incapacitated and take over the aircraft.

Q. Okay. And that didn't happen in this case, did it?

A. No.

Q. Okay. All right. Back to page 1 of the taxi statement. The next-to-last paragraph...

A. "Cause of this event"?
Q. Yes, sir. So this -- to paraphrase, are you summarizing here what you believe the causes of the event were?
A. Yes.
Q. And take a minute to look them over.
A. I have.
Q. You have? Okay.
Four of the five events were factors that were beyond the control of the flight crew; is that correct?
A. Correct.
Q. We've got very poor overhead floodlighting, we've got no edge lighting, we've got rampers angling the plane towards the left and lack of adequate pavement near the plane. Correct?
A. Correct.
Q. And then the last one is, "Overly aggressive taxi turnout by captain without looking first."
A. Correct.
Q. So who was responsible for the first four?
A. It appears jointly the company and the St. George Airport.
Q. Okay. And is it fair to say that if those

factors had not been present, the first four, do you believe that there would have been a much less likely chance that this particular incident would have occurred?

MR. HOBBS: Object to the form of the question.

Go ahead.

THE WITNESS: I answer still?

MR. HOBBS: Go ahead.

THE WITNESS: That's pure speculation, but I don't believe it would have happened. This captain is generally, from my experience, good at flying the plane and controlling the aircraft, and it's my belief -- again, it's speculation, but I don't believe he intended on doing this.

MR. JONES: Okay. Thank you.

Q. Moving ahead, the next -- I won't say next, but at some point you were contacted by an FAA investigator named Buddy Reed, correct?

A. Correct.

Q. Do you recall approximately when, using the occurrence as a reference date, he reached out to you?

A. I don't recall.

Q. One week? Two weeks? Two months? Was it

before you wrote the St. George Taxi Event statement?

A. I believe it was after.

Q. After?

A. It was sometime after, maybe a few weeks to a month, but I can't be certain. I don't know.

Q. Okay. And how many times did he -- he was calling you, obviously, to investigate the occurrence, correct?

A. Correct.

Q. And how many times did he interview you?

A. Once.

Q. Just once over the phone?

A. Yes.

Q. Okay. Did he send you any e-mails about it?

A. No.

Q. Any text messages?

A. No.

Q. Okay. And what information was he seeking from you when he called you?

A. What happened that day.

Q. Okay. And was the information that you provided him consistent with what you put forth in the IOR?

A. Pretty close.

Q. Anything you can think of that might have been different?

A. It was only a two- to three-minute conversation, very short. He did most of the talking. I did a few answers.

He said, So you got to the plane and they pushed you back?

I said, That's correct.

And he said, Did they angle you towards the left? That's what your captain said.

I said, Yeah, they did.

And then he says -- and he says -- and then I told him we started taxiing to the right, the captain changed his mind, went to the left for whatever reason, maybe the gate -- there was a plane at that gate and it was perhaps too close for comfort.

Then he said, And then it appears you went onto the dirt.

And I said, Okay.

And he said, And how was the flight?

And I said, It was fairly routine.

He says -- he said, Did you write it up?

And I said, I don't believe the captain did and I don't know if the company did.

And he says, That's what I show. I don't show any write-ups on it.

And I said, Okay.

And it was that simple. It was brief, a couple minutes.

Q. Okay. And after that conversation at some point Reed found no violation or certification towards you, correct?

A. Correct.

Q. And what does that mean? I get violation. What does certification mean?

A. I don't know. That was his writing.

Q. That's a quote from you, but that's all right. We can try to get to it later.

A. Oh. Or cer -- what did I say? Or certificate action?

Q. Yeah.

A. Where are you reading it?

Q. It's on my notes but -- yeah.

A. Your notes?

Q. Your certificate action.

A. I don't know. What are you referring to here?

Q. Yes. What I -- later on you state that Reed found no violation or certification towards you.

Does that make sense to you? Or maybe I wrote it down wrong.

A. I -- I don't know. Yeah, I don't know what you're asking.

Q. You don't know what certification would mean in that context?

A. No. Maybe certificate action is what you meant, like, penalize me in some way.

Q. Okay.

A. There was none of that.

Q. Okay. That's good enough.

And then -- so you didn't hear from FAA investigator Buddy Reed again after that, correct?

A. Correct.

Q. Later in September you were contacted by a second FAA investigator, Douglas DiFrancesco, right?

A. Right.

Q. And you were a little hesitant to provide more information after you had already gone through this once, correct?

A. Correct.

Q. So let's take a look at some e-mails you exchanged with him.

(EXHIBIT 6 WAS MARKED.)

Q. This exhibit -- the top page says, "Thank

you," and it has Douglas DiFrancesco's letterhead.

Are we all looking at the same document?

A. Yeah.

Q. This is number 6. Take a moment, Mr. Reber, to review this one. Most of it's just a long attachment.

Have you had a chance to review?

MR. SHULTZ: Yeah, I want to read the whole thing.

MR. JONES: Okay.

THE WITNESS: The first two pages are the interaction with the FAA. The rest is not an attachment.

MR. SHULTZ: Yeah, I don't want to interrupt you, but I want to read it.

MR. JONES: Okay.

THE WITNESS: That's my presentation to the review board, not an attachment.

MR. JONES: Let's give Chad a chance to look at it.

THE WITNESS: Oh, okay.

MR. SHULTZ: You can go ahead.

Q. (BY MR. JONES) I'm sorry, Mr. Reber. You were going to say something? Something about the attachment?

A. You said this was an attachment and it's not an attachment.
Q. Okay. So you are referring to the third page of the exhibit, correct?
A. There is only two. We're talking about the conversation -- the e-mail with the FAA, is that correct?
Q. Yes.
A. There is two pages, one, two. This I have here is my presentation to the review board.
Q. Okay. Well, I was going to ask about that.
A. That's not an attachment.
Q. Okay. That's what I was going to ask about.
A. Oh, okay.
Q. Thank you.
So if you read it from the bottom up -- start at page 2. That's...
A. That would be reading it backwards?
Q. Right. So the first one dated September 4, 2020, from you to Douglas DiFrancesco -- do you see that one? That's at the bottom of the page, the second of page 2 -- page 2 of the exhibit.
A. What -- yeah, sure. I've got both pages.

Q. Okay.
A. What about it?
Q. So they are in reverse order is what I'm saying, the e-mails.
So the first e-mail sent was from Justin Reber to Douglas DiFrancesco. Do you see that one at the bottom? It's dated September 4, 2020?
A. The 10:09 a.m. one? That would be the first one because it's 10:09. 10:09 comes before 1:05.
Q. Oh, you are right. Okay.
Okay. So the first one at the top of page 1 of the exhibit, it's from Justin Reber to Douglas DiFrancesco dated September 4, 2020, at 10:09 a.m.
Do you see that one?
A. I see it.
Q. Okay. Had Mr. DiFrancesco contacted you prior to this?
A. Yeah, he called me on the phone.
Q. You weren't just reaching out to him --
A. No.
Q. -- on your own?
Okay. You state that "You can expect my written statement (the same ones that I have

submitted to SkyWest) next week, probably Wednesday or Thursday."
Do you see that?
A. I see it.
Q. And what written statement were you referring to?
A. The -- that first exhibit, the St. George Taxi Event.
Q. Okay. And did you eventually send that to DiFrancesco?
A. I did not.
Q. Okay. Did you send any information to -- any documents to Mr. DiFrancesco?
A. I did not. I did not.
Q. And why not?
A. My free will and choice.
Q. Okay. And what's Mr. DiFrancesco's role with the FAA?
A. I have no clue.
Q. Okay. Does the FAA do their own independent safety investigations?
A. Perhaps. You'd have to ask them.
Q. You don't know?
A. No.
Q. Was Mr. Reed doing an independent safety

investigation when he contacted you the first time?
A. I suppose. I don't know how FAA's investigation system works. I work for SkyWest, not the FAA.
Q. Right. Okay. Now going to the one at the bottom of page 2. That's from Justin Reber to Douglas DiFrancesco dated September 4, 2020, 1:05 p.m.
Do you see that e-mail?
A. I see it.
Q. So in the second paragraph you state, "So I have three questions. If I submit in detail everything I experienced that day, one, what will be" -- "what will it be used for? Two, will it be used against me? Three, how does it benefit me?"
Do you see that?
A. I see it.
Q. So you were only willing to cooperate with Mr. DiFrancesco if there was some benefit for you; is that right?
A. That's not the only reason. I was just inquiring of what his purpose was and why I would ever submit something to the FAA when I don't need to or have to.
Q. Okay. So this -- the longer document that

I have attached to these e-mails, that wasn't actually attached to any e-mail that you sent to Mr. DiFrancesco?

A. Definitely not.

Q. Okay. All right. Let's move forward to the review board prep. In general, based on your experience as a pilot and as a captain at SkyWest and conversations with other pilots, is it standard practice at SkyWest that each pilot will be entitled to an independent review board?

A. I have no clue.

Q. Okay.

A. That would be something you would have to inquire from SkyWest Airlines.

Q. Okay.

A. I don't believe they have any policy on that, but maybe they do.

Q. Did you know that Chappell's review board hearing was scheduled for the day before your review board hearing?

A. Yes.

Q. And when your review board began, did you know that Chappell's review board had voted unanimously to reinstate him?

A. I believe I did, but I don't recall.

Q. Did you know when your review board started that the members of your review board consisted entirely of the same members of Mr. Chappell's review board?

A. I think so.

Q. How did you know that?

A. I -- I think when I was asking -- I'm not positive on this, so -- but I think I asked Nichole Chapman, HR department, who was going to be on the board or are they going to be the same or -- I, like -- it's vague. I can't recall exact.

Q. Okay. Did you ever discuss that with Richards, the composition of the review boards?

A. I don't think so.

Q. Okay. We'll go back to Exhibit 1, which is the transcript of the review board. One thing I'm just curious about this exhibit is it has -- at the top of it it says, "SkyWest 00103 Reber Hearing."

Do you see that?

A. I see it.

Q. Okay. I think I know what that is. Never mind.

So I can't remember if I -- I think I did ask you this before, but this appears to be an accurate transcript of your review board hearing,

correct?

A. I haven't read through the entire transcript, but it -- I'm guessing it's accurate. I don't know.

Q. Okay. Fair enough.

How did you prepare for your review board hearing?

A. I wrote down a lot of things that I thought could help me, you know, take responsibility for what it was. I reviewed it with my wife to help me present it well.

After that I had some friends that I presented to to practice it, you know, how to -- stand here, stand there, pointers they would give me. I, you know, tried to give examples in it of when I had spoken up and been assertive in the past to show that I -- you know, I'm a good pilot and aren't worth getting rid of, you know, tried to show where I can improve. A lot went into it.

Q. Right. So you had time on your hands at this time, unfortunately, and you spent a lot of time and a lot of work into putting together a very careful, a very scripted presentation, correct?

A. Correct. Thank you.

Q. And what documents did you review while

you were preparing?

A. I can't remember all of them, but as many as I could get my hands on and review. Policies, things like that.

Q. Maybe the taxi -- St. George Taxi statement that you made?

A. Yeah.

Q. Your IOR?

A. Yes.

Q. At this point you had no written communications with the FAA, correct?

A. No.

Q. So nothing to review there?

A. No.

Q. Did you review Chappell's IOR?

A. Probably.

Q. Okay. And did you discuss your testimony -- you mentioned wife and friends. Did you discuss your testimony, what it would be, with anyone at SkyWest prior to the hearing?

A. Say that again. Did --

Q. Did you discuss the content of your testimony with anyone at SkyWest prior to your hearing?

A. Yes.

Q. Who was that?
A. Oh, there's several of them. It was Jill Aylor. She is a flight attendant. Dirk Olson. Marie Welch. I'd have to get the list. Lew Bodkin. Yeah, there was several there that -- and several that weren't SkyWest members to just give me some practice to go in front of a board to get a job back, so...
Q. Uh-huh. Okay. Was it Dirk Olson?
A. Yes.
Q. And what was Dirk's position with SkyWest?
A. Captain, pilot.
Q. And Mary Welch, Marie Welch?
A. Flight attendant.
Q. And Lew Rodkin?
A. Bodkin.
Q. Bodkin.
A. Pilot.
Q. FO?
A. Captain.
Q. Captain. Okay.
A. There was more there too. I...
Q. Okay. And what was the purpose of contacting or working with actual SkyWest employees in your prep?

A. They would understand the verbiage and procedures and -- they are also friends. You know, some weren't members of -- or employees of SkyWest, so it -- it didn't matter who was there. I didn't actually organize this; it was Jill Aylor and her husband that were -- they -- they are the ones that contacted everyone. It wasn't even me. They organized it and I went and presented in front of them and...
Q. Okay.
A. Practice. That was the main thing.
Q. Uh-huh. Understood.
So how much time in all would you say you spent in this prep?
A. I don't know.
Q. Weeks?
A. No.
Q. No?
A. Maybe an hour or two a day for a couple weeks or something like that.
Q. Uh-huh.
A. I don't know how -- I didn't add up my time.
Q. Okay. Fair enough.
The -- so when you made your presentation

to the review board, you had a script, right?
A. Yes. Pretty much the same one as this right here.
Q. Oh, from the transcript?
A. Yeah, that's what I gave. Like, this document that you have --
Q. The one that was --
A. I just read it. I read it and that's what they transcribed -- or somebody transcribed.
Q. Okay. Understood.
A. So it's the same.
Q. So the document that I had mistakenly --
A. Thought was a attachment is just the same as the -- that's what I just read in front of the review board.
Q. Okay. Great. Thanks for the clarification.
And the -- where is my copy? The bottom of page 6 of the transcript, if you could turn there.
A. Okay.
Q. Okay. At the last -- just looking at the last sentence on that page, you stated that "I'll explain the same event I previously shared with consistency in as much detail as possible."
Do you see that sentence?

A. I do.
Q. And that was your -- you know, your goal in this hearing, was to do just that, correct?
A. Yeah.
Q. Okay. I was going to switch topics, but it is noon. You want to take lunch?
MR. SHULTZ: I just want to check once. I had somebody that's bringing a couple sandwiches. Let me see the status of that.
Yeah, we can go to lunch.
MR. JONES: All right. See everyone back at 1:00?
MR. HOBBS: How much more time do we have?
MR. JONES: Maybe two more hours.
MR. HOBBS: Do you want to do lunch, or do you want to plow through? Well, short lunch? Quick sandwich.
THE WITNESS: I'm good with anything.
MR. JONES: Yeah, 45 minutes. Fair to do that. It's tough to get out and back in anything under an hour, but we'll do our best.
MR. HOBBS: Okay.
(A break was taken from 11:58 a.m. to 12:38 p.m.)
Q. (BY MR. JONES) I want to go back to the

morning of the occurrence and talk about the ground crew. So on that day, how many grounds crew members were present, do you recall?

A. I don't recall.

Q. There was somebody on the -- what do you call the thing that pushes you back?

A. Tug.

Q. Somebody on the tug, right?

A. (Witness nods head.)

Q. And there must have been at least one other?

A. I don't recall, but generally there's either a two- or three-, sometimes five-person crew that works it.

Q. But you don't -- you don't remember the specific number this morning?

A. No.

Q. Okay. And if you can walk me through the process. Generally how does it work? Who are they communicating with? Are they communicating with the captain or the first officer when you're first starting the pushback?

A. Nearly always the captain.

Q. Okay. And they communicate via headsets or hand signals or something else?

A. Either/or or both.
Q. And do you recall in this case?
A. I don't recall.
Q. Okay. And we've kind of touched on the pushback, but if you can describe it to me again. What was the process and where did the plane end up?
A. Captain was flashing his -- the headlights of the plane on and off trying to get the ground crew to hurry up. There was only a few passengers, so they loaded easily and quickly. So he was kind of rushing them, getting them to move.
They did. We don't need a pushback clearance in St. George, so we pushed back and they angled us what I'm approximating about 20 degrees nose left, and stopped.
Q. Why is that -- I've read that in several of the documents. Why is that 20 degrees left relevant or meaningful? If it is.
A. I don't know. I'm just giving facts.
Q. Okay. Well, is it -- in a typical pushback is it zero degrees, and that's why the 20 degrees is mentioned?
A. Every pushback is a little different. Every ground crew handles things a little differently. There's no particulars. Some are kind

of poor at pushing back, some are great at it. I -- you know, some may have their individual ramp procedures. There's -- it's -- it's not untypical to be pointing nose left or nose right.

Q. Okay. So --

A. I'm just giving the facts of what happened.

Q. Right. And you can't read anything into this 20 degree left number, is that what you are saying?

A. Yeah, anything beyond that is speculative.

Q. Okay. So after they push you back, what's the next step in the process?

A. They -- in general, you're talking, or that day?

Q. Yeah. Let's go with that day.

A. Okay, that day. They would have disconnected the tow bar from the aircraft, pulled the tug back and waved us off. And that day I remember just, you know, a goodbye wave, like a -- one person to another.

Q. Okay.

A. A nondirectional wave off.

Q. Okay. So they can -- you may have mentioned this, but they can communicate to the

flight crew either with their hand wands, radio, dispatch. So they have multiple channels to reach you if they want to, right?
A. Not dispatch.
Q. Not dispatch, okay.
ACARS? Can they reach them by ACARS?
A. The ground crew?
Q. Yeah.
A. That's what you are talking about?
Q. Yes.
A. Not that I'm aware of.
Q. Okay.
A. It's either by intercom with their headset or by a hand signal.
Q. Hand signal being the wands and stuff like that?
A. Yeah, when -- when they are out there in front of the plane.
Q. Okay.
A. That's what I'm referring to.
Q. And when you start the taxi to the runway where are they? In this specific instance.
A. When we start the taxi?
Q. Yes.
A. Walking back towards their building to do

whatever they do.

Q. Okay. And then in this specific instance we know that they did observe the taxiing and that they did observe the aircraft go off the tarmac because they wrote a report about it, correct?

A. Correct.

Q. And at that point, if the grounds crew -- or ground crew observes a plane, aircraft, going off the tarmac, wouldn't it be incumbent upon them to contact the flight crew and inform them of that occurrence?

A. If we were on company frequency with our radios they could potentially do that, yes.

Q. I'm sorry. One second.

(Discussion off the record.)

Sorry. I had that a little bit wrong there. So one thing that they can do is rather than contact the flight crew, they can contact dispatch and say there has been an irregularity or an occurrence, correct?

A. I suppose they could, yes.

Q. Okay.

A. In order for that to happen, it would have to happen really quickly. It was approximated -- by my calculations for the time and distance it took to

cover from that ramp area to the end of runway 1 on the taxiway at 30 knots of average taxi speed, 51 seconds. So they would have had to contacted dispatch, dispatch call the airplane and have us acknowledge it or see it within 51 seconds. That's an estimation, but.

Q. Right.

A. It's possible.

Q. A better means, if available, obviously, would be radio contact, right?

A. That's correct.

Q. But in this case there was no -- well, okay. Let me go back.

In the -- so you are doing the maneuver, taxiing toward the runway. Do you still have eye contact with the ground crew?

A. That morning, with a left-hand turnout, went on the dirt, went back onto the paved asphalt, and after that we're looking forward down the taxiway, we're not looking back at -- to our -- 90 degrees to our left towards the building where the ramper is at; we are now focused on what's in front of us, like driving a car.

Q. Okay. So in this instance you don't know of any efforts that the ground crew made to contact

the flight crew, correct?
A. Correct.
Q. If they had contacted you and notified you that the plane had gone off the tarmac, the flight would have ended right there, correct?
A. It would have been up to captain's choice, decision. And, again, we would have to have been on the correct frequency for that -- to have communicated that. A lot of times we're not on -- or listening to company frequency as we are taxiing out, so...
Q. Okay. Do you remember in this instance whether you were on the same frequency or --
A. I don't remember, no.
Q. Okay. So if that had happened and the captain stopped the flight, then we wouldn't all be here today; is that right?
MR. SHULTZ: Objection.
THE WITNESS: That's speculative, so I don't know.
Q. (BY MR. JONES) Have you ever been back to this area of the St. George Airport since the occurrence?
A. Yes.
Q. And have they made any changes to it?

A. I don't know. I don't think so, though.
Q. You stated before that there weren't any blue light -- there weren't any blue edge lighting like you would see on a taxiway nor reflectors, signs or overhead ramp lighting. Since you've been back, you haven't seen any of those things being replaced?
A. There is no new lighting, not that...
Q. And they didn't add to the size of the ramp?
A. I don't think so. It's the same as it was.
Q. When is the last time you were there?
A. I would have to look at my records, but maybe spring of 2022.
Q. Okay. Skip down -- where are we? Okay. If I could have you take a look at page 11 of your transcript.
A. Okay.
Q. If you go down to the one, two, three, four -- fourth paragraph of that page. It starts, "With this whole 270-degree left-hand turnout."
A. I'm there.
Q. The second sentence starts with, "I was shocked that the plane was just under but now, just as baffling to me was that the captain was acting

like it had never happened as he continued to taxi the plane southbound on taxiway Alpha."

Do you see that?

A. I do.

Q. And do you recall that being your testimony?

A. No, that's -- they transcribed that wrong, I believe.

Q. Okay. What's wrong about it?

A. Well, if we compare it to what I wrote in my presentation...

Q. Okay.

A. I will have to find it.

Q. Take your time.

MR. SHULTZ: At the bottom it says Reber 00012.

THE WITNESS: Okay.

MR. SHULTZ: That's the page.

THE WITNESS: Okay. So this is what I said unless I misread my own writing during the presentation.

Q. (BY MR. JONES) Okay.

A. "This whole 270-degree left-hand turnout took just a few seconds, especially with the aggressive taxiing. I was shocked that the plane was

just on dirt but now just as baffling to me was that the captain was acting like it never happened as he continued to taxi the plane southbound on taxiway Alpha."

Q. Okay. And when you refer to "like it had never happened," you are referring to the aircraft going off the tarmac, correct?

A. Correct.

Q. We covered this a little bit earlier, but isn't it possible that you knew that the plane, aircraft, had gone off the tarmac but Captain Chappell didn't?

A. Anything is possible in this world. Highly unlikely.

Q. Okay. So once you get to the runway, you take over the controls, correct?

A. On that flight, yes.

Q. Because you're going to fly to -- operate the flight to Salt Lake City?

A. Yes.

Q. Page 13 of your transcript you note in several places that you were, quote, upset, quote, frustrated, quote, disturbed, quote, distracted and that you had trouble concentrating on the flight because of what just happened.

Do you see those references, and does that fairly summarize how you felt?

MR. HOBBS: Object to the form.

Go ahead.

THE WITNESS: Thirteen? And where are you at?

Q. (BY MR. JONES) Well, it's --

A. I'm not seeing what you are -- just talked about.

Q. Okay. Let's say --

A. Which paragraph?

Q. Third paragraph, third sentence in that paragraph, "As we took off and during the departure, I was upset knowing what had just happened and I was frustrated that I was unable to prevent it or resolve it."

Do you see that?

A. Yes.

Q. And then the next paragraph starts with, "It was a huge distraction in my mind."

Do you see that?

A. I see it.

Q. Okay. And then skip to the next paragraph. The next paragraph says, "As the pilot flying, it was very difficult to concentrate during

the flight because the event back in St." -- "because of the event back in St. George. I did my best to look forward and not let it distract me."

Do you see that?

A. Yeah, I see it.

Q. So, generally, you were distracted by what had happened, you were frustrated and you were trying to concentrate on the flight, correct?

A. That's correct.

Q. So there were references on this flight that you exceeded the -- I want to make sure I get this term right -- let me go back.

Despite being frustrated and upset, you believed you were still fit to fly the route, right?

A. Yes.

Q. During the route SkyWest has reported that the high speed warning went off.

Do you recall that?

A. Yes.

Q. And how long did it go off?

A. I have no clue.

Q. Is it, like, seconds or is it, like, 30 minutes?

A. It goes off until you resolve the issue.

Q. Okay.

A. It's, like -- if you go over a certain speed, a clacker sound will go off until you pull the speed back.
Q. Okay.
A. It's, like, the speed limit on a car is 70 -- or on the freeway is 70; say you went 72, it would notify you, Hey, you're too fast, until you resolve it.
Q. Is it an annoying clacking sound?
A. Yes.
Q. Is that the point?
A. Yes, that is the point.
Q. So it's not something you are going to do the whole flight with?
A. No, it's not something you try to do; you resolve it and move on.
Q. Right. But it happens pretty commonly, correct?
A. Occasionally.
Q. Okay. And the -- in this case it wasn't due to you being upset or frustrated, right?
A. It -- that could have played a part in it, but it's happened when I wasn't frustrated or it's happened to numerous pilots that --
Q. Sure.

A. It's just human error.

Q. Okay. But you don't recall -- like, I'm -- you know, as a layperson, I have no idea, so did this go on for --

A. Probably seconds.

Q. Seconds, okay. That's what I figured, but I didn't know. Thank you.

Then who is Scott Miller?

A. He's a flight attendant. He was the flight attendant for us that day.

Q. Had you worked with him before?

A. Yes.

Q. Did you know him pretty well?

A. Yes.

Q. He's a fairly senior flight attendant, correct?

A. Correct.

Q. So that's why he's on your flight with Captain Chappell?

A. Yes.

Q. And in your -- let me see if I can find it before I begin. Okay. If you could go to page 15 of your transcript.

A. I'm there.

Q. So you quote -- you quoted at your hearing

words from Scott Miller, correct?
A. Correct.
Q. Where did those words come from?
A. Scott Miller.
Q. Okay. So you had personally interviewed him for purposes of the hearing?
A. No.
Q. Okay. Then who -- was there a written statement that you obtained?
A. Yes.
Q. And where did you get that from?
A. He forwarded his statement to another flight attendant, and that flight attendant gave it to me, Jill Aylor.
Q. Okay. You say "statement." Was it an IOR, or was it something else?
A. I don't know what it was.
Q. Okay. Okay. And the third sentence -- well, I'm in the -- I'm in the paragraph that begins with, "Here's his words, Scott Miller's."
So now you are reading into his words from his statement, correct?
A. Correct.
Q. Okay. Quote. "I was in my cabin performing my duties and securing my cabin for

takeoff. I never felt or heard or saw anything that would suggest an IOR would have to be filled out. From my point of view, everything from boarding passengers to pushback, taxi, cruise, landing and taxi in was normal."

Does that sound accurate?

A. Yeah.

Q. And so those are Scott Miller's words, correct?

A. Correct.

Q. And he's a seasoned guy. Do you know how long he had been a flight attendant with SkyWest?

A. No.

Q. Okay. And then on the next paragraph -- again, is this quote from the statement you obtained of Scott Miller's? It starts with, "On April 1st, 2020."

A. Going down further?

Q. Yes.

A. Yeah, that's his.

Q. Okay. So it says, quote, "On April 1, 2020, after flying in from my Fresno standup, I was in the crew lounge and Mark Richards stepped out of his office saying he needed to speak with me. I went into his office and he asked me what I knew about the

incident in question. I repeated my recollection that I had shared with Alyssa. He followed up by asking if I had felt any excessive power use. I told him no; there wasn't a dip or anything peculiar about the taxiing-out procedure."

Did I read that correctly?

A. Yes.

Q. Do you believe that Mr. Miller was being truthful in that statement?

MR. HOBBS: Object to the form.

MR. JONES: I'll rephrase it.

Q. Do you have any reason to doubt that Mr. Miller was being truthful in that statement?

A. Do I have reason to doubt him? No.

Q. Right. Okay.

A. He's honest.

Q. Then going down to -- skip one paragraph to the paragraph starting with, "After this conversation."

Do you see that one?

A. I see it.

Q. Okay. And this is talking about -- go ahead and review it.

A. I'm good.

Q. Like to paraphrase it, not read the whole

thing?
So you are generally talking about your postflight walkaround, correct?
A. In Salt Lake, yes.
Q. In Salt Lake, correct.
And you had noticed some dirt on one of the wheels, right?
A. That is right.
Q. Like a four-inch amount of dirt, is that what you stated, I think?
A. On the side wall of mainly the right main tires there was maybe four inches of dirt residue. It was not mud; it was dried dirt residue. And a little on the nose and a -- some on the left mains as well, yes.
Q. Okay. And, again, you're quoting Scott Miller here. Scott Miller said -- or wrote, "I asked the captain what was Justin doing? He said, Oh, he's just being a dork, and then yelled at Justin, Get over here, you big dork. Randy then said, We must have hit a mud puddle after landing during taxiing in." Miller continues, "When I looked down I noticed the mud on the wheel of the aircraft. I didn't question the statement due to all the construction going on and the rain that happened that

morning in Salt Lake."

Do you see that?

A. I see it.

Q. And, again, you have no reason to question the honesty or the accuracy of Mr. Miller's statement?

A. Correct.

Q. Okay. Why did you feel that this should be included in your presentation?

A. It backs up everything that I told them in my presentation, precisely.

Q. Okay. What parts in particular of your presentation line up with this?

A. I'm glad you asked. I did my -- I did a walkaround of the aircraft. In fact, I did it twice. Went back up to the front where Captain Chappell was standing with flight attendant Scott Miller.

I said, Hey, it's pretty obviously -- this is with me speaking to the captain. There is dirt on the wheels, suggesting we should write it up -- the captain should write it up.

So he didn't acknowledge me; he didn't say, Okay, let's look at it. So I proceeded back around the right wing to the right main tires and pointed at them, with him looking at me in the

eyeball, with Scott Miller still standing by him at the right front of the nose of the aircraft, and he didn't follow me to come look at it himself.

Q. Okay. So the way you phrased that, you said that -- you said something and you said it suggested that we should write it up, but did you actually verbally suggest that you should write it up?

A. I didn't say the words "write it up," but I said, as I always do, you, as the first officer, point out the problem to the captain, the pilot in command, and that position -- or that person writes the issue up at their choice. First officers are not allowed to write up discrepancies or maintenance issues. So at that point, unless we force them to write it up, it's up to them.

Q. And why couldn't you write it up as a first officer?

A. We're not allowed to.

Q. Okay. Did you notify the chief pilot about the dirt on the wheel?

A. No.

Q. Did you notify maintenance?

A. No.

Q. Let's go to page 33. And this is the part



Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com 801-746-5080

of the hearing -- do you recall that after you gave your side of the story and Mr. Glassey gave the company's side, then the members of the review board were allowed to ask you questions?

A. Yeah.

Q. Okay. So I think that's what we're looking at here, right?

A. You think or you know?

Q. I'm asking you.

A. Oh.

Q. It doesn't matter what I think, unfortunately.

A. So I'm supposed to read this and figure out what it's saying?

Q. Right. You were there, correct?

A. Yeah. I haven't looked at this document.

Q. Of course.

A. Give me a minute and I'll review it and --

Q. Okay. Take your time.

A. Yeah, that looks like what you explained; they were asking me questions at the review board.

Q. Okay.

A. What's your question?

Q. I'll get there.

So on that page 33 there is a question

that was presented to you by an unidentified male. It begins with, "Do you remember any." It's right in the middle of the page.

A. Okay. I see it.

Q. Okay. So an unidentified male -- I'm assuming -- and you were there, so you would know better than me, but this was a member of the board -- the review board? Is that correct?

A. That's correct, probably.

Q. Okay. And he asked, Do you remember any -- the flight attendant -- or yeah, the flight attendant mentioned the construction in Salt Lake City that day and it rained. "Do you remember any mud puddles or anything that could have potentially led to where it led?"

Do you see that?

A. I see it.

Q. And when he says "to where it led," what's he referring to? What did you interpret that as to mean?

A. I don't know. In -- in reading this, it -- the question doesn't make sense, but I guess he's probably referring to Scott Miller's statement about Captain Chappell's statement about driving through a -- taxiing through a mud puddle and he's

asking me if that happened or -- I don't know.
Q. Okay. Let me ask it a different way.
A. Good.
Q. Were you aware that day that it had rained in Salt Lake City prior to your landing?
MR. HOBBS: Object to the form.
THE WITNESS: Yeah, I don't remember the weather. It seemed nice.
Q. (BY MR. JONES) You don't remember the runway being wet at all?
A. I -- I don't remember.
Q. Okay. Do you remember construction going on on the runway?
A. Yes. No, not on the runway. There was --
Q. Not on the runway, next to the runway.
A. Not next to the runway either.
Q. Where? Do you remember construction?
A. Yes.
Q. Where do you --
A. The terminal building is under construction and has been for several years.
Q. Okay. Was -- do you recall the tarmac was under construction?
A. Yes.
Q. Okay. But you don't recall actually there

being puddles on the runway?
A. I don't recall. I don't --
Q. Okay.
A. None that would leave four inches of dirt residue on the side of an aircraft tire.
Q. But you don't recall?
A. I don't recall, no.
Q. Okay. Do you know whether the members of your review board ever saw a copy of your IOR?
A. Do I know that?
Q. Yes.
A. I don't know if they did or didn't.
Q. Okay. You didn't present it to them, correct?
A. No.
Q. And you don't recall Mr. Glassey presenting them with a copy of the IOR, do you?
A. Not a physical one. He had one on his PowerPoint presentation of both Captain Chappell's IOR and mine.
Q. Hmm. Do you know why Captain Chappell's IOR was on his PowerPoint presentation for your review board hearing?
A. I don't know why. You'll have to ask him. That's something not for me.

Q. Okay. Will do.

Okay. Let's move on to the final exhibit of the day. It's a two-page document. It will be Exhibit Number 7.

(EXHIBIT 7 WAS MARKED.)

So this is Exhibit Number 7. And take a look. Give it a review. Let me know when you're done. This appears to be a series of e-mails between Mr. Reber, Ms. Nichole Chapman and Mark Richards is cc'd on two of them.

A. Okay.

Q. Okay. On the earliest dated e-mail, that's the one at the bottom of page 1 of this exhibit, it's dated Monday, October 12th, 2020, at 2:45 p.m. It's from Justin Reber to Nichole Chapman.

Do you see that one?

A. No. Where again?

Q. It starts at the bottom of page 1.

A. At the bottom. Okay. Okay. Go ahead.

Q. Okay. So this is now October 12th, right?

A. Apparently, yes.

Q. You've been -- the occurrence happened almost seven months ago, correct?

A. Yes.

Q. And you've been reinstated now for almost

four months, right?

A. Okay.

Q. Did somebody ask you to contact -- well, let me back up.

Who is Nichole Chapman?

A. The head of human resources, SkyWest Airlines.

Q. Okay. Is she involved in putting together the review boards -- review board hearings?

A. I believe so, yes.

Q. And were you aware at the time you sent this -- well, let me back up again.

Were there previous e-mails between you and Mrs. Chapman prior to this one?

A. I don't know. I'd have to research it.

Q. Okay. Within the previous month, do you think there were? Do you recall any?

A. I don't recall. I'd have to...

Q. Okay. And you knew on October 12th, when you sent this e-mail to Ms. Chapman in HR, that Randy Chappell was having another appeal to a review board that week. Correct?

A. I -- I was not -- let's see. Yeah, that -- say your question again.

Q. You were aware on October 12th, when you

sent this e-mail, that there was a scheduled review board hearing for Randy Chappell later that week. Correct?

A. Yeah, I believe that's correct.

Q. Okay. And I'm paraphrasing here, but you essentially tell Chapman in this e-mail that it has come to your attention that Chappell is having another appeal, and you informed Chapman that you fear for the safety of yourself and your family if the information that you, quote, honestly disclosed to the company and the FAA is not confidential.

Does that sound about right? Does that paraphrase that e-mail?

A. Yeah.

Q. You also state in this e-mail that you are concerned that you might suffer retribution -- same e-mail -- from Randy if he learns of the information you shared.

Do you see that? Or does that fairly characterize the second part of the e-mail?

A. Now what's your question again?

Q. Does that --

A. That I would suffer retribution from him, from Randy?

Q. Yeah.

A. Yeah, that's exactly what I wrote.
Q. Okay. Did you share this concern with Mark Richards prior to this e-mail?
A. Well, it shows in the e-mail that I sent it to him. And I don't think I said anything prior to him, but I certainly wrote it right there in the e-mail and included him purposefully.
Q. Okay. But as far as you recall, you didn't have a separate discussion with him prior to this e-mail about this issue, correct?
A. I can't recall, but I don't think so. I don't specifically remember.
Q. Mr. Reber, did you honestly feel -- fear retribution from Randy if he was reinstated?
A. Yes.
Q. Why did you send this e-mail just days before his second board review meeting?
A. Obviously, knowing that if he was reinstated and he would give me problems online.
Q. Why did you think that?
A. Because of his -- the nature of him. I know how he -- his character, or lack thereof.
Q. Had he ever given you problems before online?
A. Yes, and this example -- this taxi event

highlights it.

Q. Yet you never -- what's the word? You never blocked him or bid avoided him, correct?

A. No. We only have one bid avoid.

Q. Okay. So was the purpose of this e-mail to keep Randy Chappell from being reinstated?

A. No, I was -- as you can see the part you did not highlight, "I just do not want to be between the company and Randy any longer. I don't want to be a part of this." I'm stating it clear as day right there.

Q. Well, the best way not to be part of it is if Randy isn't reinstated, correct?

MR. HOBBS: Objection. Object to the form.

Go ahead.

THE WITNESS: That's your -- that's your statement, not mine.

Q. (BY MR. JONES) Again, this e-mail was entirely unsolicited by the company, correct?

A. That's correct.

You want to know the truth?

Q. I didn't ask a question, but go ahead.

A. Perfect.

Your client you represent often spoke of a

lot of weapons in the cockpit. He would go to target practice shooting a lot and has a brazen character. I didn't know if by telling the truth to the company, SkyWest, what kind of brazen actions this individual might take, and that's precisely why I unsolicitedly wrote this to the company's -- basically saying, Hey, this is a problem.

Q. Prior to this e-mail did you ever raise the issue with SkyWest that you feared Randy Chappell?

A. No. There was no reason.

Q. Do you hunt and shoot?

A. Yes.

Q. Does that make you a personal of low character?

A. Not at all.

Q. All right. Take a look at Ms. Chapman's response dated October 13, 2020, 2:58. Does she address in any way your fear of retribution?

A. Where are you at now? The middle part of the first page?

Q. Yes.

MR. HOBBS: October 20th at 2:58?

THE WITNESS: October --

Q. (BY MR. JONES) Yes. I'm sorry,

October --

A. -- 13, 2020, 2:58?

Q. Yes.

A. And you are asking me if she addressed it.

Q. Yes.

A. I'll read it. Let's see. "Hi, Justin. Mr. Chappell will not be learning anything new in his upcoming review board. It was well established by the safety department and FAA investigations that the crew had different accounts of the tarmac excursion. Be assured that your statements to the company are subject to confidential controls and will not be shared outside of the review board setting."

Q. So does she address your fear of retribution?

A. She attempted to there.

Q. Where?

A. She -- let's see. In the very first sentence she says, "He will not be learning anything new in his upcoming review board."

There is one example.

And then the final sentence again she addresses it. She says, "Be assured that your statements to the company are subject to confidential controls and will not shared outside of the review

board setting."

So that answers your question.

Q. Okay. But you didn't let it go at that, did you? You responded. And that's the next e-mail dated October 13, 2020, at 3:42:18 p.m.

A. Okay.

Q. Do you see that one?

A. I do.

Q. And here you elevate it a little bit more, don't you?

MR. HOBBS: Objection.

THE WITNESS: What's your question?

Q. (BY MR. JONES) Here you provide -- or you attempt to provide additional support for your so-called fear of Mr. Chappell.

MR. HOBBS: Object to the form.

THE WITNESS: What's your question?

Q. (BY MR. JONES) I'll read it to you. So you've already expressed your fear, but now you state, "He's the only person I know that has harbored/housed a felon (SkyWest's former own Chip Drane)."

Do you see that?

A. I see it.

Q. Are you familiar with Chip Drane?

A. I know who he is.
Q. Do you know why he went to jail?
A. He skipped out in the middle of a court hearing because he didn't pay taxes and went and hid from the government for, I don't know, a few years.
Q. So are you afraid that a -- were you afraid that Mr. Chappell was going to get Chip to falsify your taxes?
A. I wasn't worried about Chip Drane in this; I'm worried about Mr. Chappell, if you can read it clearly. I said, "He is the only person I know that has harbored or housed a felon."
It's uncommon for an average citizen to harbor felons. So that makes me worried about the character of an individual who harbors felons and also talks openly about weapons.
Q. So you truly feared somebody who you had invited to do things outside of work and who invited you to do things outside of work and who you had never contacted the company, ever, about any concerns about Randy Chappell?
A. Yeah. After this incident, yes.
Q. Did Randy contact you in any way and threaten you in any way?
A. No.

Q. So this was all in your head and all your own fear, correct?

MR. HOBBS: Object to the form.

THE WITNESS: Yes.

MR. JONES: Okay. I'm done.

THE WITNESS: Perfect.

MR. JONES: Thank you.

MR. HOBBS: I don't have anything.

MR. SHULTZ: No, I don't have anything. Thank you.

(Deposition concluded at 1:28 p.m.)

* * *

REPORTER'S CERTIFICATE

STATE OF UTAH )
) ss.
COUNTY OF SALT LAKE )

I, Dawn M. Perry, Certified Shorthand Reporter for the State of Utah, do hereby certify:

That prior to being examined, the witness, JUSTIN REBER, was by me duly sworn to tell the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in stenotype on December 8, 2022, at the place therein named, and was thereafter transcribed and that a true and correct transcription of said testimony is set forth in the preceding pages.

I further certify that, in accordance with Rule 30(e), a request having been made to review the transcript, a reading copy was sent to the witness, for the witness to read and sign under penalty of perjury and then return to me for filing with Patrick M. Jones, Attorney at Law.

I further certify that I am not kin or otherwise associated with any of the parties to said cause of action and that I am not interested in the outcome thereof.

WITNESS MY HAND this 22nd day of December, 2022.



Dawn M. Perry, CSR

Case: RANDY T. CHAPPELL, an individual vs. SKYWEST AIRLINES, INC., a Utah corporation
Case No.: 4:21-cv-0083-DN
Reporter: Dawn M. Perry, CSR
Date taken: December 8, 2022

WITNESS CERTIFICATE

I, JUSTIN REBER, HEREBY DECLARE:

That I am the witness in the foregoing transcript; that I have read the transcript and know the contents thereof; that with these corrections I have noted this transcript truly and accurately reflects my testimony.

| PAGE-LINE | CHANGE/CORRECTION | REASON |
|---|---|---|
| __________ | ______________________________ | _________ |
| __________ | ______________________________ | _________ |
| __________ | ______________________________ | _________ |
| __________ | ______________________________ | _________ |
| __________ | ______________________________ | _________ |
| __________ | ______________________________ | _________ |
| __________ | ______________________________ | _________ |
| __________ | ______________________________ | _________ |
| __________ | ______________________________ | _________ |
| __________ | ______________________________ | _________ |
| __________ | ______________________________ | _________ |

_________ No corrections were made.

I, JUSTIN REBER, HEREBY DECLARE UNDER THE PENALTIES OF PERJURY OF THE LAWS OF THE UNITED STATES OF AMERICA AND THE LAWS OF THE STATE OF UTAH THAT THE FOREGOING IS TRUE AND CORRECT.

JUSTIN REBER

Date: ___________________

**&**

**&** 2:10

**0**

**00012** 87:16
**00103** 3:7 12:9 72:18
**0083** 1:9 114:2

**1**

**1** 3:7 12:8,10 32:18 37:1 48:20 59:24 68:13 72:15 84:1 94:21 103:13,18
**10** 8:1
**10-7** 23:8,10,11 23:18 24:7,10
**10-7s** 24:12
**10-9** 24:11,13,14 24:19 25:7,13
**100** 53:24
**103** 3:14
**10:07** 1:19
**10:09** 68:8,9,9 68:15
**11** 86:16
**11:00** 44:3
**11:18** 57:11
**11:26** 57:12
**11:58** 78:23
**12** 3:7,14
**125** 2:5
**12:38** 78:24
**12th** 103:14,20 104:19,25
**13** 3:14 88:21 108:18 109:2 110:5
**15** 1:22 92:22
**1600** 1:22
**17** 13:5
**17th** 2:5
**180** 56:4
**1:00** 78:12
**1:05** 68:10 70:8
**1:28** 112:11
**1st** 94:16

**2**

**2** 3:8 29:15,16 42:3 48:18,20,23 67:19,24,24 70:6
**20** 8:1 20:5,20 48:4 80:14,17,22 81:9
**20/20** 36:9 52:16 52:17
**2000** 6:8
**2020** 3:14 7:8 9:9 19:18 22:2 25:19 41:13 43:4 67:22 68:7 68:14 70:7 94:17,22 103:14 108:18 109:2 110:5
**2022** 1:19 9:7 86:14 113:8,17 114:3
**20th** 46:9 108:23
**22nd** 113:17
**24** 25:19
**24th** 22:2 28:20 28:24 30:13 48:6
**255-7976** 2:6
**25th** 41:13
**26** 12:24 13:7,13
**26849** 113:20
**26th** 43:4
**270** 32:18 53:11 86:21 87:23
**29** 3:8
**2:45** 103:15
**2:58** 108:18,23 109:2

**3**

**3** 3:9 30:22,25
**30** 3:9 84:2 90:22 113:11
**30308** 2:16
**312** 2:6,6
**33** 98:25 99:25
**350** 5:16
**37** 30:2
**3:32** 41:13
**3:42:18** 110:5

**4**

**4** 3:3,10 40:21,23 42:24 67:22 68:7,14 70:7
**40** 3:10
**404** 2:17
**435** 2:21,22
**439** 3:9 31:1
**44** 3:11
**444** 2:20
**45** 78:19
**4:21** 1:9 114:2

**5**

**5** 3:11 12:1 44:9 44:10
**51** 84:2,5
**519-2555** 2:11
**55** 2:15
**5:30** 22:12

**6**

**6** 3:12 65:24 66:4 77:19
**6,000** 27:23
**60603** 2:5
**620** 2:10
**634-3505** 2:22
**634-3530** 2:21
**65** 3:12

**7**

**7** 3:14 103:4,5,6
**70** 91:6,6
**72** 91:6
**750** 2:16

**8**

**8** 1:19 113:8 114:3
**801** 2:11 6:24
**803-0931** 2:6
**84036** 5:16
**84103** 2:11
**84790** 2:21
**879-6274** 6:24

**9**

**90** 84:21
**965** 5:16
**978-7325** 2:17
**9:59** 43:5

**a**

**a.m.** 1:19 43:5 57:11,12 68:8,15 78:23
**acars** 82:6,6
**accidents** 13:25 14:6 30:4,12
**account** 7:2 8:8 8:10,18
**accounts** 8:8 109:10
**accuracy** 97:5
**accurate** 17:21 27:9 29:23 35:19 47:24 48:7,10 72:25 73:3 94:6
**accurately** 49:10 114:7
**acknowledge** 84:5 97:22
**acronym** 26:12
**acting** 86:25 88:2
**action** 64:16,21 65:7 113:15
**actions** 27:6 54:9 108:4
**actual** 40:10 75:24
**add** 14:11 76:22 86:8
**additional** 110:14
**address** 5:15 7:4 51:14 108:19 109:14
**addressed** 109:4
**addresses** 109:23
**adequate** 60:16
**adult** 22:24
**advice** 46:16
**advised** 43:6
**afraid** 55:5,5 111:6,7
**aggressive** 60:19 87:25
**ago** 28:17,18 103:23
**agree** 14:10
**ahead** 12:7 15:1 15:4 34:18 61:7 61:9,17 66:22 89:4 95:23 103:19 107:16 107:23
**air** 9:24
**aircraft** 12:5 24:3,4 33:25 34:3 35:8 38:25 50:12 51:23 52:10 53:17,20 53:23 56:2,3 59:20 61:13 81:18 83:4,8 88:6,11 96:23 97:15 98:2 102:5
**airline** 35:12
**airlines** 1:11 6:13 9:25 71:14 104:7 114:1
**airplane** 35:2 84:4
**airport** 22:3,10 23:7,12,19 24:16 24:17,18 60:24 85:22
**alert** 50:11
**allen** 2:15
**allowed** 52:8 98:14,19 99:4
**alluding** 11:5 51:15
**alpha** 87:2 88:4
**alyssa** 95:2
**america** 114:17
**amount** 13:4 96:9
**angeles** 58:13
**angle** 63:9
**angled** 80:14
**angling** 60:15
**annoying** 91:9
**answer** 5:1 15:4 20:16,17 39:21 40:2,15,17 44:16 55:21 61:8
**answered** 40:1 56:25
**answers** 63:5 110:2
**apparently** 103:21
**appeal** 104:21 105:8
**appear** 31:6 53:19
**appeared** 49:13
**appears** 31:7 32:6,8 42:20 49:3 52:25 60:23 63:18 72:24 103:8
**applied** 6:4
**appreciate** 33:11
**approximated** 83:24
**approximately** 5:18 6:8 7:20 61:21
**approximating** 80:14
**april** 46:9 48:4 94:16,21
**area** 84:1 85:22
**armchair** 36:12
**arrive** 22:10
**arrived** 23:7
**asked** 10:1 32:12 37:9,23 39:16 43:22 47:20 54:11 72:8 94:25 96:18 97:14 100:10
**asking** 16:15 17:3 20:15 23:3 23:20 28:3 38:15 65:4 72:7 95:3 99:9,21 101:1 109:4
**asks** 59:12
**asphalt** 84:18
**assertive** 51:22 73:16
**assigned** 17:14
**assistant** 38:3
**associate** 6:1
**associated** 113:15

**associates** 6:3
**assuming** 100:6
**assured** 109:11 109:23
**atlanta** 2:16
**attached** 71:1,2
**attachment** 66:6 66:13,18,25 67:1 67:2,13 77:13
**attempt** 110:14
**attempted** 31:15 109:16
**attendant** 75:3 75:14 92:9,10,15 93:13,13 94:12 97:17 100:11,12
**attention** 16:9 16:24 53:12 105:7
**attorney** 2:3,9 2:14,20 113:13
**audio** 58:4
**available** 84:9
**average** 8:5 84:2 111:13
**aviation** 6:3 9:23 35:15
**avoid** 18:5,6,9 18:12,20 107:4
**avoided** 18:22 107:3
**awarded** 17:16
**aware** 82:11 101:4 104:11,25
**aylor** 75:3 76:5 93:14

**b**

**b** 3:5 5:9
**bachelor's** 6:1
**back** 9:5 13:5 23:6 26:10 34:1 36:12 49:7 50:4 50:22,25 51:2 57:13,15,17 59:10,24 63:7 72:15 75:7 78:11,20,25 79:6 80:13 81:1,12,19 82:25 84:13,18 84:20 85:21 86:5 90:1,2,12 91:3 97:16,23 104:4,12
**backs** 97:10
**backwards** 56:5 67:20
**bad** 35:3
**baffling** 86:25 88:1
**bar** 81:18
**base** 19:3,4
**based** 17:16 46:8 71:6
**bases** 27:21
**basically** 108:6
**battle** 17:5
**beehive** 34:20,24
**began** 71:22
**begins** 13:6 48:15 93:19 100:2
**belief** 61:14
**believe** 7:3 10:25 12:2 24:12 40:4 44:12 47:2 57:16 59:5 60:3 61:2,11,15 62:2 63:24 71:16,25 87:8 95:8 104:10 105:4
**believed** 52:9 90:14
**benefit** 70:15,19
**best** 47:23 78:21 90:2 107:12
**bet** 37:17
**better** 47:25 84:9 100:7
**beyond** 60:10 81:11
**bid** 17:15,19,22 18:5,9,12,20,21 19:12 107:3,4
**big** 39:6 52:3 96:20
**bit** 36:25 83:16 88:9 110:9
**blocked** 107:3
**blue** 86:3,3
**board** 3:13 13:22 66:18 67:10 71:6,10,18 71:20,22,23 72:1 72:2,4,10,16,25 73:6 75:7 77:1 77:15 99:3,21 100:7,8 102:9,23 104:9,22 105:2 106:17 109:8,13 109:20 110:1
**boarding** 94:3
**boards** 8:22 72:13 104:9
**bodkin** 75:4,16 75:17
**bottom** 67:18,23 68:7 70:6 77:18 87:15 103:13,18 103:19
**boulevard** 2:15
**brazen** 108:2,4
**break** 57:3,4,11 78:23
**brief** 64:4
**briefings** 9:22
**briefly** 26:15
**bring** 10:20 16:8
**bringing** 78:8
**brings** 16:23
**brought** 54:10
**brush** 40:19 57:24 58:7
**buddy** 61:19 65:13
**building** 2:4 82:25 84:21 101:20
**buildings** 56:7,7
**burden** 10:12

**c**

**c** 2:1,19 4:1
**cabin** 93:24,25
**calculations** 83:25
**call** 24:15 40:14 40:16 41:18,23 41:25 43:6,14 45:5,5,13 58:12

79:6 84:4
**called** 4:3 18:5 37:10,22 38:4 39:18 43:5 44:20 46:4 47:8 54:14 59:6 62:20 68:20 110:15
**calling** 18:7 31:16 39:8,25 62:7
**calls** 7:14 40:10 44:22 45:7,11 46:1,23 54:13
**canyon** 54:13
**captain** 6:20 9:6 9:18,20 10:8,10 10:11,13,18,21 11:3,11,13,19,21 11:25 12:2 14:3 14:18,19,23 15:12,16,19 16:2 16:11,24 17:18 18:2,10,12,24 19:18 29:3 30:15 31:7,10 36:25 37:23 38:6 39:7,10,18 40:11 42:18 43:1,23 50:11,19 51:3,19 52:8 54:6,13 57:18 60:19 61:11 63:10,14,24 71:7 75:12,20,21 79:21,23 80:7 85:16 86:25 88:2,12 92:19 96:18 97:16,19 97:21 98:11 100:24 102:19 102:21
**captain's** 16:9 16:23 32:8 42:6 43:1 53:12 85:6
**captains** 14:2
**car** 33:22 50:16 84:23 91:5
**career** 35:23 54:25
**careful** 73:23
**carr** 37:11 38:3 44:13 45:17 46:21 47:2,3,7
**carrier** 6:25
**case** 1:9 4:10 9:18 16:4 23:8 59:22 80:2 84:12 91:20 114:1,2
**cause** 60:1 113:15
**causes** 60:3
**cc'd** 103:10
**cell** 6:21,23 7:7 7:10,13
**center** 58:13
**central** 1:2
**cer** 64:15
**certain** 21:22,23 55:2 62:5 91:1
**certainly** 10:17 106:6
**certainty** 55:4
**certificate** 64:16 64:21 65:7 113:1 114:4
**certification** 64:7,11,25 65:5
**certified** 113:4
**certify** 113:5,11 113:14
**chad** 2:14 40:22 66:19
**chain** 3:14 39:12 41:8
**challenge** 59:6 59:16
**chance** 12:12 29:20,21 41:1,4 61:3 66:7,19
**change** 114:8
**changed** 63:14
**changes** 85:25
**channels** 82:2
**chapman** 72:9 103:9,15 104:5 104:14,20 105:6 105:8
**chapman's** 108:17
**chappell** 1:4 2:24 4:10 18:10 18:22,24 19:11 19:15,18 20:11 21:3,18 22:16 29:3 31:10 37:23 39:18 40:11 41:9,16 42:4,18 43:11,13 43:23 45:25 53:2 54:6 57:3 57:18 88:12 92:19 97:16 104:21 105:2,7 107:6 108:10 109:7 110:15 111:7,10,21 114:1
**chappell's** 71:18 71:23 72:4 74:15 100:24 102:19,21
**chapter** 12:1
**character** 106:22 108:2,15 111:15
**characterize** 105:20
**chart** 24:13
**charts** 24:11 25:10
**check** 11:23 78:7
**checking** 9:22
**chicago** 2:5
**chief** 35:16 36:2 37:12 38:4 98:20
**chip** 110:22,25 111:7,9
**choice** 18:4 69:16 85:6 98:13
**choosing** 51:24 51:25
**chose** 36:19 49:25
**citizen** 111:13
**city** 1:23 2:11 38:4 88:19 100:13 101:5

**clacker** 91:2
**clacking** 91:9
**clarification** 37:24 77:17
**clarify** 51:18
**clark** 2:5
**clean** 5:2
**clear** 10:14 33:10 40:9 55:8 107:10
**clearance** 58:13 80:13
**clearly** 15:6 111:11
**client** 107:25
**close** 10:3 62:25 63:16
**closed** 53:7
**closing** 56:1
**clue** 69:19 71:11 90:21
**cockpit** 17:7 21:20 58:2 108:1
**come** 21:21 93:3 98:3 105:7
**comes** 35:17 68:9
**comfort** 63:17
**coming** 33:19,20 34:4 39:13
**command** 12:3 39:12 98:12
**commandability** 52:1
**commercial** 6:6 6:7,7,12,13
**committee** 44:19 45:13,19,20 46:23
**common** 15:25 18:17
**commonly** 91:17
**communicate** 8:25 59:11 79:24 81:25
**communicated** 85:9
**communicating** 79:20,20
**communication** 9:24 58:21
**communications** 74:11
**companies** 34:25
**company** 19:5 24:14 25:25 26:16,18 27:2,3 27:12 31:8 35:5 39:15 60:23 63:25 83:12 85:10 105:11 107:9,20 108:3 109:11,24 111:20
**company's** 99:3 108:6
**compare** 87:10
**completely** 4:24 5:1
**composition** 72:13
**computer** 19:6
**concentrate** 89:25 90:8
**concentrating** 88:24
**concern** 51:1 106:2
**concerned** 105:16
**concerns** 111:20
**concise** 34:16 35:4,7 37:9 39:14 49:25
**concluded** 112:11
**conduct** 14:9
**conference** 43:6 44:20
**confidential** 105:11 109:12 109:24
**confirm** 13:3 38:24 48:4
**confirmation** 39:1
**consisted** 72:3
**consistency** 77:24
**consistent** 37:6 48:1 62:23
**construction** 96:25 100:12 101:12,17,21,23
**consult** 46:12
**contact** 38:11 83:10,18,18 84:10,16,25 104:3 111:23
**contacted** 38:2 44:13 61:18 65:15 68:18 70:1 76:7 84:3 85:3 111:20
**contacting** 75:24
**content** 74:22
**contents** 114:6
**context** 65:6
**continue** 36:25
**continued** 52:3 58:20 87:1 88:3
**continues** 13:6 96:22
**control** 9:24 10:10 38:8 60:10
**controlled** 17:6
**controlling** 61:13
**controls** 16:14 17:4,4,5,7 88:16 109:12,25
**conversation** 39:23 43:17 47:12 50:17 51:10 63:4 64:6 67:6 95:19
**conversations** 43:19,22 47:3 71:8
**convince** 31:17
**cool** 42:13
**cooperate** 70:18
**copy** 29:23 42:21 77:18 102:9,17 113:12
**cordial** 21:20
**corporation** 1:13 114:1

**correct** 7:6 9:11 11:9,20 13:22 17:19,20,25 18:23 19:1,8,9 25:21 26:5,7,8 27:6,7,13 28:15 28:16,18,21 29:3 29:4 33:16,17 34:10,11 35:20 35:24,25 40:12 41:10,11,16,17 42:15,16,19,22 43:14,15 49:17 49:18 52:5,6,14 53:9,13 54:4,5 56:10,11,19,21 59:13,17 60:11 60:12,16,17,21 61:19,20 62:8,9 63:8 64:8,9 65:13,14,20,21 67:4,7 73:1,23 73:24 74:11 78:3 83:5,6,20 84:11 85:1,2,5,8 88:7,8,16 90:8,9 91:18 92:16,17 93:1,2,22,23 94:9,10 96:3,5 97:7 99:15 100:8,9 102:14 103:23 104:22 105:3,4 106:10 107:3,13,20,21 112:2 113:9 114:18
**corrected** 52:17
**correction** 114:8
**corrections** 114:6,15
**correctly** 32:25 95:6
**county** 113:3
**couple** 37:10 39:24 45:18 50:16,18,24 58:15 64:5 76:19 78:8
**course** 15:10 99:17
**court** 1:1 4:16 29:13 30:24 111:3
**cover** 84:1
**covered** 29:12 47:2 88:9
**crap** 51:6 57:19 57:21 58:22
**create** 50:1
**crew** 10:13 59:4 60:10 79:2,2,13 80:8,24 82:1,7 83:7,8,10,18 84:16,25 85:1 94:23 109:10
**crm** 59:3
**crossing** 49:3,13
**cruise** 94:4
**cshultz** 2:17
**csr** 1:25 113:21 114:2
**curious** 72:17
**currently** 5:13
**cv** 1:9 114:2

**d**

**d** 3:1 4:1
**damage** 14:2,7 14:17 30:5,13
**dark** 22:13,14 50:2
**date** 28:17,22 38:14,16 61:22 114:3,20
**dated** 3:14 41:12 43:4 67:21 68:7 68:14 70:7 103:12,14 108:18 110:5
**david** 1:11
**dawn** 1:25 113:4 113:21 114:2
**day** 7:21 8:1,6 23:23 24:1,1,23 25:1,17 29:6,6,9 38:18 49:16 62:21 70:13 71:19 76:19 79:2 81:15,16,17 81:19 92:10 100:13 101:4 103:3 107:10 113:17
**daylight** 52:19
**days** 29:9 37:10 106:16
**deal** 39:6 52:3
**december** 1:19 113:8,17 114:3
**decision** 85:7
**declare** 114:5,16
**defendant** 1:15 2:13
**definitely** 71:4
**definition** 26:11
**degree** 6:1 32:18 53:11 81:9 86:21 87:23
**degrees** 6:1,2 56:4 80:14,17,21 80:22 84:21
**department** 72:9 109:9
**departure** 32:19 89:13
**deposition** 1:5 4:11,12 112:11 113:8
**describe** 9:3,12 26:15 80:5
**described** 44:23 47:22
**describing** 16:18
**description** 3:6 49:16,17
**descriptions** 24:16
**desirable** 19:7
**despite** 90:13
**detail** 37:18,19 44:24 70:12 77:24
**diagram** 24:16
**dictate** 15:25
**difference** 36:14 36:17
**differences** 10:9 11:2
**different** 23:14 33:22 36:11 44:21 63:2

80:23 101:2 109:10
**differently** 80:25
**difficult** 89:25
**difrancesco** 65:16 67:22 68:6,14,18 69:10 69:13 70:7,19 71:3
**difrancesco's** 66:1 69:17
**dinner** 39:24 40:15
**dip** 95:4
**direction** 33:19
**directly** 39:12
**dirk** 75:3,9
**dirk's** 75:11
**dirt** 32:20 34:9 34:13,16 35:1,2 35:8,23 36:15,16 38:7 49:4,14 50:3 51:7,24 52:18,20,21,22 53:19,23 54:1,1 54:3,4,7 55:12 55:18 56:3 57:22 58:18,19 58:23 63:19 84:18 88:1 96:6 96:9,12,13 97:19 98:21 102:4
**disciplinary** 27:6
**disclosed** 105:10
**disconnected** 81:18
**discrepancies** 98:14
**discuss** 52:20 72:12 74:17,19 74:22
**discussion** 83:15 106:9
**dispatch** 82:2,4 82:5 83:18 84:4 84:4
**distance** 83:25
**distract** 90:3
**distracted** 88:23 90:6
**distraction** 89:20
**district** 1:1,2
**disturbed** 88:23
**division** 1:2
**dn** 1:9 114:2
**document** 12:14 12:20,25 20:25 25:20 26:3,20 30:25 31:3,5 32:13 40:21 41:6 44:7,17 45:9 46:13 66:2 70:25 77:6,12 99:16 103:3
**documentation** 26:23
**documented** 25:24
**documents** 37:18 40:24 69:13 73:25 80:17
**doing** 61:15 69:25 84:14 96:18
**dork** 96:19,20
**doubt** 95:12,14
**douglas** 65:16 66:1 67:22 68:6 68:14 70:7
**draft** 28:8
**drafting** 46:13 49:20
**drane** 110:22,25 111:9
**dried** 96:13
**drive** 54:12
**driving** 84:23 100:24
**drone** 4:25
**drove** 54:12
**dual** 17:6
**due** 91:21 96:24
**duly** 113:6
**duties** 9:22 93:25

**e**

**e** 2:1,1 3:1,5,12 3:14 4:1,1 5:8,9 5:9 7:18 62:14 65:22 67:6 68:4 68:5 70:9 71:1,2 103:8,12 104:13 104:20 105:1,6 105:13,15,17,20 106:3,4,7,10,16 107:5,19 108:8 110:4 113:11
**earlier** 88:9
**earliest** 103:12
**early** 22:5,6,10 48:5
**easily** 80:10
**east** 5:16
**eating** 39:24 40:15
**edge** 60:14 86:3
**education** 5:25
**efforts** 84:25
**eight** 5:18,20 48:14
**either** 17:17 45:13,25 56:20 79:13 80:1 82:1 82:13 101:16
**elevate** 110:9
**elk** 21:7,8
**emerson** 2:19
**employees** 75:24 76:3
**ended** 18:24 85:5
**engage** 51:10
**engines** 17:10
**entire** 73:2
**entirely** 72:3 107:20
**entitled** 71:9
**equal** 14:23
**error** 92:1
**especially** 87:24
**essentially** 105:6
**established** 109:8
**estimate** 20:14

**estimation** 84:6
**event** 3:11 25:19 25:20 26:6 44:8 44:24 46:4,21 47:5 60:1,4 62:1 69:8 77:23 90:1 90:2 106:25
**events** 9:8 22:1 60:9
**eventually** 69:9
**everybody** 57:5
**everyone's** 44:6
**evidence** 56:16
**exact** 6:8 22:11 42:13 58:10 72:11
**exactly** 29:10 54:21 55:2 57:17 106:1
**examination** 3:3 4:6
**examined** 4:4 113:6
**example** 11:15 14:15 106:25 109:21
**examples** 73:15
**exceeded** 90:11
**excessive** 95:3
**exchange** 22:16
**exchanged** 40:17 65:23
**excursion** 109:10
**exhibit** 3:7,8,9 3:10,11,12,14 12:8,10 14:20 29:13,15,16 30:2 30:22,25 40:21 40:23 42:25 43:4 44:9,10 65:24,25 67:4,24 68:13 69:7 72:15,17 103:2,4 103:5,6,14
**exhibits** 44:7
**expect** 68:24
**expectation** 14:4
**expected** 13:11 13:17,20,25 14:5 30:2
**expecting** 28:16
**experience** 61:12 71:7
**experienced** 70:13
**explain** 77:23
**explained** 99:20
**expressed** 110:19
**eye** 84:15
**eyeball** 98:1
**eyes** 51:24 53:7 55:14,15 56:2,20

**f**

**faa** 46:22 61:18 65:12,16 66:12 67:6 69:18,20 70:4,23 74:11 105:11 109:9
**faa's** 70:2
**facebook** 8:8
**facilities** 23:12
**fact** 18:24 27:11 54:2 97:15
**factors** 60:9 61:1
**facts** 80:19 81:6
**fair** 6:10 60:25 73:5 76:24 78:19
**fairly** 18:17 19:15 63:22 89:2 92:15 105:19
**false** 27:11
**falsify** 111:8
**familiar** 29:25 59:7 110:25
**familiarized** 31:3,4
**family** 39:25 105:9
**far** 24:5 48:7,10 106:8
**farthest** 25:3,5
**fast** 91:7
**fax** 2:6,22
**fear** 105:9 106:13 108:19 109:14 110:15 110:19 112:2
**feared** 108:9 111:17
**feel** 97:8 106:13
**felon** 110:21 111:12
**felons** 111:14,15
**felt** 89:2 94:1 95:3
**fight** 17:7
**figure** 99:13
**figured** 92:6
**filed** 44:11
**filing** 113:13
**fill** 27:9
**filled** 28:14 94:2
**film** 56:19,20
**final** 103:2 109:22
**find** 23:2 87:13 92:21
**fine** 29:11 38:15
**finish** 4:24,25 57:20
**first** 4:3 6:11,14 9:4,10,15,20 10:15,17,19 11:8 11:14,18,24 12:6 14:3,18 15:20,20 16:7,12,22,24 17:18 18:2,4,10 18:13 25:20 26:1,3 29:17 32:6,15 35:22 40:1 41:8,12 45:4,14 46:8 48:9,25 51:12 58:2 60:20,22 61:1 66:11 67:21 68:5,9,12 69:7 70:1 79:21 79:21 98:10,13 98:18 108:21 109:18
**fishing** 21:15,17
**fit** 90:14
**five** 13:10,15 20:3,4,22,23 32:16 48:14 57:9,10 60:9

79:13
**flashing** 80:7
**flat** 50:3
**flew** 19:20 24:4
**flight** 10:10,11 10:16 12:1 14:24 15:10,12 15:13,21 16:1,3 16:13,14,18,25 17:3,5,19,23 22:5 51:19 60:10 63:21 75:3,14 82:1 83:10,18 85:1,4 85:16 88:17,19 88:24 90:1,8,10 91:14 92:9,10,15 92:18 93:13,13 94:12 97:17 100:11,11
**flights** 17:14
**floodlighting** 60:14
**floor** 2:5
**flown** 33:22
**fly** 9:17 18:8 20:12 39:11 52:18 88:18 90:14
**flying** 9:20 19:3 35:15 61:12 89:25 94:22
**fo** 14:23 15:10 18:19 75:19
**focus** 16:6 21:25 31:21
**focused** 58:22 84:22
**follow** 98:3
**followed** 52:2 95:2
**following** 52:1
**follows** 4:4 10:18
**force** 98:15
**foregoing** 114:5 114:18
**form** 61:5 89:3 95:10 101:6 107:15 110:16 112:3
**former** 110:21
**forth** 59:11 62:23 113:10
**forward** 31:19 51:20 56:13,25 71:5 84:19 90:3
**forwarded** 93:12
**fos** 18:4
**found** 64:7,25
**four** 13:9,15 32:16,16 48:11 48:12,14 51:4 60:9,22 61:1 86:20 96:9,12 102:4 104:1
**fourth** 86:20
**free** 69:16
**freeway** 91:6
**frequency** 83:12 85:8,10,13
**fresh** 26:6 36:20
**fresno** 94:22
**friends** 73:12 74:18 76:2
**front** 53:16 56:2 56:3 75:7 76:8
77:14 82:18 84:22 97:16 98:2
**frustrated** 88:23 89:15 90:7,13 91:21,23
**full** 48:25 58:16
**further** 35:6 94:18 113:11,14

**g**

**g** 4:1
**gate** 63:15,16
**gates** 23:15
**general** 9:23 16:6 71:6 81:14
**generally** 9:13 61:12 79:12,19 90:6 96:2
**george** 2:21 3:11 22:2 23:19 24:18 30:14 38:21 44:8 46:4 47:5 60:24 62:1 69:7 74:5 80:13 85:22 90:2
**georgia** 2:16
**gesture** 58:7
**getting** 21:4 73:18 80:11
**give** 4:14 18:20 20:1,15,16,24 22:11 31:11 36:25 41:18,22 66:19 73:14,15 75:6 99:18 103:7 106:19
**given** 17:23 106:23
**giving** 80:19 81:6
**glad** 97:14
**glassey** 13:3,5,24 45:15 99:2 102:16
**glassey's** 13:21
**go** 12:7 13:5 15:1,4 21:7,12 21:15,16 23:7 24:23 30:19,23 31:18 34:18 36:12,23 38:25 43:3 44:4 45:14 48:24 49:7 51:24,25 57:15 61:7,9 66:22 72:15 75:7 78:10,25 81:16 83:4 84:13 86:19 89:4 90:12,20 91:1,2 92:4,22 95:22 98:25 103:19 107:16,23 108:1 110:3
**goal** 78:2
**goes** 51:19 90:24
**going** 4:18 16:2 17:23 23:6 30:24 34:5 47:20 50:2 53:12,18,20,23 54:16,25 57:16 58:19 66:24 67:11,14 70:5

72:9,10 78:5 83:8 88:7,18 91:13 94:18 95:17 96:25 101:12 111:7
**good** 4:8 5:4,5 57:5 61:12 65:11 73:17 78:18 95:24 101:3
**goodbye** 81:20
**gordon** 1:21 2:15
**government** 111:5
**great** 12:22 77:16 81:1
**ground** 4:14 49:2,12 55:12,13 79:1 80:8,24 82:7 83:8 84:16 84:25
**grounds** 27:12 28:6 79:2 83:7
**group** 45:23 46:22
**groups** 8:25
**grsm.com** 2:17
**guess** 13:23 35:9 36:9 55:25 100:22
**guessing** 73:3
**guy** 94:11

**h**

**h** 3:5
**halfway** 47:8
**hand** 40:20 58:7 79:25 82:1,14,15 84:17 86:21 87:23 113:17
**handles** 80:24
**hands** 73:20 74:3
**hang** 21:23
**haolaw.com** 2:12
**happen** 35:14 37:13 38:5 47:20 59:21 83:23,24
**happened** 26:15 28:20 30:13 36:5,7 38:7 44:21,23 45:7,11 48:5 49:16 50:15,23 51:19 54:15 61:11 62:21 81:7 85:15 87:1 88:2 88:6,25 89:14 90:7 91:23,24 96:25 101:1 103:22
**happens** 50:17 91:17
**harbor** 111:14
**harbored** 110:21 111:12
**harbors** 111:15
**hate** 29:12
**head** 4:19 56:4 79:9 104:6 112:1
**headed** 32:18
**headlights** 80:7
**headset** 82:13
**headsets** 79:24
**hear** 42:14 58:3 65:12
**heard** 58:5 94:1
**hearing** 3:7 12:9 12:21 13:22 58:4 71:19,20 72:18,25 73:7 74:20,24 78:3 92:25 93:6 99:1 102:23 105:2 111:4
**hearings** 104:9
**held** 11:21
**help** 47:11 73:9 73:10
**hesitant** 65:18
**hey** 51:22 54:14 91:7 97:18 108:6
**hi** 109:6
**hid** 111:4
**high** 18:25 19:11 90:17
**higher** 17:17
**highest** 5:24
**highlight** 107:8
**highlights** 107:1
**highly** 88:14
**hindsight** 36:9
**hit** 96:21
**hmm** 6:7 102:21
**hobbs** 2:9,10 14:25 15:3,22 17:1 28:11,13 44:3 55:10 57:6 57:8 61:5,9 78:13,15,22 89:3 95:10 101:6 107:14 108:23 110:11,16 112:3 112:8
**home** 5:22 7:4 21:22 54:12,12
**honest** 47:24 95:16
**honestly** 105:10 106:13
**honesty** 97:5
**horizontal** 34:2
**hose** 53:17
**hot** 24:10,11 25:7
**hour** 7:24 46:7 76:19 78:21
**hours** 41:20 78:14
**house** 29:1
**housed** 110:21 111:12
**hr** 72:9 104:20
**huge** 89:20
**huh** 75:9 76:12 76:21
**human** 92:1 104:6
**hundred** 19:22
**hunt** 108:12
**hunting** 21:7
**hurry** 80:9
**husband** 76:6

**i**

**ice** 21:15,17
**idea** 19:21,23,25 20:6,9,10 92:3
**identify** 40:10,13
**ignore** 14:14 52:8 57:25
**ignored** 58:2
**ignores** 15:19,19 16:11,24
**illinois** 2:5
**important** 27:8
**improve** 73:19
**improvements** 26:25
**incapacitated** 59:19
**inch** 96:9
**inches** 96:12 102:4
**incident** 14:16 16:1 36:20 38:21 43:23 52:9 61:3 95:1 111:22
**incidents** 14:1,6 30:4,12
**include** 9:21 36:3,4,6 46:16 49:23
**included** 49:21 97:9 106:7
**incorrect** 42:23 53:14
**incumbent** 83:9
**independent** 69:21,25 71:10
**individual** 1:5 81:2 108:4 111:15 114:1
**inform** 83:10
**information** 20:25 26:22 27:11 38:2 44:14 49:20,24 57:2 62:19,22 65:19 69:12 105:10,17
**informed** 105:8
**injuries** 14:1,6 30:4,12
**injury** 14:17
**inquire** 71:14
**inquiries** 59:19
**inquiring** 70:22
**inspection** 12:5
**instagram** 8:10
**instance** 16:3 52:7 82:22 83:2 84:24 85:12
**intended** 61:15
**interaction** 66:12
**intercom** 58:5 82:13
**interested** 113:15
**interpret** 100:19
**interrupt** 66:15
**interview** 62:10
**interviewed** 93:5
**investigate** 35:6 62:7
**investigation** 47:8 70:1,3
**investigations** 69:21 109:9
**investigator** 61:19 65:13,16
**invite** 21:9,15,16 21:18,21
**invited** 21:7,12 111:18,18
**involved** 104:8
**ior** 25:21,25 26:4 26:9,11,14 27:9 27:12 28:9,13,14 29:2 30:23 31:7 31:21,22,22 32:1 32:16 34:8,17 36:3,6 37:4,9,11 38:1,16,19 39:3 40:6 42:6,8,19 42:21 43:1 44:11,14 45:8,10 49:17,20 62:24 74:8,15 93:16 94:2 102:9,17,20 102:22
**iors** 27:5
**irregular** 10:20 26:13,16
**irregularities** 14:1,6 30:4,12
**irregularity** 14:16,21 15:11 15:15 16:23 83:19
**ish** 22:12
**issue** 10:20 16:7 16:12 44:20 51:3 52:8 90:24 98:13 106:10 108:9
**issues** 98:15
**ivan** 2:15

**j**

**j** 2:10 5:8
**jail** 111:2
**january** 7:8
**jeppesen's** 24:14
**jill** 75:3 76:5 93:14
**job** 6:11 35:18 75:7
**jointly** 31:9,13 31:15,25 32:10 32:11 60:23
**jokes** 22:22 23:5
**jones** 2:3 3:3 4:7 4:9 15:7 16:5 17:8 28:12,14 33:1,3,5,8,11 42:5,7 44:2,4 55:11 57:4,9,13 61:16 66:10,16 66:19,23 78:11 78:14,19,25 85:21 87:22 89:7 95:11 101:9 107:19 108:25 110:13 110:18 112:5,7 113:13
**jr** 2:15
**judge** 1:11
**justin** 1:7 3:2 4:2 5:8,10 68:6,13 70:6 96:18,20 103:15 109:6

113:6 114:5,16
114:19

**k**

**kamas** 5:14,16
**keep** 20:15 107:6
**kept** 47:25
**kin** 113:14
**kind** 80:4,10,25
108:4
**knew** 36:6,16
39:1 49:22 54:9
54:9,19,19,21,21
55:3,5 88:10
94:25 104:19
**knots** 84:2
**know** 4:18 7:25
8:3 9:23 15:23
17:2,22 20:18,21
22:25 23:1
24:12 27:2,2,14
27:18,21,24
29:19,19 30:18
31:2 35:1,3
37:22,25 38:22
39:6,15 42:14
43:21 46:7 48:7
48:10 52:19,24
53:2,4,5,9 54:6
54:10,17,20,22
55:16,18,19,20
55:23 56:1,10,23
59:10 62:5
63:25 64:12,22
65:3,3,5 69:23
70:2 71:18,23
72:1,6,21 73:4,9
73:13,15,17,18
76:2,15,22 78:2
80:19 81:2,20
83:3 84:24
85:20 86:1 92:3
92:7,13 93:17
94:11 99:8
100:6,21 101:1
102:8,10,12,21
102:24 103:7
104:15 106:22
107:22 108:3
110:20 111:1,2,5
111:11 114:6
**knowing** 89:14
106:18

**l**

**l** 5:8
**la** 58:12
**lack** 60:15
106:22
**lake** 1:23 2:11
37:12 38:4
54:11 88:19
96:4,5 97:1
100:12 101:5
113:3
**landed** 29:1
54:11
**landing** 94:4
96:21 101:5
**language** 58:20
**large** 10:6 29:19
**larger** 33:25
**law** 2:3,9,14,20
113:13
**laws** 114:17,17
**lawyers** 40:25
**layout** 24:17
**layperson** 10:7
92:3
**lead** 27:5 52:1
**leadership** 10:12
10:18 52:2
**learning** 109:7
109:19
**learns** 105:17
**leave** 102:4
**led** 100:15,15,18
**left** 32:22 33:16
33:20,21 34:4
53:11,13,17,20
53:25 60:15
63:10,14 80:15
80:17 81:4,9
84:17,21 86:21
87:23 96:14
**letterhead** 66:1
**level** 5:24
**levity** 14:14
**lew** 75:4,15
**license** 6:8
**licensed** 6:5
**lies** 10:12
**life** 16:1 17:12
39:6 52:22
**light** 49:2,13
86:3
**lighting** 60:14
86:3,5,7
**limit** 91:5
**lincoln** 2:9,12
**line** 32:16 46:9
48:9,15,24 49:7
55:1 97:13
114:8
**lines** 57:19
**linkedin** 8:12
**list** 9:16,25
11:13 75:4
**listening** 85:10
**lists** 28:5
**little** 14:14 32:21
33:14 44:4 55:2
65:18 80:23,24
83:16 88:9
96:14 110:9
**live** 5:13
**lived** 5:17,19
**loaded** 80:10
**located** 24:7
**location** 1:21
**logic** 56:8
**long** 5:17 13:4
46:3 51:2 57:8
66:6 90:20
94:12
**longer** 44:5
70:25 107:9
**look** 12:11,15,23
23:2 28:10,19
31:2 40:8 43:20
48:13 55:11
60:6 65:22
66:20 86:13,16
90:3 97:23 98:3
103:7 108:17
**looked** 49:1,12
53:5,6 55:19
96:22 99:16
**looking** 53:1,3,8
53:16,22 55:13
55:14,15,16,23



Advanced / CitiCourt - Veritext Companies
calendar-utah@veritext.com 801-746-5080

**[looking - monitoring]**

55:24 56:1,4,6,9 56:13,14,17,18 60:19 66:2 77:21 84:19,20 97:25 99:7
**looks** 12:21 29:25 31:24 46:8 99:20
**los** 58:13
**lot** 9:23 11:11 21:16 50:17 73:8,19,21,22 85:9 108:1,2
**lounge** 94:23
**low** 108:14
**lunch** 78:6,10,15 78:16

**m**

**m** 1:25 2:3 113:4 113:13,21 114:2
**mail** 3:14 67:6 68:5 70:9 71:2 103:12 104:20 105:1,6,13,15,17 105:20 106:3,4,7 106:10,16 107:5 107:19 108:8 110:4
**mails** 3:12 7:18 62:14 65:22 68:4 71:1 103:8 104:13
**main** 34:1 76:11 96:11 97:24
**mains** 96:14
**maintenance** 98:14,23
**making** 34:21
**male** 100:1,5
**man's** 54:25
**management** 44:19 45:1 46:23 59:4
**maneuver** 53:11 56:18 84:14
**mansukhani** 1:21 2:15
**manual** 3:8 10:3 11:12 12:1 13:16 15:24 28:5 29:14,14,18 29:24 59:18
**map** 23:14 24:7 24:17
**march** 19:18 22:2 25:19 28:20,24 30:13 35:16 41:13 43:4 48:6
**marie** 75:4,13
**mark** 28:15 29:14 30:24 40:20 43:5 45:17 46:15,21 47:14,16,18 94:23 103:9 106:3
**marked** 12:10,24 24:10 25:7 29:16 30:22 40:23 44:9 65:24 103:5
**mary** 75:13
**matched** 17:23 19:4 40:6
**matter** 9:9 76:4 99:11
**matters** 22:20
**mckenzie** 45:17
**mean** 10:2 17:3 22:1 28:13 34:23,25 35:11 40:13 52:15 59:9 64:10,11 65:6 100:20
**meaningful** 80:18
**means** 84:9
**meant** 65:8
**media** 8:7,16
**meeks** 45:17
**meeting** 45:20 106:17
**member** 44:19 45:15 100:7
**members** 10:13 46:24 72:2,3 75:6 76:3 79:2 99:3 102:8
**memorize** 25:9 27:23 28:1,3
**memorized** 24:24 28:17,22
**mention** 15:16
**mentioned** 47:4 74:18 80:22 81:25 100:12
**message** 8:22 43:10
**messages** 3:10 22:15,16 40:9,17 40:18 41:9 43:16 62:17
**messaging** 43:18
**mid** 49:8
**middle** 100:3 108:20 111:3
**midway** 49:1,11
**miller** 92:8 93:1 93:4 95:8,13 96:17,17,22 97:17 98:1
**miller's** 93:20 94:8,16 97:5 100:23
**million** 36:11
**mind** 10:9 26:7 36:20 52:22 63:14 72:22 89:20
**mine** 32:6 41:21 42:13 102:20 107:18
**minute** 60:6 63:3 99:18
**minutes** 57:9 64:5 78:19 90:23
**misread** 87:20
**missed** 33:2,7
**mistakenly** 77:12
**molehill** 34:21 35:13
**moment** 32:21 34:9,16 36:16 37:10 66:4
**monday** 103:14
**monitoring** 9:19 9:21

**monitors** 9:18
**month** 17:15 18:16 38:17 62:5 104:16
**months** 61:25 103:23 104:1
**morning** 4:8 22:6 24:3,4 25:12 28:21 32:19 48:5,21 79:1,16 84:17 97:1
**mountain** 34:21 35:12
**move** 56:25 71:5 80:11 91:16 103:2
**moving** 34:1 49:2,12 61:17
**mud** 96:13,21,23 100:14,25
**multiple** 82:2
**mumbled** 58:11
**muttered** 58:11 59:1

**n**

**n** 2:1 3:1 4:1 5:8 5:8
**name** 4:8 5:6 7:2 45:16
**named** 61:19 113:9
**national** 2:4
**nature** 22:24 106:21
**near** 24:23 60:16
**nearly** 18:16 28:17 34:2 79:23
**necessarily** 17:22 34:3
**necessary** 14:24
**need** 6:10 26:22 34:22 51:22 70:23 80:12
**needed** 39:1 94:24
**neither** 16:4
**never** 5:19 21:12 21:23 35:1 52:21 72:21 87:1 88:2,6 94:1 107:2,3 111:20
**new** 57:2 86:7 109:7,20
**nice** 5:2 101:8
**nichole** 72:9 103:9,15 104:5
**niels** 5:8
**ninth** 48:15
**nnn** 58:12
**nod** 4:19
**nods** 79:9
**non** 22:20
**nondirectional** 81:23
**noon** 78:6
**normal** 94:5
**normally** 37:1
**north** 24:5 25:4 25:5
**northbound** 32:19
**northernmost** 25:12
**nose** 34:2 49:2 49:12 50:4 53:20,25 80:15 81:4,4 96:14 98:2
**note** 88:21
**noted** 114:7
**notes** 64:19,20
**noticed** 96:6,23
**notified** 85:3
**notify** 91:7 98:20 98:23
**nuffer** 1:11
**number** 6:23 12:8 19:23,25 20:24 25:15 44:10 66:4 79:16 81:9 103:4,6
**numerous** 19:21 20:13,16 25:9 31:16,16 39:20 40:3 91:24
**nw** 2:15

**o**

**o** 4:1
**object** 61:5 89:3 95:10 101:6 107:14 110:16 112:3
**objection** 14:25 15:3,22 17:1 28:11 30:8 32:24 55:10 85:18 107:14 110:11
**objectively** 56:15
**obligated** 15:21
**observation** 56:17
**observe** 83:3,4
**observes** 83:8
**obtained** 93:9 94:15
**obvious** 51:25 52:18 54:9,17,24
**obviously** 62:7 84:9 97:18 106:18
**occasionally** 91:19
**occurred** 61:4
**occurrence** 22:1 22:1 23:6 25:1 28:20 29:7 48:4 48:5,12 53:3 61:22 62:8 79:1 83:11,20 85:23 103:22
**october** 3:14 103:14,20 104:19,25 108:18,23,24 109:1 110:5
**office** 35:17 37:12 38:4 94:24,25
**officer** 6:15 9:4 9:10,15,20 10:15 10:17,19 11:8,14 11:19,24 12:6 14:3,18 15:20,20

[officer - parking]

16:8,12,22,25 17:18 18:2,10,13 51:13 79:21 98:10,18
**officers** 18:4 98:13
**oh** 32:11 38:10 43:2 48:8 49:8 58:24 64:15 66:21 67:16 68:11 75:2 77:4 96:19 99:10
**okay** 4:14 5:19 6:2,5,10,14,21 7:13 8:1,4,22 9:12 10:5,7,19 11:1,17 12:7,20 12:22 13:2,8,9 13:17,19,19,20 13:24 14:13,20 15:17 16:5 17:13 18:9,17 20:5 21:9,25 22:3,4,13 23:6 23:14,23 24:2,6 24:18,21,25 25:11 26:3,14,18 26:24 27:5,21 28:3,8,23,25 29:11,22 30:1,11 30:16,21,23 31:9 31:14,18 32:9,14 32:15 33:8,25 34:7 35:11 36:23 37:6 38:1 40:8,20,25 42:7 42:11,24 43:2,18 44:4,6 45:20 47:13 48:2,3,11 49:7,8,9,10,15 50:2 51:2,5,12 53:15,19 54:18 56:21 57:4,13,23 58:1,22,24 59:3 59:5,9,21,24 60:8,25 61:16 62:6,14,19,22 63:20 64:3,6 65:9,11 66:10,16 66:21 67:3,11,14 67:16 68:1,11,12 68:18,24 69:9,12 69:17,20 70:5,25 71:5,12,15 72:12 72:15,21 73:5 74:17 75:9,21,23 76:10,24 77:10 77:16,20,21 78:5 78:22 79:18,24 80:4,20 81:5,12 81:17,22,24 82:5 82:12,19 83:2,22 84:13,24 85:12 85:15 86:15,15 86:18 87:9,12,17 87:19,22 88:5,15 89:10,23 90:25 91:4,20 92:2,6 92:22 93:5,8,15 93:18,18,24 94:14,21 95:15 95:22 96:16 97:8,12,23 98:4 98:20 99:6,19,22 100:4,5,10 101:2 101:12,22,25 102:3,8,13 103:1 103:2,11,12,19 103:19,20 104:2 104:8,16,19 105:5 106:2,8 107:5 110:3,6 112:5
**olson** 2:10 75:3,9
**once** 39:16 54:11 62:11,12 65:20 78:7 88:15
**ones** 68:25 76:6
**online** 8:25 106:19,24
**openly** 111:16
**operate** 88:18
**operation** 26:13 26:16
**operations** 12:1
**opportunity** 25:20,22 26:1
**optimal** 17:6
**order** 68:3 83:23
**organize** 76:5
**organized** 76:8
**outcome** 113:16
**outside** 21:4,23 109:13,25 111:18,19
**overhead** 24:17 60:13 86:5
**overly** 60:18
**override** 17:4
**oversees** 10:13
**overthink** 43:7

**p**

**p** 2:1,1 4:1
**p.m.** 41:13 70:8 78:24 103:15 110:5 112:11
**page** 3:2,6 12:15 12:24 13:5,7,13 29:17,18 30:1,25 42:3,12,12,24 43:3 44:7 59:24 65:25 67:4,19,24 67:24,24 68:13 70:6 77:19,22 86:16,20 87:18 88:21 92:22 98:25 99:25 100:3 103:3,13 103:18 108:21 114:8
**pages** 29:23 66:11 67:9,25 113:10
**paper** 32:12
**paragraph** 13:10 32:7,15 46:20 48:13,17,18,20 48:20,23 59:25 70:11 86:20 89:11,12,13,19 89:24,24 93:19 94:14 95:17,18
**paraphrase** 60:2 95:25 105:13
**paraphrasing** 105:5
**parked** 24:3,5
**parking** 23:15 24:2,5 25:2,3

**parley's** 54:13
**part** 28:1 33:1 91:22 98:25 105:20 107:7,10 107:12 108:20
**particular** 61:3 97:12
**particulars** 80:25
**parties** 113:15
**parts** 97:12
**passengers** 80:9 94:4
**patrick** 2:3 4:9 113:13
**paved** 84:18
**pavement** 50:5 52:23 60:16
**pay** 111:4
**peculiar** 95:4
**penalize** 65:8
**penalties** 114:17
**penalty** 113:12
**people** 19:11 21:16,21 45:24
**percent** 53:24
**perfect** 31:20 37:21 57:1 107:24 112:6
**performing** 93:25
**perjury** 113:13 114:17
**perry** 1:25 113:4 113:21 114:2
**person** 9:17 18:3 18:6 79:13 81:21 98:12 110:20 111:11
**personal** 108:14
**personally** 93:5
**phone** 6:21,23 7:7,13 40:10 44:21 45:11,12 47:9 54:14 62:12 68:20
**phones** 7:11
**phrased** 98:4
**physical** 102:18
**physically** 51:15 58:7
**pic** 12:3
**picture** 52:25
**pile** 44:6
**pilot** 3:8 5:10 6:6 6:12 9:14,17,18 9:20,21 10:3 11:12 12:3 13:16 14:3 15:24 17:13,22 18:5 29:14,14 36:2 38:4 52:11 71:7,9 73:17 75:12,18 89:24 98:11,20
**pilot's** 14:8 28:5 29:23 35:16 37:12 52:16
**pilots** 9:1 13:10 13:17,19,24 14:2 14:5 30:2 71:8 91:24
**pivot** 34:1,6
**place** 9:9 113:8
**places** 88:22
**plain** 56:3
**plaintiff** 1:7 2:2 4:9
**plane** 9:17 32:20 33:7,21,23 34:9 34:13,15 38:6 50:4 54:7 60:15 60:16 61:13 63:6,15 80:6,8 82:18 83:8 85:4 86:24 87:2,25 88:3,10
**plate** 23:8,10,11 23:18 24:8 25:7 25:13
**plates** 24:10,15
**played** 91:22
**pllc** 2:4
**plow** 78:16
**pmj** 2:4,7
**pmjpllc.com** 2:7
**point** 16:13 24:22 25:24 29:2 32:22 33:15 34:7,12 50:13 51:12,14 51:18 61:18 64:7 74:10 83:7 91:11,12 94:3 98:11,15
**pointed** 97:25
**pointers** 73:14
**pointing** 81:4
**policies** 27:16,19 27:22 74:3
**policy** 3:8 10:3 10:24,25 11:12 13:16 15:24,24 28:2 29:14 52:5 52:11 71:16
**poor** 60:13 81:1
**position** 6:17,19 19:1 34:2 75:11 98:12
**positive** 72:8
**possibility** 36:8
**possible** 21:20 27:9 77:24 84:8 88:10,13
**post** 8:22
**postflight** 12:4 96:3
**potential** 32:20 33:6,9 34:8,15 35:5 36:7
**potentially** 36:15 83:13 100:14
**power** 36:25 95:3
**powerpoint** 102:19,22
**practice** 18:18 71:9 73:13 75:7 76:11 108:2
**preceding** 113:10
**precise** 20:17,19
**precisely** 97:11 108:5
**preflight** 11:23 12:4
**prep** 71:6 75:25 76:14
**prepare** 46:3 73:6

**prepared** 46:9
**preparing** 74:1
**present** 2:23 61:1 73:11 79:3 102:13
**presentation** 3:12 66:17 67:10 73:23 76:25 87:11,21 97:9,11,13 102:19,22
**presented** 73:13 76:8 100:1
**presenting** 102:17
**pressure** 39:8,13
**presume** 37:25 59:19
**pretty** 10:8 29:19 42:5 62:25 77:2 91:17 92:13 97:18
**prevent** 89:15
**previous** 104:13 104:16
**previously** 7:5 77:23
**prior** 19:19 20:11,19,22 68:19 74:20,23 101:5 104:14 106:3,5,9 108:8 113:6
**priority** 19:1
**probably** 10:3 19:2 20:13,23 21:16 22:11,12 22:21 23:5,9 32:4 69:1 74:16 92:5 100:9,23
**problem** 98:11 108:7
**problems** 50:1 106:19,23
**procedurally** 47:21
**procedure** 95:5
**procedures** 23:13 76:2 81:3
**proceeded** 37:1 97:23
**process** 47:8 79:19 80:6 81:13
**produced** 40:25 43:24 45:3
**program** 19:6
**prompted** 30:14
**promptly** 13:25 14:5 30:3
**property** 14:1,7 14:17 30:5,13
**protocol** 28:1
**prove** 53:10 54:8 54:22,23
**provide** 20:7 38:2 65:18 110:13,14
**provided** 62:23
**provides** 24:15
**providing** 27:11
**puddle** 96:21 100:25
**puddles** 100:14 102:1
**pull** 91:2
**pulled** 50:25 81:18
**pulling** 50:22
**pure** 61:10
**purpose** 26:9,14 26:15 70:22 75:23 107:5
**purposefully** 106:7
**purposes** 93:6
**push** 52:7 81:12
**pushback** 79:22 80:5,12,21,23 94:4
**pushed** 63:7 80:13
**pushes** 79:6
**pushing** 81:1
**put** 20:14 37:15 41:21 44:15 62:23
**putting** 73:22 104:8

**q**

**qualitative** 36:17
**quarterback** 36:12
**question** 4:24 15:5 31:12 52:21 53:21 54:11 55:21,22 56:22 59:12,16 61:6 95:1 96:24 97:4 99:23,25 100:22 104:24 105:21 107:23 110:2,12,17
**questions** 30:19 70:12 99:4,21
**quick** 78:16
**quickly** 38:8 50:15 80:10 83:24
**quote** 50:3,4 64:13 88:22,22 88:23,23 92:25 93:24 94:15,21 105:10
**quoted** 92:25
**quoting** 96:16

**r**

**r** 2:1 4:1 5:9,9 41:15
**radio** 82:1 84:10
**radios** 9:22 83:13
**rain** 96:25
**rained** 100:13 101:4
**raise** 50:19 51:3 108:8
**raised** 51:1
**ramp** 81:2 84:1 86:5,9
**ramper** 38:21 84:22
**rampers** 60:15
**randy** 1:4 2:24 4:10 41:16 45:25 53:2 96:20 104:21 105:2,17,24

**[randy - responsibility]**

106:14 107:6,9 107:13 108:10 111:21,23 114:1
**range** 20:1
**rarely** 54:13
**reach** 17:9 46:15 82:2,6
**reached** 61:22
**reaching** 68:21
**read** 14:4 32:4 32:24 42:4 49:10 66:8,15 67:18 73:2 77:8 77:8,14 80:16 81:8 95:6,25 99:13 109:6 110:18 111:10 113:12 114:6
**reading** 64:18 67:20 93:21 100:21 113:12
**really** 50:15 83:24
**reask** 15:8
**reason** 63:15 70:21 95:12,14 97:4 108:11 114:8
**reasons** 39:5
**reber** 1:7 3:2,7 4:2,8 5:9 12:9 12:12 31:2 33:12 41:2 57:13 66:5,23 68:6,13 70:6 72:18 87:15 103:9,15 106:13 113:6 114:5,16
114:19
**reber's** 40:25
**recall** 18:21 23:24,25 24:9 25:7,9,11,14,15 28:5,7 29:5,8,9 38:14,18 40:12 45:6,7,12 47:17 47:18 49:19 58:10,14 61:21 61:24 71:25 72:11 79:3,4,12 80:2,3 87:5 90:18 92:2 99:1 101:22,25 102:2 102:6,7,16 104:17,18 106:8 106:11
**received** 42:17
**recognize** 12:20
**recollection** 37:7 47:15 95:1
**record** 20:7 33:10 57:14 83:15
**records** 40:4 86:13
**red** 50:3
**reddit** 8:23
**reed** 61:19 64:7 64:25 65:13 69:25
**rees** 1:21 2:15
**refer** 24:25 88:5
**reference** 29:18 61:22
**references** 89:1 90:10
**referring** 22:7 64:22 67:3 69:6 82:20 88:6 100:19,23
**reflectors** 86:4
**reflects** 114:7
**reinstate** 71:24
**reinstated** 103:25 106:14 106:19 107:6,13
**related** 13:25 14:5 22:20 30:3 30:3
**relation** 45:8
**relevant** 80:18
**remember** 18:11 21:14,19 22:12 23:3,4,9,17 38:20 42:1 44:25 45:16,19 72:23 74:2 79:15 81:20 85:12,14 100:2 100:10,13 101:7 101:9,11,12,17 106:12
**rep** 43:14
**repeated** 95:1
**rephrase** 95:11
**replaced** 86:6
**replied** 47:10
**report** 13:25 14:5,12,18 26:13 30:3,11 35:16,20 38:20 83:5
**reported** 90:16
**reporter** 1:25 4:16 5:7 29:13
30:24 113:5 114:2
**reporter's** 113:1
**reporting** 38:21
**represent** 4:9 107:25
**representing** 39:8
**request** 20:6,25 28:15 45:4 113:11
**requested** 25:25 29:2,5 44:13 47:4
**required** 15:15 16:8,12 52:17
**research** 104:15
**residue** 96:12,13 102:5
**resolve** 89:15 90:24 91:8,16
**resource** 59:4
**resources** 104:6
**respond** 4:18 42:11 51:9 57:24 58:6,8,8 58:18,18,25 59:6 59:13,16,18
**responded** 32:13 110:4
**responds** 43:13
**response** 28:15 40:9 42:12 57:23 108:18
**responsibilities** 9:4,13,16 10:1,4
**responsibility** 10:12,15 14:22

30:9 47:24 51:18 73:9
**responsible** 10:11 11:13,22 11:25 12:4 15:11 16:25 60:22
**rest** 66:12
**restate** 53:21
**retribution** 105:16,23 106:14 108:19 109:15
**return** 113:13
**reverse** 68:3
**reversed** 9:19
**review** 3:13 12:13 13:22 23:8,18 24:21 26:21 27:17,19 29:20,21 41:1,3 41:4 66:5,7,18 67:10 71:6,10,18 71:19,22,23 72:1 72:2,4,13,16,25 73:6,25 74:3,13 74:15 77:1,15 95:23 99:3,18,21 100:8 102:9,23 103:7 104:9,9,21 105:1 106:17 109:8,13,20,25 113:11
**reviewed** 73:10
**reviewing** 44:14
**rfi** 3:9 31:1
**richards** 28:15 29:2 45:17
46:15,22 47:14 47:16 72:13 94:23 103:9 106:3
**rid** 73:18
**ride** 21:12
**right** 4:22 5:6,11 5:12 8:2,7 9:10 11:4,15,23 17:8 17:24 19:12 21:25 22:5 26:25 27:9,24 28:4 31:21,23 34:4,5,6,13 36:21,22 40:9,14 41:13,14,15,18 41:19,23,24 44:14 45:12 46:10,11 48:22 50:25 51:13 52:19 57:17 59:24 63:13 64:14 65:16,17 67:21 68:11 70:5,20 71:5 73:20 77:1,3 78:11 79:8 81:4 81:8 82:3 84:7 84:10 85:5,17 90:12,14 91:17 91:21 95:15 96:7,8,11 97:24 97:24 98:2 99:7 99:15 100:2 103:20 104:1 105:12 106:6 107:10 108:17
**river** 2:20
**road** 2:20
**rodkin** 75:15
**rogue** 16:2
**role** 69:17
**roles** 9:19
**route** 90:14,16
**routine** 63:22
**roy** 13:3,21 45:15
**rule** 15:23 113:11
**rules** 4:15 14:8
**run** 41:22
**runway** 11:4 14:22 32:18 37:1 82:21 84:1 84:15 88:15 101:10,13,14,15 101:15,16 102:1
**rushing** 80:11

**s**

**s** 2:1 3:5 4:1 5:8 5:8
**safety** 10:20 16:7 16:12 26:25 43:14 44:19 45:13,19 46:23 69:21,25 105:9 109:9
**salt** 1:23 2:11 37:12 38:4 54:11 88:19 96:4,5 97:1 100:12 101:5 113:3
**sandwich** 78:17
**sandwiches** 78:8
**sapa** 45:15
**saw** 10:2 51:23 51:23 52:13,13 52:20,21 54:4,6 54:22 55:3,18 56:5,5,6,15 94:1 102:9
**saying** 10:14 11:15 16:16 17:9 28:4 36:14 38:22 47:25 51:17 58:17,19 68:4 81:10 94:24 99:14 108:6
**says** 10:25 12:3 12:8 13:15 14:2 42:13 47:22 48:23 50:2 54:15 59:18 63:12,12,23 64:1 65:25 72:18 87:15 89:24 94:21 100:18 109:19,23
**scheduled** 71:19 105:1
**sciences** 6:4
**scott** 37:11 38:3 44:13 45:17 46:21 47:2,3,7 92:8 93:1,4,20 94:8,16 96:17,17 97:17 98:1 100:23

**scratch** 44:11
**screenshot** 42:9 42:17
**script** 77:1
**scripted** 73:23
**scully** 1:21 2:15
**seasoned** 94:11
**seat** 34:5
**second** 30:1 32:7 32:7 39:7 40:1 40:16 45:5,20 48:13 65:16 67:24 70:11 83:14 86:23 105:20 106:17
**seconds** 50:16,17 50:18,24 51:4 84:3,5 87:24 90:22 92:5,6
**section** 30:2
**securing** 93:25
**see** 4:16 13:6,12 13:18 26:16 30:6,7 32:23 34:3,6 37:2,3 43:8,9 46:25 49:3,5,13 50:6,7 53:23 54:1,23 55:11,12 56:7 67:23 68:6,16,17 69:3,4 70:9,10 70:16,17 72:19 72:20 77:25 78:9,11 84:5 86:4 87:3 89:1 89:17,21,22 90:4 90:5 92:21 95:20,21 97:2,3 100:4,16,17 103:16 104:23 105:19 107:7 109:6,18 110:7 110:23,24
**seeing** 56:10 89:8
**seeking** 62:19
**seen** 86:6
**sees** 10:19 54:23
**send** 22:15 62:14 69:9,12 106:16
**sends** 42:2
**senior** 92:15
**seniority** 17:16 17:16,17 19:2,11
**sense** 4:20 12:16 12:17,19 15:25 65:1 100:22
**sent** 42:21 43:10 68:5 71:2 104:11,20 105:1 106:4 113:12
**sentence** 32:23 33:12 34:14 37:4 46:25 48:15,25 49:5 57:20 77:22,25 86:23 89:12 93:18 109:19,22
**sentences** 58:16
**separate** 43:18 44:21 46:22 106:9
**september** 65:15 67:22 68:7,14 70:7
**series** 103:8
**set** 113:10
**setting** 109:13 110:1
**seven** 48:14 103:23
**seventh** 13:17,19
**share** 106:2
**shared** 77:23 95:2 105:18 109:13,25
**shocked** 49:3,13 86:24 87:25
**shoot** 108:12
**shooting** 108:2
**short** 63:4 78:16
**shorthand** 113:4
**show** 48:19 64:1 64:2 73:16,18
**shows** 106:4
**shultz** 2:14 32:24 33:2,4,6,9 66:8,14,22 78:7 85:18 87:15,18 112:9
**shut** 17:9
**sick** 18:7
**side** 96:11 99:2,3 102:5
**sign** 113:12
**signal** 82:14,15
**signals** 79:25
**signature** 113:20
**signs** 86:4
**similar** 45:22,22 45:23
**simple** 35:4 37:8 39:14 49:25 56:8 64:4
**sir** 17:7,12 38:14 39:5 52:12,25 54:10 55:6 60:2
**sitting** 27:24 28:4
**situation** 16:17 16:19 17:7 58:1
**six** 13:15 48:14
**sixth** 13:10
**size** 86:8
**skip** 86:15 89:23 95:17
**skipped** 111:3
**skywest** 1:11 3:7 3:8 5:10 6:13 9:24 12:8 15:24 20:7 21:1 23:12 29:14 34:25 69:1 70:3 71:7,9 71:14 72:18 74:20,23 75:6,11 75:24 76:3 90:16 94:12 104:6 108:4,9 114:1
**skywest's** 110:21
**skywest.com** 2:22
**small** 10:6
**snowmobiles** 21:13
**social** 8:7,16
**somebody** 9:14 59:12,15 77:9 78:8 79:5,8 104:3 111:17

**son** 21:8
**soon** 37:11
**sorry** 31:25 40:22 47:11 66:23 83:14,16 108:25
**sound** 5:4 8:2 46:10 91:2,9 94:6 105:12
**sounds** 5:5 10:7 46:11
**south** 1:22 2:5 2:20 5:16
**southbound** 87:2 88:3
**speak** 94:24
**speaking** 9:13 97:19
**specific** 28:8 38:16 39:9 49:15,20,24 79:16 82:22 83:2
**specifically** 12:2 21:19 23:17 54:8 106:12
**specifics** 23:4 31:11 47:17
**speculating** 27:1
**speculation** 61:10,14
**speculative** 81:11 85:19
**speed** 84:2 90:17 91:2,3,5
**spell** 5:7
**spelled** 37:14 39:16
**spent** 73:21 76:14
**split** 32:1
**spoke** 47:13,16 51:22 107:25
**spoken** 73:16
**spot** 14:16,21 24:2,5,7 25:1,2,3 25:6,8,12,15
**spots** 15:11 16:8 16:22 23:15 24:10,11
**spring** 86:14
**ss** 113:2
**st** 2:21 3:11 22:2 23:19 24:18 30:14 38:21 44:8 46:4 47:5 60:24 62:1 69:7 74:5 80:13 85:22 90:1,2
**stand** 26:12 73:14,14
**standard** 71:8
**standing** 97:17 98:1
**stands** 12:3 41:15 59:3
**standup** 94:22
**start** 5:1 12:7 67:19 82:21,23
**started** 50:3,8 63:13 72:2
**starting** 79:22 95:18
**starts** 13:10 48:20 86:20,23 89:19 94:16 103:18
**state** 5:6 32:17 34:8 36:23 46:20 54:18 64:24 68:24 70:11 105:15 110:20 113:2,5 114:17
**stated** 13:24 33:14 54:18 57:16,17,18 77:22 86:2 96:10
**statement** 14:10 46:4,16 47:5 48:3 50:6 56:21 59:25 62:1 68:25 69:5 74:6 93:9,12,15,22 94:15 95:9,13 96:24 97:6 100:23,24 107:18
**statements** 4:23 109:11,24
**states** 1:1 12:2 30:2 41:18,21 43:5 48:25 50:8 114:17
**stating** 107:10
**status** 47:9 78:9
**stay** 47:23
**stenotype** 113:8
**step** 81:13
**stepped** 94:23
**stirring** 34:20,23
**stop** 14:23 15:12 15:13,16,21 16:1 16:2,12,14,18,25 17:3 51:13,23
**stopped** 80:15 85:16
**stories** 40:6
**story** 99:2
**street** 2:5,10
**stuff** 82:15
**subject** 109:12 109:24
**submission** 45:8 45:11
**submit** 70:12,23
**submitted** 28:18 31:22 32:9,11 37:11 38:16 40:4 41:3,6 42:8 42:13,18 69:1
**submitting** 40:5
**subsequently** 39:11
**sudden** 48:16 49:1,8,11
**suffer** 105:16,23
**suggest** 94:2 98:7
**suggested** 98:6
**suggesting** 97:20
**suggestions** 41:22
**suite** 1:22 2:16
**summarize** 89:2
**summarizing** 60:3
**summer** 9:7
**support** 110:14
**suppose** 70:2 83:21

**supposed** 99:13
**sure** 19:16,17 20:3 29:19 34:12 35:21 36:5,18,24 40:6 45:2,18 67:25 90:11 91:25
**switch** 78:5
**swiveled** 56:4
**sworn** 4:3 113:6
**system** 58:5 70:3

**t**

**t** 1:4 2:24 3:5 5:8 114:1
**tag** 21:8
**take** 8:5 9:4,9 12:11,23 16:14 31:2 39:15 40:8 46:3 47:24 57:3 57:4 59:20 60:6 65:22 66:4 73:9 78:6 86:16 87:14 88:16 99:19 103:6 108:5,17
**taken** 4:12 14:8 57:11 78:23 113:8 114:3
**takeoff** 94:1
**talk** 17:13 21:3 43:7 59:10 79:1
**talked** 46:21 47:7,18 89:8
**talking** 9:14 16:3 56:23 63:5 67:5 81:14 82:9 95:22 96:2
**talks** 23:11 111:16
**target** 108:1
**tarmac** 38:7,25 50:12,22 51:1,3 52:10 57:18 83:4,9 85:4 88:7 88:11 101:22 109:10
**taxes** 111:4,8
**taxi** 3:11 36:25 44:8 46:4 47:5 59:25 60:19 62:1 69:8 74:5,5 82:21,23 84:2 87:1 88:3 94:4,5 106:25
**taxied** 38:6
**taxiing** 11:3 14:22 15:14 16:19,20 63:13 83:3 84:15 85:10 87:25 95:5 96:22 100:25
**taxiway** 84:2,20 86:4 87:2 88:3
**telegram** 8:14
**telephone** 44:19
**tell** 12:12 21:6 28:19 29:22 30:17 32:5 36:2 47:23 105:6 113:6
**telling** 28:23 54:20 108:3
**temerson** 2:22
**temple** 1:22
**ten** 19:24 57:9
**term** 90:12
**terminal** 101:20
**terminated** 19:18 20:12 52:12
**termination** 27:12,22 28:6
**terms** 16:6 27:14
**testified** 4:4
**testimony** 13:3,4 13:6,21 74:18,19 74:23 87:6 113:10 114:7
**text** 3:10 7:20 8:5 22:15,16 40:8,17,18 41:8 41:9 43:4,10,16 43:18 62:17
**texted** 40:3
**texting** 7:16 31:16
**thank** 11:17 32:14 33:8 34:19 38:10 43:2 56:12 61:16 65:25 67:17 73:24 92:7 112:7,10
**thanks** 21:2 28:25 77:16
**thereof** 106:22 113:16 114:6
**thes** 36:24
**thing** 11:6,7 52:4 52:5 53:6 56:14 56:17 57:15 66:9 72:16 76:11 79:6 83:17 96:1
**things** 11:2,11 11:13,18,22 21:21 35:14 39:9 47:25 73:8 74:4 80:24 86:6 111:18,19
**think** 8:19,19 21:14 23:25 24:22 29:8,12 37:18 39:5 42:1 45:15,16,17 50:10 58:10,11 63:1 72:5,7,8,14 72:21,23 86:1,10 96:10 99:6,8,11 104:17 106:5,11 106:20
**third** 46:20 67:3 89:12,12 93:18
**thirds** 32:17
**thirteen** 89:5
**thorough** 12:4
**thought** 39:13 50:23 52:2 73:9 77:13
**thousand** 10:4
**threaten** 111:24
**threatening** 16:1 17:12 39:6
**three** 13:9,15 28:17,17 32:16 48:14 50:17 54:2 63:3 70:12 70:15 79:13 86:19

**thursday** 69:2
**time** 11:8 14:4 18:7 22:12 23:18 24:6,7 25:25 26:1,3 35:14,23 36:20 38:14 40:1,1 42:17 44:2 47:6 47:7 52:9 54:20 54:21 70:1 73:20,21,21 76:13,23 78:13 83:25 86:12 87:14 99:19 104:11
**times** 7:24 8:1 19:17,19 20:12 31:16,17 39:20 39:24 40:3 44:21 46:22 47:14,15 54:19 62:6,10 85:9
**tire** 102:5
**tires** 54:2 96:12 97:24
**titled** 31:1 44:7
**today** 4:11 16:4 41:4 54:15 85:17
**todd** 2:19
**told** 39:4 63:13 95:3 97:10
**tomorrow** 43:14
**top** 65:25 68:12 72:18
**topics** 58:21 78:5
**touched** 80:4
**tough** 42:5 78:20
**tow** 81:18
**traffic** 9:24
**transcribed** 77:9 77:9 87:7 113:9
**transcript** 5:3 13:2 72:16,25 73:3 77:4,19 86:17 88:21 92:23 113:12 114:6,6,7
**transcription** 113:9
**transpired** 22:2
**tried** 39:25 57:24 73:15,18
**trip** 19:4
**trips** 17:16 19:7 19:10,13
**trouble** 39:10 40:7 88:24
**true** 17:21 55:1 113:9 114:18
**truly** 111:17 114:7
**truth** 55:6 107:22 108:3 113:6,7,7
**truthful** 27:8 95:9,13
**try** 21:20 64:14 91:15
**trying** 31:17 36:10 40:5,19 55:20 80:8 90:7
**tug** 79:7,8 81:19
**turn** 32:18 49:1 49:11 50:16 53:12 77:19
**turning** 32:22 33:16,21 50:16
**turnout** 60:19 84:17 86:21 87:23
**twice** 97:15
**two** 6:1,3 13:9 13:15 19:19,20 29:9,23 32:2,16 32:17 39:4 41:20 44:7,21,21 46:22 48:14 50:17 59:19 61:25,25 63:3 66:11 67:5,9,9 70:14 76:19 78:14 79:13 86:19 103:3,10
**typical** 80:20
**typically** 11:19 11:21 23:7

**u**

**u** 5:8 50:16
**uh** 75:9 76:12,21
**unable** 89:15
**unanimously** 71:24
**unassertive** 52:4
**uncommon** 111:13
**underneath** 52:18 54:2,4
**understand** 11:2 15:8 76:1
**understood** 17:8 76:12 77:10
**unexpectedly** 38:8
**unfortunately** 18:19 73:21 99:12
**unidentified** 100:1,5
**unintelligible** 59:2
**united** 1:1 114:17
**unsolicited** 107:20
**unsolicitedly** 108:5
**untypical** 81:3
**upcoming** 109:8 109:20
**ups** 64:2
**upset** 88:22 89:14 90:13 91:21
**use** 6:25 7:13,16 8:14,20 26:18,24 95:3
**utah** 1:2,12,23 2:11,21 5:14,16 113:2,5 114:1,17

**v**

**vacation** 5:22
**vague** 14:25 15:4 28:11,12 72:11
**vaguely** 59:8
**vantage** 32:22 33:15
**vehicle** 33:22

**verbalize** 4:19
**verbally** 44:23 58:8,25 98:7
**verbiage** 76:1
**verizon** 7:1
**versus** 36:16
**video** 4:17
**view** 24:17 56:3 94:3
**violate** 52:5
**violates** 52:10
**violation** 64:7,10 64:25
**visibility** 32:21 33:15,18
**vision** 52:16,17
**voted** 71:23
**vs** 1:9 114:1

**w**

**waffled** 55:7
**waffling** 55:9
**walk** 79:18
**walkaround** 11:23 14:16 96:3 97:15
**walking** 82:25
**wall** 52:24 96:11
**wands** 82:1,15
**want** 18:1,7 20:17 26:20 30:17 34:17,20 35:12,15,17,19 36:2,3,6 41:22 48:24 51:10 55:7 57:8,15 66:8,14,15 78:6 78:7,15,16,25 82:3 90:11 107:8,9,22
**wanted** 33:10 35:4,5 39:15
**warning** 90:17
**waste** 29:13
**wave** 81:20,23
**waved** 81:19
**way** 18:1,3,6 19:16 39:9 44:15 58:6,9 65:8 98:4 101:2 107:12 108:19 111:23,24
**ways** 36:11
**we've** 47:2 60:13 60:14,14 80:4
**weapons** 108:1 111:16
**weather** 9:22 101:8
**wednesday** 41:12 69:1
**week** 38:17 61:25 69:1 104:22 105:2
**weeks** 48:11,12 61:25 62:4 76:16,20
**welch** 75:4,13,13
**welcome** 21:1
**went** 39:2 40:18 52:10 58:4,5,23 63:14,18 73:19 76:8 84:18,18 90:17 91:6 94:24 97:16 111:2,4
**west** 1:22
**wet** 101:10
**whatsapp** 8:18
**wheel** 96:23 98:21
**wheels** 34:1 96:7 97:20
**wife** 73:10 74:18
**willing** 70:18
**window** 56:6,9
**wing** 53:13,18 97:24
**witness** 2:8 4:3 15:2,5,23 17:2 42:6 57:7 61:8 61:10 66:11,17 66:21 78:18 79:9 85:19 87:17,19 89:5 101:7 107:17 108:24 110:12 110:17 112:4,6 113:6,12,12,17 114:4,5
**word** 33:2,3 55:25 107:2
**words** 54:16 93:1,3,20,21 94:8 98:9
**work** 7:13 13:25 14:5 18:2,3 21:4 21:24 22:20 30:3,3 70:3 73:22 79:19 111:18,19
**worked** 92:11
**working** 18:25 19:14 75:24
**works** 70:3 79:14
**world** 88:13
**worried** 111:9 111:10,14
**worry** 58:12
**worth** 73:17
**write** 31:15,17 33:12 34:7 35:16 36:11,19 39:3,9 63:23 64:2 97:20,21 98:6,7,9,14,16 98:17
**writes** 98:12
**writing** 37:16 45:1 64:12 87:20
**written** 46:5 68:25 69:5 74:10 93:8
**wrong** 33:1 65:2 83:16 87:7,9
**wrote** 31:8,9 34:14,14 35:10 36:12 37:4 62:1 65:2 73:8 83:5 87:10 96:17 106:1,6 108:6

**x**

**x** 3:1,5

**y**

**yeah** 7:23 13:23 15:7 22:9 25:23 27:1,25 28:7,19 33:21 34:19 40:18 42:5,10

43:13 45:24 48:8,22,24 50:25 55:4 56:7 57:6,7 57:21 59:14 63:11 64:17,19 65:3 66:3,8,14 67:25 68:20 74:7 75:5 77:5 78:4,10,19 81:11 81:16 82:8,17 90:5 94:7,20 99:5,16,20 100:11 101:7 104:23 105:4,14 105:25 106:1 111:22

**year** 6:8 20:11 20:19,22 38:18

**years** 5:18,20 19:19 28:17 101:21 111:5

**yelled** 96:19

**yep** 37:20

**yesterday** 40:25

**z**

**zero** 80:21

Utah Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

(E) Submission to Witness; Changes; Signing. Within 28 days after being notified by the officer that the transcript or recording is available, a witness may sign a statement of changes to the form or substance of the transcript or recording and the reasons for the changes. The officer shall append any changes timely made by the witness.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.